

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
100 PEARL STREET, SUITE 20-100
NEW YORK, NY 10004-2616

NEW YORK
REGIONAL OFFICE

June 14, 2022

**By ECF**
Honorable P. Kevin Castel
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Courtroom 11D
New York, N.Y. 10007

Re: <u>SEC v. Gallagher- 21-cv-8739 (PKC)</u>

Dear Judge Castel:

Plaintiff Securities and Exchange Commission respectfully submits this letter in opposition to Defendant Steven Gallagher's pre-motion letter dated June 8, 2022 (Dkt. 51) ("Lt.") requesting permission to file a motion to modify the stipulated preliminary injunction order ("PI Order") to lift the asset freeze on Gallagher's assets. Because any such motion to lift the freeze is meritless, the Court should deny Gallagher's request to file the motion.[1]

**I.     Preliminary Statement**

The SEC has met its burden for imposition of an asset freeze, given the overwhelming evidence that Gallagher engaged in hundreds of instances of illegal scalping, as well as his guilty plea to scalping in a parallel criminal case.[2] The SEC has further provided a sufficient basis to support an asset freeze of at least $5.661million based on estimated ill-gotten gains (disgorgement) of approximately $2.805 million, prejudgment interest ("PJI") conservatively estimated at $50,000, and a civil penalty of $2.805 million (equal to the disgorgement amount). The SEC's approach to calculating Gallagher's ill-gotten gains—subtracting the price at which he acquired the relevant stock from the price at which he sold it at after he encouraged his Twitter followers and the public to buy the stock without disclosing that he intended to sell the stock and often after falsely assuring them that he was holding or *not* selling the stock—is a reasonable approach to calculating ill-gotten gains. But in any event the SEC currently has reason to

---

[1] Pursuant to the Court's Order, the parties have met and conferred, and will continue to do so, but have not been able to reach any agreement relating to Defendant's pre-motion letter.
[2] "Scalping" consists of a defendant: 1) acquiring shares of a stock; 2) recommending that others purchase the stock without disclosing his intention to sell his shares; and 3) subsequently selling his shares for his own benefit.

believe that only approximately $2.4 million is frozen: less than 43% of the $5.666 million amount the SEC has reasonably estimated Gallagher may be liable for. So even if the Court ultimately imposes monetary relief on Gallagher that is considerably less than $5.666 million, the amount currently frozen may not be sufficient to pay the amount due. Finally, the SEC, far from micromanaging the Defendant's financial life, as he claims, has promptly agreed to numerous requests by Gallagher to modify the asset freeze, including by consenting to the release of over $400,000 for legal fees and the unfreezing of several business accounts; has promptly acted to resolve bank and brokerage administrative problems Gallagher has brought to the SEC's attention; and has not challenged any of Gallagher's independent business dealings since the freeze has been imposed. For all these reasons, the Court should not lift the asset freeze as to Gallagher.

## II.     Relevant Procedural Background: This Action and the Criminal Case

### A.     The SEC's Complaint and the Temporary Restraining Order

The SEC filed its Complaint on October 26, 2021, alleging that he engaged in numerous instances of illegal scalping in the stocks to 60 issuers. Dkt. 1. The same day, the SEC filed an *ex parte* emergency application for an Order to Show Cause and Temporary Restraining Order that included an asset freeze. Dkt. 5. The Court granted the emergency application, including by freezing Gallagher's assets up to $6.9 million (the "TRO"). Dkt. 11.

Although the TRO froze up to $6.9 million in assets, the frozen brokerage, bank and cryptocurrency accounts contained assets then valued at only approximately $3.25 million. Based on the subsequent release of certain funds from the asset freeze, discussed further below, and changes in the value of certain securities, the SEC has reason to believe that the securities and cash remaining in the accounts currently frozen have a value of approximately $2.4 million.

### B.     The Criminal Case

On October 26, 2021, Gallagher was arrested based on a criminal Complaint filed by the U.S. Attorney's Office for the Southern District of New York. On February 25, 2022, he pled guilty to a criminal Information charging him with one count of using a manipulative and deceptive device and contrivance in connection with the purchase or sale of securities. The Information charged that Gallagher used Twitter to misrepresent the nature of his personal financial stake in the securities of SpectraScience Inc. ("SCIE"), in order to induce others to purchase SCIE stock, and thereby drive up the stock's price, while he simultaneously and secretly sold his own previously acquired shares at an artificially inflated price. *United States v. Gallagher,* 22-cr-0122 (VEC), Dkt. 11. He is currently scheduled to be sentenced on June 27, 2022.

### C. The SEC's Consent to Gallagher's Requests to Modify the Asset Freeze to Lessen Its Impact on Him, His Family and His Businesses

The week after the TRO was entered in this action, the SEC agreed to a modification of the asset freeze. This first modification permitted Gallagher to use the Fifth Third bank account ending in 7581 in the name of CMS of Holland, which Gallagher represented to be a magazine distribution and marketing business he owned and operated, to conduct business necessary for the proper function and operation of CMS. This included taking in business receipts and withdrawing up to $60,000 per month to meet CMS's ordinary and necessary business needs, including monthly payroll for certain specified CMS employees. *See* Stipulated Order Modifying Temporary Restraining Order, dated Nov. 4, 2022, and entered on Nov. 5, 2022, Dkt. 17, at 1, ¶ 1 ("Modified TRO").

