# EXHIBIT B

FILED
2018 Feb-27 AM 09:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### Northeastern Division

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| **Plaintiff,** | : | |
|  | : | |
| **vs.** | : | **CASE NO.:** |
|  | : | |
| **BRIAN ROBERT SODI,** | : | |
| **CAPITAL FINANCIAL MEDIA, LLC, and** | : | |
| **LIST DATA SOLUTIONS LLC,** | : | |
|  | : | |
| **Defendants.** | : | |
|  | : | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint alleges as follows:

### <u>SUMMARY OF THE ALLEGATIONS</u>

1.      This case involves a type of securities fraud known as "scalping," and other violations of the federal securities laws. A Defendant illegally "scalps" when that Defendant (i) acquires shares of a stock for his own benefit prior to recommending or touting that very stock to others, (ii) does not disclose in the tout the full details of his ownership of the shares and his plans to sell them, and (iii) proceeds to sell his shares following the tout's dissemination, and into the share price and trading volume increases triggered by his touting.

2.      On at least two occasions during 2013, Defendant Brian Robert Sodi – known as "Mailman" in the penny stock fraud community because of his pervasive

participation in direct-mailed penny stock promotions – secretly acquired shares of the very stocks that he then promoted to investors through his penny stock promotion publishing houses. These Sodi publishing houses then included Defendants Capital Financial Media LLC ("CFM") and List Data Solutions LLC ("LDS") (hereinafter collectively referred to as "Sodi's Penny Stock Promotion Platform"). Those two stocks, both in the gold mining business, were Southern USA Resources Inc. (ticker symbol SUSA) and Goff Corporation (ticker symbol GOFF).

3.     Beginning by January 10, 2013, in the case of SUSA, and by March 19, 2013, in the case of GOFF, Sodi caused his Penny Stock Promotion Platform to widely disseminate, primarily through the U.S. mail, touting materials concerning these stocks. In both cases, these materials urged investors to buy and buy quickly, saying things like, "get in on SUSA now for a chance at FAST <u>3,193% gains</u>!" (emphasis in original) and "Don't Be a Sideline Sitter – GOFF Could Be Securing <u>HUGE Profits For Early Investors Like YOU</u>!" (emphasis in original).

4.     Sodi defrauded investors – including investors residing in the Northern District of Alabama – by failing to disclose in these touts material information, to wit that he held a large position in each stock and intended to immediately liquidate as much of it as he could into the rise in stock price and trading volume caused by his touts.

5.     In the case of SUSA, Sodi was secretly paid in SUSA shares for running the touting campaign, and proceeded to sell at least 239,600 of those shares during that campaign through a Swiss bank account, for illicit profits totaling at least $339,319.76.

6.     In the case of GOFF, Sodi secretly bought 500,000 shares through the same Swiss account just prior to launching the GOFF campaign, and then sold all these

shares during that campaign, for illicit profits totaling at least $116,300. Then, just before the campaign's second massive GOFF mailer was delivered to potential investors, Sodi secretly bought another 100,000 shares through the same Swiss account, which he likewise quickly sold during the renewed campaign, for illicit profits of $7,000 more, for total illicit GOFF trading profits of at least $123,300. Simply put, Sodi illegally scalped SUSA and GOFF investors.

7.     After conducting each of these scalping schemes, Sodi repatriated his trading proceeds. Sodi did this by, in the case of SUSA, disguising the illegal trading proceeds as payments for the campaign, and by, in the case of GOFF, routing them circuitously over time from the Swiss account, through accounts in Hong Kong and Singapore, to his Penny Stock Promotion Platform entities and, through a Visa debit card issued by a different Swiss bank, to himself. In addition, Defendants Sodi and CFM also reaped at least $686,033.79 in illicit profits from handling the GOFF campaign.

8.     Prior to Defendants' dissemination of the SUSA and GOFF touts, both stocks were low-priced and thinly traded. SUSA's daily trading volume (which had been zero for over a month) climbed as high as 485,149 shares during the touting campaign, while SUSA's daily closing share price climbed as high as $1.66 (reaching even higher intra-day highs). As to GOFF, its share price, which had been just $.13 prior to the touting campaign's launch, climbed to a closing-price high of $.5852 on April 5, 2013, reaching even higher intra-day prices; and its daily trading volume throughout the campaign averaged more than 25 million shares.

9.     It was these price and volume rises that Sodi immediately exploited by selling at least 239,600 shares of SUSA and 613,000 shares of GOFF at average prices of

more than $1.41 and $.48, respectively, and effecting these trades through the Swiss bank account in which Sodi's shares had been positioned for sale prior to each tout's launch.

10.     In connection with SUSA, (i) Defendants Sodi, CFM and LDS also failed to disclose in the touts that Sodi had been paid in SUSA shares for running the SUSA touting campaign; (ii) despite having received that SUSA stock from an individual who was both an affiliate of SUSA and a SUSA underwriter (hereinafter "Accomplice A"), Sodi failed to register his offerings of that SUSA stock with the Commission; (iii) Sodi failed to file any Schedule 13D with the Commission disclosing his agreement with Accomplice A to coordinate their selling of SUSA shares; and (iv) pursuant to Sodi's further agreement with Accomplice A, and with Sodi's knowledge, Accomplice A led coordinated trading in SUSA stock ahead of Sodi's launch of the SUSA campaign, both to create the false appearance of market interest in the stock, and to artificially raise SUSA's stock ahead of the campaign's launch to the radically and fraudulently elevated price of $1.15 per share.

11.     By the conduct described herein, Defendants Sodi, CFM and LDS each violated the anti-fraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), as well as the tout-funding disclosure provision of the Securities Act (Securities Act Section 17(b)); Sodi also violated the beneficial-ownership reporting provisions of the Exchange Act (Exchange Act Section 13(d) and Rule 13d-1 thereunder) as well as the registration provisions of the Securities Act (Securities Act Sections 5(a) and (c)).

12.     Defendants will continue to violate the aforementioned provisions unless restrained or enjoined by this Court.  Accordingly, the Commission seeks injunctive

relief, disgorgement of ill-gotten gains, prejudgment interest, civil penalties and other appropriate and necessary equitable and ancillary relief, including an accounting.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Securities Act Sections 20(d)(1) and 22(a) [15 U.S.C. §§ 77t(d)(1) and 77v(a)] and Exchange Act Sections 21(d), 21(e), 21A and 27 [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

14.     Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails or of the facilities of a national securities exchange, in connection with the acts, practices and courses of business alleged herein, certain of which occurred within the Northern District of Alabama.

