

**RF**
ROCHE
FREEDMAN

June 20, 2022

<u>**By ECF**</u>
The Honorable P. Kevin Castel
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Courtroom 11D
New York, NY 10007

Counsel for both sides should re-read the second sentence of p 5 of 6 of the SEC's letter of June 15, 2022. (Doc 53 at 5). If each side is acting in good faith they ought to be able to come to an interim position without prejudice to any ultimate position in the case.  TALK AGAIN!
SO ORDERED.
Dated:  6/28/2022

P. Kevin Castel
United States District Judge

Re: *SEC v. Gallagher*, No. 1:21-cv-08739-PKC
<u>Pre-Motion Reply Letter In Further Support of Permission to File a Motion to Lift</u>
<u>Stipulated Preliminary Injunction</u>

Dear Judge Castel:

On behalf of Defendant Steven M. Gallagher, we respectfully submit this pre-motion letter in reply to the SEC's response letter dated June 15, 2022 concerning Mr. Gallagher's request to move to lift and/or modify the PI Order in this case freezing Mr. Gallagher's assets.[1] This reply is necessary in part because, in responding to its earlier deficiencies, the SEC is including new details and allegations for the first time about certain stocks and statements.  For the reasons set forth below, this Court should see the SEC's asset freeze for what it is, a brazen attempt to prevent Mr. Gallagher from fighting the SEC's case.

**Even at the Asset Freeze Stage, the SEC Must Provide Some Basis for a Reasonable Approximation of Profits**

In a statement that is both stunning and without support, the SEC's position here appears to be that "the SEC need not establish a reasonable likelihood as to the amount of *any* ultimate disgorgement or penalty to obtain an asset freeze." Dkt. No. 53, "June 14 Letter," at 5 (quoting *SEC v. Liu,* 851 Fed. App'x 665, 668 (9th Cir. March 12, 2021)). Under the SEC's "logic," the SEC should be permitted to freeze an unlimited amount of a person's legitimately earned funds simply by putting forth "*some basis* for inferring a violation of the federal securities laws." *Id*. at 5 (emphasis added). The Court should reject this un-American-to-its-core suggestion, particularly in a case like this where the SEC has frozen the entirety of the Gallaghers' assets based on an ever-changing theory of disgorgement for which the SEC has *still* failed to provide evidence of nearly nine months into the asset freeze.

Of course, the SEC's contention that the agency is entitled to a permanent, unlimited asset freeze based merely on conclusory allegations of "scalping" repeated *ad nauseum* has nothing to do with a freeze's purpose: preserving the status quo.  In order to obtain disgorgement if successful, the SEC would have to provide a reasonable approximation of profits causally connected to the actual misconduct. *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013); *see also*

---

[1] This letter is not intended to address all of the issues raised by the SEC in its lengthy letter. Mr. Gallagher respectfully requests a pre-motion conference at this Court's earliest convenience.

*SEC v. Arias*, No. 12CV2937MKBSIL, 2021 WL 7908041, at *5 (E.D.N.Y. Nov. 11, 2021) (disgorgement "must distinguish between the legally and illegally derived profits"). Permitting the SEC to freeze all assets on conclusory and reed-thin allegations, especially with regards to causation (as described below), and with no attempt to provide a reasonable approximation of net profits even months into the case, is not necessary to preserve the status quo.

The SEC's Kafkaesque position, whereby the agency can (i) freeze all of a defendant's assets based on its belief that a defendant has committed *some* violation of the securities laws, (ii) prevent a defendant from then using his legitimately obtained resources to fight the case, and (iii) leave a defendant no choice but to settle a case on onerous terms because the SEC has already eliminated a defendant's ability to fight the case, must be rejected by this Court. In effect, the SEC is using the freeze to win its case without ever having done the work to justify the scope of the freeze to begin with. Moreover, the SEC provides no justification for why freezing a person's entire assets without an accurate net profit calculation months into the case is even necessary to preserve the status quo.

