

September 12, 2022

**By ECF**
The Honorable P. Kevin Castel
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Courtroom 11D
New York, NY 10007

        Re: *SEC v. Gallagher*, No. 1:21-cv-08739-PKC
        <u>Pre-Motion Letter Seeking Permission to File a Motion to Dismiss the Second Amended Complaint</u>

Dear Judge Castel:

    On behalf of Defendant Steven M. Gallagher and pursuant to Rule 3(A) of this Court's Individual Rules of Practice, we respectfully submit this pre-motion letter in anticipation of moving to dismiss, in part, the SEC's Second Amended Complaint ("SAC"), ECF No. 58.

**Introduction**

    This is now the SEC's third attempt to plead a securities fraud case against Mr. Gallagher, a magazine salesman who "tweeted" his opinions about OTC stocks to his Twitter followers. The first two complaints simply summarized a few tickers and then listed, with few details, dozens of other stocks that Mr. Gallagher allegedly "scalped." This method of pleading fell far short of pleading with "particularity." Now, in its third attempt, the SEC's SAC, weighing in at 242-pages, certainly adds additional details regarding the stocks that Mr. Gallagher allegedly "scalped," but it does little to fix the fundamental problems that the defense identified in its first two efforts to dismiss the complaint.

    In that regard, with these added details, it is now clear that the vast majority of the SEC's allegations do not concern actual misrepresentations made by Mr. Gallagher. Instead, the SEC focuses on his omissions, specifically, his alleged failure to inform his Twitter followers of his subsequent stock sales. The SEC, however, fails to identify a duty that required Mr. Gallagher to disclose his stock sales, and further, the SEC fails to plead that these omissions were material to a "reasonable investor."[1]

---

[1] As this Court is aware, Mr. Gallagher is a Twitter enthusiast and amateur trader of unregistered, over-the-counter ("OTC") stocks. Mr. Gallagher is neither a professional trader nor analyst. There are no allegations that he ever once charged anyone for investment advice, received money for promoting a stock, or was a company "insider." It is not even alleged that he ever offered any stock analysis or discussed company finances with his audience. Moreover, he does not even tweet about stocks under his real name or with any guise of credibility: Mr. Gallagher tweets using the Twitter handle @AlexDelarge655321, which is a reference to the

For this reason, and for the additional reasons set forth below, the Court should dismiss all claims that 1) depend on a fraud-by-omission theory or that 2) rely on Mr. Gallagher's vague and nebulous opinions, because those claims do not state a claim for securities fraud. In addition, this Court should also dismiss the SAC's market manipulation claims, the claims set forth under Securities Act Section 17(a), and the scheme liability claims.

## I. The SAC Fails to Plead That Mr. Gallagher Owed a Duty to Disclose His Stock Sales to His Twitter Followers

As relevant here, the 242-page SAC highlights very few actual false statements by Mr. Gallagher. Moreover, of the false statements that the SAC alleges, many will not hold up to scrutiny. For example, the SAC contends that Mr. Gallagher "falsely tweeted" about his ownership in ATOS, yet it acknowledges that the alleged "falsity" was his claim that he had 30,000 shares when he actually held 21,000 shares. SAC ¶ 294. This tweet was obviously an innocent error and not a material misstatement designed to induce others to purchase ATOS. As another example, the SEC avers that Mr. Gallagher lied by "retweeting" another's person tweet that contained allegedly false information about a company. *Id.* ¶ 69. The SEC fails to allege, even circumstantially, that Mr. Gallagher was aware that the information was false.[2]

Instead, for the vast majority of the 59 stocks in the SAC, the SEC's theory is that Mr. Gallagher bought the stock low, disclosed his ownership of the stock, and shared generic and empty opinions touting the stock but omitted his own subsequent sales of the stock. *See, e.g.*, SAC ¶¶ 169, 170, 175, 176 (describing sequence with regards to ALPP). For example, without identifying a single affirmative misstatement, the SEC alleges that Mr. Gallagher scalped ENZC for nine months. (*id.* ¶¶ 839 – 921). Instead, the SEC relies solely on omissions, arguing, for example, that his tweeting that ENZC was a buy in February 2021 mandated that he disclose his sales of that stock on March 19, 2021, nearly three weeks later. *See Id.* ¶¶ 918-21. In short, Mr. Gallagher allegedly committed fraud by "omission," in that he failed to broadcast the specifics of his future stock sales to his Twitter followers.

All claims arising from the SEC's newfound "omission" theory of liability should be dismissed because the SEC has failed to allege that Mr. Gallagher owed a duty to disclose his sales to his Twitter followers. It is well-settled that ordinary investors do not owe duties to disclose their stock trades to the outside world. Specifically, the landmark case of *Chiarella v. United States*, 445 U.S. 222 (1980) limited the reach of our nation's securities laws by rejecting the government's argument that there existed a "general duty" owed by everyone to "all participants in market transactions." *Id*. at 233.  The SEC here ignores this precedent, and instead, in this novel case of alleged fraud by *failing* to tweet, contends that Mr. Gallagher, who

---

fictional criminal and prisoner number in the movie *Clockwork Orange*. He created this handle in September 2019, shortly before the Covid pandemic engulfed this country.

[2]   Notwithstanding the SEC's errors regarding these and other false statements, for the purposes of this anticipated Motion to Dismiss, Mr. Gallagher is not moving to dismiss claims arising from allegedly affirmatively false statements. This includes his affirmative misstatement regarding SCIE that he had "never sold a share" of SCIE. SCIE, as previously explained to this Court, was the **only** stock at issue in Mr. Gallagher's criminal plea' and not relevant to "scalping" claims set forth here.

operated a meme anonymous Twitter account in the name of a fictional criminal from the movie Clockwork Orange, owed a general duty to disclose his stock sales to his Twitter followers. Put simply, the SEC's position is that tweeting about a stock – even something as innocuous as "$$ucpa dclt combo alert," SAC ¶ 704, - imposes a requirement on *every person*, even those unassociated with the issuer and not privy to inside information, to disclose in detail on Twitter his own personal stock sales subsequent to that Tweet. *See, e.g.*, *id.* ¶¶ 169, 170, 175, 176 (describing sequence with regards to ALPP whereby Mr. Gallagher bought the stock low, disclosed his ownership position and shared generic and empty opinions touting the stock, but omitted his own subsequent sales of the stock). In short, even though there is no SEC rule mandating such a disclosure obligation, the SEC now wants this Court to hold, as a matter of law, that anonymous meme Twitter accounts must disclose specific individual stock sales to their anonymous Twitter followers. That cannot be the law, and it is *not* the law.

Tellingly, the SAC does not allege the source of any duty that Mr. Gallagher had to disclose his stock sales to his Twitter followers. *See, e.g., In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (omissions are actionable only when there is a duty to disclose the omission). Instead, the SEC's position appears to be that a duty arose because Mr. Gallagher committed "scalping," which occurs, as pled in the SAC, when a defendant "(i) acquires shares of a stock; (ii) recommends that others purchase the stock without disclosing his intention to sell; and (iii) subsequently sells the stock for his own benefit." (SAC ¶ 8). But this definition, which would impose a disclosure duty on *everyone* who recommends or praises a stock and then proceeds to sell even small portions of that stock down the road, is nonsensical and runs afoul of current scalping law and the SEC's prior scalping definitions.

