

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
100 Pearl Street, Suite 20-100
New York, NY 10004-2616

DIVISION OF
ENFORCEMENT

September 30, 2022

**By ECF**
Honorable P. Kevin Castel
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Courtroom 11D
New York, N.Y. 10007

       Re: <u>SEC v. Gallagher- 21-cv-8739 (PKC)</u>

Dear Judge Castel:

       Plaintiff Securities and Exchange Commission respectfully submits this letter in opposition to Defendant Steven Gallagher's pre-motion letter dated September 12, 2022 (Dkt. 67) ("Ltr."), seeking permission to file a motion to dismiss, in part, the Second Amended Complaint ("SAC") (Dkt. 58). Gallagher seeks permission to move to dismiss: 1) all claims that "depend on a fraud-by-omission theory"; 2) all claims that rely on Gallagher's "vague and nebulous opinions"; 3) the market manipulation claims; 4) the claims set forth under Section 17(a) of the Securities Act of 1933 (Section 17(a)"); and 5) the "scheme liability" claims. Ltr. at 2.[1]

       Gallagher's pre-motion letter is 19 single-spaced pages. To respond to all of his arguments in detail, many of which are frivolous, would require a letter of equal or greater length, which we do not think is contemplated in the pre-motion context. Accordingly, this letter is limited to summarizing the SEC's response to Gallagher's primary arguments.[2]

**Brief Summary of Second Amended Complaint**

       In summary, the SAC charges that, "from at least December 2019 and continuing until at least October 2021, Gallagher engaged in a fraudulent scheme to promote and manipulate primarily OTC [over-the counter] quoted and traded securities ["penny stocks"] using his Twitter handle @AlexDelarge6553, by

---

[1] The SAC charges Gallagher with violations of Section 17(a) (First Claim); Section 9(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") (Second Claim) and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (Third Claim).

[2] In the event that the Court decides to treat Gallagher's pre-motion letter as a motion to dismiss (given its length), the SEC respectfully requests permission to file a formal opposition brief more fully addressing Gallagher's arguments.

encouraging investors to buy specific securities (the "Target Securities"), while at the same time – contrary to his advice to his tens of thousands of Twitter followers, as well as to the viewing public who read his Twitter posts – selling his own holdings of those securities into the inflated price and liquidity that his tweets helped create." SAC ¶ 31.  This is a practice known as "scalping."  Gallagher engaged in scalping in connection with at least 59 Target Securities and generated over $3 million in profits prior to the filing of this action.

Gallagher did not engage in this fraudulent scheme alone. The SAC contains overwhelming evidence that Gallagher engaged in a massive, highly coordinated scheme involving at least 91 Associates (Associates A-MMMM) with whom he variously coordinated to buy ("load up") on stocks at a low price before engaging in coordinated efforts to tout the stocks to their various followers and readers.

The large scale of Gallagher's scheme and Gallagher's central role in it are clearly evidenced by, among many other communications discussed in the SAC, the following private direct message ("DM") Gallagher sent an Associate telling him that Gallagher was coordinating with people in 30 chat rooms to generate trading volume in the penny stock "Life on Earth" before issuing touts to his followers and readers. Gallagher said: "im in 30 rooms ill let one at a time know and build slowly … ok end of day ill gather groups together throughout the day… oh we will rock this easy" and "MOVING THIS GOOD TELLING PEOPLE IN DMS… ok ive gotten 100s of buyers … im gonna alert to the masses you cool with that… WE A GOOD TEAM BUDDY."  SAC ¶ 39.

**SEC's Summary Response to Gallagher's Arguments**

Gallagher first argues that the SAC fails to plead that he owed a duty to disclose his stock sales to his Twitter followers, because he was not an investment adviser or financial columnist and just sent anonymous "generic and empty opinions." (Ltr. at 2-7).  Gallagher would have the Court believe that he was just casually sending random investment thoughts out into the internet. This grossly understates the scale of Gallagher's highly orchestrated, exploitive scheme.

