**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

                                        Plaintiff,

                v.

STEVEN M. GALLAGHER, a/k/a "Alexander
Delarge 655321,"

                                        Defendant.

No. 1:21-cv-8739-PKC-GWG

[ORAL ARGUMENT
   REQUESTED]

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, IN PART, THE SECOND AMENDED COMPLAINT

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................... iii

I.      PRELIMINARY STATEMENT ..................................................................... 1

II.     OVERVIEW OF SECOND AMENDED COMPLAINT ................................... 1

III.    THE SAC FAILS TO PLEAD THAT MR. GALLAGHER OWED A DUTY TO
DISCLOSE HIS STOCK SALES TO HIS TWITTER FOLLOWERS ........................... 3

      A.     Mr. Gallagher's stock sales did not render his generic Tweets about stocks
materially misleading. ................................................................................ 4

      B.     Mr. Gallagher, a magazine salesman who Tweeted in the name of a fictitious
criminal, had no general duty to disclose his stock sales to his Twitter followers. 5

IV.    MR. GALLAGHER'S ALLEGED FAILURE TO DISCLOSE HIS STOCK SALES
WAS NOT MATERIAL TO A REASONABLE INVESTOR. ...................................... 10

      A.     Materiality Standard for an "Omission" ................................................. 10

      B.     The SEC fails to plead materiality with respect to undisclosed stock sales. ........ 11

V.     MR. GALLAGHER'S TWEETS CONSTITUTE FIRST AMENDMENT
PROTECTED SPEECH THAT CANNOT FORM THE BASIS FOR A FRAUD
BY OMISSION CAUSE OF ACTION. ............................................................. 18

VI.    MR. GALLAGHER'S ALLEGED "SCALPING" CANNOT BE A BASIS FOR
SCHEME LIABILITY UNDER 10B-5 OR 17(A)(1) AND (3)...................................... 21

VII.   THE SAC'S 17(A)(2) CLAIM SHOULD BE DISMISSED TO THE EXTENT
THAT THE SAC FAILS TO ALLEGE THAT MR. GALLAGHER "OBTAINED
MONEY OR PROPERTY" FROM "SCALPING."........................................................ 22

VIII.  THE SAC DOES NOT ALLEGE A 9(A)(2) CLAIM FOR MANIPULATIVE
TRADING.................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*,
    568 U.S. 455 (2013) ................................................................................................. 13

*Ashcroft v. Am. Civil Liberties Union*,
    535 U.S. 564 (2002) ................................................................................................. 19

*Ashcroft v. Am. Civil Liberties Union*,
    542 U.S. 656 (2004) ................................................................................................. 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 18

*ATSI Commc'ns v. Shaar Fund Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ......................................................................................... 3

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................................................. 11

*Bd. of Trs. of the State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989) ................................................................................................. 20

*Bogart v. Shearson Lehman Bros., Inc.*,
    No. 91 CIV. 1036 (LBS) (NG), 1995 WL 46399 (S.D.N.Y. Feb. 6, 1995) ............................ 11

*Brass v. Am. Film Techs., Inc.*,
    987 F.2d 142 (2d Cir. 1993) ....................................................................................... 3

*Central Hudson Gas & Elec. Corp. v. Public Serv. Common.*
    447 U.S. 557 (1980) ................................................................................................. 21

*Chiarella v. United States*,
    445 U.S. 222 (1980) ................................................................................................... 5

*Debora v. WPP Grp. PLC*,
    No. 91 Civ. 1775, 1994 WL 177291 (S.D.N.Y. May 5, 1994) ................................. 12

*Evergreen Ass'n v. City of New York*,
    740 F.3d 233 (2d Cir. 2014). ..................................................................................... 20

*Finger v. Pearson PLC*,
    No. 17 CIV. 1422 (RJS), 2019 WL 10632904, (S.D.N.Y. Sept. 16, 2019) ............... 11

*Ganske v. Mensch*,
    480 F.Supp.3d 542 (S.D.N.Y. 2020) ........................................................................... 3

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ............................................................................. 11

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
  42 F.3d 204 (4th Cir. 1994) ................................................................................. 11

*In re Donald Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993) .................................................................................... 11

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010). ................................................................................. 4

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  437 F.Supp.3d 329 (S.D.N.Y. 2020) .................................................................... 15

*In re Vivendi, SA Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016). ............................................................................... 11

*Levitin v. PaineWebber, Inc.*,
  159 F.3d 698 (2d Cir. 1998) ............................................................................... 11

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ..................................................................................... 5

*Rapaport v. Barstool Sports, Inc.*,
  No. 18 CIV. 8783 (NRB), 2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021),
  *reconsideration denied*, 2021 WL 2635821 (S.D.N.Y. June 25, 2021) .................. 16

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ................................................................................... 3

*SEC v. Blavin*,
  557 F.Supp. 1304 (E.D. Mich. 1983) ..................................................................... 9

*SEC v. Capital Gains Research Bureau, Inc.*
  375 U.S. 180 (1963) ....................................................................................... 6, 14

*SEC v. Corp. Relations Grp., Inc.*,
  No. 2003 WL 25570113 (M.D. Fla. Mar. 28, 2003). ............................................. 14

*SEC v. Fiore*,
  416 F. Supp. 3d 306 (S.D.N.Y. 2019) ............................................................ 7, 8, 14

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ............................................................................. 11

*SEC v. GPL Ventures LLC*,
  No. 21 Civ. 6814, 2022 WL 158885 (S.D.N.Y. Jan. 18, 2022) ............................... 8

iv

*SEC v. Huttoe*,
   No. 96-CV-2543, 1998 WL 34078092 (D.D.C. Sept. 14, 1998) ............................................. 14

*SEC v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007) ....................................................................................... 24

*SEC v. Park*,
   99 F.Supp.2d 889 (N.D. Il. 2000) ............................................................................................... 7

*SEC v. Reynolds*,
   No. 08-CV-0384, 2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) ........................................... 14

*SEC v. Rio Tinto*,
   41 F.4th 47 (2d Cir. 2022) ........................................................................................................ 21

*SEC v. Wey*,
   246 F.Supp.3d 894 (S.D.N.Y. 2017) ........................................................................................ 22

*Slattery v. Cuomo*,
   531 F.Supp.3d 547 (N.D.N.Y. 2021) ....................................................................................... 20

*Stadnick v. Vivint Solar, Inc.*,
   861 F.3d 31 (2d Cir. 2017) ........................................................................................... 11, 15, 16

*Steamfitters Local 449 Pension v. Sketchers USA*,
   412 F.Supp.3d 353 (S.D.N.Y. 2019) ........................................................................................ 16

*Turner Broad. Sys. v. FCC*,
   512 U.S. 622 (1994) .................................................................................................................. 20

*Valley Elec. AG v. Polis*,
   No. 20-CV-2133 (ARB) (LB), 2021 WL 3919244 (E.D.N.Y. 2021) ......................................... 3

*Zweig v. Hearst Corp.*,
   594 F.2d 1261 (9th Cir. 1979) ............................................................................................. 7, 14

**Other Authorities**

15 U.S.C. § 77(q) ............................................................................................................................ 22

17 C.F.R. § 240.13d-2 ..................................................................................................................... 10