At the same time, the SEC also agreed to a modification of the asset freeze to permit Gallagher to use the Fifth Third bank account ending in 1634 in the name of the Gallagher Group Ltd., which Gallagher represented to be a business he and his wife owned that manages a number of rental properties they own. This modification permitted the business to take in rental receipts and withdraw up to $5,000 per month to meet the Gallagher Group's ordinary and necessary business needs. *Id.* at 2, ¶ 2. The SEC also agreed that, with the SEC's prior consent or the Court's prior approval, Gallagher could withdraw additional funds to meet business expenses that exceeded the specified amounts. *Id.* at 2, ¶ 3.

Approximately three weeks later, the SEC agreed to a further modification of the asset freeze as part of a Stipulated Preliminary Injunction Order that the parties proposed and the Court entered on November 30, 2021 ("PI Order"). Dkt. 21. Specifically, the SEC agreed that Gallagher was permitted to use the funds currently in the CMS and Gallagher Group Fifth Third bank accounts and any income generated from CMS and the Gallagher Group for all business expenses, daily living expenses, educational expenses of Gallagher's daughter, and legal fees. *Id.* at 6, ¶ 6. In addition, the SEC agreed that Gallagher was permitted to use and liquidate the fiat currency and crypto assets held in Gallagher's Coinbase account to pay legal fees and any legal retainer. *Id.* at 6, ¶ 6. While the PI Order also gave the SEC the right to request monthly statements and documents reflecting the expenditure of funds from the CMS and Gallagher Group bank accounts, the SEC has not challenged any expenditure of funds by Gallagher from these or any other accounts to date.

On March 21, 2022, the SEC consented to yet another request from Gallagher to modify the asset freeze. Dkt. Nos. 34, 36. This time, Gallagher obtained a modification of the asset freeze to permit him to sell securities in brokerage accounts in his and his wife's name, subject to keeping the proceeds in the frozen accounts, in order to address his concerns regarding the actual or potential loss in value of the stocks in those accounts.

### D. The SEC's Prompt Attention to Administrative Issues

On several occasions, Gallagher's counsel has asked for the SEC's assistance in resolving situations where banks have erroneously frozen funds or sought to close out bank accounts that interfered with Gallagher's use of those funds and accounts. Each time, the SEC promptly communicated with the relevant institution and resolved the issue.

### E. The SEC's Amended Complaint

On March 4, 2022, Gallagher filed a pre-motion letter seeking permission to file a motion to dismiss the Complaint. Dkt. 29. On March 10, 2022, the SEC requested permission to file an Amended Complaint (Dkt. 30), which the Court granted. Dkt. 31. The SEC filed its Amended Complaint on April 7, 2022. Dkt. 38. The Amended Complaint reduced the amount of Gallagher's estimated net profits from his illegal scalping from approximately $3,394,970 to $2,805,000. Amended Complaint, Attachment A. As explained in footnote 1 of Attachment A, most of the downward adjustment—$437,336 of the $589,000—was attributable to a change from a net profit of $111,336 to a net loss of $326,000 in one stock, with a ticker of VXIT, due to a cost basis adjustment. *Id.* at n.1. The remaining adjustments related to certain stocks traded in the names of Gallagher and his wife or son, where the SEC eliminated the profits attributable to trades in his wife's or son's name. *Id.* at n. 2.[3]

### F. Gallagher's Recent Requests to the SEC to Consent to Modifying the Asset Freeze Yet Again

More recently, Gallagher's counsel asked SEC counsel to consider a further modification of the asset freeze to pay legal fees, suggesting that counsel was close to exhausting the over $400,000 in funds that the SEC consented to carve out of the asset freeze from Gallagher's Coinbase account to pay legal fees. We responded that we would be disinclined to agree to unfreeze additional monies for legal fees, given the sizeable amount already unfrozen for legal fees and the case law disfavoring unfreezing monies needed to satisfy anticipated SEC judgments. But we responded that we would consider any such request and would need to know the specific amount Gallagher sought to unfreeze and an explanation as to why other financial resources Gallagher had available were not sufficient to cover any additional, reasonable legal fees.

Gallagher also recently informed SEC counsel that he did not have sufficient funds to pay his taxes. We asked for information, including copies of his most recent tax return and sufficient information to determine whether there were alternative sources of payment aside from investor funds. Gallagher has not yet provided his 2021 tax return. However, the SEC remains willing to continue to meet and confer with Gallagher on both issues.

---

[3] In discovery, the SEC hopes to determine whether Gallagher in fact executed those trades and whether either his wife or son should be named as relief defendants.

Thus, Gallagher's accusation that "the entirety of the Gallaghers' financial lives is being micro-managed by the SEC…, Lt. at 4, is completely unfounded. To the contrary, the SEC from the start has been willing to work with Gallagher and his counsel to accommodate reasonable requests to modify the asset freeze to permit Gallagher to run his businesses, support his family, preserve his assets and pay legal fees, consistent with its obligation to ensure that sufficient assets are preserved to satisfy any judgment.

### III.     Argument

#### A.     Standard for an Asset Freeze

"A freeze of assets is an ancillary remedy that merely 'assures that any funds that become due can be collected,'…including disgorgement of profits, penalties[,]…and possibly prejudgment interest." *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 416 (S.D.N.Y. 2001) (quoting *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990)). An asset freeze simply "functions like an attachment." *Unifund*, 910 F.2d at 1041.