15.     Venue in this district is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within the Northern District of Alabama.

## THE DEFENDANTS

16.     **Brian Robert Sodi**, 46, is a resident of Boca Raton, Florida.  At all relevant times, Sodi was owner and principal of various penny stock promotion publishing houses, all operated out of the same Delray Beach, Florida address, i.e. 103 N.E. 4th Street, including Defendants CFM and LDS.  Prior to establishing CFM in January 1998, Sodi worked from September 1994 through December 1997 as an auditor with a "Big Four" accounting firm in Boca Raton.  He holds a B.S. in Accounting from Florida Atlantic University (conferred in August 1993), and was licensed as a Certified Public Accountant by the State of Florida in 1995.

17.  **Capital Financial Media LLC ("CFM")**, a Florida limited liability corporation whose address at all relevant times was 103 N.E. 4th Street in Delray Beach, Florida, was established by Sodi in January 1998.  CFM was a penny stock promotion publishing house, having Sodi as its owner and president.  Florida corporate records reflect CFM has been in inactive status since September 2016, based on its failure to file annual reports; at least one of its accounts with financial institutions, however, has remained open, active, and in use by Sodi, through at least December 2017.

18.  **List Data Solutions, LLC ("LDS")**, a Florida limited liability corporation whose business address was 103 N.E. 4th Street in Delray Beach, Florida, was established by Sodi in July 2012.  At all relevant times, LDS was a penny stock promotion publishing house, having Sodi as its owner.  Although Florida corporate records reflect that LDS has been in inactive status since September 2013 (for failure to file annual reports), bank records reflect it remained actively engaged in business through at least September 2014, and did not close its bank account until late January 2016.

## THE STOCKS

19.  **Southern USA Resources Inc. ("SUSA")** is a Delaware corporation headquartered in Ashland, Alabama that was in the gold mining business.  Formerly known as Atlantic Green Power Holding Company and as Lodestar Mining Inc., the company registered its common stock with the Commission under Exchange Act Section 12(g) on May 10, 2012.  SUSA's securities were quoted on OTC Link under the symbol "SUSA."  It filed periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Exchange Act Section 13(a) and rules thereunder until November 22, 2013, when, pursuant to Exchange Act Section 12(j), the Commission revoked SUSA's

registration.  From January 10, 2013 through March 1, 2013, when the Commission suspended trading in SUSA, SUSA's stock was the subject of a promotional campaign prepared and disseminated by Defendant Sodi through Defendants CFM and LDS.

20.　　**Goff Corporation ("GOFF")** is a Nevada corporation headquartered in Cork City, Ireland that, through its wholly owned subsidiary Golden Glory Resources S.A., owned land in Colombia's gold country.  On March 4, 2013, the company registered its common stock with the Commission under Exchange Act Section 12(g).  At all relevant times, GOFF's securities were quoted on the OTC Link under the ticker symbol "GOFF."  On June 29, 2016, the Company filed a Form 15-12G notice of termination of its registration under Exchange Act Section 12(g).  From mid-March through mid-May 2013, GOFF's stock was the subject of a massive promotional campaign, whose entire postal-mailed portion, and a sizeable share of whose email portion, were prepared and disseminated by Defendant Sodi through Defendant CFM.

## OTHER RELEVANT PERSONS AND ENTIITIES

21.　　**Accomplice A**, age 50, a U.S. citizen and resident of New Jersey who has on two separate occasions pled guilty to conspiracy to commit securities fraud and twice been named in Commission enforcement actions, partnered with Defendant Sodi in the scalping of SUSA investors.

22.　　**Swiss Administrative Firm A** is headquartered in Geneva, Switzerland. At all relevant times, Swiss Administrative Firm A has been registered as an external asset manager with the Swiss Financial Market Supervisory Authority ("FINMA"). Swiss Administrative Firm A provided administrative services over Front Company A and Front Company B (both defined below).

23.     **Front Company A** was, at all relevant times, regularly made available for Sodi's use.  Front Company A was incorporated in the British Virgin Islands in October 2009.  From Fall 2009 through Spring 2013, Front Company A held a bank account at Swiss Bank A (defined below), its beneficial owner was a citizen of the United Kingdom, and its banking and securities-trading activities were administered by Swiss Administrative Firm A.  Sodi used Front Company A to, among other things, secretly sell SUSA and GOFF stock while disseminating promotional materials urging investors to buy those stocks.  When Front Company A's account at Swiss Bank A was closed in Spring 2013, $2 million of its then remaining funds, and all of its remaining SUSA stock, were routed to the account of Front Company B (defined below) in Singapore.

24.     **Front Company B** was incorporated in Dubai, United Arab Emirates, in March 2012.  At all relevant times, Front Company B's beneficial owner was Swiss Administrative Firm A's president, the signatories on Front Company B's bank accounts have included Swiss Administrative Firm A personnel, and, from the Spring of 2013 through at least the Spring of 2015, Front Company B functioned at least in part as Front Company A's successor, in that, among other things, Front Company B was likewise made available for Sodi's use.

25.     **Swiss Bank A** has at all relevant times been a Swiss bank headquartered in Geneva, Switzerland.  Front Company A had an account at Swiss Bank A.

26.     **Swiss Bank B** has at all relevant times been a Swiss bank headquartered in Lugano, Switzerland.  Swiss Bank B issued the Visa debit card that Sodi used to repatriate a portion of his GOFF trading proceeds, as well as other potential scalping fraud proceeds from Front Company A, as described below.

8

## FACTS

### *Sodi Knew of the Relevant Disclosure Requirements*

27.     At the time he engaged in the conduct detailed below, Sodi was familiar with the disclosure requirements applicable to dissemination of penny-stock promotional materials.  In particular, Sodi has on at least two separate occasions acknowledged under oath in SEC investigative testimony that he has understood since at least 2004 that, when his companies disseminated materials promoting a stock, those materials had to disclose all compensation, both received and expected, and had to specifically disclose the details of any compensation in shares of the company being promoted.

### *Sodi Had Used Front Company A's Swiss Bank Account for Years*

28.     At the time he engaged in the conduct detailed below, Sodi had for several years been using Front Company A's bank account at Swiss Bank A in Geneva.  For example, on three separate occasions between November 2010 and October 2011, Front Company A's Swiss bank account wired funds to Sodi's personal "player" account at a casino in Las Vegas, Nevada ("the Casino"); and on or about August 15, 2011, Sodi personally emailed the Casino concerning one of these wires to  confirm it was credited to Sodi's account.