The SEC's reliance on the unsigned, unpublished, out-of-circuit summary order in *Liu* does not help explain why the SEC believes it is entitled to freeze an arbitrary and overwhelming amount of money on its say so. *First*, the case sheds no light on Mr. Gallagher's specific arguments on causation and losses here. And the SEC fails to explain how avoiding *any* calculation work at the asset freeze stage (as it would have to do if it were successful) supports the purpose of preserving assets for a potential judgment based on a proven theory of disgorgement. (June 14 Letter at 5). The case law relied on in the summary *Liu* opinion does not address these points either. *Second*, the summary opinion also appears to suggest that courts can only issue preliminary injunctions for the purpose of preserving the possibility of equitable remedies, and not for civil punishments. *Liu*, 851 Fed. App'x at 668. *Third*, *Liu* also ruled that "[a]n overbroad injunction," like the one here, "is an abuse of discretion." The court determined that the injunction there was not overbroad because Liu had a history of expatriating assets and refused to provide financial information justifying a narrower freeze. *Id*. at 669. Here, Mr. Gallagher has no history of expatriating assets and he has provided the SEC with a sworn statement detailing every asset he has.

More fundamentally, the summary *Liu* holding is far afield from the very limited freeze permitted in *SEC v. Unifund SAL*, the seminal case in the Second Circuit addressing when asset freezes are necessary to preserve the status quo. 910 F.2d 1028, 1042 (2d Cir. 1990) ("[W]e do not believe that the Commission is entitled to keep even the modified order in force for whatever period of time the Commission may take to prepare for trial"). To be sure, the Second Circuit has not yet detailed, either pre- or post-*Liu*, what "reasonable approximation" of net profits the SEC has to show to sustain an asset freeze, and how that burden compares to the SEC's burdens at the conclusion of a case. *But*, at least here, where the DOJ has determined that the correct amount of forfeiture is less than $22,000, the SEC should be required to present significant evidence justifying a freeze that is approximately 300 times the amount sought by experienced federal prosecutors. The SEC has not.

**The SEC Has Presented No Evidence Justifying "Ill-Gotten Gains" of $2,805,600**

The idea that the SEC is entitled to an unlimited asset freeze here on its say so is particularly inappropriate given that nearly nine months into this case the SEC has put in virtually no work to accurately calculate the potential disgorgement in this case in accordance with the law.

The SEC has instead relied on ever-changing theories of "ill-gotten" gains:[2]

*First*, in its initial motion to freeze Mr. Gallagher's assets, the SEC submitted two sworn declarations averring that "Gallagher obtained over $3.39 million in profits from his illegal scalping and manipulative trading activity." This Court relied on the SEC attorneys' averments because the SEC provided virtually no supporting documentation.

*Second*, in its Amended Complaint, the SEC abandoned its previous disgorgement calculation and conceded that it had no disgorgement calculation. Instead, the new profit calculation of $2.805 million reflected not *scalping* profit, but the "net trading profits from when he first started buying a stock to when he last sold it." Dkt No. 38, "Amended Complaint," ¶ 10 n.1.

*Third*, now realizing its significant and fatal error, the SEC, with no new declarations, exhibits or evidence, claims that actually, on second-thought, the $2.805 million figure *does* reflect "*potential* ill-gotten gains" because it includes "the profits he made from the time he first purchased a stock that he scalped until shortly after his last scalping trade." June 14 Letter at 6.

Yet the relevant standard here is not "potential" profits, but rather a "reasonable approximation" of "net profits" from fraud. And he SEC admittedly does not meet that standard. Even before getting to disgorgement calculations, the SEC provides no evidence buttressing its conclusory statement that Mr. Gallagher actually "scalped" all those 60 stocks, and instead relies on circular logic, claiming that it has "met its burden for imposition of an asset freeze" because there is "overwhelming evidence that Gallagher engaged in hundreds of instances of illegal scalping." June 14 Letter at 1.[3] In fact, especially in light of its characterization of the conduct

---

[2] To be clear, Mr. Gallagher's June 8 Letter did not "suggest[] or impl[y] that the SEC "intentionally misled the Court" about Mr. Gallagher's profits. June 14 Letter at 14 n.8. Rather, the contention is that the SEC intentionally sought to freeze an overwhelming amount of assets in order to force Mr. Gallagher to settle, was reckless in equating ill-gotten gains with trading profits, corrected its error when amending the complaint, and still has no accurate disgorgement calculation eight months after the asset freeze was put into place, despite having access to Mr. Gallagher's Tweets, trading records, and stock and volume charts, which is all the "discovery" the SEC needs.