The Supreme Court's 1963 decision in *SEC v. Capital Gains Research Bureau, Inc.* 375 U.S. 180 (1963) established modern "scalping" law. The Supreme Court debated whether a "registered investment advisor" was mandated to "disclose to his clients a practice of purchasing shares of a security for his own account shortly before recommending that security for long-term investment and then immediately selling the shares at a profit upon the rise in the market price following the recommendation." *Id.* at 181. In holding that an investment advisor had such a duty, the Supreme Court's ruling centered on the duty assumed by the investment advisor to his clients because of the relationship of "trust and confidence" that advisors have with clients. *Id.* at 190. It was because of this fiduciary duty the Supreme Court determined that the advisor's "scalping" was a fraud. Put differently, people expect their advisors to offer disinterested advice, and as a result, advisors must "fully and fairly" reveal their "personal interests" to their clients.

Over the ensuing decades, scalping caselaw developed to hold that scalping occurred not when every person expressing a positive opinion about a stock fails to disclose future sales, but rather when a person purportedly offering legitimate investment advice fails to disclose that he had any pecuniary motive *at all* in making his stock recommendations.

In *Zweig v. Hearst Corp*., 594 F.2d 1261 (9th Cir. 1979), a prominent "scalping" case, the defendant was found liable when he, as a newspaper columnist writing about securities, failed to disclose that he had purchased stocks days before his column was to be published in order to sell the stock on the "short-swing rise in price." The columnist's readers, relying on his expertise and credibility, believed he was a disinterested advisor, when in reality, he expected to profit from his recommendations.

In *SEC v. Park*, 99 F.Supp.2d 889 (N.D. Il. 2000), the court's decision focused on whether the defendant, who operated an Internet bulletin board for which he charged a significant subscription fee, had a duty to disclose his personal interests in his investments. The court ruled that he did. The court stated that because of the unique facts of the case (such as the fact that the defendant charged his subscribers a "not-insubstantial" fee for his recommendations), Park may have had a relationship of "trust and confidence" that created a duty. *Id.* at 899. In addition, the court adopted the definition of scalping set forth in *Zweig*[3] in holding that a "person who intends to engage in scalping assumes a duty to disclose his interest in the targeted stock." *Id.* at 900. The *c*ourt noted that the alleged fraud relied on the fact that the defendant "did not disclose that he already owned shares of [the stock] or that he had placed a limit order to sell his shares one minute before issuing his recommendation to buy." *Id.* at 901. Critically, the court did not state that everyone speaking about a stock had to reveal their personal trading decisions; rather, such a duty extended only to people who, by their station in life, could lead investors to believe that their advice was both financially sound, well-researched, independent and accurate. This too makes sense from both a duty and materiality perspective, as it limited the reach of securities fraud laws to those who had the ability to actually defraud reasonable investors.

Last, in *SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019), the defendant engaged in scalping because he secretly funded supposedly independent promoters that recommended that investors buy the stock Plandai, while failing to disclose that the defendant, the organizer and funder of the promotional campaign, "beneficially owned shares of Plandai, intended to sell shares, and was actively selling his Plandai holdings into the public market." *See SEC v. Fiore*, Complaint, Dkt. No. 2 at 3, 18-CV-5474 (S.D.N.Y. June 18, 2018). It was this failure of the defendant to disclose his pecuniary interest in the stock during the promotions that rendered Fiore's conduct to be "scalping."

Obviously, simply recommending or talking positively about a stock does not create a duty to tell the entire world either of an intent to sell or to affirmatively disclose future sales. Rather, following *Chiarella*, a duty to disclose applies only in limited circumstances*, i.e.*, where a person is either acting in some type of fiduciary or trusting capacity *or* fails to disclose *any* beneficial ownership in the touted securities, thereby making it appear that he is offering independent and unbiased finance advice that can be relied upon by reasonable investors. Neither situation is present here for the majority of stocks charged.

The SEC has endorsed these limits on scalping in its enforcement actions and accordingly pled a limited definition of scalping. According to the SEC's "historical" definition, scalping occurs when a person "(i) acquires shares of a stock for his own benefit prior to recommending or touting that stock to others, (ii) **does not disclose in the tout the full details of his ownership of the shares** and his plans to sell them, and (iii) proceeds to sell his shares following the tout's dissemination, and **into the share price and trading volume increases triggered by his**

---

[3] A "newspaper columnist scalped stocks by praising certain stocks in his columns without revealing that he had invested in the stock at a discount price prior to publishing the article with the intention of selling the stock on the wave of the price increase resulting his article." *Id*. at 899.

**touting**."[4] A side-by-side comparison between the historic definition of "scalping" and the SAC's current definition of scalping here illustrates the stark differences between earlier cases and the current case:

| Historic Definition | SEC's Definition in *Gallagher*[5] |
|---|---|
| "(i) acquires shares of a stock for his own benefit prior to recommending or touting that stock to others, (ii) **does not disclose in the tout the full details of his ownership of the shares** and his plans to sell them, and (iii) proceeds to sell his shares following the tout's dissemination, and **into the share price and trading volume increases triggered by his touting**." | "Scalping is a scheme or artifice to defraud in which a defendant (i) acquires shares of a stock; (ii) recommends that others purchase the stock without disclosing his intention to sell; and (iii) subsequently sells the stock for his own benefit." |

Here, despite it being their chief allegation for the vast majority of stocks in the SAC, the SEC has not pled that Mr. Gallagher failed to disclose to his followers that he owned shares of the stocks he tweeted about. To the contrary, Mr. Gallagher's tweets affirmatively told his followers that he owned the stocks that he was touting. *See, e.g.*, SAC ¶¶ 169, 292, 386. The SEC's elimination of this element concerning a person's disclosure about his share ownership is critical as to whether Mr. Gallagher owed a "duty" to disclose stock sales. This is because when a person discloses their long position in a particular stock, every reasonable investor seeing that disclosure would naturally assume that the stock owner would want the stock price to rise so that he could profit by selling the stock. Indeed, that is the *only* plausible reason for encouraging others to purchase stocks in which a person discloses their long position. Further, given that Mr. Gallagher disclosed his stock purchases, where would his Twitter followers think that Mr. Gallagher got money to buy the stocks if he was not selling stocks along the way? Because of this, there cannot be a "duty to disclose" stock sales because such future stock sales are *already implicit* in the disclosed stock ownership. Such double disclosure makes no sense.