As discussed below, the SAC contains overwhelming evidence that Gallagher engaged in a massive, concerted campaign to actively engender the trust of his Twitter followers who he then cynically and fraudulently exploited, reaping millions of dollars in illegal profits.  Gallagher inundated his followers with thousands of tweets urging them to buy his Target Securities, often dozens of tweets a day directed at just one stock, enticing them with how much money they would make if they followed his advice (at times with specific examples of how much stock prices had jumped after his prior Alerts), and repeatedly falsely assuring his followers that he was not selling his stocks after sending his touts.

In fact, contrary to those assurances and unbeknownst to his trusting followers, this was precisely what Gallagher did, time after time. The SAC details

2

scores of instances where, shortly after sending touts urging his followers to buy a Target Security and/or hold it "long," Gallagher sold large quantities of his own shares without disclosing that material fact to his followers. *See, e.g.,* ¶¶ 35-37; 56-68; 77-86; 283-285; 307-310; 385-387; 499-504; 744-745; 848-850; 851-852; 1125-1131; 1166-1179; 1267-1293; 1327-1333; 1647-1655;1667-1672;1790.

Gallagher argues that there is no general duty of disclosure and that he did not owe any specific duty of disclosure to his followers because he was not a fiduciary or investment professional and did not otherwise have a relationship of trust with them. However, both Section 17(a) and Section 10(b) and Rule 10b-5 thereunder require that when one does choose to speak, and communicate trading recommendations to potential investors, as Gallagher did thousands of times here, one must not make material misrepresentations or omit information necessary to make statements made, in the light of the circumstances in which they were made, not misleading.  And it is well-settled that the duty to disclose material information such as one's intent to imminently sell the stocks one is recommending to others, is not limited to fiduciary relationships. *See, e.g.*, Z*weig v. Hearst Corp.*, 594 F.2d 1261, 1268-1269 (9th Cir. 1979)(financial columnist); *U.S. v. Wenger*, 427 F.3d 840, 854 (10th Cir. 2005) (defendant circulated an apparently free newsletter); *SEC v. Huttoe*, 1998 WL 34078092, at *7 (D.D.C. Sept. 14, 1998) (contributor to stock recommendation newsletter); *SEC v. Park*, 99 F. Supp. 2d 889, 899 (N.D. Ill. 2000) (defendant posted stock touts on various financial internet bulletin boards under an alias; holding that a "person who intends to engage in scalping assumes a duty to disclose his interest in the targeted stock."); *SEC v. Corporate Relations Group, Inc.,* 2003 WL 25570113, at *9 (M.D. Fla. Mar. 28, 2003) (defendant disseminated stock touts through apparently free newsletters); *SEC v. Fassari*, 2021 WL 2290576 at *1, 6-7, SACV-21-403 (C.D. Cal. May 5, 2021)(defendant used Twitter handle @OCMillionaire and similar user names on media sites while scalping).

The SAC more than sufficiently alleges that Gallagher owed a duty to disclose his sales to his Twitter followers and readers, whom he so assiduously encouraged to trust and have confidence in him, *see, e.g.,* ¶¶151; 439; 458; 820; 826; 878-879; 882; 980; 1173; 1417; 1597; 1655.

Second, Gallagher argues that the SAC fails to plead that his failure to disclose his stock sales was material to a reasonable investor. Ltr. at 7-13. However, the case law is clear that a defendant's intent to imminently sell securities that he is encouraging others to buy is a material fact an investor would want to know when deciding whether to follow the defendant's advice. *See, e.g., SEC v. Reynolds*, 2008 WL 3850550, at *6 (N.D. Tex. Aug. 19, 2008) (stating that the "fact that Defendants were encouraging recipients of promotional mailers and [ ] emails to buy stock at the same time that they were selling their stock would be material to reasonable investors."); *Huttoe*, 1998 WL 34078092, at *7 (stating that defendants scalping "reflects on the objectiveness of the investment advice and is therefore material"); *Corporate Relations Group*, 2003 WL 25570113, at *8 (stating the "fact that the [ ]

3

Defendants were not heeding their own advice about the subject stocks would be important to a reasonable reader of the publications.").