22 C.F.R.§ 9(a)(2) ........................................................................................................................... 24

## I.   PRELIMINARY STATEMENT

In this novel enforcement action, the SEC contends that Mr. Steven Gallagher, a magazine salesman who "tweeted" his opinions about OTC stocks to his Twitter followers using the Twitter handle @AlexDelarge655321—a reference to the fictional criminal and prisoner number in the movie *Clockwork Orange*—committed securities fraud by failing to inform his Twitter followers that he was selling stock that he touted on Twitter. Factually, this is untrue; he did disclose that he was both selling stock *and* that he would not tell his followers precisely when he sold. In any event, federal securities laws impose no duty to disclose stock sales to Twitter followers. Moreover, Mr. Gallagher's tweets, which lacked any indicia of reliability, analysis, or trustworthiness, and at times consisted only of "alerts," could not have been material to *any* reasonable investor. For these reasons, as well as others set forth below, the second amended complaint ("SAC") must be dismissed, in part, to the extent that the claims 1) depend on a fraud-by-omission theory or 2) rely on Mr. Gallagher's vague and nebulous opinions.[1]

## II.   OVERVIEW OF SECOND AMENDED COMPLAINT

Mr. Gallagher tweeted under the fictional moniker "@AlexDelarge6553." SAC ¶ 31. Mr. Gallagher would purchase large quantities of a certain stock, tell others that he was acquiring that stock, and then, using the "DeLarge" Twitter account, tweet out a flashing red "Alert" that would encourage others to purchase the stock. Mr. Gallagher then sold his shares without informing his Twitter followers (and others) that he was doing so. *Id*. at ¶¶31-46. According to the SEC, this

---

[1] The 242-page SAC pleads 59 different stocks that Mr. Gallagher allegedly "scalped." However, the SAC does little to fix the fundamental problems with this enforcement action, as discussed herein. Because this is now the SEC's third bite at the apple, and also because the SEC did not ask for leave to amend in their pre-motion response (as required by this Court's rules), leave to amend should be denied. Due to the length of the SAC, attached hereto, as <u>Exhibit A</u>, is a chart listing each stock and whether it should be dismissed, in accordance with the arguments set forth in this memorandum of law.

practice of *not* Tweeting that he was selling his shares, in light of his affirmative Tweets, was a material omission that constitutes the fraud of "scalping." [2] *Id.* ¶ 18. The SAC contains no allegations that Mr. Gallagher: was a professional trader or analyst or that he purported to offer *bona fide* financial advice; that he charged for any stock tips; that he hid his ownership stake in the stocks he promoted; that he received money for promoting a stock; that he was a company "insider"; or, that he coordinated any stock sales with others as part of a "dump."

In addition to the material omissions that form the core of the SAC,[3] the SAC alleges a few false statements. Although these alleged false statements are not the subject of this motion to dismiss, many of these "false" statements will not hold up to scrutiny. For example, the SAC alleges that Mr. Gallagher "falsely tweeted" about his ownership in ATOS, yet it acknowledges that the alleged "falsity" was his claim that he had 30,000 shares when he held only 21,000 shares. SAC ¶ 294. As another example, the SEC avers that Mr. Gallagher lied by "retweeting" another's person tweet that contained allegedly false information about a company. *Id.* ¶ 69. The SEC fails to allege, even circumstantially, that Mr. Gallagher was aware that any information was false.

In addition, the SAC paints an inconsistent picture of Mr. Gallagher's disclosures about his selling strategy and sales.  The SAC alleges Mr. Gallagher did not tell his Twitter followers

---

[2] As an example, without identifying a single affirmative misstatement, the SEC alleges that Mr. Gallagher scalped ENZC for nine months. (SAC ¶¶ 839 – 921). The SEC relies solely on omissions, arguing, for example, that his tweeting that ENZC was a buy in February 2021 mandated his disclosure of sales on March 19, 2021, nearly three weeks later. *See Id.* ¶¶ 918-21. In short, Mr. Gallagher allegedly committed fraud by "omission," in that he failed to broadcast the specifics of his future stock sales to his Twitter followers.

[3] Despite these errors, Mr. Gallagher is not moving to dismiss claims arising from allegedly affirmative false statements. This includes his misstatement regarding SCIE that he had "never sold a share" of SCIE. SCIE, as previously explained to this Court, was the **only** stock at issue in Mr. Gallagher's criminal plea, and not relevant to "scalping" claims set forth here.

that he was selling stock while also pleading that Mr. Gallagher repeatedly told his followers that

he was taking "profits." *See, e.g.*, SAC ¶¶ 181, 233, 466, 595, 862, 878. Other Tweets not

included in the SAC unequivocally demonstrate that Mr. Gallagher: did not hide his sales from

his followers (*see* Exhibit B [Tweets about selling stock]), did not pretend to be a financial

advisor (*see* Exhibit C [Tweets about alcohol and being "not smart"]); and, disclosed the risks

associated with OTC stocks (*see* Exhibit D [Tweets about OTC being a "gamble"]). [4] Further,

Mr. Gallagher's public Tweets made clear that: 1) he was both holding and selling the stocks he

was promoting; 2) that he would *not* tell people when or if he was going to sell; and 3) when he

did sell stock and take profits, he "normally" sold "half" of his holdings. *See* Ex. B at 2, 5, 6, 8,

11 and 14. In fact, Mr. Gallagher advised his followers to "[b]uy alerts fast take profits(at the

ask)" (*Id*. at 12), which is the trading strategy the SEC now accuses Mr. Gallagher of hiding.

## III.   THE SAC FAILS TO PLEAD THAT MR. GALLAGHER OWED A DUTY TO DISCLOSE HIS STOCK SALES TO HIS TWITTER FOLLOWERS

The SAC alleges primarily a fraud by "omission" theory, in that Mr. Gallagher bought

the stock low, disclosed his ownership of the stock, shared generic and empty opinions touting

the stock, and then failed to disclose his stock sales to his followers. *See, e.g.*, SAC ¶¶ 169, 170,

175, 176 (describing sequence with regards to ALPP). All claims arising from the fraudulent

---

[4]    Judicial notice of Mr. Gallagher's tweets is proper because they are not being offered for the truth of the matter asserted therein, but rather to demonstrate his followers' knowledge. *See, e.g.*, *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (court can take judicial notice of public records in decision rule 12(b)(6) motion for fraud complaint); *see also Ganske v. Mensch*, 480 F.Supp.3d 542, 545-46 (S.D.N.Y. 2020) (Court took judicial notice of tweets to provide the "necessary or proper context" for understanding defendant's statements."); *Valley Elec. AG v. Polis*, No. 20-CV-2133 (ARB) (LB), 2021 WL 3919244, *1 (E.D.N.Y. 2021) (judicial notice of public tweets). In addition, because the SAC's allegations rely almost entirely on Mr. Gallagher's tweets, they are either documents "incorporated by reference" or "of which plaintiffs had knowledge and relied on" in bringing suit. *See, e.g.*, *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *see also ATSI Commc'ns v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

"omission" theory of liability should be dismissed because the SAC does not allege that Mr.

Gallagher owed a duty to disclose his stock sales to his Twitter followers.