A freeze order requires a lesser showing than that needed to obtain other forms of a preliminary injunction. *See Gonzalez de Castilla,* 145 F. Supp. 2d at 415 (S.D.N.Y. 2001). When there are concerns that a defendant might dissipate assets, a court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. *Unifund*, 910 F.2d at 1041; *see also Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011).

Moreover, the SEC need not establish a reasonable likelihood as to the amount of any ultimate disgorgement or penalty to obtain an asset freeze. *See, e.g., SEC v. Liu,* 851 Fed. App'x 665, 668 (9th Cir. March 12, 2021) ("To require a party to show a reasonable likelihood of the amount of an equitable remedy to obtain an asset freeze would require showing a definitive entitlement to an equitable remedy and would run contrary to *Marcos.* Any finding of an amount of equitable relief would be premature at this stage.") (citing *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1364 (9th Cir. 1988)).

#### B.     The SEC's Evidence Meets the Standard for an Asset Freeze.

The SEC's evidence is more than sufficient to meet the standard described above. As set forth in more detail in the SEC's moving papers in support of the TRO, Dkt. 6 (McGrath Local Rule 6.1 Statement); Dkt. 7 (Memorandum of Law); Dkt. 8 (Peirce Declaration and Exhibits attached thereto), the SEC has established not only that there is a basis to infer that Gallagher committed securities fraud but indeed has made a substantial showing of a likelihood of success on the merits.

The SEC has also demonstrated a serious risk that Gallagher will dissipate and transfer assets. As set forth in more detail in the McGrath Local Rule 6.1 Statement, Dkt. 6, Gallagher has shown a disdain for the federal securities laws, ignored warnings from Broker A that his trading appeared to violate the law, and transferred funds to a new brokerage account and continued his illegal scalping scheme even after Broker A shut down his brokerage account. It is critical that an asset freeze be imposed to preserve the

remaining funds for investors and to satisfy any civil money penalty that may be imposed in the event the SEC obtains a final judgment against Gallagher. The risk of dissipation remains high, given, among other grounds, that defense counsel has apparently already exhausted over $400,000 in legal fees since November 2021.

Accordingly, while a reduction of the asset freeze from $6.9 million to $5,661,200 is appropriate, an Order freezing that amount—consisting of estimated potential disgorgement of at least $2,805,600 in ill-gotten gains, PJI conservatively estimated at approximately $50,000, and a civil money penalty of $2,805,600—is warranted.

### C. The SEC Has Provided a Reasonable Estimate of Gallagher's Potential Ill-Gotten Gains.

The SEC calculated Gallagher's potential ill-gotten gains by determining the profits he made from the time he first purchased a stock that he scalped until shortly after his last scalping trade. The SEC then applied a first in, first out ("FIFO") methodology for calculating the cost basis of any particular trade. The SEC submits that this is the most appropriate method for calculating Gallagher's ill-gotten gains from his scalping scheme.

As set forth in more detail in the SEC's moving papers in support of the TRO and in the Amended Complaint, Gallagher's illegal scalping in each stock followed a similar pattern. He would first accumulate a significant amount of shares in a stock he intended to scalp (the "target stock"), which he referred to as "loading." At times, Gallagher communicated with associates who were also loading up on the stock and telling each other when they planned to start touting the stock to the public. Gallagher would often pick thinly traded microcap stocks where his fraudulent and manipulative conduct could more readily impact share price. He would then start issuing tweets lauding the stock and encouraging his followers to buy it, in some cases followed by increasingly urgent tweets to buy immediately, called "Alerts." When the time was ripe, Gallagher would issue further tweets encouraging his followers to buy the target stock, often falsely assuring his followers that he was "holding" or "not selling " or not "dumping" the stock, when he in fact intended to and did sell off substantial portions of his holdings without disclosing that material fact to his followers.

In many cases, Gallagher's scalping scheme unfolded over a relatively short time frame: he started loading up on the target stock, sending public tweets and Red Alerts shortly thereafter, and then began engaging in scalping trades. In these instances, one can see a clear correlation between Gallagher's conduct and the stock's increase in price and volume: Gallagher (and sometimes his associates) loaded up on and tweeted about a stock and then the stock price and volume increased. Gallagher took advantage of that price increase and dumped his shares for sizeable profits.[4]

---

[4] For each of the stocks in question, Gallagher sent numerous touts, ranging from the dozens to the hundreds, and engaged in numerous scalping trades. And the period over which he scalped any particular stock also varied, from several months to over a year in several instances. So on any given stock, the general pattern sometimes varied.

There is clear evidence that Gallagher has formed the intent to scalp in these stocks from the outset. For example, on December 28, 2020, in the course of his sending touts encouraging people to buy ALPP, Gallagher sent a DM to an associate stating: "otc, the sec don't even look at" and "if we were f**king with aapl (Apple) they may take a look. otc stocks are 99% scams and they don't look at them."

In addition, deed, Gallagher's own statements made clear his intention that his tweets would and did pump up the price of the stocks. On December 28, 2020, Gallagher bragged in a tweet: "Alex [part of his Twitter handle] is a pumper!! I pump all my Stocks! $alpp $sanp $mjlb $couv all of these pumps up 300% minimum after alerted just to name a few pumps!! $."