### SODI ENGAGED IN SCALPING SCHEMES IN SUSA AND GOFF

29.     As detailed below, during the first six months of 2013, Sodi used his Penny Stock Promotion Platform to disseminate touts urging investors to buy at least two penny stocks—SUSA and GOFF.  Sodi failed to inform investors, however, that he had secretly positioned himself, prior to launching those promotional campaigns, to sell both SUSA and GOFF through Front Company A's account in Switzerland.

30. In both cases, Sodi proceeded to sell each stock through Front Company A into the price and volume rises generated by the very touts he disseminated, all without making the disclosures required by law.

31. Sodi's ill-gotten gains from this conduct totaled at least $1.149 million, including approximately $340,000 in illegal SUSA trading profits, approximately $123,000 in illegal GOFF trading profits, and approximately $686,000 in net income from disseminating the entire postal-mailed portion, and a significant share of the e-mailed portion, of the GOFF promotional campaign through his Penny Stock Promotion Platform.

## THE SUSA SCHEME

### Sodi Agrees to Handle the SUSA Campaign for Payment in SUSA Stock

32. By the Summer of 2012, Accomplice A and a small group he led had acquired secret control of SUSA's stock and were ready to begin preparations for launching a massive promotional campaign through which they hoped to reap trading profits by selling their SUSA stock.

33. Accomplice A also *de facto* controlled SUSA by this time, and at all relevant times thereafter, as illustrated by, among other things, his (i) frequently and readily obtaining SUSA's CEO's signature on convertible note issuances and assignments, conversion notices, and other documents regarding SUSA stock; (ii) installing an investor relations consultant for the company and instructing that person as to the timing and substance of press releases timed to coincide with the promotional campaign; and (iii) approving company budgets for the use of investor funds.

34.     In or about August 2012, Accomplice A approached Sodi and asked whether Sodi would be willing to (i) handle the SUSA promotional campaign through his publishing houses, and (ii) be paid in SUSA shares rather than in cash.  Sodi agreed to both (i) and (ii).

### Sodi Visits SUSA's Mine and Prepares SUSA Touts

35.     On or about September 4, 2012, Sodi, Accomplice A and others participated in a conference call concerning what would ultimately become the SUSA promotional campaign that Sodi caused his LDS and CFM entities to launch in January 2013.

36.     Participants in this call included two of Sodi's subordinates ("Sodi Subordinate A" and "Sodi Subordinate B"), both of whom worked for Sodi's Penny Stock Promotion Platform.  By September 24, 2012, Sodi Subordinate B had prepared and emailed to Sodi an early draft of what would become the SUSA tout.

37.     On Wednesday, October 10, 2012, a group that included Sodi, Accomplice A, and Sodi Subordinates A and B, among others, traveled to SUSA's gold mine in northeastern Alabama, at a site located within this Judicial District.  The group inspected and took pictures both of the mine and of SUSA's gold-extraction equipment.

38.     Thereafter, on multiple occasions between at least November 13 and December 19, 2012, Sodi Subordinate B further revised and forwarded to Sodi SUSA promotional material drafts, which Sodi, in turn, shared with Accomplice A.  By or about December 26, 2012, the SUSA promotional material was finalized.

***Sodi Takes Payment – in SUSA Shares to Front Company A – for Promoting SUSA***

39.     Meanwhile, as the SUSA promotional materials were approaching their final form, Accomplice A and Sodi made arrangements for Sodi to be paid in SUSA shares, as they had agreed, for Sodi's and his Penny Stock Promotion Platform's SUSA touting efforts.  At the time, the SUSA stock over which Accomplice A had control included over 9 million shares obtainable through a $375,000 convertible promissory note Accomplice A held in the name of an *alter ego* entity.  That note gave Accomplice A the right to convert the note's principal-and-interest balance into SUSA shares, at a fixed price of $.04 per share.

40.     In order to deliver SUSA shares to Sodi as agreed, Accomplice A proposed assigning a portion of the aforementioned convertible note to whatever entity Sodi might designate.  The entity Sodi designated, and for which Sodi had paperwork provided to the escrow agent for the note assignment, was Front Company A.  The portion of the note that was assigned to Front Company A was $120,000, a sum that, by the terms of the assignment (executed, in behalf of Front Company A, by a Managing Director of Swiss Administrative Firm A ("the Swiss Administrative Firm A Director")), was convertible to 3 million SUSA shares.  The immediately convertible portion of the assigned note was, however, by its terms capped at 4.9% of SUSA's outstanding shares, which at the time equaled approximately 1.66 million shares.

41.     On December 18, 2012, Front Company A submitted a "notice of conversion," likewise signed by the Swiss Administrative Firm A Director, for half, or $60,000, of that assigned note, worth 1.5 million SUSA shares – or over 90% of the SUSA shares that the note's terms permitted Front Company A to immediately convert –

and requested delivery of those shares to Swiss Administrative Firm A in Geneva, Switzerland.

### *Sodi and Accomplice A Concoct Phony Payment Trail*

42.     Sodi and Accomplice A agreed to arrange funds transfers to create the false appearance that Front Company A was actually paying in full for the note assignment, without in fact requiring such payment either from Front Company A or otherwise from Sodi.  In furtherance of this arrangement:

      a.     *first*, on December 6, 2012 (using funds supplied or reimbursed directly or indirectly by Sodi, whether through all or part of two $100,000 transfers into its account on December 5 and 10, 2012, or otherwise), Front Company A wired $120,000 – the face amount of the assigned note – to the trust account of the escrow agent for the note assignment, a law office in New York (the "Escrow Agent");

      b.     *second*, on December 17, 2012, the Escrow Agent, in turn (i) wired $166,600 to Accomplice A's *alter ego* entity that had assigned the note to Front Company A and (ii) emailed Accomplice A a breakout of the $166,600 reflecting it was primarily composed of the $120,000 from Front Company A as well as payments the Escrow Agent had received for other SUSA note assignments;

      c.     *third*, on December 28, 2012, Accomplice A's *alter ego* entity, in turn, wired $125,000 to a Cayman Islands bank account then widely used in the penny-stock fraud community as a money-laundering vehicle (the "Cayman Account"); and

d.    *fourth*, on January 8, 2013, the Cayman Account in turn, wired $100,000 to Sodi's CFM entity in Florida.

43.    Once all these transfers had been completed, the Cayman Account was ahead $25,000; Accomplice A was out $5,000 (the difference between the $120,000 Front Company A had sent via the Escrow Agent and the $125,000 that Accomplice A's *alter ego* entity had, in turn, sent to the Cayman Account); and Sodi was out $20,000 (the difference between the $120,000 that he had used Front Company A to send to the Escrow Agent and the $100,000 that his CFM entity ultimately received at the back end), as illustrated by the following graphic:



44.     Accomplice A and Sodi apparently were willing to incur these costs in return for the enhanced obfuscation they believed these differences in amounts accomplished, by tending to obscure the links between and among these wires.