[3] While the SEC complains about the amount of work needed to document actual scalping trades for 60 stocks, let us not forget that it is the SEC that chose to allege scalping for 60 stocks. The SEC, of course, could have been a bit more selective and picked a reasonable number of tickers. Having hoisted itself on its own petard, the SEC's feet must be held to the fire given the

regarding ALPP and BNGO in its June 14 Letter, it is clear that the SEC is strategically redefining what constitutes "scalping" is as well as what constitutes profits derived from scalping.

To justify its determination that Mr. Gallagher engaged in "scalping," the SEC defines scalping as occurring when a defendant: "1) acquir[es] shares of a stock; 2) recommend[s] that others purchase the stock without disclosing his intention to sell his shares; and 3) subsequently sell[s] his shares for his own benefit." June 14 Letter at 1 n.2 (citing no caselaw); *see also* Amended Complaint ¶ 8 (same); Dkt. 7 at 8.

As an initial matter, the SEC cannot even meet this definition because Mr. Gallagher disclosed his intent to sell. Mr. Gallagher repeatedly and unequivocally told his followers over and over again that: (i) his trading strategy was to "take profits," meaning sell shares, and buy the dips and sell the rips (buy low and sell when the price increased); and, (ii) he would not tell his Twitter followers when he himself was selling his own shares as he was worried that such disclosures would hurt the stock price. *See, e.g.,* Ex. A. Put simply, no reasonable investor would have expected Mr. Gallagher to disclose his specific stock sales because he had in fact explicitly told them that he would *not* disclose his sales.

But even more importantly, this is not the definition of scalping. This is a different, novel definition of scalping designed to lessen the SEC's own burden of proof. Until recently, the SEC pleadings defined scalping differently. Previously, the SEC repeatedly stated that scalping occurred when a defendant "(i) acquires shares of a stock for his own benefit prior to recommending or touting that stock to others, (ii) *does not disclose in the tout the full details of his ownership of the shares* and his plans to sell them, and (iii) proceeds to sell his shares following the tout's dissemination, and *into the share price and trading volume increases triggered by his touting*." *See, e.g., SEC v. Sodi*, 18-CV-00313-HNJ Dkt. 1 ¶ 1 (N.D. Al. Feb. 26, 2018) (attached as Ex. B); *SEC v. Babikian*, 14-CV-01740-PAC Dkt. 1 ¶ 1 (S.D.N.Y. Mar. 13, 2014) (attached as Ex. C); *SEC v. GPL Ventures LLC*, 2022 WL 158885, *2 (S.D.N.Y. Jan. 18, 2022) (citing the complaint and providing the definition of scalping included in *Babikian* and *Sodi*). There are two major differences between the old and new definitions of scalping. And these changing goalposts fatally undermine the SEC's repeated *ipse dixit* that Mr. Gallagher engaged in scalping.

*First*, the SEC now strategically employs a novel scalping definition that eliminates the requirement that a defendant "not disclose in the tout the full details of his ownership of the shares," a concept embedded in "scalping" law since at least 1963. *Cf. Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979) (defendant liable under 10b-5 for "scalping" when he failed to disclose "that he had invested in ASI stock at a discount price two days before his column was to be published to sell it on the short-swing rise in price …"); *see also SEC v. Capital Gains Research Bureau*, 375 U.S. 180 (1963) (defendant engaged in scalping where he bought stock, recommended stock to clients, and then sold thereafter when price rose and did not disclose "any aspect" of the transactions to their clients); *SEC v. Park*, 99 F.Supp.2d 899 (2000) (defendant's

---

enormity of the impact that the freeze has had on the Gallagher family, as detailed in Defendant's June 8 Letter. *See* Dkt. No. 51.

scalping consisted of him purchasing stocks, pumping those stocks, and then selling his shares profitably, and he "never revealed any of his true interests in the stocks he was recommending to his members to buy and sell."). The SEC is surreptitiously reading this requirement out of the definition of scalping because Mr. Gallagher, for one, always disclosed his ownership interest in the stocks that he was touting. In fact, Mr. Gallagher frequently provided screenshots of his exact stock holdings. Ex. D. This is important because these disclosures of stock ownership told his followers that he was not a disinterested party; rather, his followers knew that he would personally benefit from price increases and would be selling his shares as prices ticked higher, as any rationale investor would.