The SAC also contains few allegations that Mr. Gallagher's tweets drove a material increase in the stock price or sales volume. But, as discussed in more detail in the materiality section below, it makes little sense for a person whose tweets are not moving the stock price higher to have an affirmative "duty to disclose" his sales. Such a requirement would serve no actual purpose as the tweets would clearly not be directly impacting purchasing decisions. If

---

[4] *See SEC v. Sodi*, 18-CV-00313-HNJ Dkt. 1 ¶ 1 (N.D. Al. Feb. 26, 2018); *SEC v. Babikian*, 14-CV-01740-PAC Dkt. 1 ¶ 1 (S.D.N.Y. Mar. 13, 2014); *SEC v. GPL Ventures LLC*, 21 Civ. 6814, 2022 WL 158885, *2 (S.D.N.Y. Jan. 18, 2022) (citing the complaint and providing the definition of scalping included in *Babikian* and *Sodi*). The *GPL Ventures* materials (Dkt. No. 57) were filed *after* the complaint in this matter. Thus, even the SEC itself cannot agree as to what the proper definition of "scalping" is. If the SEC does not know, how could Mr. Gallagher be expected to know?

[5] SAC ¶ 8.

someone has only 50, 100 or 1,000 Twitter followers, why should they be subject to securities fraud charges by failing to disclose to their few followers that they sold stock?[6]

That Mr. Gallagher was not obligated to disclose his stock sales is further reinforced by current SEC disclosure rules and recent events. The securities laws mandate strict disclosure rules for company insiders, major investors in the stock, as well as paid promoters. For example, when a person or group of persons acquires more than 5% of a stock, that person must file a Schedule 13D. Likewise, when such an insider or control person sells stock, they must file an amended Schedule 13D "promptly." Notably, these insiders do not have to file immediately or prior to their sales; rather, the amended Schedule 13D must be filed within two business days *after* the sale.[7] If company insiders are not required to immediately disclose their sales, why would a company outsider holding a *de minimus* amount of stock have a duty to disclose his sales?

Finally, recent events have made it clear that the SEC does not uniformly mandate disclosure requirements by individuals who promote securities without compensation. As examples:

- Billionaire investor Michael Novogratz repeatedly touted and promoted the crypto-asset Luna through the fall and winter of 2021-22.[8] Novogratz even promoted the asset by posting pictures on Twitter of a Luna tattoo that he received .[9] Novogratz's firm, undisclosed, dumped Luna in Q1 2022, realizing $355 million in profits.[10] The price of Luna later spectacularly collapsed; Novogratz later credited the fact that he was taking

---

[6] The SEC's failure to allege the number of Twitter followers is particularly important here. While at the time of his arrest in October 2021, Mr. Gallagher had approximately 70,000 followers, for the vast majority of 2020, Mr. Gallagher had few Twitter followers. The SEC has charged him with "scalping" stocks, such as SPOM, anyway, while ignoring the fact that his Tweets (seen by few people) were having virtually no impact on the OTC market.

[7] *See* 17 CFR § 240.13d-2

[8] Elliott Laybourne, *LUNA Price Explodes 80% After Novogratz Pumps Terra Coin on Twitter*, INVESTINGCUBE (Aug. 19, 2021), https://tinyurl.com/3varh3v4.

[9] Gregory Zuckerman and Justin Baer, *Mike Novogratz's Crypto Comeback Faces a Trial By Fire*, WALL ST. J. (June 4, 2022, 12:00 AM), https://tinyurl.com/7raszcc7 (Galaxy reported on May 9 that it sold at least part of its Luna stake during the first quarter of 2022. Realized gains on sales of Luna and other assets totaled $355 million in the period ending in March, the firm said. Galaxy hasn't said if it was still holding any of the currency when it lost nearly all its value in May); *see also* https://tinyurl.com/4cdtka8p (Twitter account of Novogratz, Jan. 4, 2021, posting photo of tattoo – the Tweet received more than a 1,312 retweets).

[10] Rodney Holmes, *Galaxy Digital Lost $544 Million After Fall of Terra (LUNA), Bitcoin and Other Cryptocurrencies*, CRYTOSAURUS (Aug. 8, 2022), https://cryptosaurus.tech/galaxy-digital-lost-544-million-after-fall-of-terra-luna-bitcoin-and-other-cryptocurrencies/.

"profits" during Luna's rise, a "core tenant[] of investing," as the reason why his firm did not suffer from its fall.[11] Novogratz has not been charged with "scalping."

- In the spring of 2022, investor Ryan Cohen purchased a large stake in Bed Bath and Beyond (BBB).[12] Cohen advertised this as a long-term position that he would hold in order to turn around the struggling retailer.[13] Cohen also purchased far out-of-the-money stock options with an expiry date in January 2023 (again indicating that he bought to hold). On August 16, 2022, Cohen filed a Schedule 13D with the SEC touting that he had *increased* his ownership of BBB shares to 11.8% of all outstanding shares.[14] BBB stock price then skyrocketed, and Cohen, with the assistance of JP Morgan Chase, secretly dumped all his shares into the market. Two days later, Cohen filed a Form 4 with the SEC, confirming that he had sold all of his BBB shares, and as a result, BBB's stock price fell 45%.[15] Cohen has not been charged by the SEC with scalping.

The Luna and BBB collapses caused hundreds of millions, if not billions, in losses to investors, all while the dumpers profited. If Novogratz, Galaxy Digital, Ryan Cohen and JP Morgan all believe that the securities laws do not mandate sales disclosure in such circumstances, how would a low-level retail investor with no financial background or experience know that he has a duty to disclose his sales to his Twitter followers? Accordingly, for all the reasons set forth above, the SEC's SAC has failed to plead, for the vast majority of issuers listed, that Mr. Gallagher had a duty to disclose his stock sales to his Twitter followers. Thus, the fraudulent "omission" claims (namely scalping) in the SAC must be dismissed.

## II.   The SAC Fails to Plead that Mr. Gallagher's Failure to Disclose His Stock Sales Was Material to a Reasonable Investor

Relatedly, the SAC fails to plead materiality, *i.e.* that a *reasonable investor* would have found Mr. Gallagher's undisclosed intent to sell stocks to be material.

As this Court is aware, materiality means that a statement or omission must, "in the view of a *reasonable investor*, 'have significantly altered the total mix of information made available." *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1466 (2d Cir. 1996) (SEC must allege that "disclosure of the omitted fact would have been" material); *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). A reasonable investor, in turn, is not a novice and does not have "a child-

---

[11]   Twitter (May 18, 2022 2:00 PM), https://tinyurl.com/v8uzw7zu

[12]   *See Si v. Bed Bath and Beyond Corp. et al.*, Class Action Complaint, filed on Aug. 24, 2022 (D.C.), available at: https://tinyurl.com/2vrjypby

[13]   *See* https://s.wsj.net/public/resources/documents/bbbletter030622.pdf (March 6, 2022 letter touting that Cohen was "maniacally focused on the long-term").