Gallagher obviously expected investors to follow his advice. He sent thousands of tweets encouraging people to buy the stocks he was recommending; bragged about how successful a trader he was; told people he would help them make money and repeatedly assured them, falsely, that he was not scalping. His entire business model was predicated on people relying on his advice. The SAC also contains summaries of interviews with seven investors who relied upon Gallagher's advice and lost money doing so, several of whom stated that, if they had known he was selling the stocks he was encouraging them to buy, they would not have bought those stocks. SAC ¶¶ 1848-1869.

Gallagher argues that his victims do not rise to the level of a "reasonable investor" because they were novice, unsophisticated traders and too trusting. He argues that a reasonable investor must be more sophisticated and understand concepts such as the time value of money, etc. Ltr. at 7-8; 9. However, while the standard of a reasonable investor is an objective one, the standard may vary depending on the particular market at issue. "The reasonable investor in a market in which many individual investors trade will be deemed somewhat less schooled and sophisticated than a reasonable investor in a market . . . in which only institutions trade with the help of complex programs and professional traders." *United States v. Litvak,* 889 F.3d 56, 65 (2d Cir. 2018). Here, the standard of a reasonable investor in the OTC markets should take into account such "somewhat less schooled and sophisticated traders." Indeed, imposing a sophisticated reasonable investor standard in this context would allow fraudsters such as Gallagher to run rampant in these markets, escaping liability for their fraud by arguing that investors lacking sophistication do not warrant protection from fraudsters who prey on precisely those types of investors.

Moreover, Gallagher attempts to gloss over the fact that he has pled guilty to an Information charging him with using his Twitter account "to misrepresent the nature of his personal financial stake in the securities of SpectraScience Inc. ("SCIE"), in order to induce others to purchase SCIE stock, and thereby drive up the stock's price, while Gallagher simultaneously and secretly sold his own previously acquired shares at an artificially inflated price." SAC ¶ 6. Gallagher owed the same duty of disclosure to the investors in the other 58 Target Securities he scalped that he owed to the investors in SCIE. In light of his own admissions and pattern of behavior, Gallagher cannot now argue that it was unreasonable for people to rely on his recommendations.

Gallagher's argument that, because he disclosed his stock ownership, any reasonable investor would have expected him to sell his shares at some point (Ltr. at 8-9) also fails. This is not a case about a person who, after promoting a stock, decides at some point down the road to sell.  This is a case about a person who on hundreds of occasions promoted stocks while at the same time scheming to

4

promptly sell those stocks contrary to the advice he was giving, and while also giving frequent false assurances that he did not engage in such deceptive conduct. A reasonable investor would not have expected Gallagher to do what he did here, namely sell significant amounts of his shares on the very days when he was urging others to buy and/or hold these securities for long-term gains. *See, e.g.,* ¶¶ 45; 61-62; 80-81; 151; 566; 733; 861-863; 878.

Third, Gallagher argues that the vast majority of the SAC's allegations involve generic opinions lacking specificity that cannot form a basis for securities fraud charges. Ltr. at 13-14. However, the SAC does not seek to hold Gallagher liable for his opinions or recommendations to buy stocks, *per se*, unless those statements were false or misleading. Rather, the SAC seeks to hold Gallagher responsible for failing to disclose material facts, namely his intent to imminently sell the very stocks he was urging others to buy. Gallagher's alternative argument that his touts were protected by the First Amendment (Ltr. at 14) because they "do not seek to propose a 'commercial transaction'" is frivolous. Gallagher's touts explicitly recommended that his followers buy his Target Securities, clearly commercial transactions.