### A.    Mr. Gallagher's stock sales did not render his generic Tweets about stocks materially misleading.

In arguing that Gallagher had a duty to disclose his sales, the SEC maintains that "when

one does choose to speak, and communicate trading recommendations to potential investors …

one must not make material misrepresentations or omit information necessary to make

statements made, in the light of the circumstances in which they were made, not misleading."

Dkt. 70 at 3. In short, if one Tweets positively about a stock, such a statement is materially

misleading if contemporaneous and future stock sales are not fully disclosed.

*First*, the SEC did not cite a single case standing for the proposition that Tweeting

something positive about a stock or recommending a stock to others mandates disclosure of

future sales. Nor could such a rule exist. As every investor knows, selling a stock in the future

does not render a prior stock "recommendation" or tout false or misleading. Individuals sell

stock for many different reasons: the person could be overweight in a particular stock or sector

and is selling to reduce risk, he could need cash to fund a purchase elsewhere, he could be taking

profits based on prior gains in that stock, or he could be diversifying his portfolio. These

scenarios make clear that recommending or tweeting positively about a stock is not rendered

false by future sales.

*Second,* it is well-settled that making one statement about a topic does "not trigger a

generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding"

that topic. *See In re Morgan Stanley Info. Fund Sec. Litig*., 592 F.3d 347, 365–66 (2d Cir. 2010).

Rather, the duty to speak fully about a particular subject arises only when a defendant speaks

directly about that *particular subject*. *Plumber & Steamfitters Local 773 Pension Fund v. Danske*

4

*Bank A/S*, 11 F.4th 90, 103 fn. 4 (2d Cir. 2021) (rejecting omissions-based theory of liability because the connection between the topic discussed and the omission was "fairly attenuated."). Here, connection between the topics Mr. Gallagher chose to discuss on Twitter (general trash-talking, puffery and vague opinions about stocks) and the allegedly omitted information (stock sales) is too attenuated to support a material omission claim. As an example, although the SEC contends that Mr. Gallagher scalped when he tweeted "$TSOI WHAT A GREAT FIND," while selling 25% of his TSOI holdings that same day, SAC ¶¶ 1681-82, the sale of 25% of his TSOI holdings did not render false his generic opinion that he was glad to find TSOI. The tweet did not represent that he was continuing to hold the stock, or even that people should buy the stock. Thus, the SEC's argument, that every time a person tweets positively about a stock they must, in the future, disclose their stock sales, makes little sense and is contrary to Second Circuit law.

> **B.     Mr. Gallagher, a magazine salesman who Tweeted in the name of a fictitious criminal, had no general duty to disclose his stock sales to his Twitter followers.**

Ordinary investors, such as Mr. Gallagher, do not owe a duty to disclose their stock trades to others. See *Chiarella v. United States*, 445 U.S. 222, 233 (1980) (rejecting government's argument that there existed a "general duty" owed by everyone to "all participants in market transactions.").  The SEC ignores this Supreme Court precedent, and instead, in this case of alleged fraud by *failing* to tweet, contends that Mr. Gallagher, who operated a meme anonymous Twitter account in the name of a fictional criminal, owed a general duty to disclose his stock sales to his Twitter followers. Put simply, the SEC's position is that tweeting about a stock—even something as innocuous as "$$ucpa dclt combo alert," SAC ¶ 704—imposes a requirement on everyone, even those unassociated with the issuer and not receiving money to promote stocks, to contemporaneously disclose on Twitter his own personal stock sales. *See, e.g.*, *id.* ¶¶ 169-176 (describing sequence for ALPP whereby Gallagher bought the stock,

5

disclosed his ownership position, shared generic and empty opinions about the stock, but omitted his own subsequent sales of ALPP). That cannot be the law, and it is *not* the law.

Nonetheless, the SEC's position is that a duty arose because Mr. Gallagher committed "scalping," which occurs when a defendant "(i) acquires shares of a stock; (ii) recommends that others purchase the stock without disclosing his intention to sell; and (iii) subsequently sells the stock for his own benefit." SAC ¶ 8. But as the SEC has made clear in its pre-motion submission, this overbroad definition imposes a disclosure obligation on *everyone* who recommends or praises a stock and then proceeds to sell even small portions of that stock down the road. *See* Dkt. 70 at 3 ("the duty to disclose … one's intent to imminently sell the stocks one is recommending to others, *is not limited to fiduciary relationships*"). Such a broad reading of the law is inconsistent with *Chiarella* as well as the other decisions discussed below.

The Supreme Court's decision in *SEC v. Capital Gains Research Bureau, Inc.* 375 U.S. 180 (1963) established modern "scalping" law. *Capital Gains* held that a registered investment advisor had a duty to disclose to his clients a "practice of purchasing shares of a security for his own account shortly before recommending that security for long-term investment and then immediately selling the shares at a profit upon the rise in the market price following the recommendation." The investment advisor assumed a duty to his clients because of the relationship of "trust and confidence" that advisors have with clients. *Id.* at 190.  Because of this duty, the Court held that the advisor's "scalping" was a fraud. Clients expect their advisors to offer disinterested advice; as a result, advisors must "fully and fairly" reveal their "personal interests" to their clients.

Cases following *Capital Gains* built on the Supreme Court's limiting principle that scalping occurs when a person purportedly offering legitimate investment advice fails to disclose

*any* pecuniary motive in making stock recommendations. As examples, in *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979), a prominent newspaper columnist was found liable because, when writing about securities, failed to disclose that he had purchased stocks days before his column was to be published so that he could sell the stock on the "short-swing rise in price." The columnist's readers, relying on his expertise and credibility, believed he was a disinterested advisor when in fact he profited from his recommendations.

The court in *SEC v. Park*, 99 F.Supp.2d 889 (N.D. Il. 2000) court found that the defendant, who operated an Internet bulletin board, had a duty to disclose his personal interests in his investments. Because of the unique facts of that case (*e.g.* the defendant charged his subscribers a "not-insubstantial" fee for his recommendations), Park may have developed a relationship of "trust and confidence" that created a duty. *Id.* at 899. Notably, the *Park* court adopted the *Zweig* definition of scalping, determining that Park "scalped stocks by praising certain stocks in his columns *without revealing that he had invested in the stock at a discount price* prior to publishing the article with the intention of selling the stock on the wave of the price increase resulting his article." *Id*. at 899. Relying on that, the *Park* court noted that the alleged fraud in *Park* occurred because the defendant "did not disclose that *he already owned shares of [the stock]* or that he had placed a limit order to sell his shares one minute before issuing his recommendation to buy." *Id.* at 901.

Last, in *SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019), the defendant scalped because he secretly funded supposedly independent promoters that recommended that investors buy the stock Plandai, while failing to disclose that he (while organizing and funding the promotional campaign), "beneficially owned shares of Plandai, intended to sell shares, and was actively selling his Plandai holdings into the public market." *See Fiore*, Complaint, Dkt. No. 2 at

3, 18-CV-5474 (S.D.N.Y. June 18, 2018). It was this failure of the defendant to disclose his pecuniary interest in the stock during the promotions that rendered Fiore's conduct to be "scalping." In short, following *Chiarella*, a duty to disclose sales applies only in limited circumstances, 1) where a person is acting in some type of fiduciary or trusting capacity *or* 2) fails to disclose *any* beneficial ownership in the touted securities, thereby making it appear that he is offering independent finance advice that can be relied upon by reasonable investors.