For these reasons, the SEC submits that it is reasonable to attribute all of the profit Gallagher amassed by selling stocks shortly after encouraging his followers trading in these target stocks to his illegal scalping scheme, at least for purposes of estimating his ill-gotten gains for purposes of the asset freeze.

Although Gallagher contends that this methodology is inappropriate, the SEC has yet to obtain documents and other discovery sufficient to test Gallagher's arguments. For example, there may be instances where Gallagher bought a stock, and the price went up before he touted the stock. Gallagher argues that it would be improper to include that portion of the price increase in his ill-gotten gains from scalping, as he had not yet sent a tweet touting that stock. While at first blush that appears to be a plausible argument, there are reasons why it may not be correct. Among other things, there is strong evidence that Gallagher did not randomly pick stocks based on the merits of the stock but rather based on his ability to easily manipulate its price. There is also strong evidence that he did so in conjunction with associates who were also loading and scalping. So there is a fair inference that a sudden price increase after Gallagher bought a stock and before he sent his first tweet was a result of a coordinated loading period by Gallagher and his associates and tweets by his associates. Indeed, there are numerous instances of Gallagher retweeting touts on target stocks sent by associates. And the two stocks that Gallagher focuses on in his pre-motion letter, ALPP and BNGO, demonstrate this pattern, as discussed below. Thus, the mere fact that Gallagher had not yet personally sent a tout does not eliminate the possibility that he was not already coordinating a scalping scheme with associates.[5]

### D. The Two Stocks That Gallagher Focuses On Do Not Support Lifting the Asset Freeze.

According to Gallagher, his trading in ALPP and BNGO "follow a similar pattern where Mr. Gallagher luckily bought and touted stocks before significant gains" and "were the result of legitimate business activity and had nothing to do with his touting." Lt. at 7. He further argues that "the SEC cannot attribute any change in stock price, and thus unjust enrichment to Gallagher, from his tweeting," "[n]or will the SEC ever be able

---

[5] The SEC does not currently have all of Gallagher's private communications with other scalpers.

to identify any victims who lost money….” *Id.* The evidence, however, shows that Gallagher's purchase of both stocks was not based on luck and that his profits were not solely the result of "legitimate business activity" but rather the result, in large part, of coordinated touting and scalping by Gallagher and his associates.

### 1. Gallagher Profited from His Touting and Scalping In ALPP.[6]

The Amended Complaint alleges that Gallagher obtained approximately $471,000 in profits by engaging in a scheme to scalp shares of ALPP, which he traded between December 8, 2020, and March 11, 2021. Amended Complaint, Attachment A, line 24. Gallagher argues that his profits were the result of a December 24, 2020 ALPP press release announcing that it was making plans to be uplisted to NASDAQ, rather than his tweets. Lt. at 7-8. However, Gallagher first bought, touted about, and scalped shares of ALPP prior to the December 24 press release and bought, touted about, and scalped shares of ALPP long after any discernable market impact the press release would have had. Gallagher's relentless touts of ALPP to his thousands of followers and readers correlate with a discernable stock price increase and are a reasonable explanation for the cause of his profits.

Gallagher admits that he "touted" ALPP over the trading period. Lt. at 7. In fact, during the trading period, Gallagher tweeted approximately 350 ALPP touts to his thousands of followers and readers. These tweets were heavily re-tweeted, commented on, and "liked" and consisted of urgent ALPP buy recommendations, red alerts, and tout lists. Indeed, in a tweet on December 28, 2020, Gallagher, who used the Twitter name "Alex Delarge," acknowledged that his touts caused ALPP's share price to rise: "Alex is a pumper!! I pump all my Stocks! $alpp $neca $sanp $mjlb $couv all of these pumps up 300% minimum after alerted just to name a few pumps!! Sorry for your gain. and yes a few haven't taken off yet!! But they will!!"

Gallagher first purchased shares of ALPP on December 8, 2020. Minutes before his purchase, Gallagher received a Direct Message ("DM") from a Twitter follower: "ALPP is about to fly my friend, military contract and acquisition finalized this thursday 12/10!, Don't miss the run to $1." Gallagher tweeted his first buy alert to his followers and readers on the same day: "OK I bought $alpp after two years of listening i give up! Im in at 52 week high!"

Between Gallagher's purchase of 10,000 shares of ALPP on December 8, 2020, and his sale of those same shares on December 22, 2020, prior to the December 24 press release, ALPP's price per share rose approximately 400%. This price increase correlates with Gallagher having tweeted 56 ALPP buy touts during this period. Gallagher made a profit of approximately $19,570 from the sale of those shares.

---

[6] The SEC is prepared to document all of the tweets, direct messages and trading data cited herein if and when so directed by the Court.

For instance, on December 16, 2020, Gallagher tweeted, "Thursday list!! Big day after recovery late!! 1 $alpp…RETWEET GETS A FOLLOW." This buy tout list was retweeted 44 times, had 33 comments, and had 90 "likes" and, on December 21, 2020, Gallagher tweeted 19 urgent buy touts. These included a red alert, "$alpp new highs and my new #1 load $alpp"; "YOU WANT TO OWN THIS UP LISTING STOCK!!"; "Tuesday list!! Longs! 1 $alpp…"; and "My $alpp confidence! Not selling a share!!... $alpp will up list and we will see multi dollar run!! Whos with me?" Despite his December 21 tweets that his followers should buy and hold ALPP long and his assurance to them that he was "Not selling a share!…Whos with me," the very next day Gallagher sold all 10,000 shares of ALPP he owned.