45.     A deliberate purpose, agreed upon by Sodi and Accomplice A, of the phony payment trail described and illustrated above was to further the materially misleading appearance that a third party – an entity called Core International Co. Ltd – had hired Sodi's Penny Stock Promotion Platform and was paying it money for the SUSA promotional campaign, when, in fact (as noted above) Sodi's Penny Stock Promotion Platform was being paid only in SUSA stock for that campaign and had been engaged by Accomplice A.

46.     To create this phony paper trail, both the third and the fourth wires referenced above (i.e. the wire from Accomplice A's *alter ego* entity to the Cayman Account and the Cayman Account's wire, in turn, to CFM) included the reference "Core International Co. Ltd" in the wire's message field.  The SUSA promotional materials later disseminated by Sodi's Penny Stock Promotion Platform falsely identified Core International Co. Ltd as, among other things, the paying party for the SUSA campaign.

### Sodi and Accomplice A Arrange Phony SUSA Client-Communication Trail

47.     The insertion of Core International Co. Ltd as the supposed client for whom Sodi's Penny Stock Promotion Platform was running the SUSA promotion resulted from Accomplice A's approaching a Canadian business acquaintance ("Accomplice B"), with Sodi's knowledge and agreement.  Accomplice B agreed to allow Core International Co. Ltd, one of his *alter ego* entities, to be characterized as Sodi's Penny Stock Promotion Platform's client and paying party for the SUSA touts.  In

return, Accomplice A assigned 625,000 shares of SUSA at a discounted price of $.04 per share to another *alter ego* entity of Accomplice B.

48.     Then, Sodi, who knew about the fictitious and materially misleading insertion of Core International Co. Ltd as his Penny Stock Promotion Platform's supposed client and paying party for the SUSA promotion, generated materially misleading correspondence between himself and a purported representative of Core International.  This correspondence, conducted via email between Sodi and a Hotmail address ostensibly belonging to the purported Core International representative, indicates, among other things, that Core International (i) had approved the SUSA promotional material and the postal-mailed SUSA promotion schedule in telephone conversations by December 26, 2012, (ii) formally signed off on the SUSA material on January 5, 2013, and (iii) confirmed, on January 8, 2013, that "the first $100,000" of the Sodi Penny Stock Promotion Platform-invoiced amount for the SUSA campaign had been wired that day to one of that Platform's entities, Defendant CFM.

### *Sodi Launches SUSA Promotional Campaign*

49.     The SUSA promotional campaign was launched on or about January 10, 2013, when Sodi caused his Penny Stock Promotion Platform to drop off over 1 million copies of a mailer consisting of an outer envelope, a double-sided cover letter, or "lift," and a 16-page color "magalog," all promoting SUSA, at a Chicago-area United States Postal Service ("USPS") bulk mail facility for distribution by mail throughout the United States.  Over subsequent days, significant additional "drops" of this mailer, as well as post-card mailers also touting SUSA, were made at the same facility.

50. The mailer claimed SUSA had made a "gargantuan" gold discovery in Alabama that offered investors "a chance at FAST 3,193% gains!" and urged each reader to buy "as many shares of SUSA as you can comfortably afford," and do so quickly.

51. The mailer included no disclosure whatsoever of Sodi or his Penny Stock Promotion Platform having been paid in SUSA stock, or of Sodi's plans to trade in the very opposite direction to that in which the mailer, on virtually every page, urged investors to trade. Instead, in its "important disclaimer on page 9," the magalog stated that SUSA:

> appears as paid advertising by Core International Co, LTD to provide public awareness for SUSA. Core International Co., LTD has received funds from shareholders of SUSA, who will sell their shares of SUSA at or about the time of this mailing. Core International Co. LTD has approved and signed off as "approved for public dissemination" all statements herein regarding SUSA's history, assets, technologies, current as well as prospective business operations and industry information. …. [T]he information contained in this advertisement is believed to be reliable …. LDS has managed a total production budget from Core International Co., LTD of $900,000 for this print advertising effort and will retain any amounts over and above the cost of production, copywriting services, mailing and other distribution expenses, as a fee for services.

52. As Sodi and his Penny Stock Promotion Platform well knew at the time, however:

a. Core International Co. LTD was not truly behind the SUSA mailer and did not commission, pay for, or approve its contents, but instead was inserted for the purpose of concealing the SUSA touting campaign's true orchestrators and giving investors false comfort that Core, rather than selling shareholders, was the party saying good things about SUSA;

17

b.       Sodi and his Penny Stock Promotion Platform *were paid in SUSA shares* for the SUSA mailer;

c.       Sodi was not a SUSA shareholder before being engaged by Accomplice A to run the SUSA promotional campaign, and became a SUSA shareholder only because he, through his Penny Stock Promotion Platform, was running that campaign;

d.       the only money "paid" to Sodi's Penny Stock Promotion Platform in connection with the SUSA promotional campaign consisted of funds Sodi himself supplied through Front Company A's account, and then laundered through others;

e.       the SUSA mailer was in fact commissioned by Accomplice A, who headed a group (including Sodi) that secretly controlled virtually all the free-trading shares of SUSA, so that anyone buying SUSA stock in response to the mailer would be buying from them;

f.       Accomplice A and Sodi approved the mailer's content;

g.       the purpose of the SUSA mailer was not to "provide public awareness for SUSA" but instead to generate increases to SUSA's share price and trading volume into which Sodi, Accomplice A, and other accomplices planned to unload their SUSA stock for illicit gains; and

h.       neither Sodi nor Accomplice A "believed to be reliable" the claims in the mailer, as reflected by their significant selling of their SUSA shares in the wake of its dissemination.

***Sodi Sells SUSA Stock After Disseminating the SUSA Promotion, Then Repatriates
His SUSA Trading Proceeds, Disguised as Payment for SUSA Tout***

53.     As the SUSA mailer described above was being disseminated across the country through the U.S. mail, the SUSA stock held for Sodi's benefit in Front Company A's name was being positioned for immediate sale.  The process to so position Front Company A's SUSA shares had begun (as noted in paragraph 41 above) on December 18, 2012, when Front Company A submitted its note-conversion notice to the Escrow Agent.  That process included a January 3, 2013 attorney opinion letter (expressly relying exclusively on the note assignment documents) that Front Company A's SUSA shares could be issued without restrictive legend.