*Second*, and critical for the issue of this asset freeze, the SEC has now abandoned the requirement that the SEC prove that a defendant's stock sales were done "into the share price and trading volume *increases triggered by his touting*." In short the actual scalping definition requires the SEC to prove causation, namely that the defendant's touts increased both the price and trading volume of the stock, and that the sales were made into those price and volume increases. Without an increase in volume and price caused by the touting, there can be no scalping. The SEC makes virtually no attempt to prove causation for the vast majority of the stocks listed in its motion for a preliminary injunction. For these reasons, the SEC's preposterous current method of calculating disgorgement by including all trading profits earned, regardless of whether Mr. Gallagher caused an increase in the price or volume of a stock or not, including all stocks, regardless of whether he disclosed his ownership in the stock or not, and labelling all his actions as scalping, regardless of whether he informed his followers that he would be selling stock or not – should be rejected out of hand.

The two stocks discussed in Mr. Gallagher's June 8 Letter (ALPP and BNGO) illustrate just why proving causation, which the SEC now believes it does not have to do, is so important. For ALPP, the stock's volume increased well before Mr. Gallagher started Tweeting or even bought the stock, confirming that his "touting" did not cause his gains. Ex. E. For BNGO, the stock volume and price did not increase when Mr. Gallagher started Tweeting, but instead increased when the company reported good news. Ex. F. Further confirming that Mr. Gallagher did not sell into the increase in price caused by his tweets (as is required), the stock prices for both companies went up and stayed up well *for months he stopped Tweeting*. Dkt. 51 at 8-9.

The SEC's reply letter neglects to even respond to the argument about the profits from stocks that stayed up long after he tweeted about them. That is hardly surprising given that there is no legal reason why a person should be forced to disgorge all the profits of stocks that there were still up 400% or more *months* later. Instead, the SEC resorts to cherry-picking Mr. Gallagher's Tweets (nearly all of which are opinions with no analysis, such as "$alpp the future people" and "I have no clue what $bngo even does!"),[4] describing them as touts, stating that he sold shares during the time period of the Tweets, and concluding, from that, that Mr. Gallagher's profits were "the result of his relentless tweets." But that conclusory logic necessarily fails due to the staying power both stocks had *after* Mr. Gallagher's Tweeting ended. In fact, weeks after Mr.

---

[4] The SEC does not explain how any reasonable investor would have viewed Mr. Gallagher's largely nonsensical opinion Tweets that contained no financial or business analysis, and then decided to purchase stock based on those Tweets.

Gallagher stopped Tweeting about ALPP, the stock price increased from approximately $3.00 to over $5.00. June 8 Letter at 8. It is this complete failure to prove causation (as required under the SEC's own scalping definition) that is so fatal to the SEC's demand for an asset freeze.

Rather than offer any actual evidence in support of its illogical theory that all of Mr. Gallagher's net trading profits approximates ill-gotten gains, the SEC distracts by tackling uncontended straw man arguments. The SEC argues that it does not need to establish profit "directly and solely traceable to each specific scalping tweet," June 15 Letter at 13 n.7. Although that is not what Mr. Gallagher requests, Mr. Gallagher does ask that the SEC follow the law and prove that his profits were causally connected to any false and misleading touts. The SEC then contends that Mr. Gallagher touted ALPP 350 times and as a result, his touts "correlate with a discernable stock price increase." *Id*. at 8. But this argument only confuses correlation with causation. The SEC must prove that it was Mr. Gallagher's tweets that caused the increase, not just that Mr. Gallagher happened to be *reacting* to a price and volume increase that was already occurring.