[14]   *See* Bed Bath & Beyond Inc. Schedule 13D (Amendment No. 2), *EDGAR*, Securities and Exchange Commission, 2022, https://tinyurl.com/pmv67fww

[15]   *See* Bed Bath & Beyond Inc. Schedule 13D (Amendment No. 3), *EDGAR*, Securities and Exchange Commission, 2022 (https://tinyurl.com/4jxn78sh)

like simplicity." *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988) (internal quotation marks omitted). Reasonable investors understand concepts like the time-value of money, the peril of trusting assumptions, and unpredictable difficulties with launching products. *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998); *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204,1213 & n.7 (4th Cir. 1994)). They discount sales talk and understand general economic conditions. *Bogart v. Shearson Lehman Bros., Inc.*, No. 91 CIV. 1036 (LBS) (NG), 1995 WL 46399, at *2–3 (S.D.N.Y. Feb. 6, 1995); *In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 377 (3d Cir. 1993).

And with regards to omissions in opinion statements, like those at issue here, materiality is a "highly-context-specific inquiry." *Finger v. Pearson PLC*, No. 17 CIV. 1422 (RJS), 2019 WL 10632904, at *10 (S.D.N.Y. Sept. 16, 2019). This is because "a reasonable investor reads a statement 'in light of all of its surrounding text, including hedges, disclaimers, and apparently conflicting information,' while taking into account 'the customs and practices of the relevant industry.'" *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)). The more general the statement, the higher the bar because "a reasonable investor would not understand the vague statements in question to be a reflection of every fact known to" to the person making the statement. *Id.* Mr. Gallagher's omissions here, which were premised on vague, boorish tweets untethered to any financial analysis, could not have been material to reasonable investors.[16]

*First*, as noted, Mr. Gallagher did disclose his underlying financial ownership of the stocks that he supported and recommended. For example, in ALPP, Mr. Gallagher promoted the stock two minutes after his first purchase. SAC ¶¶ 168-69.  In another example, Mr. Gallagher tweeted that he owned "a lot of $hdii," a stock which the SAC alleges that Mr. Gallagher scalped. SAC ¶ 1029. Of course, any reasonable investor would have believed that Mr. Gallagher was going to sell his shares when the stock price increased. In fact, Mr. Gallagher repeatedly told his Twitter followers that he was selling his stock and also, like Mr. Novogratz above, that he was taking "profits." *S*ee Ex. A. This could only mean that he was selling stock. *Cf. Debora v. WPP Grp. PLC*, No. 91 Civ. 1775, 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994) ("A complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed.").[17] Even the SEC's SAC, which cherry-picked Mr. Gallagher's tweets, acknowledges

---

[16] A buy recommendation is an opinion statement, and "liability for making a false statement of opinion may lie if either the speaker did not hold the belief she professed or the supporting fact she supplied were untrue." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (internal quotation marks omitted). Of course, meeting this standard is "no small task for an investor." *Id.* (quoting *Omnicare,* 575 U.S. at 194). Further, this rule derives from cases like *Omnicare* and *Sanofi*, where the speaker was an issuer or other relevant market participant; in other words, a trustworthy source of information that reasonable investors typically rely upon. None of the cases impose a duty on every speaker, in every medium, at all times, to actively disclose their own trading history about companies they informally discuss.

[17]   The Court can take judicial notice of these public tweets. So long as defendants are not offering the contents of document for the truth of the matter asserted, courts in this district regularly take judicial notice of documents in securities fraud suits to determine what statements a defendant made. *See, e.g.*, *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Frankfurt-Tr.*

that Mr. Gallagher repeatedly and explicitly told his followers that he was profiting from his recommendations. *See, e.g.*, SAC ¶¶ 181, 233, 466, 595, 862, 878. Profits, by definition, mean that a person sold stock to realize gains.

*Second*, rather than try to plead the objective reasonable investor standard, the SEC instead relies on a number of conclusory allegations, SAC ¶¶ 20, 66-67, 86, 87, 132, stating, for example, that Mr. Gallagher's alleged failure to disclose stock sales was "material information that his followers, and *any other reasonable investor*, would have wanted to know before making a decision whether to buy the shares Gallagher was recommending." But such conclusory allegations, which simply presume that his Twitter followers are reasonable investors, are insufficient. The SEC makes no attempt to explain why an anonymous Twitter user's personal trades could be material to a reasonable investor. Unlike in the case of a pump-and-dumper, there are no allegations that Mr. Gallagher held a large proportion of stock or was responsible for a large volume of the trading or alleged dumping.[18] Unlike an issuer withholding information about the company's performance, the SEC makes no allegations that Mr. Gallagher had any special insight into the performance of these stocks. Unlike an investment adviser being paid to act as a fiduciary, the SEC elicits no non-conclusory allegations that Mr. Gallagher held himself out an expert putting others' interests before his own.

Instead, in attempting to argue that generic Twitter "buy" recommendations are material, the SEC relies entirely on interviews with a few "novice investor[s]" (out of more than 70,000 Twitter followers) to plead materiality. SAC ¶¶ 1853-69. The SEC's allegations about these individuals confirms that the SEC cannot meet the reasonable investor standard as a matter of law.[19] As examples of the SEC's allegations, Victim B was a "novice investor" who bought stock because "Alex Delarge" tweeted that companies "had a bunch of potential." Victim C purchased stock because Alex Delarge issued "alerts" and "gave the impression that he wanted to teach people investing strategies." Victim D bought stock because of her belief that Alex Delarge was investing "for the long haul" and because Delarge had tweeted that it was a "good idea to hold" a stock. Victim E reportedly held a stock even though Alex Delarge encouraged her to sell if she was "afraid." Victim G was a "novice investor" who purchased stocks based on Delarge's tweets that allegedly stated: "I'll hold your hand and you'll have some of the success I do." Simply put, there is nothing *reasonable*, subjectively or objectively, about how these individuals made a decision to purchase these OTC stocks, some of which were worth fractions of a penny.

---

*Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d Cir. 2019). In addition, because the SEC's allegations depend on Mr. Gallagher's public tweets, they should be fairly considered either documents "incorporated by reference" or "of which plaintiffs had knowledge and relied on in bringing the suit." *See, e.g.*, *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

[18]   In fact, the SEC strategically and repeatedly omits that context. For example, the SEC alleges that Mr. Gallagher's purchase of 1,000 ALPP shares on January 6, 2021 would "attract buyers," neglecting to mention that over *4.4 million* shares traded in ALPP that day.

[19]   Mr. Gallagher explicitly raised this issue in his prior letters seeking to dismiss the Complaint against him, the SEC's failure to correct its allegations indicates that the SEC can never meet the materiality threshold required to plead a securities fraud claim based on omissions.

Instead, as dictated by applicable case law, the *generic* statements littered throughout the complaint, and purportedly relied upon by the "victims" here, could not have been material to objective "reasonable investors'" decisions to purchase stocks.

*Third*, the SEC is likely relying on the materiality assessments of novice investors to hide two key differences between this case and prior scalping cases: (1) Mr. Gallagher is not a journalist, analyst, or other kind of relevant market participant addressed in prior scalping cases, as described above, and (2) as also noted, the SEC has redefined scalping because, unlike prior cases, Mr. Gallagher disclosed his ownership interest (and thus incentive to sell) in the stocks he touted *and* he did not cause price increases with his tweets.