Fourth, Gallagher argues that scalping cannot be a basis for scheme liability under Rule 10b-5 or 17(a), citing the Second Circuit's recent holding on *SEC v. Rio Tinto*, 41 F.4th 47, 52 (2d Cir. 2022) that misstatements or omissions cannot form the "sole basis" for scheme liability under Sections 17(a)(1) and (3) and Section 10(b) and Rule 10(b)-5 (a) and (c). Ltr. at 14-15. However, as Gallagher acknowledges, the Second Circuit further held that a misstatement coupled with "dissemination" is sufficient to establish scheme liability and the SAC details with great specificity hundreds of touts that Gallagher disseminated via Twitter omitting the material information of his intent to sell the securities he was touting. Gallagher's argument that one cannot disseminate an omission is frivolous. Section 17(a)(2) makes it unlawful "to obtain money or property by means of an untrue statement of material fact or any omission to state a material fact necessary *in order to make the statements made, in light of the circumstances under which they were made, not misleading*. (emphasis added). Thus, Section 17(a)(2) is violated when a person disseminates a statement that omits a material fact. Here, the SAC alleges that Gallagher disseminated hundreds of touts that omitted the material fact that he intended to sell the touted securities at the very time he was urging his followers to buy them.

Moreover, Gallagher's fraudulent scheme was not just limited to the dissemination of materially false and misleading tweets. The SAC charges that Gallagher's fraudulent scheme included enlisting the assistance of numerous Associates who participated in coordinated scalping campaigns with Gallagher. Gallagher's fraudulent scheme also included end of day market manipulation, as discussed below. Thus, the SAC sufficiently alleges scheme liability.

Fifth, Gallagher argues that the Section 17(a)(2) claim should be dismissed because its fails to allege that he "obtained money" as required by that provision, in

that it fails to allege that the profits Gallagher generated when he sold his securities were the result of his fraudulent scalping scheme as opposed to independent market forces. Ltr. at 16-17. However, the SAC plausibly alleges that Gallagher obtained money as a result of his scalping, including numerous instances where Gallagher bragged that his tweets caused price increases in the Target Securities (*see, e.g.,* ¶¶ 71-72; 119; 179; 265; 828-832; 1174; 1347; 1678) and numerous examples of repeated, substantial price increases almost immediately after Gallagher and his Associates commenced their public campaigns touting a particular stock. *See, e.g.,* ¶¶134-147*;* 251-265; 313-323; 335-345; 602-612; 711-718; 828-838; 961-977; 1157-1175; 1267-1293; 1294-1318.

Sixth, Gallagher's argument that the Section 17(a) claim should be dismissed because the SAC does not allege that Gallagher's fraud was "in the offer or sale of securities" because there are no allegations that "Gallagher sold securities to any specified victim of his fraud" (Ltr. at 17) is frivolous. Gallagher's scalping scheme was clearly in connection with his "sale" of his Target Securities. And Gallagher fails to point to any language in Section 17(a)(2) or relevant case law that requires proof that Gallagher sold his shares to any "specified victim."

Finally, Gallagher's argument (Ltr. at 17-18) that the SAC fails to plead manipulative trading in violation of Section 9(a)(2) because it fails to allege that Gallagher's "sole" reason for engaging in end of day trading was to manipulate the stock's closing price fails because Section 9(a)(2) and Section 10(b) and Rule 10b-5, which also makes market manipulation unlawful, contain no such pleading requirement. The SAC sufficiently pleads that Gallagher engaged in market manipulation of two stocks by entering multiple end-of-day buy orders above the market price (which makes no legitimate economic sense), with the intent of artificially raising the stocks' closing prices, including after being warned by his broker on three occasions that his trading appeared to constitute unlawful "marking the close." Gallagher also sent numerous tweets evidencing his intent to raise the closing price of these stocks. SAC ¶¶ 93-114 and 121-130. Gallagher's claim that he submitted buy orders above the current market price for the legitimate reason of inducing sellers to respond to his unfilled orders is contradicted by the fact that he was simultaneously encouraging others to also submit above-market end-of-day buy orders, as well as otherwise buy these stocks. In any event, this defense is, at most, an issue for the trier of fact to decide, not a basis to dismiss the SAC.

The SEC respectfully requests that Gallagher's pre-motion request be denied.

Respectfully submitted,

*/s/ Kevin P. McGrath*
Senior Trial Counsel
Securities and Exchange Commission

Cc. Eric Rosen, Esq. (via ECF)