The SEC's prior scalping cases (unlike here) have largely reflected these limitations, limiting scalping cases to those where the scalper fails to disclose any beneficial interest in the stock, and those cases where it is clear that the scalper's touts caused the increase in stock price and volume: [5]

| **Historic Scalping Definition** | | **SEC's Definition in *Gallagher*[6]** | |
|---|---|---|---|
| (i) | acquires shares of a stock for his own benefit prior to recommending or touting that stock to others, | (i) | acquires shares of a stock; |
| (ii) | **does not disclose in the tout the full details of his ownership of the shares** and his plans to sell them, and, | (ii) | recommends that others purchase the stock without disclosing his intention to sell; and |
| (iii) | proceeds to sell his shares following the tout's dissemination, and **into the share price and trading volume increases triggered by his touting**. | (iii) | subsequently sells the stock for his own benefit. |

The SAC does *not* plead that Mr. Gallagher failed to disclose to his followers that he owned shares of the stocks he tweeted about. To the contrary, Mr. Gallagher's tweets told his followers that he owned those stocks. *See, e.g.*, SAC ¶¶ 169, 292, 386. The elimination of this

---

[5]   *See, e.g., SEC v. Sodi*, 18-CV-00313-HNJ Dkt. 1 ¶ 1 (N.D. Al. Feb. 26, 2018); *SEC v. Babikian*, 14-CV-01740-PAC Dkt. 1 ¶ 1 (S.D.N.Y. Mar. 13, 2014); *SEC v. GPL Ventures LLC*, No. 21 Civ. 6814, 2022 WL 158885, *2 (S.D.N.Y. Jan. 18, 2022)(citing complaint and definition of scalping included in *Babikian* and *Sodi*).

[6] SAC ¶ 8.

element is critical as to whether Mr. Gallagher owed a "duty" to disclose stock sales, because when a person discloses their long position in a particular stock, every reasonable investor seeing that disclosure would assume that the owner would want the stock price to rise so that he could profit by selling the stock. Indeed, that is the *only* plausible reason for encouraging others to purchase stocks in which a person has a long position. Because of this, there cannot be a "duty to disclose" stock sales because such future stock sales are *already implicit* in the disclosed stock ownership.[7] *Cf. SEC v. Blavin*, 557 F.Supp. 1304, 1312 (E.D. Mich. 1983) (citing *Zweig* and *Capital Gains* and holding that "Blavin's *failure to disclose his substantial ownership of stock in the companies he was touting, and* his intent to sell them soon after recommending that they be bought, was a material omission in violation" of Section 10(b)).

The SAC also contains few allegations that Mr. Gallagher's tweets drove a material increase in the stock price or sales volume, as prior scalping definitions required. As discussed in more detail below, it makes no sense for a person whose tweets are not moving the stock price higher to have an affirmative "duty to disclose" his sales, as such a requirement would serve no practical purpose because the tweets would not be impacting purchasing decisions.[8] The SEC's

---

[7] The SEC concedes in its pre-motion filing that Mr. Gallagher disclosed his long positions, but argues anyway that this is immaterial as to whether Mr. Gallagher engaged in "scalping." This makes little sense as the very definition of scalping put forth by the SEC in prior cases included the disclosure of share ownership. Further, the SEC's speculation that no reasonable investor would have expected Gallagher to "sell significant amounts of his shares on the very days when he was urging others to buy and/or hold these securities for long-term gains," Dkt. 70 at 5, cannot be true in light of Mr. Gallagher's tweets that he would sell on the "rips," take "profits," would "normally" sell up to half his holdings, and would not disclose specific sales. *See* Ex. B.

[8] The SEC's failure to allege the number of Twitter followers is particularly important here. While at the time of his arrest in October 2021, Mr. Gallagher had approximately 70,000 followers, for the vast majority of 2020, Mr. Gallagher had few Twitter followers. The SEC has charged him with "scalping" stocks, such as SPOM (SAC ¶ 92), anyway, while ignoring the fact that his Tweets (seen by few people) were having virtually no impact on the OTC market.

prior scalping definition limiting securities fraud liability to people whose touts materially move the market makes sense; the SEC's current abandonment of that element does not.

That Mr. Gallagher was not obligated to disclose his stock sales is further reinforced by current SEC disclosure rules. The securities laws mandate strict disclosure rules for company insiders, major investors in the stock, as well as paid promoters. For example, when a beneficial owner acquires more than 5% of a stock, that person must file a Schedule 13D. Likewise, when such an insider or control person sells stock, they must file an amended Schedule 13D "promptly." Notably, these insiders do not have to file immediately or prior to their sales; rather, the amended Schedule 13D must be filed within two business days *after* the sale.[9] If company insiders are not required to immediately disclose their sales, why would a company outsider holding a *de minimus* amount of stock have a duty to disclose his sales just because he Tweets? For these reasons, Mr. Gallagher had no duty to disclose his stock sales to his Twitter followers.

## IV.   MR. GALLAGHER'S ALLEGED FAILURE TO DISCLOSE HIS STOCK SALES WAS NOT MATERIAL TO A REASONABLE INVESTOR.

The SAC fails to plead materiality, *i.e.* that a *reasonable investor* would have found Mr. Gallagher's undisclosed intent to sell stocks to have significantly altered the total mix of information available on Twitter.

### A.   Materiality Standard for an "Omission"

A material omission is one that, viewed by a reasonable investor, would have "significantly altered" the "total mix of information made available." *See, e.g.*, *Stadnick v. Vivint Solar, Inc.,* 861 F.3d 31, 37 (2d Cir. 2017); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1466 (2d Cir. 1996) (SEC must allege that "disclosure of the omitted fact would have been" material).

---

[9] *See* 17 C.F.R. § 240.13d-2

This is an objective standard. *See In re Vivendi, SA Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016). A reasonable investor is not a novice and does not have "child-like simplicity." *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988) (internal quotation marks omitted). Reasonable investors understand concepts like the time-value of money, the peril of trusting assumptions, and unpredictable difficulties with launching products. *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998); *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204,1213 & n.7 (4th Cir. 1994)). They discount sales talk and understand general economic conditions. *Bogart v. Shearson Lehman Bros., Inc.*, No. 91 CIV. 1036 (LBS) (NG), 1995 WL 46399, at *2–3 (S.D.N.Y. Feb. 6, 1995); *In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 377 (3d Cir. 1993).

With regards to omissions in opinion statements, like those here, materiality is a "highly-context-specific inquiry." *Finger v. Pearson PLC*, No. 17 CIV. 1422 (RJS), 2019 WL 10632904, at *10 (S.D.N.Y. Sept. 16, 2019); *Stadnick*, 861 F.3d at 37 (courts must consider omissions in context). This is because "a reasonable investor reads a statement 'in light of all of its surrounding text, including hedges, disclaimers, and apparently conflicting information,' while taking into account 'the customs and practices of the relevant industry.'" *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)). Context is particularly important where the underlying statements made are vague, generic, or puffery, because "a reasonable investor would not understand the vague statements in question to be a reflection of every fact known to" to the person making the statement. *Id.*

### B.    The SEC fails to plead materiality with respect to undisclosed stock sales.

For the reasons set forth below, Mr. Gallagher's alleged omissions here, in the context of his vague, boorish tweets untethered to any financial analysis, could not have been material.