Gallagher accumulated more ALPP shares between December 15, 2020, and January 12, 2021, and scalped those shares from January through March 2021. Gallagher sold during and after his relentless touting of ALPP without disclosing that he was, or would imminently be, selling. Even with other corporate news, it is reasonable to conclude that Gallagher's profits were the result of his relentless tweets touting ALPP, which were widely distributed, and his illegal scalping of that stock.

The three examples that follow are just several of many examples the SEC can establish demonstrating that Gallagher scalped and profited from his tweets well after the December 24, 2020 press release.

*First*, on January 5, 2021, Gallagher sent multiple tweets touting ALPP, including: "$alpp is my #1 long otc stock!"; "Investors read! $alpp OTC stock! NASDAQ bound! investors this is what you want your core positions to make real money! OTC to NASDAQ"; and "$ALPP No one can pry my shares out of my hands!" After sending these tweets on January 5 encouraging investors to buy ALPP, Gallagher sold 14,000 shares of ALPP for a profit of approximately $27,800. While he was selling his shares, he sent additional tweets encouraging others to buy ALPP, including "$alpp is the overall #1 OTC stock to own!! I buy Every dip!! The reason? Because it inst gonna be OTC in 2021." On January 6, Gallagher tweeted two touts prior to selling shares— "$alpp the future people!" and "$alpp new updates #1"—and two touts while selling shares: "Loaded both these today $cydy and always $alpp the best" and "$alpp is my overall #1 OTC." That day, contrary to his tweet that he "loaded" (bought) ALPP that day, Gallagher in fact sold 11,000 shares of ALPP for a profit of approximately $20,600. And on January 7, Gallagher sold 9,020 shares of ALPP for a profit of approximately $16,200.

*Second*, on February 4, 2021, Gallagher tweeted, "$ALPP $5.00 A SHARE!!" and while selling shares tweeted, "$alpp!!! $5.11 pps!!! $10.00 next NASDAQ bound!! Who do you think is buying now!! People who know!" Later that day, Gallagher sold 14,020 shares of ALPP for a profit of approximately $61,050. Following those sales, Gallagher then tweeted: "Any $alpp happy people out there? $5 bucks soon to be gone!" and "OTC best of the best. These are the core of a good portfolio! 1 $alpp." On February 5, Gallagher sold 25,000 shares of ALPP for a profit of approximately $133,490. On February 6, Gallagher tweeted a tout list: "Long holds! Buy these get rich simple! 1

Alerting Monday! Massive alert coming!…$ALPP." He sent additional tweets touting ALPP on February 8 and 9. On February 10, Gallagher sold 2,980 shares of ALPP for a profit of approximately $15,200.

*Third,* in March 2021, Gallagher continued to scalp shares of ALPP. For example, he sent touts and then sold shares on March 5 for a profit of approximately $8,480 and on March 8 for a profit of approximately $1,550. When the market closed on March 8, Gallagher tweeted (replying to two Twitter users): "fully loaded in $alpp. It's a big board to me!" In reality, by this date, Gallagher had sold off approximately 94% of his ALPP shares. The next day, March 9, Gallagher sold 2,000 shares of ALPP for a profit of approximately $3,370. On March 10, 2021, Gallagher tweeted, "$alpp up list ready!!" The next day, March 11, Gallagher sold 2,000 shares of ALPP for a profit of approximately $3,400.

Notwithstanding Gallagher's claims to the contrary, Gallagher committed fraud on the market by his scalping of ALPP shares. Gallagher argues that "any individual who purchased stock in ALPP based on Mr. Gallagher's tweets would have been handsomely rewarded with a significant sustained return on his or her investment, confirming there are no 'victims' who lost funds from the tweets." Lt. at 8. In fact, investors who bought ALPP shares based on Gallagher's self-serving touts have advised us they lost money. *See* Amended Complaint, ¶¶ 157-178. Moreover, Gallagher touted ALPP as it reached a high of $9.49 on February 9, 2021, and continued touting it as its price subsequently trended downward. Investors who bought at higher prices and did not sell in a timely fashion would have lost money.

### 2. Gallagher Profited from His Touting and Scalping In BNGO.

The Amended Complaint alleges that Gallagher obtained approximately $96,700 in net profits by engaging in a scheme to scalp shares of BNGO, which he traded between December 17, 2020, and February 4, 2021. Amended Complaint, Attachment A. Gallagher argues that BNGO's stock price rose as a result of the issuance of a press release on December 23, 2020, after Gallagher started touting the stock, and that "the stock gain had nothing to do with his touting." Lt. at 8-9. However, prior to the issuance of the press release, Gallagher and an associate had already agreed to manipulate BNGO's price through a series of stock alerts and coordination with other associates, as reflected in the direct messages below.