54.     Shares issued without restrictive legend are immediately and freely tradeable.  But shares obtained from an affiliate of the issuer, as Front Company A's SUSA shares were obtained, by law must be held for a period of at least six months, and must be stamped with a "restricted" legend.

55.     By January 15, 2013, SUSA's Transfer Agent had electronically transferred all 1.5 million of those shares, without restrictive legend, to Front Company A's account.  Front Company A began selling SUSA stock the very next day, January 16, 2013.

56.     Prior to launch of the SUSA promotional campaign, Sodi and Accomplice A had also agreed to coordinate the selling of their SUSA shares by, among other things, effecting that selling primarily through a single stockbroker ("the Broker Accomplice"), and pursuant to daily instructions from Accomplice A.

57.     Individuals who agree to act as a group for purposes of disposing of a stock, and whose combined ownership of that stock exceeds 5% of its outstanding shares,

are by law required to file a Schedule 13D with the Commission, reporting both their agreement and their combined ownership. Such persons are further required by law to subsequently file an amended Schedule 13D with the Commission whenever their combined ownership materially changes.

58.     Despite the fact that Sodi's and Accomplice A's then combined holdings of SUSA stock well exceeded 5% of SUSA's outstanding stock, at no time did Sodi file a Schedule 13D with the Commission disclosing either his agreement with Accomplice A or their combined holdings in SUSA, or any material changes to those holdings.

59.     Just as Sodi and Accomplice A had hoped, the delivery of the SUSA mailer to citizens across the United States was followed by increases in SUSA's share price and trading volume. SUSA's daily trading volume (which had been zero for over a month prior to launch of the promotional campaign) climbed as high as 485,149 shares during the campaign, while SUSA's daily closing share price (which began at the radically and fraudulently elevated level of $1.15 when the first batch of SUSA mailers were dropped off at the Post Office on January 10, 2013) climbed as high as $1.66 (reaching even higher intra-day highs), as shown here:



60.     Between January 16 and January 28, 2013, the Front Company A account took advantage of these SUSA price and volume rises, by selling, through the Broker Accomplice, a total of 239,600 SUSA shares into those rises, for illicit proceeds totaling $339,319.76.

61.     On February 25, 2013, less than a month after it realized the SUSA sales proceeds described above, the Front Company A account wired $525,000 to the Cayman Account, along with the reference, "Core International Co Ltd."

62.     On February 27, 2013, just two days later, the Cayman Account, in turn, wired $516,000 to Defendant LDS – one of the entities comprising the Sodi Penny Stock Promotion Platform – which booked the payment as "project income" for the SUSA campaign. Thus, on February 27, 2013, Sodi realized his trading proceeds from the SUSA scalping fraud.

### *The SUSA Fraud's Victims Include Residents of This District*

63.     During the SUSA promotional campaign, at least twenty-six (26) investors residing within the Northern District of Alabama purchased at total of at least 25,076 shares of SUSA stock, and sustained combined losses totaling at least $36,801.29.

### *The Commission Suspends Trading in SUSA*

64.     On March 1, 2013, while the promotional campaign was still underway, and before more SUSA shares were sold for Sodi through the Front Company A account, the Commission issued an order suspending trading in SUSA's stock.  Thus, at the time of the suspension, the Front Company A account had sold for Sodi's benefit only the 239,600 SUSA shares described in paragraph 60 above.

65.     On April 25, 2013, approximately seven weeks after the trading suspension, and as Front Company A's account was being closed, Swiss Bank A transferred 1,264,400 shares of SUSA to Front Company B.  That number of SUSA shares – 1,264,400 – precisely equals the difference between the 1.5 million shares originally transmitted to Front Company A and the 239,600 SUSA shares that were sold through Front Company A's account prior to the suspension.

### THE GOFF SCHEME

### *Sodi and His Platform Handle Entire Postal Portion, and Significant E-mail Portion, of GOFF Promotion*

66.     By February 26, 2013, Sodi and his Penny Stock Promotion Platform had begun work on what would become a postal- and e-mailed campaign promoting GOFF.  On that date, Sodi Subordinate B emailed Sodi an early draft of the GOFF tout.  A written contract between Sodi's CFM entity and the purported client commissioning the GOFF tout, Pisces Enterprises Inc., is dated March 15, 2013.

67.     By March 18, 2013, through Defendant CFM (one of the entities comprising Sodi's Penny Stock Promotion Platform), Sodi had caused to be printed the final version of the GOFF postal-mailed tout.  By that date, Sodi knew through, among other things, email communication from his Penny Stock Promotion Platform's bookkeeper, that this GOFF mailer would be placed in the U.S. mail the next day.

68.     On March 19, March 21 and March 23, 2013, in three "drops" of approximately 400,000 pieces each, of which Sodi was aware both in advance and contemporaneously, these GOFF mailers were delivered to a USPS bulk-mail facility for dissemination across the United States by mail.

69.     Between March 25 and 28, 2013, pursuant to arrangements Sodi made through defendant CFM, over 1 million blast emails promoting GOFF – incorporating the same tout as included in the mailer – were disseminated through at least thirteen different online newsletters.

70.     On April 3, 2013, a second batch of Sodi Penny Stock Promotion Platform-prepared GOFF mailers, this one consisting of 800,112 pieces, was also mailed out, again with Sodi's advance as well as contemporaneous knowledge.

### On the Eve of GOFF Tout's Launch, Sodi Buys GOFF Stock Through Front Company A

71.     On March 18, 2013 – the day before the first "drop" of the GOFF mailer at the Post Office – Sodi used the Front Company A account in Switzerland to buy 500,000 GOFF shares on the open market, at a price of $.24 per share.  By so doing, Sodi placed himself in a position to reap profits from selling significant quantities of GOFF stock into any price and volume rises triggered by the very Sodi Penny Stock Promotion Platform-prepared GOFF mailer that Sodi knew would soon be reaching potential investors.

### *The GOFF Campaign Triggers Significant GOFF Price and Volume Rises*

72.     The GOFF promotional campaign included not only the postal-and e-mailed portion that Sodi's Penny Stock Promotion provided, but also (as Sodi knew contemporaneously) massively disseminated promotional emails from two groups of affiliated websites comprising the "AwesomePennyStocks" ("APS") and "Victory Mark" ("VM") platforms.  That combined GOFF campaign triggered dramatic increases in GOFF's trading volume and share price.  During that combined campaign, GOFF's share price, which had been just $.13 prior to the APS/VM portion of the campaign's launch, climbed to a closing-price high of $.5852 on April 5, 2013, reaching even higher intra-day prices; and its daily trading volume throughout the campaign averaged more than 25 million shares, as illustrated by the following graphic:



73.     Through the Front Company A account, Sodi took full advantage of these price and volume rises, proceeding over the next two weeks to sell all the GOFF shares

he had just purchased on March 18 through that account. By April 1, 2013, all 500,000 of those GOFF shares in the Front Company A account had been sold for Sodi's benefit, at an average price of over $.48 per share, for net proceeds totaling $116,300.