The SEC also argues that Mr. Gallagher should disgorge profits even when "the price went up before he touted the stock" because he worked with "associates who were also loading and scalping."[5] The SEC's argument, however, is long on supposition and hypotheticals, and short on actual evidence. In fact, the SEC confirms as much, stating that "there is a *fair inference* that a sudden price increase after Gallagher bought a stock and before he sent his first tweet" was due to coordination between conspirators.  The SEC then admits that this is just a hypothetical, writing that the "the mere fact that Gallagher had not yet personally sent a tout *does not eliminate* the possibility that he was not already coordinating a scalping scheme with associates." The SEC offers no evidence that this occurred with either ALPP or BNGO, or even could have occurred given the volume of stock already being traded in these tickers. The SEC's attempt to shift the burden of causation proof to Mr. Gallagher and freeze all his assets because of a "possibility" that the SEC can "not eliminate" should be rejected.

Finally, the SEC is factually wrong about many of its arguments concerning ALPP and BNGO. With respect to ALPP, the SEC, citing to its own Amended Complaint, claims that investors who bought ALPP shares based on "Gallagher's self-serving touts" have told the SEC that they lost money. But the Amended Complaint contains no such allegations regarding ALPP. The SEC also claims that Mr. Gallagher chose stocks to purchase that were part of a ploy (whatever that means), but provides no evidence of that with regard to ALPP, a stock that uplisted to NASDAQ.[6] The SEC falsely claims that Mr. Gallagher touted ALPP on December 21, and then sold all of his shares the next day. In fact, Gallagher sold only 10,000 of the 125,000 shares that he owned, a *de minimus* amount that would not have defrauded anyone, *and*, he then re-commenced his purchase of shares as the price of ALPP ticked higher. *See* Ex. G. Moreover, Mr. Gallagher disclosed to his followers that he had sold those 10,000 shares. *Compare* Ex. H at 1 *with id.* at 2 (showing difference in position). In fact, the SEC chooses to ignore that Mr.

---

[5] Notably, there are no conspiracy claims in the Amended Complaint.

[6] Andy Blye, *Alpine 4 Holdings Uplists to Nasdaq, Announces New Acquisitions*, BizJournals.com (Oct. 20, 2021) https://www.bizjournals.com/phoenix/news/2021/10/20/alpine-4-holdings-uplists-to-nasdaq-stock-exchange.html

Gallagher also told his followers that he was selling small chunks of ALPP on "rip days," which is exactly what did.[7] Ex. H at 3. As for BNGO, the SEC claims the increase was "caused by attention Gallagher and his associates brought to bear," June 15 Letter at 13, but overlooks that between January 20 and January 29, the stock rose an additional 50% (after also gaining over 1000% in the previous 2 weeks) with almost no attention from Mr. Gallagher, except for, as the SEC explains, one *retweet* of someone else on twitter that stated BNGO was a "Monday potential buy list" stock. See id. at 13; *see also* Dkt. No. 51 at 9 (showing BNGO price movement)

  In sum, by literally re-defining scalping to better fit Mr. Gallagher and social media, ignoring Mr. Gallagher's tweets about his stock sales, and then failing to even acknowledge that it is the SEC's burden to prove causation (both on the merits and for disgorgement), what is clear is that the SEC is not targeting actual fraud committed by Mr. Gallagher. Instead, the SEC is upset that Mr. Gallagher is coordinating with others to tout stocks on social media. *See, e.g.*, June 15 Letter at 6 n.4 ("[f]or each of the stocks in question, Gallagher sent numerous touts, ranging from the dozens to the hundreds," and then states "and engaged in numerous scalping trades," as if simply using the word "scalping" confirms that Mr. Gallagher engaged in scalping); *id.* at 8 ("Gallagher admits that he 'touted' ALPP over the trading period," as if touting itself is a fraud). The problem for the SEC is that touting or commenting or expressing an opinion on a stock constitutes core First Amendment protected speech.[8] Jim Cramer does it every day on MadMoney. Further, it is not unlawful to coordinate with others to purchase stocks.[9] For this reason, the SEC's attempts to freeze all of the Gallaghers' assets solely because the SEC is upset that he touted stocks on social media is a violation of Mr. Gallagher's First Amendment rights and should be rejected.