Regarding the first difference, the materiality of omissions concerning inconsistent trading is readily met in other scalping cases because the source of the recommendation (whether as an investment advisor,[20] financial columnist,[21] or professional promoter secretly paid by the issuer, conveys to the investor that the source is trustworthy.[22] In this case, by contrast, the SEC is seeking to hold a meme Twitter account in the name of a Clockwork Orange criminal to the same standard. Context is critical, and the SEC never explains how any reasonable investor would have seen Mr. Gallagher's largely nonsensical opinion tweets that contained no financial or business analysis, and then decided to purchase stock based on those tweets. In addition, it is not even clear how many Twitter followers he had for most of the period alleged in the SAC. Many of the allegations in the SAC concern tweets from 2020, well before he had any sizeable Twitter following.

Regarding the second difference, in prior scalping cases it is obvious that a promoter's statements caused the increase in price and volume of the stock. While not dispositive, this causal relationship between touts and volume *could* support the inference that a particular person's touts were "material" to a reasonable investor. Here, by contrast, for the vast majority of the tickers at issue, the SEC does not plead (because it cannot) that Mr. Gallagher's tweets caused an increase in the price of the stock. Again, this indicates that for most of the alleged "scalping" at issue here, very few investors (reasonable or unreasonable) actually relied on Mr. Gallagher's tweets in making stock purchase decisions. This too cuts against the SEC.

In fact, for multiple stocks that the SEC accuses Mr. Gallagher of "scalping," there is definitive, reliable evidence that *others* caused the stock price increase. For example, the SEC seeks disgorgement of nearly $500,000 for Mr. Gallagher's trades in the stock ALPP. But, an industry research report on ALPP alleges, in a detailed and convincing analysis, that it was the executives of the company who caused ALPP's stock price increase during the time period in question.[23] Similarly, the SEC alleges that Mr. Gallagher gained nearly $300,000 from his "scalping" of TSNP. But the SEC fails to note that TSNP's executives and other insiders have

---

[20]  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963).

[21]  *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1268 (9th Cir. 1979).

[22]  *SEC v. Fiore*, 416 F. Supp. 3d 306, 314 (S.D.N.Y. 2019).

[23]  Grizzly Reports, *ALPP: A Failed Holding Company Propelled by the Wings of Defunct Drone Company*, (Mar.10, 2021), https://grizzlyreports.com/Research/ALPP.pdf.

been sued because they were responsible for the fraud that led to the run-up in the TSNP price. *See Pasquinelli v. HUMBL et al.*, 22-CV-0723 (S.D. Ca. 2022). By not pleading that Mr. Gallagher caused the price increase of the stocks, the SEC effectively wants Mr. Gallagher to pay for the fraud of other, completely unrelated parties. This cannot be the law. And further, it leaves Mr. Gallagher in the unenviable position of having to potentially file cross-claims against dozens of others who were responsible for investors' losses here. The SEC's determination to hold Mr. Gallagher accountable for every single dollar that he earned trading, without any attempt to show a link between the profits and fraud, has the potential to create an unwieldly monstrous multi-party litigation due to the need to determine who is responsible.

*Fourth*, the SEC fails to plead materiality for the vast majority of the issuers alleged in the SAC because the tweets that the SAC relies upon are too vague, opinioned and generic to have actually been relied upon. *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021); *Steamfitters Local 449 Pension Plan v. Skechers USA*, 412 F.Supp.3d 353 (S.D.N.Y. 2019) ("[S]tatements that are too vague or general or are merely reflections of corporate puffery are not actionable." (quoting *Lopez v. CTPartners Executive Search Inc.*, 173 F. Supp. 3d 12, 27–28 (S.D.N.Y. 2016)). This is because "[t]o be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *Id.* (internal quotation marks omitted).

As examples, on May 28, 2020, Mr. Gallagher tweeted "$hdii is ready to explode I feel that tomorrow we cash big!!" SAC ¶ 1028. On March 19, 2021, Mr. Gallagher tweeted a "red alert" and stated: "$bzwr growing this is the perfect buy time! . . . $$bzwr strong buy alert!! . . . 1000% gains this year IMO." *Id.* ¶ 473). On September 26, 2021, Mr. Gallagher tweeted "$asta! Bitches!" *Id.* ¶287. As a final example, on February 4, 2021, Mr. Gallagher tweeted, with respect to ARST, "Micro pennies best." *Id.* ¶ 269. The SAC is replete with tweets like this that are vague, boorish, lacking any indicia of reliability, contain virtually no financial analysis, and are accompanied by "alert" gifs. These tweets, reflective solely of Mr. Gallagher's uninformed opinion, cannot expose him to liability for securities fraud as no reasonable investor would have relied on those tweets, *and*, the alleged failure to disclose his sales would not have rendered those generic, vague tweets to be fraudulent. *Sketchers USA*, 412 F.Supp.3d at 366 (plaintiff must explain how the alleged omission rendered the statements fraudulent).

Relatedly, consistent with guidance to take statements in context from *Omnicare*, Mr. Gallagher's tweets, in assessing materiality to an objective reasonable investor, must be understood in light of the forum in which he was operating. Twitter is inherently an unreliable forum, and doubly so for anonymous accounts. For example, Judge Buchwald granted a defendant's summary judgment motion (and then confirmed on reconsideration) for a defamation claim concerning comments made on Twitter. *Rapaport v. Barstool Sports, Inc.*, No. 18 CIV. 8783 (NRB), 2021 WL 1178240, at *22 (S.D.N.Y. Mar. 29, 2021), *reconsideration denied*, 2021 WL 2635821 (S.D.N.Y. June 25, 2021). Judge Buchwald recognized the "the clear trend in cases interpreting New York law that recognizes that a statement's publication on blogs or social media may signal to reasonable audiences that what they are reading is likely to be a statement of opinion as opposed to an actionable statement of fact." 2021 WL 2635821 at *7. And even the

plaintiff in *Rapaport* conceded that comments "made by anonymous and pseudo-anonymous individuals" cannot be actionable. *Id.* This is because courts recognize that statements made online "are vigorous expressions of personal opinion, rather than the rigorous and comprehensive presentation of factual matter." 2021 WL 1178240, at *19 (quoting *Jacobus v. Trump*, 51 N.Y.S.3d 330, 339 (N.Y. Sup. Ct.), *aff'd*, 64 N.Y.S.3d 889 (2017). In light of those, and consistent with the requirements for Rule 9(b), the SEC must identify specific, false factual statements that Mr. Gallagher made *on Twitter* that would have been construed to a reasonable investor, in the appropriate context, as actual "factual matter" and not expressions of opinion. The SEC's lengthy SAC fails to do that here.