*First*, while the SEC's case is premised on the alleged failure to disclose stock sales, any reasonable investor, viewing Mr. Gallagher's tweets in context, would have realized that Mr. Gallagher was going to sell his shares when the stock price increased. This is because: 1) as noted, Mr. Gallagher disclosed his underlying financial ownership of the stocks that he supported and recommended (*see, e.g.,* SAC ¶ 1029 (Mr. Gallagher tweeted that he owned "a lot of $hdii")), and 2) he repeatedly told his Twitter followers that he was selling shares and taking "profits," even telling his followers that he would "normally" sell half his holdings. *S*ee Ex. B; *Cf. Debora v. WPP Grp. PLC*, No. 91 Civ. 1775, 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994) ("A complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed."). Even the SAC, which cherry-picks Mr. Gallagher's tweets, acknowledges that he explicitly told his followers that he was profiting from the stocks he touted. *See, e.g*., SAC ¶¶ 181, 233, 466, 595, 862, 878. Profits, by definition, mean that a person sold stock to realize gains. Further, Mr. Gallagher also repeatedly told his Twitter followers that he would *not* tell them when he sold stock. *See* Ex. B. Given these Tweets, which the SEC ignores, no reasonable investor would believe that Mr. Gallagher would disclose the stock sales that he repeatedly told them he would not disclose.

*Second*, rather than plead the objective reasonable investor standard, the SEC instead relies on conclusory allegations, SAC ¶¶ 20, 66-67, 86, 87, 132, stating, for example, that Mr. Gallagher's alleged failure to disclose stock sales was "material information that his followers, and *any other reasonable investor*, would have wanted to know before making a decision to buy the shares Gallagher was recommending."

But simply touting someone as a "reasonable investor" does not make one so. The SAC's conclusory allegations ignore that materiality is a "highly-context-specific inquiry," and the

"context" here is critical. Unlike in the case of a pump-and-dumper, there are no allegations that Mr. Gallagher held a large proportion of stock or was responsible for a large volume of the trading or alleged dumping.[10] Unlike an issuer withholding information about the company's performance, there are no allegations that Mr. Gallagher had any special insight into the performance of these stocks. Unlike an investment adviser being paid to act as a fiduciary, there are no non-conclusory allegations that Mr. Gallagher, who tweeted in the name of a *fictitious criminal*, held himself out as an expert putting others' interests before his own. Instead, in its pre-motion letter, the SEC employs an entirely *subjective* version of materiality, claiming that Mr. Gallagher's tweets were material because Mr. Gallagher "obviously expected investors to follow his advice." Dkt. 70 at 4. Such subjective circular reasoning is prohibited under Supreme Court precedent. *See Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*, 568 U.S. 455, 467 (2013) (the test for materiality is "an objective one").

*Third*, the SEC's reliance on interviews with a few "novice investor[s]" (out of more than 70,000 Twitter followers) to bolster its argument that generic Twitter "buy" recommendations were material to reasonable investors must be rejected. SAC ¶¶ 1853-69.[11] As examples, Victim B was a "novice investor" who bought stock because "Alex Delarge" tweeted that companies "had a bunch of potential." Victim C purchased stock because Alex Delarge issued "alerts" and "gave the impression that he wanted to teach people investing strategies." Victim D bought stock

---

[10]   In fact, the SEC strategically and repeatedly omits that context. For example, the SEC alleges that Mr. Gallagher's purchase of 1,000 ALPP shares on January 6, 2021 would "attract buyers," neglecting to mention that over *4.4 million* shares traded in ALPP that day. *See* SAC ¶ 187.

[11]   The SEC's pre-motion letter points to these interviews to support their materiality argument, but even in that letter the SEC fails to explain how these "investors," who purportedly would not have purchased stock if they had known that Mr. Gallagher was selling stock, meet the criteria of "reasonable investors." To the contrary, the SAC alleges that these investors purchased stock based purely on generic, speculative tweets that no reasonable investor would rely on.

because of her belief that Alex Delarge was investing "for the long haul" and because Delarge had tweeted that it was a "good idea to hold" a stock. Victim E held a stock even though Alex Delarge encouraged her to sell if she was "afraid." Victim G was a "novice investor" who purchased stocks based on Delarge's tweets that allegedly stated: "I'll hold your hand and you'll have some of the success I do." There is nothing *objectively reasonable* about how these people decided to purchase these stocks, some of which were fractions of a penny.[12]

The SEC is likely relying on interviews with novice investors to hide two key differences between this case and prior scalping cases. First, unlike in prior scalping cases, Mr. Gallagher is not a journalist, analyst, or any other kind of relevant market participant. This difference is important because the materiality of any failures to disclose trading is readily met in those other cases as the source of the recommendation (whether as an investment advisor,[13] financial columnist,[14] professional promoter secretly paid by the issuer, or professional promoter distributing legitimate looking mailers and emails touting a stock[15]) conveys to the investor that the source is trustworthy.[16]   Second, as also noted, for many of the stocks alleged, Mr. Gallagher

---

[12] The SEC's pre-motion letter straw-man argument, that imposing a "sophisticated reasonable investor standard in his context would allow fraudsters to run rampant in these markets," is decidedly not Mr. Gallagher's contention. Some reasonable investors, even in the penny-stock context, could be misled by a fraudster's failure to disclose stock sales. But given the factual circumstances here, involving a meme Twitter account in the name of a fictional criminal putting out "alerts," that is not what happened.

[13] *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963).

[14] *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1268 (9th Cir. 1979).

[15] *SEC v. Reynolds*, No. 08-CV-0384, 2008 WL 3850550, at *6 (N.D. Tex. Aug. 19, 2008); *SEC v. Huttoe*, No. 96-CV-2543, 1998 WL 34078092, at *7 (D.D.C. Sept. 14, 1998) *SEC v. Corporate Relations Group, Inc*., 99-CV-1222, 2003 WL 25570113, at *9 (M.D. Fla. Mar. 28, 2003).

[16] *SEC v. Fiore*, 416 F. Supp. 3d 306, 314 (S.D.N.Y. 2019).

did not cause price increases with his tweets. In other scalping cases a promoter's statements directly caused an increase in price and volume of the stock. This causal relationship between touts and volume *could* support an inference that a particular person's touts were "material" to a reasonable investor. Here, by contrast, for many of the stocks at issue, the SAC does not plead (because it cannot) that Mr. Gallagher's tweets caused an increase in the price of the stock. This too cuts against a finding of materiality.[17]

*Fourth*, because Mr. Gallagher's tweets were too vague, opinionated and generic to have actually been relied upon by any reasonable investor, *see In re Philip Morris International Inc. Securities Litigation,* 437 F.Supp.3d 329, 350 (S.D.N.Y. 2020) (statements of puffery are optimistic statements that are so vague, broad and non-specific that a reasonable investor would not have relied on them), the alleged omissions at issue here (the stock sales), when viewed in this critical context, would not have "significantly altered the total mix of information [already] made available" to a reasonable investor. *See Stadnick,* 861 F.3d at 38.