**Thursday, December 17, 2020**

| 11:46 AM | Associate: | "brotha small cap alert for friday<br>BNGO .50 starter (1 Bullet) Confirmation: 2 close above .53 Wedge Break stock in sympathy to Santa Rally Bio stocks are strong refer to the IBB Pharma ETF Last run 1.15 Floor .45 (15th floor)" |
|---|---|---|
| 11:46 AM | Associate: | [Link sent] |
| 11:46 AM | Associate: | "perfect setup" |

| 11:46 AM | Associate: | "in sympathy to GHSI Cancer treatment" |
|---|---|---|
| 11:51 AM | **Gallagher:** | "loading thanks" |
| 11:51 AM | Associate: | "Bio stocks are hot" |
| 11:52 AM | Associate: | "this will be great next week santa rally" |
| 11:56 AM | **Gallagher:** | "thank you sir 20k bought" |
| 11:56 AM | Associate: | "we will send Friday near close" |
| 11:56 AM – 12:02 PM | **Gallagher** | **Gallagher buys 20,000 shares of BNGO at $0.5096 per share.** |

The associate's tweet "we will send Friday near close" shows that the associate planned to start sending tweets on Friday touting BNGO to increase the stock's price. The next day, Gallagher and the associate coordinated manipulation of yet another issuer and then agreed that they would send out a buy alert for both that issuer and BNGO at the end of the day ("EOD"). The Associate told Gallagher that two others were also going to join in, as reflected in the direct messages below.

**Friday December 18, 2020**

| 10:47 AM | **Gallagher** | "whats the friday play? my man!" |
|---|---|---|
| 10:49 AM | Associate | "brotha we traded this one before but [Associate #2] is in" |
| 10:49 AM | Associate | "and i think we all send it" |
| 10:49 AM | Associate | "now it will do great" |
| 10:50 AM | Associate | "[Associate #2] and his brother are in we go live?" |
|  |  |  |
| 10:55 AM | **Gallagher** | "love the Catalyst lots to talk about, ran it before" |
| 10:57 AM | **Gallagher** | "lets roll this EOD. GOOD?" |
| 10:59 AM | Associate | "we can do that" |
| 10:59 AM | Associate | "I will also send out the BNGO end of day" |
| 10:59 AM | Associate | "Small Cap" |
| 11:00 AM | **Gallagher** | "YES LOADED ALOT IN THAT, THANK ILL PREAD THE WORD" |

On Friday, December 18, 2020, at 3:47 p.m., as the associate and Gallagher had agreed, the associate tweeted a tout for BNGO. The associate's tweet was retweeted 15 times, quoted in 13 tweets, and received 45 likes. Multiple stock promotion Twitter accounts commented on the post with one encouraging another associate to "join your brother on BnGO." The same day, Gallagher retweeted his associate's BNGO tout to his thousands of followers adding, "$BNGO I SUPPORT THIS SMALL CAP GOLD! 20K SHARES IM IN!" Gallagher's tout was retweeted 12 times and "liked" 21 times.

Between Friday, December 18, 2020, and Monday, December 21, 2020, the associate tweeted 11 more touts. These touts, along with Gallagher's tweet, appear to have impacted BNGO's price per share: BNGO had an adjusted closing price of $0.54

per share on Friday, December 18, and by Monday, December 21, 2020, BNGO hit a high of $0.59 per share—a 9.2% increase. BNGO closed at $0.55 on December 22.

On December 23, 2020, the date of the press release, BNGO traded at a high of $0.82 per share, about a 49% increase over the prior day's adjusted close. However, the next day, it closed down at $0.71. On December 28, the next trading day, BNGO closed up at $0.88 and increased from there for a period of time. Given that Gallagher and his associate and apparently others had agreed to "spread the word" about BNGO (as Gallagher stated in the above-cited tweet) with the obvious intent to move the share price, BNGO's price increase cannot be solely attributed to this single press release.

For example, on December 29, 2020, Gallagher re-tweeted his Associate's tout and tweeted, "im up 128% on $bngo thank you [Associate]." Gallagher tweeted three more BNGO touts that day: "dammmnnn@[Associate] $bngo 200% gains in a week great! thank you OTC god!!"; "@[Associate] you see this massive $bngo after hours!! Lol. 204% gains thanks buddy!"; and a red buy alert, "After hours small cap! $bngo get your ass some shares! This is my second AH alert ($ocgn up 100% 1st) ! You can buy till 8pm est! Thanks again @[Associate]."

By December 30, 2020, Gallagher's associate had tweeted at least 30 BNGO touts to his thousands of followers, and the tweets were re-tweeted dozens of times. On December 31, 2020, Gallagher tweeted: "Shout out to the great @[Associate] I bought 20k shares at 50 cents. I have no clue what $bngo even does! But it does fucking green!! Thank you and follow @[Associate] The best in the business!"

Gallagher sold shares on four days over the trading period and, in each instance, he touted BNGO beforehand without disclosing that he was selling or would be imminently selling. For example:

- On January 1, 2021, Gallagher tweeted a "2021 life changers" tout list with "$slpp and $bngo" and on January 2, 2021, Gallagher tweeted, "$bngo im holding its been up huge everyday." On January 4, 2021, Gallagher sold 10,000 shares of BNGO—50% of his holdings—at $4.78 per share and bought 10,005 shares at prices between $6.26 and $6.38 per share.

- On January 4, 2021, Gallagher tweeted, "$bngo up 60% today look like a good day!"; "Small cap gold all from @[Associate] 1 $bngo 1300 gains in .50…. All green! 100% on small caps!"; "My 3rd AH small cap alert! …$bngo up 600% since last pm alert…"; and "20k shares and lovev $bngo." On January 6, 2021, Gallagher sold 20,005 shares of BNGO, all his shares, at prices between $4.70 and $4.71 per share.