74.     Then, on April 4, 2013 – the day after the massive second batch of GOFF mailers referenced in paragraph 70 above was dropped off at the postal facility – Sodi again used Front Company A to buy more GOFF shares, purchasing another 100,000 shares at $.52 per share. On April 5, 2013, the very next trading day, and as the mailers' delivery was contributing to further rises in GOFF's price and volume, Sodi used Front Company A to sell all 100,000 shares at a profit of $.07 per share, or 13.46%, for additional illicit GOFF sales proceeds of $7,000. The illicit GOFF sales proceeds realized in the Front Company A account thus totaled at least $123,300.

### Sodi's GOFF Tout Was False and Materially Misleading

75.     Like the SUSA mailer before it, the GOFF postal- and e-mailed touts disseminated from Sodi's Platform included no disclosure as required by law that Sodi held or planned to sell GOFF stock. Instead, all that they stated as to Sodi's or CFM's compensation was that "CFM has received and managed a total production budget of $1,500,000 [which was increased to $2,200,000 in later versions of the tout] for this … advertising effort and will retain any amounts over and above the cost of production, copywriting services, mailing and other distribution expenses, as a fee for its services." Contrary to this claim, Sodi's and CFM's financial incentives in the GOFF campaign were not limited to the difference between the campaign's cost and the "total production budget" because Sodi had positioned himself to profit from selling GOFF stock.

76.     These GOFF touts also urged, on every page, that investors buy GOFF stock, and do so quickly, in order to reap substantial gains.  (*E.g.,* "QUADRUPLE-digit profits could be yours for the taking!" (emphasis in original); "investors who get in NOW could <u>profit big</u>!" (emphasis in original); and "Don't Be a Sideline Sitter – GOFF Could Be Securing <u>HUGE Profits For Early Investors Like YOU</u>!" (emphasis in original).)  And the GOFF touts' disclaimer similarly included assertions that its purpose was "to provide public awareness of GOFF" and that information contained in the mailer "is believed to be reliable."

77.     Contrary to these claims, Sodi's purpose was instead to reap profits from selling GOFF into the price and volume rises triggered by these touts, and Sodi obviously did not believe the information in the mailer to be reliable, as evidenced by his immediate sale of every last share of GOFF stock held for his benefit by Front Company A.

### Sodi's Penny Stock Promotion Platform Reaped Further Profit from GOFF Touting

78.     As reflected in its own accounting records, Sodi's Penny Stock Promotion Platform realized net income from the GOFF promotional campaign totaling $686,033.79.  In particular, these accounting records reflect that Defendant CFM – the entity within the Sodi Penny Stock Promotion Platform to which its GOFF promotional campaign expenses and income were booked – received $2.14 million in income and incurred $1,453,926.21 in postage, printing and other expenses for the GOFF campaign. Because that campaign, as detailed above, was an integral component of the GOFF fraud scheme, all $686,033.79 of the aforementioned net income constituted ill-gotten gains from that GOFF scalping fraud.

***The GOFF Fraud's Victims Include Residents of This District***

79.     During the GOFF promotional campaign, at least one hundred and seventy-two (172) investors residing within the Northern District of Alabama purchased at total of at least 244,328 shares of GOFF stock, and sustained combined losses totaling at least $56,558.92.

## SODI CONTINUED TO RECEIVE FRONT COMPANY A FUNDS AFTER GOFF CAMPAIGN

80.     On April 16, 2013, eleven days after Front Company A had sold the last of its GOFF shares, Swiss Administrative Firm A faxed instructions to Swiss Bank A to close Front Company A's account once its balance had been brought to zero.  Outgoing funds transfers from Front Company A's account during April 2013 included two transfers of $1 million each to Front Company B – the first (on April 5th) to its account in Singapore, and the second, five days later, to its account in Dubai, United Arab Emirates. On May 6, 2013, the Dubai account, in turn, transferred the $1 million it had received from Front Company A to the same Front Company B Singapore account.  Thus, by May 6, 2013, all $2 million of the Front Company A-Front Company B wires had been consolidated into Front Company B's Singapore account.

81.     Over the ensuing two years, Sodi and his Penny Stock Promotion Platform continued to receive directly or indirectly from Front Company B the majority, if not all, of the aforementioned Front Company A-originating funds; for example:

        a.      *First*, on September 3, 2013, Front Company B wired $500,000 directly to a Sodi Platform entity, Defendant LDS.

        b.      *Second*, on March 18, 2014, Front Company B wired $500,000 to a Hong Kong bank account ("Hong Kong Account A"), with the reference,

"subscription into [another account at the same Hong Kong bank] ("Hong Kong Account B"). This transfer was shortly followed, on April 1 and 2, 2014, by two outgoing transfers likewise totaling $500,000, from Hong Kong Account B to Sodi's CFM entity.

        c.    *Third*, on February 17, 2015, Front Company B wired $25,000 to a Swiss bank to refill a particular VISA debit card issued by that same bank (hereinafter the "Swiss Visa Card"). That Swiss Visa Card was then used to make dozens of cash withdrawals which, on information and belief, were made by Sodi. These include (i) thirteen separate cash withdrawals between October 2 and November 25, 2015, totaling $8,900, all at ATM locations either in Delray Beach, Florida, where Sodi then lived and worked, or in nearby Boca Raton, Florida, where Sodi now resides; and (ii) a cash withdrawal at an ATM in Bali, Indonesia on October 21, 2015, the very day Sodi had arrived there by plane.

82.    At least $123,300 of the aforementioned Front Company A-originating funds that were circuitously routed to Sodi between September 2013 and October 2015, as described in paragraph 81 above, constituted ill-gotten gains from the Sodi sales of GOFF stock through the Front Company A account, alleged at paragraphs 73-74 above.