**The SEC's Unjustified Asset Freeze Has Severely Harmed the Gallaghers**

  As the SEC now concedes, the SEC has frozen almost the entirety of Mr. Gallagher's assets, including brokerage and bank accounts, as well as his real estate and capital from his businesses. This includes assets (such as those earned from entirely legitimate business

---

[7] Undersigned counsel has provided this information that Mr. Gallagher Tweeted that he was selling his shares of ALPP to SEC attorneys on numerous times, including via email as early on November 9, 2021. The SEC has chosen to ignore this evidence.

[8] *See* SEC Investor Bullet (Nov. 12, 2014) https://www.sec.gov/oiea/investor-alerts-bulletins/ia_socialmediafraud.html#:~:text=Touting%20isn't%20illegal%20as,track%20records%20in%20recommending%20stocks ("Touting isn't illegal as long as the newsletters disclose who paid them, how much they're getting paid, and the form of the payment, usually cash or stock."). Here Mr. Gallagher was not getting paid by anyone. *See also* Carmen Reinicke, *"We Don't Regulate Euphoria," Says Former SEC Chairman Jay Clayton*, CNBC (Oct. 26, 2021) https://www.cnbc.com/2021/10/26/former-sec-chair-clayton-says-social-media-will-continue-to-influence-investing.html

[9] Kevin Sankiewicz, *Ex-SEC Chief: Reddit-Fueled GameStop Frenzy Was Not a Modern-Day Pump-and-Dump Scheme*, CNBC (Feb. 19, 2021) https://www.cnbc.com/2021/02/19/jay-clayton-reddit-fueled-gamestop-frenzy-not-a-pump-and-dump-scheme.html (Jay Clayton rejected argument that coordinated group buying in GameStop was an illegal pump and dump)

enterprises) that have nothing to do with any purported ill-gotten gains, because the SEC has frozen double the amount of even the SEC's proposed disgorgement.

Nonetheless, the SEC believes that it is acting benevolently by letting the Gallaghers access small portions of their own legitimately earned assets to pay their bills, feed themselves, operate their legitimate businesses, and hire lawyers (up to a point). Yet in truth, the SEC's two concessions, all of which were fought over, have been limited. First, the SEC has granted Mr. Gallagher use of the unequivocally legitimate ongoing profits generated by the Gallaghers' two businesses every month. Second, the SEC has provided Mr. Gallagher with *some* funds to pay attorneys.

Contrary to the SEC's misleading narrative, the Gallaghers' financial life is being micromanaged, as Mr. Gallagher has had to fight for these concessions and jump through many time-consuming and costly hoops based on the SEC's demands for voluminous documentation for non-controversial issues. As just one example, the SEC claims that it consented to the "release of over $400,000 for legal fees." That is true. However, despite his constitutional entitlement to use legitimately obtained monies to fund a legal defense for the parallel criminal case, Mr. Gallagher was forced to write multiple letters to the SEC about the applicability of *Luis v. United States*, 136 S. Ct. 1083, 1088 (2016), as well as provide justification of our Firm's rates and budgets for simultaneous civil and criminal cases.[10] During these conversations, the SEC has made clear that because of the size of the asset freeze obtained by the SEC, Mr. Gallagher has no right to use his own legitimately obtained monies to fight the SEC's case, confirming that the SEC has frozen Mr. Gallagher's funds in an attempt to bully him into settling. Moreover, while the SEC complains that Mr. Gallagher has spent $400,000 in legal fees over a period of eight months, it was the SEC who decided to charge 60 tickers, involving tens of thousands of Tweets, over a more than two-year period.[11] Just because the SEC has done no work to actually analyze the tickers it chose does not mean that Mr. Gallagher should sit idly by doing the same.

Mr. Gallagher has also had to fight for weeks and months (a very costly delay) to obtain other concessions as well, such as the ability to exit positions to lower the exposure of his accounts during this market downturn. And most recently, Mr. Gallagher has been fighting to try to obtain funds to pay his 2021 income taxes. Yet despite regularly providing monthly reports and sworn statements about his assets, he is only met with more red tape and demands about proof of his inability to pay his taxes from other sources (which the SEC has frozen). Moreover, the SEC will make no representations that it will release money to pay the taxes even if Mr. Gallagher complies with their demands. Because of the SEC's intransigence, the Gallagher family is now being charged interest and penalties of approximately $15,000/month by the IRS, even though Mr. Gallagher set aside funds to pay those taxes well-before he was charged here. The SEC knows about this, but just does not seem to care.