*Fifth*, the SEC also relies on stock sales that, because of their volume, could not have been material to any reasonable investor. For example, the SAC alleges that on December 7, 2020, Mr. Gallagher sold approximately "2% of his holdings of ENZC." SAC ¶ 884. As another example, on February 19, 2021, Mr. Gallagher sold 1,000 shares of ALPP, which amounted to approximately 5% of his holdings. *Id.* ¶ 232. Put simply, no reasonable investor would have cared about these immaterial sales, consistent with his trading strategy to "take profits," in the least. Relatedly, with regards to the stock SPOM, for which the SEC seeks nearly $200,000 in disgorgement, the SEC claims that Mr. Gallagher began "scalping" as early as February 2020. SAC ¶ 92. The SEC neglects to mention that this was just months after Mr. Gallagher created his Twitter account, and he had very few followers. Mr. Gallagher's tweets could not have been material to a reasonable investor because investors would not have seen his tweets. Indeed, the SEC does not allege that Mr. Gallagher actually moved the price himself. Moreover, the volume of Mr. Gallagher's *de minimus* stock sales in SPOM would not have been material. *See* SAC ¶ 1386 (1%); *id.* ¶¶ 1389, 1391 (3%); *id.* ¶ 1396 (5%).

It cannot simply be enough to plead that a sale contrary to generic, vague tweets is material to a reasonable investor. Surely a small sale of less than $10,000 worth of stock, perhaps to cover a margin call or to lock in profits, would not thereby render Mr. Gallagher's positive Tweets about a stock to be materially false. Once more returning to ALPP, for example, the SEC alleges Mr. Gallagher sold 10,000 shares on 12/22/20. SAC ¶ 175. But Mr. Gallagher (1) still had over 90% of his position (115,000 shares), (2) bought repeatedly between December 29 and January 4, and (3) traded less than 0.01% of the volume of the stock, which rocketed up on news of its up listing to Nasdaq. Locking in profits on his stock positions by selling a small portion of his holdings is smart trading (as Mr. Novogratz encouraged) and it is not fraud. But by the SEC's allegations, it is impossible to assess materiality because none of the mandatory accompanying context is provided.

*Sixth*, as the Second Circuit recently explained, "Old information tends to become less salient to a prospective purchaser as the market is influenced by new information that is related or of overriding impact." *Danske Bank A/S*, 11 F.4th at 101. This should be especially true in the ephemeral world of social media, but the SEC never discusses intervening events between Mr. Gallagher's alleged touts and his subsequent stock sales. For example, the SEC alleges Mr. Gallagher purchased shares of INQD on May 29, 2020 at prices between $0.0042 and $0.0075. SAC ¶ 1146. Then Mr. Gallagher tweeted "at least 100 touts of INQD." *Id.* ¶ 1147. But the price of INQD went nowhere. Months later, on August 13, 2020, he sold 33% of his holdings at $0.0044, a price lower than what he paid for it. *Id.* ¶ 1148. This lack of temporal linkage

confirms that Mr. Gallagher was not scalping, and it further indicates that Mr. Gallagher had little ability to push the stock.

In sum, the SEC has not alleged that Mr. Gallagher's omissions were material because Mr. Gallagher never held himself out to be a professional, never charged for his advice, and engaged in a forum everyone understands is inherently unreliable. Otherwise, if Mr. Gallagher's tweets are considered material, it would mean that everyone, regardless of background and intent, must always be literally truthful in describing the trading activity of *any* stock they like or tout, even on social media forums such as Twitter. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (inferences must be plausible). This is not what Congress intended in passing the nation's securities laws and it is not what courts have held.[24]

### III.   The Vast Majority of the SAC's Allegations Involve Generic Opinions Lacking Specificity that Cannot Form the Basis for Securities Fraud Charges

As noted, the SEC's SAC rests almost entirely on Mr. Gallagher's alleged omission of his stock sales. *See* 17 C.F.R. § 240.10b–5(b) ("It shall be unlawful for any person ... to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]"). In addition to the reasons set forth above, there are a number of reasons why these "omissions" cannot form the basis of securities fraud claims.

*First*, the SEC's omission-based theory is strained because the connection between the topics Mr. Gallagher chose to discuss on Twitter (general trash-talking regarding certain stocks) and the allegedly omitted information (stock sales) is completely attenuated. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365–66 (2d Cir. 2010) (making one statement about a topic "did not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding" that topic). For example, the SEC claims Mr. Gallagher scalped because he tweeted "$TSOI WHAT A GREAT FIND," while simultaneously selling 25% of his TSOI holdings. SAC ¶¶ 1681-82. The SEC fails to explain how his sale of 25% of his holdings cast doubt on his opinion that he was happy to find TSOI. The tweet at no point explained he was continuing to hold the stock, or even that people should buy the stock. Thus, the SEC's

---

[24] It also bears noting that even if Mr. Gallagher's stock sales were material to reasonable investors, complying with the SEC's demand that he disclose his stock sales at the time of the sale would not protect investors given that it is not unlawful to tout stocks. Under the SEC's theory, as accepted - the stock would still rise with Mr. Gallagher's touting; he would still be free to sell it at a profit in the future; and then, if Mr. Gallagher's sale was material to others, the stock would then fall when he announced his stock sale after completing the sale. Even if Mr. Gallagher disclosed all his sales at the time when he made them, he would still profit (because he was the one selling), while other investors would lose (because the stock price would drop after he disclosed his sales). This makes clear that the SEC's real issue is not Mr. Gallagher's allegedly hidden stock sales, but that Mr. Gallagher touted stocks on Twitter to begin with. However, as long as a tout does not publish knowingly false information, it is not illegal to tout a stock on Twitter, as Mr. Gallagher has a First Amendment right to express his opinion. The SEC's action here is a backdoor way of attacking this lawful conduct, which tramples upon Mr. Gallagher's constitutional rights.

requirement that every time a person tweets positively about a stock they are simultaneously required, in the future, to disclose their stock sales makes little sense.

*Second*, Mr. Gallagher's vague and nebulous opinions are undoubtedly entitled to broad First Amendment protections. As an initial matter, most of Mr. Gallagher's tweets were not "commercial speech" given that they did not seek to propose a "commercial transaction." *See Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473–74 (1989) ("There is no doubt that the AFS 'Tupperware parties' the students seek to hold 'propose a commercial transaction,' which is the test for identifying commercial speech." (*quoting Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). Instead, Mr. Gallagher offered general opinion commentary and projections on certain penny-stocks.[25]

> "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content*." Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, (2002) (internal quotation marks omitted). As a result, the Constitution "demands that content-based restrictions on speech be presumed invalid ... and that the Government bear the burden of showing their constitutionality." *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660, (2004).

Moreover, when the government seeks to compel an individual "to speak a particular message," as the SEC does here by requiring Mr. Gallagher to tweet out his stock sales, government "alter[s] the content of [their] speech,' "and engages in content-based regulation. *See Slattery v. Cuomo,* 531 F.Supp.3d 547, 562 (N.D.N.Y. 2021) (quoting *Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). A court is to "apply the most exacting scrutiny" to such restrictions on speech. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642(1994). Under such "strict scrutiny," a court considers "whether a law is narrowly drawn to serve a compelling governmental interest." *Evergreen Ass'n v. City of New York*, 740 F.3d 233, 245 (2d Cir. 2014). "The statute must use the least restrictive means to achieve its ends." *Id.* (quoting *United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000)).