As examples, on May 28, 2020, Mr. Gallagher tweeted "$hdii is ready to explode I feel that tomorrow we cash big!!" SAC ¶ 1028. The next day, Mr. Gallagher sold 18% of his HDII stock. SAC ¶ 1030. On March 19, 2021, Mr. Gallagher tweeted a "red alert" and stated: "$bzwr growing this is the perfect buy time! . . . $$bzwr strong buy alert!! . . . 1000% gains this year

---

[17] For multiple stocks that the SEC accuses Mr. Gallagher of "scalping," there is evidence that *others* caused the stock price increase. As examples, the SEC seeks disgorgement of nearly $500,000 for "scalping" ALPP, even though an industry research report on ALPP alleges that it was the executives of the company who caused ALPP's price increase during the time in question. Grizzly Reports, *ALPP: A Failed Holding Company Propelled by the Wings of Defunct Drone Company*, (Mar.10, 2021), https://grizzlyreports.com/Research/ALPP.pdf. Similarly, the SEC alleges that Mr. Gallagher gained nearly $300,000 from "scalping" TSNP, even though TSNP's executives and other insiders have been sued for fraud leading to the run-up in the TSNP price. *See Pasquinelli v. HUMBL et al*., 22-CV-0723 (S.D. Ca. 2022). That others caused the price increase negates any plausible inference that Mr. Gallagher's tweets were material.

IMO." *Id.* ¶ 473. Later that day, Mr. Gallagher sold approximately $3,000 worth of stock. SAC ¶ 474. And, on September 26, 2021, Mr. Gallagher tweeted "$asta! Bitches!" *Id.* ¶287, while selling $16,000 worth of stock two days later, SAC ¶ 288. The SAC is chock full of tweets that are vague, boorish, lacking indicia of reliability, contain no financial analysis, and are accompanied by "alerts." These tweets, reflective of Mr. Gallagher's uninformed opinion, are not made false by the small stock sales that followed because those sales did not, as a matter of law, substantially alter the "total mix of information" that a *reasonable* investor would have relied upon. *See also Steamfitters Local 449 Pension v. Sketchers USA*, 412 F.Supp.3d 353, 366 (S.D.N.Y. 2019) (plaintiff must explain how the omission rendered the statements fraudulent).

*Fifth*, in assessing materiality, Mr. Gallagher's tweets (and omissions) must be understood in the context of the forum in which he was sharing his opinion. Twitter is an unreliable forum, and doubly so for anonymous accounts. For example, in *Rapaport v. Barstool Sports, Inc.*, No. 18 CIV. 8783 (NRB), 2021 WL 1178240, at *22 (S.D.N.Y. Mar. 29, 2021), *reconsideration denied*, 2021 WL 2635821 (S.D.N.Y. June 25, 2021), Judge Buchwald granted a defendant's summary judgment motion for a defamation claim concerning comments made on Twitter, and in doing so recognized the "the clear trend in cases interpreting New York law that recognizes that a statement's publication on blogs or social media may signal to reasonable audiences that what they are reading is likely to be a statement of opinion as opposed to an actionable statement of fact." 2021 WL 2635821 at *7. Thus, because Mr. Gallagher was operating anonymously on a meme Twitter account, and tweeting out boorish, vague generic statements of opinion, no reasonable investor would have expected that Mr. Gallagher would have fully disclosed his personal stock sales. *See Stadnick* ("The materiality of an omission must be assessed in light of the total mix of information in the public domain.")

*Sixth*, the SEC also relies on allegedly undisclosed stock sales that, because of their volume and timing, could not have been material. For example, the SAC alleges that on December 7, 2020, Mr. Gallagher sold approximately "2% of his holdings of ENZC." SAC ¶ 884. As another example, on February 19, 2021, Mr. Gallagher sold 1,000 shares of ALPP, which amounted to approximately 5% of his holdings. *Id.* ¶ 232. No reasonable investor would have cared about these immaterial sales, consistent with his trading strategy to "take profits." Likewise, for example, with regards to the stock SPOM, the SEC claims that Mr. Gallagher began "scalping" as early as February 2020. SAC ¶ 92. The SEC neglects to mention that this "scalping" occurred just months after Mr. Gallagher created his Twitter account, and he had very few followers. *See also* TLSS, INQD and others. Mr. Gallagher's tweets would not have been material to a reasonable investor because investors would not have seen his tweets.[18]

*Seventh*, and finally, "[o]ld information tends to become less salient to a prospective purchaser as the market is influenced by new information that is related or of overriding impact." *Danske Bank A/S*, 11 F.4th at 101. This is especially true in the ephemeral world of social media, but the SEC never discusses intervening events between Mr. Gallagher's alleged touts and his subsequent stock sales. For example, the SEC alleges Mr. Gallagher purchased shares of INQD on May 29, 2020 at prices between $0.0042 and $0.0075. SAC ¶ 1146. Then Mr. Gallagher tweeted "at least 100 touts of INQD." *Id.* ¶ 1147. Months later, on August 13, 2020, he sold 33%

---

[18] Once more returning to ALPP, for example, the SEC alleges Mr. Gallagher sold 10,000 shares on Dec. 22, 2020. SAC ¶ 175. But Mr. Gallagher (1) still had over 90% of his position (115,000 shares), (2) bought repeatedly between December 29 and January 4, and (3) traded less than 0.01% of the volume of the stock, which rocketed up on news of its up listing to Nasdaq. Locking in profits on his stock positions by selling a small portion of his holdings is smart trading; it is not "scalping." But by the SEC's allegations, it is impossible to assess materiality because none of the mandatory accompanying context is provided.

of his holdings at $0.0044, a price lower than what he paid for it. *Id.* ¶ 1148. This lack of temporal linkage confirms that Mr. Gallagher's tweets were not material.

In sum, the SEC has not alleged that Mr. Gallagher's omissions were material for the reasons set forth above. Otherwise, if Mr. Gallagher's omissions *are* considered material, it would mean that everyone, regardless of background and intent, must always be truthful in describing their trading activity in *any* stock they like or tout, even on unreliable social media forums such as Twitter.[19] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (inferences must be plausible). This is not what Congress intended in passing the nation's securities laws.

## V.   MR. GALLAGHER'S TWEETS CONSTITUTE FIRST AMENDMENT PROTECTED SPEECH THAT CANNOT FORM THE BASIS FOR A FRAUD BY OMISSION CAUSE OF ACTION.