- On January 11, 2021, Gallagher bought 5,000 shares of BNGO at prices between $5.85 and $6.29.

- On January 20, 2021, Gallagher tweeted a tout list, "Great small cap safe winners! …Bonus $bngo I bought at a buck! Now 8 bucks! Some of these will do the same." On January 24, 2021, Gallagher retweeted a tout list from an associate: "Monday potential buy list: …$bngo…." On January 26, 2021, Gallagher sold 2,500 shares of BNGO at prices between $12.1001 and $12.1091 per share.

- On January 29, 2021, Gallagher tweeted another buy tout list: "Small cap list! Hold forget and win" with his #1 buy recommendation "$bngo…. All green big green you need these!" On January 30, 2021, Gallagher re-tweeted the same tout list: "Small cap list! Hold forget and win 1 $bngo…." On February 4, 2021, Gallagher sold his remaining 2,500 shares of BNGO at $11.65 per share.

As with ALPP, Gallagher's claim that he had no victims with respect to BNGO is wrong. For example, anyone who bought BNGO at or near its high of $11.60, based on Gallagher's self-serving tweet—"Hold forget and win 1$bngo"—and then followed Gallagher's advice and held BNGO long, would have begun losing money just 18 days later, when BNGO's price began a sustained downward trend. By March 31, 2021, BNGO's price had dropped to $8.08 per share.

Thus, while some portion of BNGO's price increase may be attributable to the positive press release, the price rose dramatically long after the market would have incorporated the impact of that press release into the stock price. It is therefore reasonable to conclude that the stock increase was caused by attention Gallagher and his associates brought to bear on the stock through their fraudulent touts.

Finally, the SEC was not able to engage in any public investigation while the U.S. Attorney's Office conducted its covert, criminal investigation. Thus, we have not yet had the chance to depose Gallagher or his associates. At the end of the day, there may be price increases that are explainable by legitimate market forces that may reduce the amount of Gallagher's ill-gotten gain in a particular stock. Alternatively, further investigation may result in the SEC identifying more ill-gotten gains Gallagher obtained through his illegal stock and manipulation scheme.[7]

---

[7] Gallagher's contention that the disgorgement portion of the asset freeze should be limited to only the specific amount of profit that the SEC can establish is directly and solely traceable to each specific scalping tweet is not supported by law and goes far beyond the well-settled principle that disgorgement need only be a reasonable approximation of Defendant's ill-gotten gain and that the purpose of an asset freeze is to maintain the *status quo* and preserve assets for a potential judgment. *See, e.g., Liu,* 851 Fed. App'x at 668. At a minimum, the SEC should not be required to parse out the portion of Gallagher's profits attributable to each of his touts at the initial stages of the case to obtain an asset freeze. Moreover, there is a reasonable argument that even price increases independent of Gallagher's scalping scheme should not necessarily be excluded in calculating his ill-gotten gains under *Liu*, given that he was only in a position to benefit from the price bump as a result of his illegal conduct in purchasing the stock with the intent to illegally scalp it.

Given that, the SEC submits that its approach to calculating Gallagher's ill-gotten gains is the most reasonable and appropriate one, particularly for purposes of determining the appropriate amount of assets to freeze to preserve the SEC's ability to collect on any disgorgement, PJI, and penalty judgment.[8]

### E. Gallagher's Brokerage Fees May Ultimately Be Deducted For Purposes of Calculating Disgorgement, But Any Such Calculation Is Premature Before Discovery

While transaction costs, such as brokerage fees, Gallagher incurred in generating his ill-gotten gains may ultimately be deducted in calculating disgorgement after a final judgment on liability is obtained, any such calculation is premature because the SEC does not currently know what Gallagher's transactions fees were and cannot calculate that amount without discovery. However, Gallagher's argument that capital gains taxes should also be deducted from any ultimate disgorgement amount is unfounded. To the extent that Gallagher has paid capital gains taxes on amounts that he is subsequently ordered to disgorge, his remedy is to seek a rebate from the Internal Revenue Service.

The cases Gallagher cites on this point do not merit a different result. For example, in *CFPB v. Klopp,* 957 F.3d 454, 461 (4th Cir. 2020), the Fourth Circuit merely overturned a disgorgement order arising from a contempt finding, holding that disgorgement was not based on the contemnor's earnings from the limited actions that actually violated the court order. The lower court had reduced disgorgement by the amount of the contemnor's income tax withholdings and did so again on remand, but the Fourth Circuit did not address this issue. Nor is *SEC v. Liu*, 18-cv-974 (C.D. Cal. Apr. 23, 2021), Dkt. 319-1, relevant. There, the SEC merely conceded that certain taxes (believed to be franchise taxes) paid by corporate defendants in connection with development of a project were legitimate business expenses.[9]

### F. Gallagher's Ill-Gotten Gains From Scalping Certain Stocks Should Not Be Reduced By Losses He Incurred in Trading Separate Stocks.