### IT IS LIKELY THAT SODI HAS ENGAGED IN ADDITIONAL SCALPING FRAUD WITHIN THE LAST FIVE YEARS

#### *Sodi for Years Had Access to Administrative Firm A's Network of Offshore Accounts*

83.    Sodi made regular use of Swiss Administrative Firm A – administered accounts from as far back as 2005 and continuing through at least 2015, as demonstrated by, among other things:

     a.     both Front Company A and Front Company B being Swiss Administrative Firm A-administered accounts;

     b.     a third, older account ("Front Company C"), which was active from at least early 2005 through early 2010, and which was also Swiss Administrative Firm A-administered – having been used repeatedly to make payments for Sodi's benefit to many of the same persons and entities to which Front Company A likewise made payments, including parties who designed, built and landscaped Sodi's vacation home on Nicaragua's Pacific Coast, "Casa Sodi";

     c.     Swiss Administrative Firm A itself having sent at least one wire, on September 8, 2010, to Sodi's very same "player account" at the very same Casino to which Front Company A also wired funds (as alleged in paragraph 28 above);

     d.     other Swiss Administrative Firm A-administered accounts, including "omnibus" accounts, transferring funds to, and/or receiving funds from, the Front Company A account; and

     e.     other Swiss Administrative Firm A-administered accounts wiring funds to reload the very same Swiss Visa Card that Front Company B, as alleged in paragraph 81.c above, wired funds to reload.

### *Sodi's Pattern of Scalpings Dates Prior to 2013*

84.     Sodi used the Front Company A account to perpetrate additional scalping frauds with respect to penny stocks that his Penny Stock Promotion Platform promoted, including at least two such stocks in 2012: Potash America Inc. (PTAM) and Great Wall Builders Ltd (GWBU).  In both cases, Sodi used Front Company A to sell these stocks

into the price and volume rises triggered by his Platform's touting, without disclosing in those touts any details whatever of his selling or his plans to sell. Also in both cases, residents of the Northern District of Alabama were among the harmed investors.

85. In the case of PTAM, Sodi used Front Company A to sell at least 115,000 PTAM shares between May 2 and May 14, 2012 – with all these sales taking place during the postal-mailed, e-mailed and "click advertising" PTAM touting campaign disseminated by Sodi's Penny Stock Promotion Platform – for illicit proceeds totaling at least $87,600.

86. In the case of GWBU, Sodi first used Front Company A to buy 165,000 shares of GWBU on the open market between May 9 and May 12, 2012. At the time of these purchases, Sodi knew that the massive GWBU promotional campaign his Penny Stock Promotion Platform had prepared was about to launch, and that it would also coincide and be coordinated with a massive APS campaign likewise promoting GWBU. Then, on May 15, and 16, 2012, in the very midst of that consolidated GWBU touting campaign, Sodi used Front Company A to sell all 165,000 of those GWBU shares, for illicit proceeds totaling at least $119,700.

87. The following month, on June 22, 2012, Front Company A wired $300,000 to one of the entities comprising Sodi's Penny Stock Promotion Platform, Defendant CFM. This wire potentially constituted, in whole or in part, repatriation of the PTAM and GWBU trading proceeds realized for Sodi's benefit in April and May 2012 through the Front Company A account.

### *Sodi Appears to Have Engaged in Other Scalpings Since 2013*

88.     In addition to the Front Company A and Front Company B-linked funds that were routed circuitously to Sodi's CFM entity in April 2014 via Hong Kong Account A, as alleged in paragraph 81.b above, other funds followed a similar path.  These include six transfers totaling $950,000 between June 18 and September 22, 2014 from Hong Kong Account A to Sodi's LDS entity.

89.     Sodi's Penny Stock Promotion Platform booked all $950,000 of the aforementioned wires from Hong Kong Account A as income relating to the Sodi Platform's promotion of a marijuana stock called Graham & Hill Industries (GHIL). Every penny of this $950,000 however, was first sent to Hong Kong Account A by the very same account – which happened to be at a Cayman Islands bank – that was selling GHIL stock into the price and volume rises generated by that touting campaign. Moreover, every penny of this $950,000 was funded by sales of GHIL stock.

90.     In addition to the $500,000 in Front Company A/Front Company B originating wires that Sodi's Penny Stock Promotion Platform received from Hong Kong Accounts A and B in April 2014 (as alleged in paragraph 81.b above) and the $950,000 in GHIL sales-proceeds-originating wires that Sodi's Platform received from Hong Kong Account A from June through September 2014 (as alleged in paragraphs 88-89 above), Sodi's entities received still another $2.5 million in wires from Hong Kong Accounts A and B between May 2014 and May 2015.

### *Sodi's Platform Was a Major Disseminator of Penny Stock Touts for Years*

91.     From 1998 through at least 2015, Sodi's Penny Stock Promotion Platform was a significant disseminator of penny stock promotional materials, handling, at its peak, as many as two dozen or more such campaigns annually.

### *Sodi and His Platform Likely Received Other Potential Scalping Fraud Proceeds*

92.     In light of the extent and duration of Sodi's Penny Stock Promotion Platform's participation in the penny stock space, as well as Sodi's demonstrated willingness to "scalp" investors in stocks his publishing houses promoted, as well as Sodi's frequent use of Swiss Administrative Firm A – administered offshore accounts in multiple bank-secrecy jurisdictions, as well as, finally, Sodi's receipt of circuitously routed wires from Hong Kong Accounts A and B through as least 2015, it is likely that Sodi has received additional scalping proceeds since February 2013 over and above the SUSA and GOFF scalping fraud proceeds he reaped through Front Company A, as alleged above.

### SODI LIES TO THE SEC STAFF

93.     During the staff's investigation leading to the filing of this action, Sodi appeared for testimony.  During that testimony, Sodi made false statements, including claims that he (i) never had, and never was given the use of, any foreign accounts; (ii) never received or shared, directly or indirectly, in any proceeds of any sales of any of the stocks his publishing houses promoted; and (iii) had never – apart from a single instance over twelve years ago – been paid in stock for running a promotional campaign.

# CLAIMS FOR RELIEF

## FIRST CLAIM
## [Securities Fraud]

### Violations of Securities Act Section 17(a)
### [Against All Defendants]

94.     Paragraphs 1 through 93 are realleged and incorporated herein by reference.

95.     As described above, Defendants Sodi, CFM, and LDS, acting knowingly, recklessly or negligently, in the offer or sale of SUSA and GOFF securities, by use of the means or instruments of transportation or communication in interstate commerce or of the mails, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers of SUSA and GOFF securities.