---

[10] During those conversations, the SEC also made clear its view that Mr. Gallagher is not legally entitled to use untainted assets to fund a defense for a purely civil SEC case.

[11] Notably, the money used for the criminal case was undoubtedly well spent. Federal prosecutors, after multiple presentations and argument regarding many of the same issues here, reduced the loss amount from over $1mln (as stated in the Complaint) to under $22,000 (as set forth in the Information), an unprecedented drop.

The SEC is correct in one aspect, however: the freeze represents more than what Mr. Gallagher has. Of course, it is inappropriate to base the starting point of an asset freeze on what assets Mr. Gallagher actually possesses. But it is notable that even though Mr. Gallagher and his family have had two successful and profitable businesses for years, the SEC still froze substantially more than he has.  If he does not have the funds available to cover legal costs after his assets have been frozen, what kind of defendant would? The SEC's scorched-earth litigation strategy, which involves freezing legitimately-earned funds to the point where a defendant is unable to fight the case, must be tempered by this Court.

And to be clear, the disparity between the frozen amount and his current assets is not because Mr. Gallagher has dissipated funds. Contrary to the SEC's conclusion that Mr. Gallagher was or has dissipated assets, there are absolutely no allegations that Mr. Gallagher (1) has foreign accounts (2) spends money recklessly or with luxurious habits or (3) was transferring assets to friends and family to avoid recovery. Instead, the facts do not support dissipation at all: his primary and rental properties are all fully paid off. He and his companies have had the same main bank account at Fifth Third bank for years. He diligently set aside money in a separate savings account to pay for taxes. Of course, *those* facts are missing from the SEC's TRO Motion regarding dissipation, where instead the SEC focused on the irrelevant fact that he switched brokerage accounts after TD Ameritrade told him it was closing his account, as he had to do. TRO Motion at 33. And the SEC's latest argument, that the legal fees expended over eight months to fund his criminal defense[12] (at 6) somehow constitutes dissipation, is astonishing both because *Luis* determined that a defendant has a constitutional right to use legitimately obtained funds to mount a defense, and because of the nature of case brought by the DOJ and SEC. This first-of-its kind social-media case contains a massive number of tweets and transactions to review in order to address fact-intensive questions such as intent. This case also presents novel legal issues regarding intent, duty and materiality, as well as, as evident here, disgorgement. The SEC's frustration that Mr. Gallagher did not just fold and accept their unsupported allegations as fact should not be blamed on Mr. Gallagher.

In sum, SEC's narrative that it does not control the Gallaghers' financial life is absurd. And its views of Mr. Gallagher's legal fees as "dissipation" to be prevented, inapposite to the binding Supreme Court precedent of *Luis v. United States*, reflects how it will exercise that control going forward.[13]

---

[12] The SEC repeatedly attempts to use the criminal case as a sword. But there, the DOJ actually listened and realized its complaint was overbroad, reducing the loss amount from over $1 million in the criminal complaint to under $22,000 at his plea.

[13] Defense counsel would be remiss not to note the irony of the SEC's dissipation argument. While the SEC complains that Mr. Gallagher has spent money on legal fees, the SEC fails to mention that because of the SEC's freeze of Mr. Gallagher's brokerage account, which prevented him from trading, the account lost hundreds of thousands of dollars due to the general market decline. Far from preserving the status quo, the SEC has effectively squandered significant funds that could have been returned to investors (if the SEC prevails, which is doubtful).

**SEC's Net Profit Approximation Must Take Into Account Mr. Gallagher's Losses**

Case law makes clear that when calculating disgorgement for scheme liability cases, the court has to analyze all the trades in the scheme. *SEC v. Nadel*, 206 F.Supp. 3d 782, 785-86 (E.D.N.Y. Sept. 8, 2016) (not including other trades in disgorgement calculation because unlike the cited *McCaskey* case, *Nadel* involved transaction specific [claims which] require calculation of disgorgement on a trade-by-trade basis").