Here, the SEC's approach does even remotely satisfy the "strict scrutiny" requirement as the SEC seeks to prohibit all tweets, material or not, regarding particular issuers when Mr. Gallagher does not disclose his accompanying trades on Twitter. In fact, even if Mr. Gallaghers tweets were to qualify as commercial speech (and the vast majority do not), the SEC's broad-based no holds barred approach to speech regulation would not even satisfy the "intermediate scrutiny" test set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Common.* 447 U.S. 557 (1980) (under this test, the government must show that it has a substantial interest, that its regulation directly and materially advances the interest, and that the regulation is *narrowly tailored*).

### IV.     Mr. Gallagher's Alleged "Scalping" Cannot be a Basis for Scheme Liability Under 10b-5 or 17(a).

---

[25]   Mr. Gallagher is not generally challenging the ability of the SEC to regulate securities fraud. Rather, he is arguing that "as-applied" to his generic opinion tweets that lack any financial analysis, the application of the securities fraud laws in this particular context is unconstitutional.

99 Park Avenue, Suite 1910, New York, NY 10016 | (t) (646) 350-0527 | www.rochefreedman.com

14

As described, the "fraud" in "scalping" is the alleged material omission, that is, Mr. Gallagher's alleged failure to tell investors that he was selling stock.

On July 15, 2022, the Second Circuit Court of Appeals decided *SEC v. Rio Tinto*, 41 F.4th 47 (2d Cir. 2022), which confirmed that misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections of the securities laws. Specifically, the Court analyzed the Supreme Court's recent decision in *Lorenzo v. SEC*, which held that although "dissemination of false or misleading statements with intent to defraud" does come within the scheme subsections," 139 S. Ct. 1094, 1100, and determined that it was the "dissemination" of those misstatements that was key. *Rio Tinto*, 41 F.4th at 52. In short, something more than misstatements or omissions alone is required to establish scheme liability, and in *Rio Tinto*, that "something more" was the dissemination.

Here, while misstatements coupled with dissemination could conceivably establish scheme liability, the SEC's "scalping" scheme is not based on what Mr. Gallagher said, but rather what he did *not* say. Under *Rio Tinto*, fraud by omission cannot, standing alone, provide a basis for scheme liability. This is because Mr. Gallagher did not disseminate (or do anything else) with his "omissions," as an omission, by its very definition, is a concealment. Mr. Gallagher hid his stock sales from his investors and did not disseminate them. Thus, because there is "nothing more" alleged as part of his omission-based scalping scheme, to the extent SEC's scheme liability claims encompass "scalping," those must fail.

Relatedly, the scheme liability claims must be dismissed for another reason, as the "scheme" allegations fail to comply with Fed. R. Civ. Procedure 9(b). This is because scheme liability requires more than showing a defendant simply made a "misstatement or omission"; scheme liability requires that separate "deceptive conduct" that must be pled with particularity. *See Danske Bank A/S*, 11 F.4th at 105. Put differently, because scheme liability is different from the other 10b sub-sections, a properly pled complaint must adequately define with precision the "contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Id.* at 105.

In *Danske*, the Second Circuit dismissed "scheme" securities fraud claims because the plaintiffs did not "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it. Instead, the claims rested upon the incorporation of the previous 140 pages of the pleading paired with the conclusory assertion that 'Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to … deceive the investing public" and "artificially inflate the market price of Danske Banke ADRs." *Id.* That is exactly what occurred here. The SEC's "scheme" liability simply incorporates "paragraphs 1 through 1869" of the SAC and rests on the conclusory assertion that the defendants "knowingly or recklessly employed one or more devices, schemes or artifices to defraud." SAC ¶¶ 1870-71, 1876-77. The SEC fails to define the contours of the scheme or explain how the scheme differs, at all, from the misrepresentations and omissions alleged in the Second Amended Complaint. Accordingly, pursuant to *Danske*, all the alleged scheme liability claims must be dismissed.

**V.    The SAC's Claim for Violations of Securities Act Section 17(a)(2) Should Be Dismissed to the Extent that the SAC Fails to Allege that Mr. Gallagher "Obtained**

**Money or Property by Means of One or More Untrue Statements of a Material Fact or Omissions of a Material Fact."**

Section 17(a)(2) provides that it is unlawful 'for any person in the offer or sale of securities … directly or indirectly … to obtain money or property by means of any untrue statement of a material fact." As this Court ruled in *SEC v. Wey*, 246 F.Supp.3d 894, 914-915 (S.D.N.Y. 2017), under this statute it is the government's burden to prove that any money or property obtained must be earned "by means of an untrue statute." As this Court aptly noted:

> It is not sufficient that a materially untrue statement was made and the person also made money, such as the incidental payment of a scheduled salary and bonus. It must be plausibly alleged that the money was obtained "by means of" the false statement. 15 U.S.C. § 77q(a). Thus, regardless of the manner of compensation, **if the person would have earned the same fees or compensation regardless of whether the statement was false, a Section 17(a)(2) claim does not lie.** *See,* [*SEC v. DiMaria*, 207 F. Supp. 3d 343, 358-59 (S.D.N.Y. 2016)] (dismissing 17(a)(2) claim against executive who signed off on fraudulent financial statements in part because there were no allegations that defendant's compensation was increased in any way by the fraud); [*SEC v. Syron*, 934 F. Supp. 2d 609, 637-38 (S.D.N.Y. 2013)] (rejecting argument that employee "obtains money or property" by engaging in fraudulent activity that is within the scope of his employment and for which he is compensated by his employer, without allegations that employee's compensation was affected in some way by the fraud).

*Wey*, 246 F. Supp.3d at 915 (emphasis added).

Here, for the vast majority of the stocks, the SEC has certainly alleged that Mr. Gallagher made money. However, like with the defendant in *Wey*, the SEC has failed to connect these earnings to Mr. Gallagher's alleged omissions. For example, although the SEC alleges that Mr. Gallagher "made approximately $471,200 in net profits by engaging in a scheme to scalp shares of Alpine 4 Holdings, Inc.," SAC ¶ 133, the SAC is devoid of any causal connection between Mr. Gallagher's alleged scalping and his obtaining money and property. While the price of ALPP certainly increased during the period in which Mr. Gallagher owned the stock, the SAC fails to link the stock price rise to the scalping. This failure to link the price increase to the alleged scalping is hardly surprising given that ALPP's executives, completely unrelated to Mr. Gallagher, were allegedly engaging in a massive fraud to pump up the price of ALPP.[26] The fact that Mr. Gallagher's tweets cheered the stock on as it rose in price in late 2020 and early 2021 cannot support a Section 17(a)(2) claim, given that it is not pled that Mr. Gallagher had no knowledge of the executives' alleged fraud.

There are many stocks in the SAC where the SEC alleges that Mr. Gallagher made money but fail to provide any causal basis to link the earnings to Mr. Gallagher's alleged

---

[26] Grizzly Reports, *ALPP: A Failed Holding Company Propelled by the Wings of Defunct Drone Company*, (Mar.10, 2021), https://grizzlyreports.com/Research/ALPP.pdf.

falsities. As this Court correctly held, "if the person would have earned the same fees or compensation regardless of whether the statement was false, a Section 17(a)(2) claim does not lie." That applies here just as it did in *Wey*.