The core of the SEC's case is that Mr. Gallagher, unlike a typical pump-and-dumper, was not spreading materially false information to induce others to purchase stocks; instead, he was touting stocks and coordinating the purchase of stocks with others while *not* disclosing his stock sales. *See* Dkt. 70 at 5 ("the SAC seeks to hold Gallagher responsible for failing to disclose material facts, namely his intent to imminently sell the very stocks he was urging others to buy."); *cf.* SEC Website Defining Pump and Dump Schemes ("In a pump and dump scheme, fraudsters typically spread *false or misleading information* to create a buying frenzy that will "pump" up the price of a stock and then "dump" shares of the stock by selling their own shares at

---

[19] The SEC's attempt to capitalize on Mr. Gallagher's guilty plea to bolster their "reasonable investor" arguments falls short. Mr. Gallagher did not plead guilty to scalping. Mr. Gallagher did not acknowledge in his plea colloquy that reasonable investors had a right to know the details of his stock sales. Instead, Mr. Gallagher pled guilty to a few, specific *affirmative misrepresentations* regarding his stock sales and ownership. *See* Colloquy, Dkt. 42-3 at 19:7-8 ("I sent a few tweets about my personal finance stake in SCIE that were false.").

the inflated price.").[20] There are no allegations that Mr. Gallagher coordinated his stock sales together with others. Instead, Mr. Gallagher used his social media bullhorn to tweet his opinions about stocks that he himself was purchasing (and let others know he was purchasing), while at the same time encouraging his followers to "sell smart" and "take profits."[21]

But as the SEC has recognized, recommending or touting stocks, without spreading false information, is protected First Amendment activity. *See* SEC Cyberfraud Website ("Because the U.S. Constitution's First Amendment protects freedom of speech, the SEC cannot simply prohibit newsletters from recommending or touting particular stocks."); [22] SEC Website on Social Media ("Touting isn't illegal as long as the newsletters disclose who paid them, how much they're getting paid, and the form of the payment, usually cash or stock.").[23]

Such protected activity also extends to coordinated purchasing of stocks. When former SEC Chairman Jay Clayton gave an interview about the GameStop phenomenon, where retail traders banded together to push up the price of Gamestop to punish hedge funds who had shorted the stock, he opined that Gamestop was not an illegal pump-and-dump because the traders were "very transparent about what they were doing and why they were doing it."[24] Mr. Clayton's conclusion makes sense because the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content*." Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted). As a result, the Constitution "demands that content-based restrictions on speech be presumed invalid ....". *Ashcroft v. Am.*

---

[20] *See* https://tinyurl.com/mt42hrt2
[21]   Mr. Gallagher is not challenging the ability of the SEC to regulate securities fraud. Rather, he is arguing that "as-applied" to his generic opinion tweets that lack any financial analysis, the requirement that he affirmatively Tweet out his stock sales is unconstitutional.

[22] *See* https://www.sec.gov/investor/pubs/cyberfraud/newsletter.htm, last checked Oct. 26, 2022.
[23] *See* https://tinyurl.com/2p8t7shd, last checked Oct. 26, 2022.
[24] *See* https://tinyurl.com/mrxvuz6y

*Civil Liberties Union*, 542 U.S. 656, 660 (2004). It thereby follows that restrictions on sending messages to others recommending the purchase of stock are "presumed invalid."

It is for these reasons that the SEC does not focus on what Mr. Gallagher *did* Tweet, but rather what he did *not* Tweet (his specific stock sales). But the SEC now seeks to compel Mr. Gallagher to Tweet, that is to publicly disclose his stock sales to his Twitter followers. When the government seeks to compel an individual "to speak a particular message," the government "alter[s] the content of [their] speech,' "and engages in content-based regulation. *See Slattery v. Cuomo,* 531 F.Supp.3d 547, 562 (N.D.N.Y. 2021) (quoting *Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). A court is to "apply the most exacting scrutiny" to such restrictions on speech. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). Under such "strict scrutiny," a court considers "whether a law is narrowly drawn to serve a compelling governmental interest." *Evergreen Ass'n v. City of New York*, 740 F.3d 233, 245 (2d Cir. 2014). "The statute must use the least restrictive means to achieve its ends." *Id.* (quoting *United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000)).[25]

The SEC's approach does even remotely satisfy this "strict scrutiny" requirement. Rather than narrowly tailoring this action to a few particular incidents where Mr. Gallagher's failure to disclose his stock sales may have rendered a particular Tweet misleading (*see* Attachment A), the SEC's action here, encompassing 59 different stocks over 1869 paragraphs, sweeps in nearly every Tweet where he uttered *anything* positive about a particular stock. *See, e.g.*, SAC ¶¶ 1332

---

[25] While First Amendment protections are more limited with commercial speech, most of Mr. Gallagher's tweets were not "commercial speech" as they did not seek to propose a "commercial transaction." *See Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473–74 (1989) ("There is no doubt that the AFS 'Tupperware parties' the students seek to hold 'propose a commercial transaction,' which is the test for identifying commercial speech." Instead, Mr. Gallagher primarily (although not exclusively) offered general opinion commentary and projections on certain penny-stocks. *See, e.g.*, SAC ¶¶ 185, 187, 205, 630.

("6 $phbi); ¶ 1365 ("Oh Shit!! We have a smart trader!! $shom smart!!"); 1495 ("Wednesday

$spom week rebound!!"); 1742 ("Monday list RETWEET I'll follow on RETWEETS …

$uapc"). The SEC's pleadings cannot survive a "strict scrutiny" analysis.[26]

## VI.   MR. GALLAGHER'S ALLEGED "SCALPING" CANNOT BE A BASIS FOR SCHEME LIABILITY UNDER 10B-5 OR 17(A)(1) AND (3).

The Second Circuit's recent decision in *SEC v. Rio Tinto*, 41 F.4th 47 (2d Cir. 2022) held

that misstatements and omissions alone could not form the "sole basis" for liability under the

scheme subsections of the securities laws. Rather, something is required, and in *Rio Tinto*, that

"something more" was the misstatements' dissemination.

Here, while misstatements coupled with dissemination could conceivably establish

scheme liability, the SEC's "scalping" scheme is not based on what Mr. Gallagher said, but

rather what he did *not* say. Under *Rio Tinto*, fraud by omission cannot, standing alone, provide a

basis for scheme liability. This is because Mr. Gallagher did not disseminate (or do anything

else) with his "omissions." An omission, by its very definition, is a concealment. Thus, because

there is "nothing more" alleged as part of his omission-based scalping scheme, to the extent

SEC's scheme liability claims encompass "scalping," those must fail.[27]

---

[26] Even if Mr. Gallaghers tweets were to qualify as commercial speech (and the majority do not), the SEC's broad-based no holds barred approach to speech regulation would not satisfy the "intermediate scrutiny" test set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Common.* 447 U.S. 557 (1980) (government must have a substantial interest, that its regulation directly and materially advances the interest, and that the regulation is *narrowly tailored*).

[27] The SEC's attempt to plead "scheme liability" through allegations of violating Section 17(a)(2) (omissions) is puzzling. Section 17(a)(2) is not the scheme liability provision; Section 17(a)(1) and (3) are. *Rio Tinto* specifically states that in evaluating scheme liability pleadings, court must "[m]aintain[ ] distinctions between the subsections of Rule 10b-5 and between the subsections of Section 17(a)(2) … [w]ere misstatements and omissions alone sufficient to constitute a scheme, the scheme subsections would swallow the misstatement subsections." 41 F.4th at 54.