Gallagher's argument that the ill-gotten gains he obtained from scalping certain stocks should be reduced by losses he incurred in scalping other stocks, Lt. at 10-11, is

---

[8] Defense counsel's pre-motion letter repeatedly suggests or implies that the SEC intentionally misled the Court in setting forth Gallagher's ill-gotten gains. However, the SEC's moving papers clearly explained that the SEC calculated Gallagher's estimated ill-gotten gains by taking the difference between the price at which Gallagher sold the stocks after tweeting and the price at which he initially bought the stocks. *See, e.g,* Complaint ¶¶ 56, 67, 70, 101, Attachment A; Amended Complaint ¶¶ 10; 48, 63, 66, 74, 75, 82, 85, 86, 91, 123, 147, 149, 151, 153, fn.1; Peirce Declaration at ¶ 18, 20, 24, 25, 27, 33, 34, 37, 39, 42, 43, 67; Ex. 2, 3, 4, 5, 23, 42, 54, 74.

[9] Gallagher claims that he paid an effective tax rate of 32.7 % during the relevant period and argues that the SEC's net profit calculation of $2.805 million in the Amended Complaint should be reduced by that amount, resulting in a net profit of $1.89 million. However, even assuming *arguendo* that capital gains taxes should be deducted, the actual capital gains taxes that Gallagher paid, not the "effective tax rate," is the relevant figure.

meritless. The ill-gotten gains that Gallagher obtained in scalping any one stock were not in any way generated by his trading in any other stock; so his profits in any one stock should not be reduced by any expenses or losses incurred in connection with another stock. Moreover, doing so would inequitably reduce the amount of ill-gotten gains available for distribution to the victims of Gallagher's scalping.

The cases Gallagher cites, Lt. at 10, actually support the SEC's position. In *SEC v. Nadel*, 206 F. Supp. 3d 782, 785-86 (E.D.N.Y. Sept. 8, 2016), the court held that the defendants were not entitled to deduct trading losses in certain stocks from gains in separate trades. It stated: "It is well-established in this Circuit that the profit made on an independently unlawful trade is subject to disgorgement, regardless of whether losses were sustained on any other transaction." *Id.* at 786 (citing cases). The court distinguished *SEC v. McCaskey*, No. 98-cv-6153, 2002 WL 850001 (S.D.N.Y. Mar. 26, 2002), relied upon by Gallagher, on the ground that that case involved a set of facially valid trades that only became unlawful when considered as a whole. *Nadel,* 206 F. Supp. 3d at 786. *SEC v. Video Without Borders, Inc.*, No. 08-61517-civ, 2010 WL 11606307, at *6 (S.D. Fla. Sept. 10, 2010), *report and recommendation adopted,* 2010 WL 5790684 (S.D. Fla. Dec. 8, 2010), is also unavailing. That case involved the deduction of losses arising from the issuance of a block of corporate shares as part of a fraudulent scheme to relieve the corporation of its debt. Here, in contrast, each scalping trade was independently unlawful. [10]

### G. The Specific Assets Currently Frozen Will Not Be Cover Even A Conservatively Estimated Penalty Amount.

Gallagher argues that the SEC has failed to justify the assumption of a penalty equal to the estimated, potential disgorgement amount in calculating the amount it seeks to have frozen.[11] Lt. at 11-12. However, a penalty equal to the gross amount of Gallagher's pecuniary gain is warranted here given the range and magnitude of Gallagher's illegal scalping, including scalping profitably in at least 58 stocks, with multiple illegal scalping trades in each stock; scalping in numerous other stocks; brazenly ignoring warnings from his brokerage firms that his manipulative trading was illegal and openly bragging about his ignoring these warnings; Gallagher's numerous admissions that he was intentionally engaged in blatant touting of stocks with the intent to increase the price; Gallagher's cynical scheme to induce his followers to trust him by assuring them that he wanted to help them make money and "beat cancer"; and Gallagher's betrayal of that trust by encouraging his followers to buy a target stock, often falsely

---

[10] Gallagher's argument that by including losses from certain stocks in the Amended Complaint, the SEC has conceded that scalping losses must be included in calculating his ill-gotten gains, Lt. at 10, is incorrect. The SEC makes no such concession. It included these amounts in the Amended Complaint so the Court and Gallagher could see where and why the SEC had reduced the amount of estimated disgorgement from the initial Complaint.

[11] Pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)], courts can impose a penalty up to the gross amount of pecuniary gain to the defendant.

assuring them that he was "holding" or "not selling" or not "dumping" that stock when he, in fact, intended to and did sell his shares and profit at the expense of his followers.

The cases Gallagher cites, Lt. at 11, are inapposite. *SEC v. Tavella*, 77 F. Supp. 3d 353, 363 (S.D.N.Y. Jan. 6, 2015), addressed the standard for imposing a penalty at the remedies stage, not for estimating a penalty for purposes of an asset freeze. *SEC v. Fassari,* 21-cv-103 (C.D. Cal.), involved a defendant who posted false tweets regarding one company over a nine-day period, far less extensive misconduct than Gallagher. *See* Dkt. 69 (First Amended Complaint). And the fact that there was no penalty in *SEC v. Melnick,* 21-cv-4054 (N.D. Ga.), standing alone, is not relevant to whether an amount should be frozen to cover a potential penalty equal to the estimated disgorgement here.

For all these reasons, any motion by Gallagher to lift the asset freeze would be meritless, and the Court should therefore deny Gallagher's request for leave to file such a motion.

Respectfully submitted,

/s/ *Kevin P. McGrath*
Kevin P. McGrath
Senior Trial Counsel
Securities and Exchange Commission

Cc. Eric Rosen, Esq.