96.     By engaging in the foregoing conduct, Defendants Sodi, CFM, and LDS violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM
## [Securities Fraud]

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### [Against All Defendants]

97.     Paragraphs 1 through 93 are realleged and incorporated herein by reference.

98.     As described above, Defendants Sodi, CFM, and LDS, acting knowingly or recklessly, directly or indirectly, in connection with the purchase or sale of SUSA and GOFF securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

99.     By engaging in the foregoing conduct, Defendants Sodi, CFM, and LDS violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM**
**[Unregistered Offering of Securities]**

**Violations of Securities Act Sections 5(a) and 5(c)**
**[Against Defendant Sodi]**

100.     Paragraphs 1 through 93 are realleged and incorporated herein by reference.

101.     At all relevant times, the SUSA shares referenced in paragraphs 55 and 60-62 above as having been offered and sold by Sodi through Front Company A were not registered in accordance with the provisions of the Securities Act and no exemption from such registration was applicable.

102.     Defendant Sodi's offers and sales of SUSA shares were made in the United States in that: (a) sales were executed by broker-dealers firms in the United States;

(b) irrevocable liability with respect to sales was incurred in the United States; and (c) title with respect to the sales passed in the United States.

103.     By reason of the foregoing, Sodi, directly or indirectly, made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was available.

104.     By reason of the foregoing, Sodi has violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

**FOURTH CLAIM**
**[Touting Disclosure]**

**Violations of Securities Act Section 17(b)**
**[Against Defendants Sodi, CFM and LDS]**

105.     Paragraphs 1 through 93 are realleged and incorporated herein by reference.

106.     Defendants Sodi, CFM and LDS, by engaging in the conduct described above, published, gave publicity to, or circulated a notice, circular, advertisement, newspaper article, letter, investment service, or communication describing a security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter or dealer without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

107.     By engaging in the conduct described above, Sodi, CFM and LDS violated and, unless restrained and enjoined will continue to violate, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## FIFTH CLAIM
### [Beneficial Ownership Reporting]

### Violations of Exchange Act Section 13(d) and Rule 13d-1 Thereunder
### [Against Defendant Sodi]

108.    Paragraphs 1 through 93 are realleged and incorporated herein by reference.

109.    Pursuant to Exchange Act Section 13(d) and Rule 13d-l thereunder, persons who are directly or indirectly the beneficial owners of more than 5% of the outstanding shares of a class of voting equity securities registered under the Exchange Act are required to file a Schedule 13D within ten days of the date on which their ownership exceeds five percent, and to notify the issuer and the Commission of any material increases or decreases in their percentage of beneficial ownership by filing an amended Schedule 13D.  The Schedule 13D filing requirement applies both to individuals and to two or more persons who act as a group for the purpose of acquiring, holding, or disposing of securities of an issuer.

110.    By December 18, 2012, and continuing at all relevant times thereafter, Defendant Sodi's and Accomplice A's combined ownership of SUSA's shares exceeded 5% of SUSA's outstanding shares.

111.    By no later than January 10, 2013, Defendant Sodi and Accomplice A had agreed to act as a group in furtherance of disposing of their SUSA securities.  Sodi thus had an obligation to file a Schedule 13D disclosing the agreement and his and Accomplice A's combined SUSA holdings, and had the further obligation to file an amended Schedule 13D whenever their holdings materially changed.  No such 13D was ever filed.

112.     By reason of the foregoing, Defendant Sodi violated, and unless restrained and enjoined will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-l thereunder [17 C.F.R. § 240.13d-1].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment that:

(i)     permanently enjoins Defendants Sodi, CFM, and LDS, through hybrid antifraud injunctions consistent with *SEC v. Goble*, 682 F.3d 934 (11th Cir. 2012), from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5] by, directly or indirectly, recommending the purchase of any U.S. publicly traded or quoted stock without simultaneously disclosing the full details of (1) any plans or intentions to sell such stock within 30 days of such recommendation and (2) any compensation in shares of the stock being recommended;

(ii)     permanently enjoins Defendants Sodi, CFM, and LDS, and any entity that each controls or with which each is affiliated, including but not limited to CFM and LDS, from directly or indirectly engaging in any activity for the purpose of inducing or attempting to induce the purchase or sale of any security; causing any person or entity to engage in any activity for the purpose of inducing or attempting to induce the purchase or sale of any security; or deriving compensation from any activity engaged in for the purpose of inducing or attempting to induce the purchase or sale of any security; unless that security is: (1) listed on a national securities exchange; and (2) has had a market capitalization of at least $50,000,000 for 90 consecutive days;

(iii)     permanently enjoins Defendants Sodi, CFM and LDS from violating Securities Act Section 17(b) [15 U.S.C. § 77q(b)];

(iv)     permanently enjoins Defendant Sodi from violating Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a) and (c)];

(v)     permanently enjoins Defendant Sodi from violating Exchange Act Section 13(d) and Rule 13d-1 thereunder [15 U.S.C. § 78m(d) and 17 C.F.R. § 240.13d-1];

(vi)     permanently bars Defendants Sodi, CFM, and LDS from participating in an offering of penny stock;

(vii)     orders Defendants Sodi, CFM, and LDS to pay civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] for all violative conduct occurring within five years of the filing of this Complaint;

(viii)     orders Defendants Sodi, CFM, and LDS, jointly and severally, to disgorge, with prejudgment interest, any and all ill-gotten gains each received as a result of the conduct described herein within five years of the filing of this Complaint;

(ix)     orders Defendants Sodi, CFM, and LDS to prepare an accounting of (i) all their trading, singly or in concert, directly or indirectly, domestically or abroad, in any stock any or all of them promoted within five years of the filing of this Complaint, as well as of (ii) all profits each realized, singly or in concert, directly or indirectly, domestically or abroad, from promoting any stock that any or all of them also sold during the dissemination of such promotion; and

(x)     grants such other relief as the Court deems just or appropriate.

## REQUEST FOR TRIAL BY JURY

The Commission requests a jury trial on all issues so triable.

February 26, 2018                              Respectfully submitted,

                                              /S/ Charles D. Stodghill
                                              Charles D. Stodghill (DC Bar No. 256792)
                                              J. Lee Buck II (DC Bar No. 421878)
                                              Benjamin D. Brutlag (NY Bar No. 4596698)
                                              Edward B. Gerard (CA Bar No. 248053)
                                              Sarah R. Lamoree (CA Bar No. 249681)
                                              John P. Lucas (GA Bar No. 109208)
                                              Attorneys for Plaintiff
                                              United States Securities and Exchange
                                              Commission
                                              100 F Street, N.E., Mail Stop 5985
                                              Washington, D.C. 20549
                                              (202) 551-4413 (Stodghill direct dial)
                                              (202) 772-9246 (Stodghill facsimile)
                                              Email: stodghillc@sec.gov
                                              Appearing pursuant to Local Rule 83.1(c)