In fighting against this case law and Mr. Gallagher's common-sense argument, bolstered by the SEC's own pleadings, that profits must be reduced by trading losses when analyzing "scheme-liability," the SEC appears to reject the argument that it has even pled a scheme, instead contending that each stock must be separately analyzed for scalping profits and that "each scalping trade was independently unlawful." The SEC makes this argument even though it relies entirely on scheme liability in both the Amended Complaint and in its letter here, claiming, for example, that "Gallagher's illegal scalping in each stock followed a similar pattern." June 14 Letter at 6; *see also* Id. at 13 n. 7 ("Gallagher's contention that the disgorgement portion of the asset freeze should be limited to only the specific amount of profit that the SEC can establish is *directly and solely traceable to each specific scalping tweet is not supported by law* …" (emphasis added)). Further, the SEC has not even attempted to show scalping for each stock (as it now claims is how disgorgement should be calculated), and in fact has actively fought attempts by Mr. Gallagher to force the SEC to do so. In addition, the SEC's bold assertion that "each scalping trade was independently unlawful," stands in stark contrast to its self-serving narrative that it has provided a reasonable estimation of scalping proceeds simply by looking at the "first trade and last trade" of each ticker.[14] *See also* June 14 Letter at 13 n.7. The SEC attempts to rely on a scheme when it serves the SEC's purposes, but eschews a scheme when it would help Mr. Gallagher. The SEC cannot have it both ways.

**The SEC Offers No Support to Justify the Freeze for Penalties**

The SEC does not refute that, at least at the conclusion of the case, if it succeeds, it will have to make a case-specific argument about what civil penalty is appropriate. *SEC v. Tavella*, 77 F. Supp. 3d 353, 363 (S.D.N.Y. 2015). Nonetheless, the SEC argues here that that standard is irrelevant at this stage because the SEC is entitled to automatically freeze the maximum penalty permitted by statute, again based off an entirely untested calculation. At minimum, the SEC, to justify a freeze, should be forced to provide comparator cases where the SEC has obtained similar results. Indeed, the entire point of the asset freeze is to preserve assets for the payment of future penalties. If the future penalties are unlikely to occur, what is the point of the freeze?

The SEC's response to the two cases cited by Mr. Gallagher as to why such a freeze is unwarranted is instructive. It is incredible that the SEC deems *SEC v. Fassari*, 21-cv-103 (C.D.

---

[14] The SEC's claim that its inclusion of losses in the Amended Complaint is not a concession that losses must be included in calculating ill-gotten gains is disingenuous. This was not done, as the SEC now contends, solely to inform the Court as to why the SEC had reduced the amount of estimated disgorgement from the original Complaint. Rather, the original Complaint included multiple instances where the SEC acknowledged that trading losses reduced the amount of ill-gotten gains. *See* Dkt. No. 1 ¶¶ 56, 70.

Cal.) to involve "far less extensive misconduct than Gallagher" even though the defendant there created fake websites and conversations with a CEO, causing the stock to rise 4,000% over 4 trading days and losing folks like Mr. Gallagher huge sums of money. And the SEC cannot even come up with any reason for distinguishing Melnick (where no civil penalty was imposed), even though the conduct in *SEC v. Melnick*, 21-CV-4054 (N.D. Ga.) involved more than 100 scalping instances. The SEC simply dismisses that as "not relevant" here.

In sum, it would be one thing to argue that the Court can and should freeze an amount equivalent to penalty that is routinely awarded for similar cases. But when the SEC can provide no examples that the sought-for penalty is within the practical realm of possibility, the only reason to seek a freeze up to and including the penalty amount is to strongarm Mr. Gallagher into a settlement. Because of this Mr. Gallagher asks for a court conference as soon as possible.

Respectfully submitted,

*/s/ Eric Rosen*
Eric Rosen
Richard Cipolla
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, New York 10016
(617) 977-4163
erosen@rochefreedman.com
rcipolla@rochefreedman.com

CC: Counsel of Record