## VI. The Claim for Violations of Securities Act Section 17(a) Should Be Dismissed in Its Entirety Because The SEC Does Not Allege that Mr. Gallagher's Alleged Fraud Was in the "Offer or Sale of Securities."

Put simply, Section 17(a) only applies to fraud in the "offer or sale of securities." Mr. Gallagher's alleged fraud in "scalping" was not in the offer or sale of securities. There are no allegations that Mr. Gallagher sold securities to any specified victim of his fraud. Instead, the SAC provides that Mr. Gallagher defrauded investors who were *purchasing* securities by his failure to disclose his stock sales. While this may suffice for a 10b-5 claim, it cannot suffice for a 17(a) claim. Accordingly, the SAC's Section 17(a) claim must be dismissed.

## VII. The SAC Fails to Plead Manipulative Trading

The SAC's Second Count is for manipulative trading charged under Section 9(a)(2) of the Exchange Act with respect to Mr. Gallagher's alleged conduct of "marking the close" in SPOM and BZWR over a handful of days. SAC ¶¶ 93-114, 121-130. "Marking the close" seeks to influence the closing price of a stock by executing real purchase or sale orders at or near the close of the market.

Here, the SEC failed to plead the element of Mr. Gallagher's intent as to both SPOM and BZWR because they fail to allege that his trades were made for no legitimate reason. It is not illegal to purchase or sell securities at the end of the trading day, and in fact, some studies show that most trading occurs near the end of the day.[27] This is why "marking the close" is regulated activity under Section 9(a)(2). Unlike Section 9(a)(1), which pertains to facially illegitimate trading such as match-trading, section 9(a)(2) addresses facially legitimate trading which could be used inappropriately. That is, trades where "beneficial ownership is changing and the volume of trading is reflective of market activity." *SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007). Congress drafted Section 9(a)(2) to narrowly circumscribe liability, making such trades unlawful *only where* the government can prove that the trades were "for *the* purpose of inducing the purchase or sale of such security by others." *See* Section 9(a)(2).

Thus, to prove market manipulation for legitimate transactions such as the ones at issue, a defendant must act "with the intent of artificially affecting the price of the security, *and not for any legitimate reason*." *Masri*, 523 F. Supp. 2d at 372. The SEC must plausibly allege that Mr. Gallagher engaged in end-of-day trading for the *sole* purpose of inducing the purchase or sale of the security, and not for "*any legitimate reason*." For instance, if Mr. Gallagher believed that the price was too low and was marking the close to help "correct" or increase the price, those trades

---

[27] Michelle Fox, *Why the Last Minutes of Trading Are Crucial: Traders*, CNBC (May 28, 2015, 5:36 PM), https://www.cnbc.com/2015/05/28/why-the-last-minutes-of-trading-are-crucial-traders.html; Gunjan Banerji, *The 30 Minutes That Can Make or Break the Trading Day*, WALL ST. J. (Mar. 11, 2020, 5:00 PM), https://www.wsj.com/articles/the-30-minutes-that-can-make-or-break-the-trading-day-11583886131.

would not be for the sole purpose of artificially affecting the price of the security. And because this element about Mr. Gallagher's "purpose" goes to his frame of mind, the SEC also must allege scienter, or a mental state to defraud. *See SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 290 (S.D.N.Y. 2020); *Sharette v. Credit Suisse International*, 127 F. Supp. 3d 60, 79 (S.D.N.Y. 2015).

The allegations regarding SPOM can be quickly addressed as there is nothing that suggests anything other than Mr. Gallagher's desire to accumulate more stock. In that regard, while Mr. Gallagher certainly purchased stock at the end of the trading day, he did not sell that stock. In fact, Mr. Gallagher did not sell stock between July 15, 2020 and August 5, 2020. The SEC alleges that Mr. Gallagher "marked the close" to "artificially raise the price per share of SPOM" between July 23, 2020 and July 31, 2020, with the purchase on August 3, 2020 of a single 10,000 share block (approximately $1,500 worth of stock). In short, Mr. Gallagher was clearly trying to accumulate SPOM. One effect of attempting end of day purchases is to raise the price so that others would sell *to him*. Accumulation of stock is an entirely legitimate reason for trading at the end of day, which therefore prevents liability under Section 9(a)(2). Further, while the SEC alleges that placing limit buy orders above market price made no "legitimate economic sense," in fact, as the trading blotters make clear, Mr. Gallagher's stock orders were only being partially filled. He needed to place buy orders above the market price to accumulate stock.

Likewise with BZWR, Mr. Gallagher was placing large orders for BZWR that were only being partially filled. For example, at the end of day on March 2, 2021, he attempted to purchase 120,000 shares of BZWR. The price, as the SEC notes, was $0.24/share, above the market price of $0.222/share. Despite this, Mr. Gallagher was able to accumulate only 43,000 shares. Once again, Mr. Gallagher needed to place orders above the market price in order to accumulate stock, a perfectly legitimate reason for doing so. In addition, Mr. Gallagher's intent to accumulate stock is borne out by the fact that during the "marking the close" Mr. Gallagher, for the most part, did not sell the stock after he bought it. The only sale that occurred the day after he "marked the close" was on March 3, 2021. And while the SEC claims that Mr. Gallagher profitably sold his 33,000 shares that he had purchased the afternoon before, in fact, the price had moved up only approximately 1 cent from where it was at the close on March 2, 2021. This netted Mr. Gallagher, at best, a few hundred dollars based on the sales he made the day before. This *de minimus* profit did not leave Mr. Gallagher "emboldened by the success of this manipulation," and certainly does not evince an intent to manipulate the market.

In short, while Mr. Gallagher wanted to raise the price of the stock – as all purchasers of stock do – the SEC does not plausibly allege that his *only* purpose was to artificially induce others to buy and sell their shares. Indeed, to the contrary, the allegations indicate that Mr. Gallagher, at least in part, placed his end of day of trades to accumulate more stock. This alone mandates dismissal of the 9(a)(2) claim.

\* \* \*

The SEC's 242-page SAC pleads allegations related to 59 separate stocks, which would take weeks if not months to try before this Court. The SEC's SAC does this even though its theories of liability exceed the bounds of federal securities laws. Because of that, judicial

ROCHE FREEDMAN LLP

99 Park Avenue, Suite 1910, New York, NY 10016 | (t) (646) 350-0527 | www.rochefreedman.com
18

intervention is needed to narrow this case down and confine the SEC only to actual misstatements that had the ability to defraud reasonable investors. For all these reasons, Mr. Gallagher respectfully requestions authorization to move to dismiss, at least in part, the Second Amended Complaint.

                                              Respectfully submitted,

                                              */s/ Eric Rosen*
                                              Eric Rosen
                                              Richard Cipolla
                                              ROCHE FREEDMAN LLP
                                              99 Park Avenue, Suite 1910
                                              New York, New York 10016
                                              (617) 977-4163
                                              erosen@rochefreedman.com
                                              rcipolla@rochefreedman.com

CC: Counsel of Record