The scheme liability claims must be dismissed for another reason, as the allegations fail to satisfy Fed. R. Civ. Procedure 9(b). This is because scheme liability requires more than showing that a defendant simply made a "misstatement or omission"; scheme liability requires that separate "deceptive conduct" that must be pled with particularity. *See Danske Bank A/S*, 11 F.4th at 105. A complaint must adequately define with precision the "contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Id.* at 105. In *Danske*, the Court dismissed "scheme" securities fraud claims because the plaintiffs simply incorporated by reference the previous 140 pages of the pleading and paired that with the conclusory assertion that 'Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to … deceive the investing public" and "artificially inflate the market price of Danske Banke ADRs." *Id.*

That is exactly what occurred here. The SAC's "scheme" liability incorporates "paragraphs 1 through 1869" of the SAC and rests on the assertion that the defendants "knowingly or recklessly employed one or more devices, schemes or artifices to defraud." SAC ¶¶ 1870-71, 1876-77. The SAC failed to define the contours of the scheme or explain how the scheme differs, at all, from the misrepresentations and omissions alleged in the SAC. Accordingly, under *Danske*, the scheme liability claims must be dismissed.

**VII.    THE SAC'S 17(A)(2) CLAIM SHOULD BE DISMISSED TO THE EXTENT THAT THE SAC FAILS TO ALLEGE THAT MR. GALLAGHER "OBTAINED MONEY OR PROPERTY" FROM "SCALPING."**

Section 17(a)(2) of the Securities Act 15 U.S.C. § 77(q) provides that it is unlawful "for any person in the offer or sale of securities … directly or indirectly … to obtain money or property by means of any untrue statement of a material fact" or omission. As this Court ruled in *SEC v. Wey*, 246 F.Supp.3d 894, 914-915 (S.D.N.Y. 2017), it is the government's burden to prove that any money obtained be earned "by means of an untrue" statement. *Id*. at 915 (this

Court aptly noted: "It is not sufficient that a materially untrue statement was made and the person also made money … **if the person would have earned the same fees or compensation regardless of whether the statement was false, a Section 17(a)(2) claim does not lie.**").

Here, for many stocks, while the SEC has alleged that Mr. Gallagher made money, the SEC has failed to connect these earnings to Mr. Gallagher's alleged omissions. For example, although the SEC alleges that Mr. Gallagher "made approximately $471,200 in net profits by engaging in a scheme to scalp ALPP," SAC ¶ 133, the SAC does not plead a causal connection between Mr. Gallagher's alleged scalping and his obtaining that money. While the price of ALPP increased during the period in which Mr. Gallagher owned the stock, the SAC does not link the price rise to scalping. This is hardly surprising given that ALPP's executives, completely unrelated to Mr. Gallagher, were allegedly engaging in a fraud to pump up the price of ALPP.[28] That Mr. Gallagher's tweets cheered the stock on as it rose in price cannot support a Section 17(a)(2) claim. There are numerous listed stocks where the SEC alleges that Mr. Gallagher made money but fails to provide a causal link between the earnings and Mr. Gallagher's alleged falsities or omissions. For those stocks, the Section 17(a)(2) claims should be dismissed.

## VIII.   THE SAC DOES NOT ALLEGE A 9(A)(2) CLAIM FOR MANIPULATIVE TRADING.

The SAC's charges Mr. Gallagher under Section 9(a)(2) of the Exchange Act (15 U.S.C. § 78i) for "marking the close" in SPOM and BZWR over a handful of days. SAC ¶¶ 93-114, 121-130. "Marking the close" refers to manipulating the closing price of a stock by executing real purchase or sale orders at or near the close of the market. Here, this claim must be dismissed

---

[28] Grizzly Reports, *ALPP: A Failed Holding Company Propelled by the Wings of Defunct Drone Company*, (Mar.10, 2021), https://grizzlyreports.com/Research/ALPP.pdf.

because the SAC fails to allege that "but for" Mr. Gallagher's alleged manipulative intent, he would not have engaged in the purchases of SPOM and BZWR.

Section 9(a)(2) addresses facially legitimate open-market trading such as "marking the close," that is, trades where "beneficial ownership is changing and the volume of trading is reflective of market activity." *SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007). Because of this, Congress drafted Section 9(a)(2) to narrowly circumscribe liability, making such trades unlawful *only* where the government can allege that a person "created actual or apparent active trading" in a security or "raising or depressing the price of such security," for "***the*** purpose of inducing the purchase or sale of such security by others." *See* 22 C.F.R.§ 9(a)(2) *see Masri*, 523 F. Supp. 2d at 372 (a defendant must act "with the intent of artificially affecting the price of the security, *and not for any legitimate reason*."). Put differently, to "impose liability for an open market transaction, the SEC must prove that *but for* the manipulative intent, the defendant would not have conducted the transaction." *See Masri*, 523 F. Supp. 2d at 373.

Here, the SEC's pleading falls far short of that high barrier. With respect to trading in SPOM (SAC ¶¶93-120), the SAC's allegations demonstrate, at least in part, that Mr. Gallagher was buying SPOM at the end of the day because of his desire to accumulate more stock. In that regard, while Mr. Gallagher certainly purchased stock at the end of the trading day, he did not sell that stock to capture any alleged profits that came from purchasing SPOM at the end of the day. In fact, Mr. Gallagher did not sell SPOM between July 15, 2020 and August 5, 2020. Thus, as a matter of law, the SEC cannot prove that "but for" any manipulative intent, Mr. Gallagher would not have purchased SPOM at the end of the day.

Likewise, with BZWR (SAC ¶¶121-30), the only sale that occurred the day after he allegedly "marked the close" was on March 3, 2021. SAC ¶ 122. And while the SEC claims that

Mr. Gallagher profitably sold his 33,000 shares that he had purchased the afternoon before, in fact, the price had moved up only approximately 1 cent from where it was at the close on March 2, 2021. This netted Mr. Gallagher, at best, a few hundred dollars based on the sales he made the day before. This *de minimus* profit did not leave Mr. Gallagher "emboldened by the success of this manipulation," and certainly does not demonstrate a "but for" intent to manipulate.

In short, while Mr. Gallagher wanted to raise the price of the stock – as all purchasers of stock do – and he discussed that with his Twitter friends, the SEC does not plausibly allege that he would not have engaged in the transactions "but for" any manipulative intent. To the contrary, the allegations indicate that Mr. Gallagher, at least in part, placed his end of day of trades to accumulate more stock. This alone mandates dismissal of the 9(a)(2) claim.

\* \* \*

The 242-page SAC pleads allegations related to 59 separate stocks, the vast majority of which concern only Mr. Gallagher's alleged failure to disclose his specific stock sales. Judicial intervention is needed to narrow this case and confine the SEC only to actual misstatements that had the ability to defraud reasonable investors. For all these reasons, Counts I and III of the SAC should be dismissed with respect to the stocks for which no affirmative misstatements are pled (*see* Attachment A), and the remaining stocks should be dismissed, in part, to the extent that the claims do not allege specific affirmative misstatements. *See* Attachment A. Count II of the SAC should also be dismissed in its entirety for failure to plead a claim for open market manipulation.

Dated: October 26, 2022

Respectfully submitted,

*/s/ Eric Rosen*
Eric Rosen
Richard Cipolla
**FREEDMAN, NORMAND AND FRIEDLAND LLP**
99 Park Avenue, Suite 1910
New York, New York 10016
(617) 977-4163
erosen@fnf.law
rcipolla@fnf.law