**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                    **Plaintiff,**

          **-against-**

**STEVEN M. GALLAGHER, a/k/a Alexander**
**Delarge655321;**

                    **Defendant.**

**21 Civ. 8739 (PKC)(GWG)**

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**
**THE SECOND AMENDED COMPLAINT**

Kevin P. McGrath (mcgrathk@sec.gov)
Thomas Peirce (not admitted SDNY)
Securities and Exchange Commission
New York Regional Office
100 Pearl Street Suite 20-100
New York, NY 10004-2616
(212) 336-0533 (McGrath)

November 30, 2022

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ......................................................................................... ii

**PRELIMINARY STATEMENT** .....................................................................................1

**RELEVANT PROCEDURAL BACKGROUND**..................................................................5

**THE SAC'S ALLEGATION** ........................................................................................ 6

    I.    Summary of Gallagher's Fraudulent Scalping Scheme ....................................6

    II.   Summary of Gallagher's "Marking the Close" Violations ................................7

**STANDARD OF REVIEW** ...........................................................................................8

**ARGUMENT** ............................................................................................................9

    I.    The SAC Sufficiently Pleads that Gallagher Made Actionable Omissions in Failing to Disclose His Stock Sales to His Twitter Followers and Other Twitter Readers.................9

        A.  Gallagher's Recommendations Were Rendered Misleading by His Omissions....10

        B.  Gallagher Misconstrues the Applicable Law ........................................11

    II.   The SAC Adequately Alleges Material Omissions ........................................16

    III.  Gallagher's Alleged Tweets are Not Protected Speech Under the First Amendment .......20

    IV.  The SAC Adequately Alleges That Gallagher's Scalping Scheme Violates Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) .................................................................21

    V.   The SAC Sufficiently Pleads That Gallagher Obtained Money by Means of His Materially False Statements or Omissions in Violation of Section 17(a)(2) ....................22

    VI.  The SAC Sufficiently Pleads Manipulative Trading under Section 9(a)(2) ....................24

**CONCLUSION** ........................................................................................................25

i

## **TABLE OF AUTHORITIES**

**Cases**

*Altimeo Asset Mgt. v. Qihoo 360 Tech. Co. Ltd.,* 19 F. 4th 145 (2d Cir. 2021) ...........................16

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) .................................................................................8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................8

*Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002)..................................................................9

*Central Hudson Gas & Elec. Corp. v. Public Serv. Common,* 447 U.S. 557 (1980) ...................21

*Chiarella v. United States,* 445 U.S. 222 (1980)...................................................................9, 11, 13

*Donald L. Koch*, Exchange Act Rel. No. 72179, 2014 WL 1998524 (May 16, 2014).................25

*ECA v. JP Morgan Chase,* 553 F.3d 187 (2d Cir. 2009) .............................................................16

*Evergreen Ass'n v. City of New York,* 740 F.3d 233 (2d Cir. 2014)..............................................20

*Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2015)................................................................................25

*Lorenzo v. SEC*, __ U.S. __, 139 S. Ct. 1094 (2019)...................................................................21

*Mills v. Polar Molecular Corp.,* 12 F.3d 1170 (2d Cir. 1993).........................................................8

*In re Morgan Stanley Info., Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010) .............................10n4

*In re Parmalat Securities Litigation*, 376 F.Supp.2d 472 (S.D.N.Y. 2005) .................................21

*In re Philip Morris International Inc., Securities Litigation,*
    437 F. Supp. 3d 329 (S.D.N.Y. 2020)..............................................................................19n13

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S,*
    11 F.4th 90 (2d Cir. 2021).......................................................................................10n4, 22

*Rapaport v. Barstool Sports, Inc.,*
    No. 18 CIV. 8783 (NRB), 2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021)...........................17n8

*Roth v. Jennings,* 489 F.3d 499 (2d Cir. 2007) ........................................................................9, 23

*In re Salomon Analyst AT&T Litig.*, 350 F.Supp.2d 455 (S.D.N.Y. 2004) (Lynch, J.)................21

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963)...................................12, 14n6

*SEC v. Corporate Relations Group, Inc.,* 2003 WL 25570113 (M.D. Fla. Mar. 28, 2003) ....11, 16

*SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019)..........................................................13, 14n6

*SEC v. Huttoe*, No. CIV.A. 96-2543 (GK), 1998 WL 34078092 (D.D.C. Sept. 14, 1998)..........16

*SEC v. Kwak*, 2008 WL 410427 (D. Conn. Feb. 12, 2008) ....................................................24, 25

*SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) (Holwell, J.)...............................................24

*SEC v. North Am. Research & Dev. Corp.,* 424 F.2d 63 (2d Cir. 1970) ................................19n12

*SEC v. Park*, 99 F. Supp. 2d 889 (N.D. Ill. 2000) ........................................................................13

*SEC v. Power,* 525 F. Supp. 2d 415 (S.D.N.Y. 2007) .....................................................................8

*SEC v. Reynolds*, 2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) .................................................17

*SEC v. Rio Tinto*, 41 F.4th 47 (2d Cir 2022)...........................................................................4, 21

*SEC v. Thompson,* 238 F. Supp. 3d 575 (S.D.N.Y. Mar. 2, 2017) .......................................11, 14n6

*SEC v. Wey,* 246 F. Supp. 3d 894 (S.D.N.Y. 2017)......................................................................23

*Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64 (2d Cir. 2021)....................................24

*In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223 (2d Cir. 2016) ..........................................................9

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)..............................................................19

*United States v. Litvak,* 889 F.3d 56 (2d Cir. 2018) .....................................................................17

*United States v. Stein*, 456 F.2d 844 (2d Cir. 1972) .....................................................................24

*United States v. Wenger*, 427 F.3d 840 (10th Cir. 2005)...............................................................11

*Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989 (2016) .........................................9

*Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979)................................................12, 13, 14, 16

**Regulations**

15 U.S.C. § 77q(a)(2)......................................................................................................................9

17 C.F.R. § 240.10b-5(b) ................................................................................................................9

Plaintiff Securities and Exchange Commission respectfully submits this memorandum of law in opposition to Defendant Steven Gallagher's partial motion to dismiss the Second Amended Complaint ("SAC") (Dkt. 72, "Motion," and Dkts. 73 ("Br." and 73-1 to 73-4).

## PRELIMINARY STATEMENT

The SAC alleges that, from at least December 2019 through October 2021, Gallagher engaged in a fraudulent scheme to promote and manipulate primarily OTC [over-the counter] quoted and traded securities ["penny stocks"] using his Twitter handle @AlexDelarge6533, by encouraging investors to buy specific securities (the "Target Securities"), without disclosing his imminent intent to sell his own holdings of those securities, and then selling his shares. This is a practice sometimes called "scalping." Gallagher engaged in this conduct in connection with at least 59 Target Securities and generated over $3 million in profits prior to the filing of this action.

The SAC also contains detailed allegations that Gallagher at times communicated with dozens of associates in deciding which stocks to target and load up on before engaging in coordinated efforts to tout the stocks to the public. And, as the SAC alleges, Gallagher pled guilty to an Information charging him with using his Twitter account to "induce others to purchase [one particular] stock, and thereby drive up the stock's price, while Gallagher simultaneously and secretly sold his own previously acquired shares at an artificially inflated price." ¶¶ 5-6. [1]

The SAC also alleges that Gallagher engaged in manipulative trading in two stocks by placing multiple end-of-day ("EOD") bids, often above the current asking price, in order to increase the share price and induce others to buy the stock, a practice known as marking the close. Based on the SAC's factual allegations, the SAC charges Gallagher with securities fraud and market manipulation in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") (First Claim); Section

---

[1] All references to "¶" are to the numbered paragraphs in the SAC.

9(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") (Second Claim); and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (Third Claim).

Despite the SAC's detailed allegations, Gallagher moves to dismiss portions of Counts I and III and all of Count II. Specifically, Gallagher moves to dismiss: 1) Counts I and III with respect to the stocks for which no affirmative misstatements are pled; 2) Count I under Section 17(a)(2) with respect to stocks for which there are no allegations that Gallagher obtained money due to scalping (*see* Br., Ex. A); and 3) Count II in its entirety for failure to plead a claim for "marking the close" market manipulation. Mot. at 1. Gallagher makes six main arguments, all of which are baseless.

*First*, Gallagher argues that he did not owe any duty to disclose his stock sales to his Twitter followers because he was not a fiduciary or recognized investment authority. Instead, he claims he was a "magazine salesman" who merely sent "generic" tweets about stocks through an anonymous Twitter handle (named for a character from the movie *A Clockwork Orange*) and disclosed that he owned the stocks he was touting. Br. at 3-10. He argues that a reasonable investor would have expected that he would eventually sell his securities and take profits.

Gallagher would have the Court believe that he was just casually sending random investment thoughts out over the internet. This grossly understates the scale and degree of intentional manipulation behind Gallagher's fraudulent scheme. Gallagher inundated his followers with thousands of tweets urging them to buy his Target Securities, often dozens of tweets a day directed at just one stock. He supplemented these recommendations with examples of how much the stock prices had risen right after his prior tweets, and he made false assurances that he was not selling his shares after sending his tweets. The SAC details hundreds of instances where, on the day, or shortly after, Gallagher urged his followers to buy a Target Security or hold it "long," he sold large quantities of his own shares without disclosing that material fact to his followers.

Gallagher's failure to disclose his intent to sell the Target Securities he urged his Twitter followers to buy was an omission of a material fact in violation of Section 17(a)(2) and Section 10(b) and Rule 10b-5(b) thereunder. His coordinated scheme to defraud investors also violated Section 17(a)(1) and (3) and Rule 10b-5(a) and (c). Gallagher's disclosure of his ownership of the Target Securities is not a defense. While a reasonable investor would expect him to eventually sell his shares, such an investor would have no reason to expect that he was selling substantial portions of his shares on the very day he urged investors to buy those shares or shortly thereafter, especially given his frequent assurances that he was not in fact doing any such thing.

Gallagher also argues that the SAC fails to plead that his touts caused an increase in the Target Securities' price or trading volume. However, the applicable statutes contain no such requirement, nor does any case law of which the SEC is aware. In any event, the SAC amply alleges, including through Gallagher's own self-congratulatory tweets, that his touts caused price increases. In sum, the SAC sufficiently alleges that Gallagher had a duty to disclose his imminent stock sales.

*Second*, Gallagher argues that the SAC fails to plead that his failure to disclose his stock sales was material to a reasonable investor. However, materiality, a mixed question of fact and law, is rarely a basis to dismiss a complaint, as the Second Circuit has held. Moreover, the case law is clear that a defendant's intent to imminently sell securities that he is encouraging others to buy is a material fact a reasonable investor would want to know when deciding whether to follow the defendant's advice and buy the stock. And Gallagher's arguments that it was unreasonable for investors to rely on his recommendations because he was not a recognized investment professional and sent them via Twitter under an anonymous handle are also unavailing. He sent thousands of tweets encouraging readers of his tweets to buy the stocks he was recommending, bragging about how successful he was as an investor, and assuring them he wanted to help them make money. Indeed, as described above, Gallagher pled guilty to an Information charging him with using his

3

Twitter account to "induce others to purchase [one particular] stock, and thereby drive up the stock's price, while Gallagher simultaneously and secretly sold his own previously acquired shares at an artificially inflated price." ¶ 6. And the SAC alleges statements from investors who relied on Gallagher's advice and lost money, including investors who explained why, if they had known he was selling the stocks he encouraged them to buy, they would not have bought those stocks. The SAC more than sufficiently alleges materiality.

*Third*, Gallagher's argument that his stock recommendations were protected First Amendment activity, Br. at 18-21, should fail. His stock touts omitting that he intended to sell substantial shares of the stocks he was urging his followers to buy was fraudulent commercial speech that the government has a legitimate interest in regulating and prohibiting.

*Fourth*, Gallagher argues that his omissions of his intent to sell his shares of the Target Securities shortly after touting them cannot be a basis for scheme liability under Rule 10b-5(a) and (c) or 17(a)(1) and (3). Br. at 21-22. He claims, citing *SEC v. Rio Tinto*, 41 F.4th 47, 52 (2d Cir. 2022), that misrepresentations and omissions cannot form the "sole basis" for scheme liability. Br. at 21-22. But the Second Circuit held in *Rio Tinto* that false or misleading statements coupled with "dissemination" are sufficient to establish scheme liability, and the SAC details hundreds of statements that Gallagher disseminated via Twitter omitting the material information that he intended to sell the securities he was touting. Moreover, Gallagher's fraudulent scheme was not limited to such dissemination. The SAC alleges that his fraudulent scheme included other deceptive conduct: his first "loading up" on Target Securities (buying the stock)—often in coordination with many Associates, with whom he coordinated the timing of his tweets touting the Target Securities— before unloading his shares at substantial profits. His scheme also included end-of-day market manipulation. In sum, the SAC adequately alleges scheme liability.

*Fifth*, Gallagher argues that the Section 17(a)(2) claim should be dismissed because the SAC fails to allege that the profits he generated when he sold the Target Securities were the result of his fraudulent scheme as opposed to independent market forces. Br. at 22-23. However, the SAC amply alleges that Gallagher's stock touts caused price increases. Indeed, Gallagher frequently bragged about and provided evidence of price increases right after he touted various Target Securities.

*Sixth*, Gallagher argues that the SAC fails to plead manipulative trading in violation of Section 9(a)(2) because it fails to allege that, "but for" his manipulative intent, he would not have engaged in the EOD trades. Br. at 22-25. Whether this is a requirement is an unsettled question - the statute contains no such requirement- but the Court need not reach this issue now. The SAC amply alleges that Gallagher engaged in EOD trading with the specific intent to manipulate the stocks' price for the purpose of inducing others to buy the stocks, thereby violating Section 9(a)(2).

The Court should deny Gallagher's Motion in its entirety.

## RELEVANT PROCEDURAL BACKGROUND

The SEC filed its Complaint on October 26, 2021. Dkt. 1. That day, the Court entered an order temporarily freezing Gallagher's assets up to $6.9 million. Dkt. 11. The Court subsequently entered a Stipulated Preliminary Injunction Order enjoining Gallagher from violating the charged securities laws and freezing his assets up to $6.9 million, with certain carve-outs. Dkt. 21.

On March 4, 2022, Gallagher sought leave to move to dismiss the Complaint, primarily arguing that it failed to sufficiently specificity Gallagher's scalping as to each of the Target Securities. Dkt. 29. On March 10, the SEC requested permission to file an Amended Complaint, Dkt. 30, which was granted. Dkt. 31. The SEC filed its Amended Complaint on April 7, providing at least one example of scalping for each Target Security. Dkt. 38.

On May 5, Gallagher sought to move to dismiss the Amended Complaint. Dkt. 42. The Court granted the SEC leave to file a SAC after indicating that the SEC should provide more

detailed examples of the alleged scalping. Dkt. Entry of May 25, 2022. The SEC filed its over 1800

paragraph SAC was filed on June 29. Dkt. 58.  On June 30, the Court denied Gallagher's motion to

vacate the asset freeze in its entirety but modified the amount frozen to $3,172,990.00. Dkts. 61, 66.

## THE SAC'S ALLEGATIONS

### I.     Summary of Gallagher's Fraudulent Scalping Scheme

The SAC alleges that Gallagher's scheme followed a pattern. He used his Twitter handle

@AlexDelarge6533 to encourage his Twitter followers and the public who read his Twitter posts to

buy the "Target Securities", primarily penny stocks, without disclosing his intention to sell his own

holdings of those securities, and then subsequently sold those securities at a significant profit. ¶ 31.

Gallagher typically acquired millions of shares of a Target Security in advance of his promotional

campaign – a practice he referred to as "loading." ¶ 33.

As part of his scheme, Gallagher "often initially communicated by private direct messaging

('DMs') on Twitter with a select group of 'Associates' about potential stocks to manipulate, choosing

issuers that had: a large public float, i.e., a large quantity of shares on the public market; and a low

price per share (generally, a fraction of a cent.)." ¶ 32. He often reached an agreement with certain

Associates on a date and time when he would start publically tweeting a message telling his followers

and other readers to buy the Target Security. ¶¶ 33, 39. Giving select associates and private chat

room members advance notice to start buying Target Securities before his public Alert often

increased the Target Securities' trading volume and price trend, making the stock look more

attractive to his intended victims when he issued his public Alerts touting the stocks. ¶ 40.

Gallagher referred to the public signal to begin buying as the "Alert." ¶ 34. Sometimes it

consisted of a flashing red graphic with the words "ALERT!!!! Alexander Delarge," accompanied by

a reference to the Target Security's ticker and words of encouragement to his followers and readers

to buy and/or hold the stock. *E.g.,* ¶ 37. Following Gallagher's often numerous, urgent Alerts about

that Target Security and the momentum generated by his and his Associates' prior purchases of the Target Security, Gallagher then began to sell his shares, often further deceiving his followers and readers by falsely assuring them that he was "holding" or "not selling" his shares. *E.g.,* ¶¶ 43-45.

Certain tweets also included affirmatively false information. For example, some tweets included false or misleading information about a pending merger of a particular issuer whose stock Gallagher was touting; contained false information that Gallagher was not selling a stock (*e.g.,* "$tsnp…Not selling!") – minutes before he sold shares in the same stock; or falsely claimed that he did not benefit from sending his buy Alerts (*e.g.,* "Never have I alerted a stock and sold."). ¶ 45.

The SAC further details hundreds of specific instances where Gallagher chose a Target Security to tout, often in coordination with numerous Associates. The SAC provides the dates, amounts and price of his purchases; the dates and contents of his tweets; the dates and contents of his private DMs with his Associates coordinating the scheme; and the dates, amounts and prices of his sales of each of the Target Securities and his profits. ¶¶ 47-92; 115-120; 131-1847; and Att. A.

## II.      Summary of Gallagher's "Marking the Close" Violations

The SAC alleges in detail Gallagher's manipulative trading in two securities, stocks with the tickers SPOM (¶¶ 93-114) and BZWR (¶¶ 121-130), in violation of Section 9(a)(2), Section 10(b) and Rule 10b-5. Specifically, Gallagher had been engaged in a scheme to scalp SPOM beginning in February 2020. ¶¶ 1383- 1446. Beginning on July 15, when SPOM's price had declined, Gallagher sent Associate ZZ a DM urging him to "get your boys back together" to start pumping SPOM and raise its price above $0.20. ¶ ¶ 1407; 1442; 1444; ¶ 1441 ("Buy $spom before EOD!"). On July 22, the day before commencing his manipulative SPOM EOD trades, Gallagher tweeted User B: "A friend is putting a spom article together and massive buys eod." ¶ 96; see also ¶ 95.

Between July 23 and August 3, 2020, Gallagher entered multiple buy limit orders above the offer price just before the market close. ¶¶ 93–114. Meanwhile, he urged his followers to help him

manipulate SPOM's price: "Hey traders can you guys buy $spom if it moves 1 penny I'll be green" ¶102; *see also* ¶¶ 105; 106 ("I'll be hitting $spom at .17 come join me move this. EOD"). On August 4, Gallagher tweeted: "$spom run [understood to mean price rise] has started! I think we see green every day for many days! load up! $spom ers"; ¶118. He continued EOD trading in SPOM despite his broker's warnings that it appeared to be illegal. ¶¶ 98; 100; 101; 108-112. On August 5, two days after his last manipulative EOD trades in SPOM, Gallagher began selling his shares. ¶¶ 117-118.

The SAC also alleges that Gallagher marked the close in BZWR on March 2 and 5, 2021. ¶¶ 121–130. His EOD buy order on March 2 appears to have raised the closing price and he profitably sold these shares the next day. ¶ 122. On March 5, he placed two EOD buy orders above the ask price, which appeared to raise the stock's closing price. ¶ 128. On March 8, the next trading day, he sent two tweets touting BZWR and then profitably sold 20,000 BZWR shares the following day. ¶ 130. The SAC also cites Gallagher DMs evidencing his intent to manipulate BZWR's share price. *E.g.,* ¶ 124 (Gallagher DM to an Associate: "i can move it [bzwr]10 cents eod."). ¶125.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On such a motion, all factual allegations are accepted as true, and all inferences are drawn in favor of the pleader. *SEC v. Power*, 525 F. Supp. 2d 415, 418 (S.D.N.Y. 2007) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993)). A motion to dismiss should be granted only if the complaint is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

# ARGUMENT

## I.      The SAC Sufficiently Pleads that Gallagher Made Actionable Omissions in Failing to Disclose His Stock Sales to His Twitter Followers and Other Twitter Readers.

Section 17(a)(2), Section 10(b), and Rule 10b-5(b) prohibit "any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2); 17 C.F.R. § 240.10b-5(b) (with "to omit" in place of "omission"). Under these provisions, both false representations and "half-truths - representations that state the truth only so far as it goes, while omitting critical qualifying information - can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2000 & n.3 (2016); *see also In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016). In contrast, pure omissions - where a defendant remains silent on an issue - are actionable only where the defendant has an independent duty to disclose the omitted information. *See Chiarella v. United States,* 445 U.S. 222, 232 (1980).

Once a person chooses to speak about an issue rather than remain silent, he has "a duty to be both accurate and complete" even absent any independent duty to disclose. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty [to disclose] is not, under such circumstances, a defense to Rule 10b–5 liability because upon choosing to speak, one must speak truthfully about material issues…[and] ha[s] a duty to be both accurate and complete.").

Gallagher nevertheless argues that the fraud claims based on an omission theory of liability (namely, his failure to disclose his imminent intent to sell the Target Securities he was urging others to buy) should be dismissed because the SAC fails to allege that he had a duty to disclose his stock sales to his Twitter followers. Br. at 3-10. Gallagher's arguments on this ground are meritless.[2]

---

[2] Gallagher's claim that the SAC only "alleges a few false statements" by him, Br. at 2, is wrong. The SAC identifies numerous false statements beyond those he cites in the Chart attached as Exhibit A to his brief: *see, e.g.*, ¶¶ 37; 81-82; 84; 592; 638; 660; 815; 834-835; 863; 896-897; 1042; 1045; 1149-1150; 1543; 1771; 1835; However, because Gallagher is not moving to dismiss claims based on his false statements, the SEC does not further address this erroneous assertion here.

### A. Gallagher's Recommendations Were Rendered Misleading by His Omissions.

Gallagher first argues that there is no generalized duty that, "every time a person tweets positively about a stock they must, in the future, disclose their stock sales," Br. 5, and that selling his stock in the future did not render all his prior stock recommendations false or misleading, Br. at 4-5. More specifically, Gallagher argues that "the connection between the topics Mr. Gallagher chose to discuss on Twitter (general trash-talking, puffery and vague opinions about stocks) and the allegedly omitted information (stock sales) is too attenuated to support a material omission claim." *Id.* at 5.

But the SEC does not contend that every time someone tweets something positive about a stock they must disclose their intent to sell the stock, and the SAC does not allege "trash-talking, puffery [or] vague opinions."[3] Rather, the SAC alleges that Gallagher's stock recommendations to his Twitter followers and the investing public were rendered misleading by his omission of highly material information: his then-*present* intention to imminently sell substantial shares of the Target Securities he was urging his followers to buy. He had an obligation to disclose that when he made his recommendations, because the information was relevant to the basis for his recommendations and their trustworthiness – that is, whether he was making legitimate recommendations or merely conning his followers into buying the Target Securities so that he could sell his shares at a profit.[4]

---

[3] Gallagher cherry picks one tweet regarding "TSOI: "$TSOI WHAT A GREAT FIND," and argues that it was not an actual buy recommendation and that his sale of 25% of his TSOI shares later that day (SAC ¶¶ 1681-82) did not render false his opinion that he was glad to find TSOI. Br. at 5. However, Gallagher cites this tweet out of context. The day before his 25% TSOI sale, Gallagher sent a tweet including TSOI on his buy list. ¶ 1680. In fact, on five separate days, Gallagher sold TSOI stock after sending tweets that day or shortly before recommending that others buy it. ¶¶ 1673-1691. Indeed, the SAC cites hundreds of Gallagher tweets that were specific buy recommendations.

[4] The cases Gallagher cites finding no duty of disclosure are inapposite. In *In re Morgan Stanley Info., Fund Sec. Litig.*, 592 F.3d 347, 364-66 (2d Cir. 2010), Br. at 4, the court merely held that mutual funds did not have a duty to disclose internal conflicts of interests at affiliate broker-dealers that were not relevant to how the funds approached investment decisions. In *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 n.4 (2d Cir. 2021), Br. at 4-5, plaintiffs failed to allege any actionable false statements or omissions or identify specific acts in furtherance of the fraudulent scheme. The SAC, in contrast, is replete with such specific acts.

### B.     Gallagher Misconstrues the Applicable Law.

Gallagher next claims that "[o]rdinary investors, such as Mr. Gallagher, do not owe a duty to disclose their stock trades to others." Br. at 5. And Gallagher then argues that the SEC claims Gallagher's duty to disclose arises because he was scalping and that the case law on scalping – a term not defined in the statutes or rule – holds that a defendant cannot be held liable for such conduct if he discloses his ownership of stock but not his intent to imminently sell the stock. But Gallagher misconstrues the case law on both grounds. Many courts have found a defendant liable for scalping where there was no fiduciary duty or relationship of "trust and confidence" between the defendant and the investors. *See e.g., United States v. Wenger*, 427 F.3d 840, 843-46, 854 (10th Cir. 2005) (defendant circulated touts through an apparently free newsletter and radio show); *SEC v. Thompson,* 238 F. Supp. 3d 575, 596-599 (S.D.N.Y. Mar. 2, 2017) (rejecting defendant's contention that a scalper's duty of disclosure arises only in the context of a "fiduciary or trust relationship"); *SEC v. Corp. Relations Gr., Inc.,* 2003 WL 25570113, at *9 (M.D. Fla. Mar. 28, 2003) (defendants' disseminated stock touts in apparently free newsletters). And none of the cases Gallagher cites holds that disclosure of stock ownership is sufficient where one fails to disclose one's imminent intent to sell the stocks into the touts.[5] The SEC adequately alleges that Gallagher's duty to disclose his intent to imminently sell shares of stock he was recommending arises from the otherwise-misleading nature of his recommendations, as described above in Section I.A, and the case law on "scalping" shows that the SEC's allegations are actionable, absent any fiduciary duty.

First, Gallagher cites *Chiarella,* 445 U.S. at 233, for his proposition that ordinary investors owe no duty to disclose their stock trades. Br. at 5. But *Chiarella* makes no such sweeping holding. It

---

[5] Gallagher's argument that, because he disclosed his ownership of the Target Securities, he had no obligation to disclose his future stock sales because a reasonable investor would expect that he would sell his shares in the future, Br. at 8-9, is an argument for the jury, not an argument for a motion to dismiss. Drawing all plausible inferences in the SEC's favor, the Court should infer from the SAC that reasonable investors would not expect from his ownership disclosure that Gallagher intended to almost immediately sell substantial amounts of the Target Securities he was urging them to buy.

addressed whether a financial printer owed a duty to disclose his possession of inside information to stockholders and companies he never communicated with. In contrast, Gallagher sent thousands of communications to potential investors in which he misleadingly recommended that they buy his Target Securities without disclosing his reason for doing so – a situation *Chiarella* does not address.

Next, Gallagher cites *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963), for his claim that a person 1) owes a duty to disclose his stock sales only when he has a relationship of "trust and confidence" with the recipients of his stock recommendations; and 2) is liable for scalping only where he fails to disclose any financial interest in the stocks he is recommending. Br. at 6. *Capital Gains* supports neither proposition. *Capital Gains* involved the question of whether a financial advisor had a duty of disclosure under the Investment Advisers Act of 1940 ("Advisers Act") – a question irrelevant to the SEC's claims here. The Advisers Act, unlike the Securities Act and the Exchange Act, imposes a general obligation on investment advisers, who are fiduciaries to their clients, to disclose conflicts of interest, even when the advisers do not make representations to their clients that would be rendered misleading by the omission of such conflicts. 375 U.S. at 200-01. But the Securities Act's and Exchange Act's anti-fraud provisions operate differently, as described above: even where there is no independent duty to disclose certain information, they proscribe the omission of information when a person makes statements that are rendered misleading without that missing information. *Capital Gains* did not address that situation and is thus irrelevant to the issue here.

Gallagher then argues that cases following *Capital Gains* hold a person can be found liable for scalping only when "purportedly offering legitimate investment advice [that] fails to disclose *any* pecuniary motive in making stock recommendations." Br. at 6-7. Gallagher highlights *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1268 (9th Cir. 1979), as an example. Br. at 7. But *Zweig* undermines Gallagher's position. The court held there that the defendant's failure to disclose "that he had purchased the stock at a bargain price knowing that he would write his column and then sell on the rise, as he had

done with other stocks before," 594 F.2d at 1266, violated Section 10(b) and Rule 10b-5 and was material because reasonable investors would have considered his "motivations" important. *Id.* at 1266-1267. The court did not hold that disclosure of stock ownership, without also disclosing his intent "to sell on the rise," would have been sufficient. In addition, the defendant's duty of disclosure was not limited to only those with whom he had a relationship of trust and confidence. The court held that he owed a duty of disclosure to two non-readers whose company was harmed by its commitment to buy stock the defendant promoted and scalped, because they "relied on the existence of an honest market. A market presumes the ability of investors to assess all the relevant data on a stock, including the credibility of those who recommend it, in creating demand for the stock." *Id.* at 1269.

Gallagher also discusses *SEC v. Park*, 99 F. Supp. 2d 889, 898- 900 (N.D. Ill. 2000), where the court declined to dismiss scalping claims. Gallagher tries to distinguish it on the ground that the defendant there charged subscribers to his Internet bulletin board a "not-insubstantial" fee for his recommendations and "may have developed a relationship of 'trust and confidence'" that created a duty. Br. at 7. However, the defendant in *Park* disseminated stock touts to paying *and non-paying* followers through his website using a pseudonym. Moreover, the court recognized a duty of disclosure, even absent a relationship of trust and confidence, where one encourages others to purchase stock, holding: "[A] person who intends to engage in scalping assumes a duty to disclose their scalping." *Id.* at 900. In short, *Park* supports the SEC's theory of liability here.

Lastly, Gallagher suggests that, in *SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019), it was only the defendant's failure to disclose his pecuniary interest in the stock he was promoting that made him liable for scalping. Br. at 7-8. Yet the opinion makes no such limited holding. The complaint charged Fiore, who paid multiple promoters to promote stocks he owned, and others, with failing to disclose that they "beneficially owned, intended to sell[,] and were actively selling

shares" of the promoted stock. 416 F. Supp. 3d at 314-315. In denying a motion to dismiss, Judge Karas held: "[T]he fact that 'it is widely assumed that promotional campaigns have been funded by someone' [citing to defendants' brief] has not prevented courts from finding that failing to disclose a beneficial interest in promoted stock *and a present intent to sell* is a material omission under the securities laws." *Id.* at 323 (emphasis added). The court thus held that the complaint adequately alleged that Fiore owed a duty of disclosure, even though he was not a fiduciary and had no relationship of trust or confidence with the recipients of the bulk promotional mailings.

Gallagher further argues that, in some SEC cases, the complaints have alleged, or the courts have defined, scalping to include evidence that the scalper's touts caused an increase in the stock's price or trading volume and that the SAC fails to do so. Br. at 8-10. However, there is no statutory definition of scalping. Section 17(a), Section 10(b) and Rule 10b-5 contain no requirement that a defendant's materially misleading statements or scheme to defraud cause an increase in a stock's price or trading volume, and various courts have defined scalping without referencing the touts' impact on price or trading volume.[6] Gallagher fails to cite to a single case where a court dismissed a complaint for failure to allege that the scalper's touts caused an increase in the stock price or trading volume. And it would make no sense to require such allegations, given that the deceit of investors occurs, and is complete, upon the dissemination of the false or misleading touts.

But even if any such allegations as to stock price or volume increases were required, Gallagher's claim that the SAC contains "few" such allegations, Br. at 9, is incorrect. The SAC contains many allegations evidencing substantial price increases almost immediately after Gallagher commenced the public campaign touting a stock. ¶¶ 134-147, 251-265, 313-323, 335-345, 602-612,

---

[6] *See, e.g., Fiore*, 416 F. Supp. 3d at 314 n.1 ("Scalping is 'a practice in which the owner of a security recommends it for investment and then sells it at a profit,'" citing *SEC v. Thompson*, 238 F. Supp. 3d 575, 590 (S.D.N.Y. 2017)); *SEC v. Capital Gains*, 375 U.S. 180, 181 (Scalping is "a practice of purchasing shares of a security for his own account shortly before recommending that security for long-term investment and then immediately selling the shares at a profit upon a rise in the market price following the recommendation."). Neither definition requires proof the touts caused a price increase.

711-718, 828-838, 961-977, 1157-1175, 1267-1293, 1294-1318. The SAC also alleges many instances where Gallagher bragged that his tweets caused price increases in the Target Securities. *E.g.*, ¶¶ 71-72 (bragging "scie was as good as I made it"); ¶ 119; 179 ("Alex is a pumper!! I pump all my Stocks! $alpp $neca $ sanp $ mjlb $couv all of these pumps up 300% minimum after alerted just to name a few pumps!!"); ¶¶ 265, 828-832, 1174, 1347, 1678.

Finally, Gallagher's claim that he put his followers on notice of his intent to sell in tweets saying he would sell on the "rips," take "profits," and would "normally" sell up to half his holdings is misleading. First, Gallagher's claim that he told investors he would "normally" sell half his holdings, Br. at 9 n.7, is contradicted by his numerous tweets falsely investors that it was his practice to buy the dips and sell *small* on the "rips," meaning he would buy when the stock price fell ("dips") and sell small quantities when the price rose ("rips"). *E.g.*, ¶¶ 120, 208, 544, 896, 1252. Moreover, even if Gallagher sent some isolated tweets that he normally sold half his shares, he did not disclose that he was selling substantial portions of his shares on the very day, or shortly thereafter after, he urged his followers to buy those shares. Indeed, the SAC alleges that Gallagher repeatedly and falsely assured investors that he was not selling the Target Securities on days he was recommending that they buy them. *E.g.*, ¶ 80, ¶ 86. Indeed, at times he admonished investors not to sell their shares on the day he was doing exactly that. *E.g.*, ¶¶ 84-86. Given these false and misleading tweets, a reasonable investor would not have expected, and would have wanted to know, that Gallagher was in fact dumping substantial quantities of his shares on days he was urging investors to buy the Target Securities. The SAC thus sufficiently pleads that Gallagher had a legal obligation to disclose his intent to imminently sell his shares of the Target Securities he was touting.[7]

---

[7] Gallagher's reference to the requirement that beneficial owners of a stock need only disclose their sales two days after the sales on amended Schedule 13D, Br. at 10, is inapposite. There is no risk investors are making contemporaneous decisions to buy or sell a stock based on the beneficial owners' sales, which are unknown to them until filing.

II.     **The SAC Adequately Alleges Material Omissions.**

Gallagher makes various arguments as to why a reasonable investor would not have found his omissions material. Br. at 10-18. They are all unavailing. First, "a complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA v. JP Morgan Chase,* 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted); *see also Altimeo Asset Mgt. v. Qihoo 360 Tech. Co. Ltd.,* 19 F. 4th 145, 150 (2d Cir. 2021).

Second, numerous courts have held that a reasonable investor would want to know that, while a person was urging him to buy a stock, that individual planned to sell his own shares, as that information would call into question whether the recommendation was sincere or motivated by self-interest. *See, e.g., Zweig,* 594 F.2d at 1266; *SEC v. Reynolds,* 2008 WL 3850550, at *6 (N.D. Tex. Aug. 19, 2008); *SEC v. Huttoe,* 1998 WL 34070892, at *7; *Corp. Relations Grp.,* 2003 WL 25570113, at *8.

Indeed, the SAC summarizes interviews with seven of Gallagher's victims who did exactly what Gallagher intended: they trusted him and bought Target Securities based on his recommendations. They explained that they relied on his advice because he portrayed himself as an experienced trader willing to help others benefit from his knowledge and make money and wanted to raise money to fight cancer. ¶¶ 1848-1869. Some explained specifically why they would not have relied on his advice if they had known he was selling the stocks he was encouraging them to buy: "because it would have revealed that Gallagher was not giving honest stock recommendations," ¶ 1857 (Victim C); "because she trusted Gallagher and that would have revealed that Gallagher was misleading her," ¶ 1865 (Victim E); "because he would have wanted to know that Gallagher was profiting at his expense" and "because it would have showed that Gallagher was being manipulative and he would not have followed his lead," ¶ 1867 (Victim F); and "because it would have revealed that Gallagher's strategy was different from what he was telling his readers," ¶ 1869 (Victim G).

Gallagher argues that the Court cannot look to the victims' statements in determining materiality because "[t]here is nothing *objectively reasonable* about how these people decided to purchase these stocks." Br. at 13-14. In sum, he argues that the victims were "novices" and, because he was not a financial professional and tweeted his recommendations using a violent character's name, his victims were foolish to trust him. *Id.* at 13-16. These arguments are meritless.

Gallagher's contention that a reasonable investor must be sophisticated and understand concepts such as the time value of money, Br. at 11, 13-14, is erroneous. While the standard of a reasonable investor is an objective one, "[t]he standard may vary…with the nature of the traders involved in the particular market." *United States v. Litvak,* 889 F.3d 56, 64-65 (2d Cir. 2018). "The reasonable investor in a market in which many individual investors trade will be deemed somewhat less schooled and sophisticated than a reasonable investor in a market…in which only institutions trade with the help of complex programs and professional traders." *Id. at 65*. Here, the reasonable investor in the penny stock markets is a less sophisticated trader, such as the Victims here.

Moreover, Gallagher spent 18 months sending thousands of tweets urging his followers to follow his buy recommendations on virtually a daily basis, and the success of his scheme was dependent on their doing so. He created a highly successful Twitter persona as someone looking to help less experienced microcap investors, and he assured them he was not scalping or hurting them and indeed wanted to help them. *E.g.,* ¶¶ 151, 439, 458, 820, 826, 878-879, 882, 980, 1173, 1417, 1597, 1655. He sent numerous tweets proclaiming how dramatically stock prices had risen after his prior tweets to give his followers further reason to trust and rely on his recommendations. His Twitter handle name did not prevent him from luring a growing cadre of followers and the fact that he committed his fraud via Twitter does not insulate him from liability.[8]

---

[8] Gallagher's reliance on *Rapaport v. Barstool Sports, Inc.,* 2021 WL 1178240, at *2 (S.D.N.Y. Mar. 29, 2021), *reconsideration denied,* 2021 WL 2635821 (S.D.N.Y. June 25, 2021), Br. at 16, is unavailing. That case involved defamation claims relating to hyperbolic insults two sports commentators traded over social media sites. The court noted that such comments

In addition, Gallagher pled guilty to a criminal charge that "he used Twitter to misrepresent the nature of his personal stake in the securities of SpectraScience Inc. ('SCIE') *in order to induce others to purchase SCIE stock, and thereby drive up the stock's price*, while Gallagher simultaneously and secretly sold his own previously acquired shares at an artificially inflated price." ¶ 6 (emphasis added). Gallagher should not now be permitted to evade liability by arguing that it was unreasonable for the followers he so assiduously courted to rely on his recommendations.[9]

Gallagher's other arguments as to materiality should also fail. He argues that, because he disclosed his ownership of stocks he was recommending, any reasonable investor would have realized that he was going to sell his shares when the stock price increased. Br. at 12. However, as discussed above, while a reasonable investor would expect Gallagher to sell his shares at some point, he would not expect that, while Gallagher was urging his followers to buy a Target Security, he planned to imminently sell, often substantial, portions of his shares. And here Gallagher also falsely assured his followers that he was not selling his own shares into his touts, *see* Section I.B.

Gallagher's statements that he would not disclose his stock sales also do not render his omissions immaterial. If anything, such tweets furthered Gallagher's fraud by suggesting his non-disclosure of his sales was for the investors' benefit, when the non-disclosure actually provided cover for Gallagher's scalping.[10]

---

made on "free-wheeling fora, such as blogs or social media sites," can be understood by readers to reflect an author's opinion rather than an actionable statement of fact. Gallagher cannot reasonably argue from this that it was unreasonable for his followers to rely on his tweets touting the Target Securities because he sent them via Twitter.

[9] Gallagher claimed in his pre-motion letter that his SCIE plea is not relevant to the scalping claims here because it only involved "an affirmative misstatement that he never sold a share" of SCIE. Dkt. 67 at 2 n.2. However, Gallagher fails to explain why his affirmative false statement that he was holding SCIE, when he was actually selling it following his tout, would be material to his followers but his omission of the very same fact from his hundreds of other stock recommendations would not be.

[10] In Exhibit B to his brief, Gallagher cites tweets not referenced in the SAC telling investors he never disclosed his stock sales because it would hurt people (which were false justifications), and tweets saying he sold "small on the rips" not to "hurt" people (which falsely described his selling practices).

Gallagher's argument that his tweets could not be material because they did not cause price increases for many of the Target Securities, Br. at 14-15, is both legally and factually incorrect. Whether a misleading stock recommendation moves the stock price is not determinative of whether it is material. *See United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("[W]hether a public company's stock price moves up or down or stays the same … does not establish the materiality of the statements made, though stock movement is a factor the jury may consider relevant."). In any event, as discussed above at pp. 14-15, the SAC amply alleges that Gallagher's touts were followed by dramatic price increases, as Gallagher liked to remind his followers.[11]

Gallagher's argument that his tweets were "too vague, opinionated and generic to have actually been relied upon by any reasonable investor" and therefore immaterial, Br. at 15, is also baseless.[12] The SAC sets forth hundreds of tweets in which Gallagher made specific stock recommendations. Moreover, the SAC does not seek to hold Gallagher liable for his stock recommendations ("opinions") in themselves – aside from those containing affirmatively false or misleading statements about a stock. It seeks to hold him liable for failing to disclose specific, material *facts*, namely his present intent to imminently sell the stocks he was urging others to buy.[13]

Gallagher further argues that the SEC "relies on allegedly undisclosed stock sales that, because of their volume and timing, could not have been material." Br. at 17. He then cherry picks two instances of small sales, where the SAC alleges he sold approximately 2% of his holdings of ENZC, ¶ 884, and approximately 5% of his holdings of ALPP, ¶ 232. He fails to disclose that the SAC also alleges that he sold substantial portions, ranging from 10% to 70%, of his holdings of ENZC on days he was urging his followers to buy the stock or shortly after. *E.g.*, ¶¶ 846-854, 860-

---

[11] Exhibit A to Gallagher's brief fails to cite numerous allegations evidencing Gallagher's touts' impact on stock prices; *E.g.*, ¶¶ 256, 258, 265, 273, 319, 320, 322, 323, 334, 368, 372, 393, 423, 612, 831, 953, 980, 984, 1175, 1292.

[12] Reliance is not an element of SEC fraud claims. *SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 84 (2d Cir. 1970).

[13] His reliance on *In re Philip Morris Int'l Inc., Sec. Lit.*, 437 F. Supp. 3d 329, 350 (S.D.N.Y. 2020), is thus unavailing.

861, 864, 870-873, 875-878. And the SAC makes similar allegations as to ALPP. ¶¶ 182-183. Furthermore, the SAC contains numerous examples of sizeable stock sales by Gallagher on days he was touting buys. *E.g.,* ¶¶ 35-37, 56-68, 77-86, 283-285, 307-310, 385-387, 499-504, 744-745, 848-850, 851-852, 1125-1131, 1166-1179, 1267-1293, 1327-1333, 1647-1655, 1667-1672, 1790.[14]

Finally, Gallagher's argument that he cannot be liable for scalping during the earlier time period when he had fewer followers, Br. at 17, is meritless because his tweets were sent to the entire Twitter universe, not just his registered "followers." And his complaint that the SAC "never discusses intervening events between Mr. Gallagher's alleged touts and his subsequent stock sales," Br. at 17, is irrelevant because Gallagher's misleading tweets typically urged his followers to buy the Target Securities right away and his undisclosed stock sales occurred shortly thereafter.[15] The SAC sufficiently alleges that Gallagher's omissions were material.

### III. Gallagher's Alleged Tweets Are Not Protected Speech Under the First Amendment.

Gallagher argues that his fraudulent tweets constitute speech protected by the First Amendment. Br. at 18-21. Specifically, Gallagher argues that compelling him to disclose his stock sales to his Twitter followers constitutes content-based regulation subject to "strict scrutiny" that requires a court to consider "whether a law is narrowly drawn to serve a compelling governmental interest," citing *Evergreen Ass'n v. City of New York,* 740 F.3d 233, 245 (2d Cir. 2014). Br. at 20.

Gallagher's First Amendment argument is baseless. First, as he concedes, First Amendment protections are more limited for commercial speech. Br. at 20 n.25. Indeed, he fails to cite a single case holding that a stock recommendation is protected First Amendment speech. Second, Gallagher's argument that most of his tweets were not "commercial speech" because they did not

---

[14] For completeness, the SAC sets forth all of Gallagher's sales of a Target Security, including sales below 5% of his holdings or sales further removed from his touts. These sales may also be relevant in calculating any monetary relief.
[15] Gallagher cites one stock, INQD, where he bought shares on May 29, 2020, sent at least 100 touts, and "[m]onths later, on August 13, 2020, he sold 33% of his holdings" for less than he paid for the stock, citing ¶¶ 1147-48. Br. at 17-18. This is misleading. The SAC references touts Gallagher sent on August 10, 11 and 12, urging his followers to buy INQD, before he sold 33% of his shares on August 13, ¶ 1147, at a profit under the first-in-first-out accounting method.

propose a "commercial transaction," *id.*, is frivolous. Gallagher's tweets recommended that his followers buy a stock or falsely assured his followers that he was not "pumping and dumping" the Target Securities, so they would trust his recommendations and buy the stock – commercial transactions in either case. Third, Gallagher conclusory claims that, even if his tweets are commercial speech, the SEC cannot satisfy the "intermediate scrutiny" test set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Common,* 447 U.S. 557 (1980), requiring that the government have a substantial interest and that the regulation be narrowly tailored to advance that interest. Br. at 21 n.26. However, as the cases in Section I.B show, courts have recognized the government's compelling interest in prohibiting defendants from defrauding investors through scalping schemes.

## IV. The SAC Adequately Alleges That Gallagher's Scalping Scheme Violates Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).

In *Rio Tinto*, the Second Circuit held that "misstatements and omissions alone" cannot "form the basis for scheme liability" under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3). 41 F.4th at 53. Instead, the court required "something extra," such as "'dissemination of false or misleading statements with intent to defraud,'" for scheme liability based on representations. *Id.* (quoting *Lorenzo v. SEC*, __ U.S. __, 139 S. Ct. 1094, 1100 (2019)). Indeed, courts in this District have long permitted scheme liability to rest on "a manipulative or deceptive device…intended to mislead investors, even if a material misstatement…creates the nexus between the scheme and the securities market." *In re Parmalat Sec. Lit.*, 376 F.Supp.2d 472, 502 (S.D.N.Y. 2005) (citation omitted); *see also, e.g., In re Salomon Analyst AT&T Litig.*, 350 F.Supp.2d 455, 472-74 (S.D.N.Y. 2004) (Lynch, J.).

The SAC's scalping allegations satisfy this standard in two ways. First, the SAC alleges that Gallagher disseminated hundreds of false and misleading tweets. That is sufficient to establish scheme liability under *Rio Tinto* and *Lorenzo*. Second, the SAC pleads deceptive conduct in addition to omissions that, taken together, adequately allege a fraudulent scheme. Specifically, the SAC alleges that Gallagher 1) developed the false online persona of someone who wanted to help others make

money; 2) coordinated with numerous Associates in dozens of "chat rooms" to first target and then "load" up on (purchase) a security they planned to tout to the public; 3) sent tweets and alerts urging his followers to buy the Target Security, while at times coordinating the timing of his touts with his Associates; and 4) sold substantial portions of his shares of the Target Securities shortly after urging his followers to buy them. *See, e.g., supra* at 6-7; 17; 19-20.

Gallagher nevertheless argues that "fraud by omission" cannot, standing alone, form a basis for scheme liability because one cannot disseminate an omission. Br. at 21. Gallagher cites no authority for this novel argument. In any event, the SAC does not plead mere omissions: it pleads that Gallagher disseminated touting tweets that were rendered misleading by his omission of his intent to imminently sell the stock he was touting. And Gallagher disseminated those tweets (among others) in violation of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).

Gallagher also argues that the scheme liability claims fail to comply with Rule 9(b) because scheme liability requires that "separate 'deceptive conduct' aside from the misstatements or omissions be pled with particularity," citing *Danske Bank A/S,* 11 F.4th at 105. Br. at 22. However, whether any such additional deceptive conduct must be pled or not, the SAC alleges such specific deceptive conduct in addition to the misrepresentations and omissions, as described above.

**V.     The SAC Sufficiently Pleads That Gallagher Obtained Money By Means of His Materially False Statements or Omissions in Violation of Section 17(a)(2).**

Gallagher argues that the SAC fails to satisfy Section 17(a)(2)'s requirement that the defendant "obtain money or property" by means of his false or misleading statements because it fails to sufficiently plead a causal connection between Gallagher's scalping and the profits he obtained. Br. at 22-23. However, the SAC alleges that Gallagher purchased a Target Security at a low price, quietly loaded up on the Target Security, often in conjunction with numerous Associates, then urged his Twitter followers and the public to buy the Target Security and at times bragged about the stock price rising due to his actions. *See* pp. 6-7; 15, *supra.* The SAC also alleges that, on hundreds of

occasions, Gallagher sold his shares at enormous profits. *See,* 7; 14-15*, supra.* As discussed above, the SAC also cites numerous instances of substantial stock price increases almost immediately after Gallagher began touting a Target Security. The most plausible inference from these allegations is that Gallagher's actions caused the Target Securities' price increases, at least in part, and that Gallagher thus obtained money by means of his fraud.

Gallagher's reliance on *SEC v. Wey,* 246 F. Supp. 3d 894, 914-915 (S.D.N.Y. 2017), is misplaced. There, this Court dismissed Section 17(a)(2) claims against two lawyers alleged to have made certain false statements that facilitated their co-defendant's fraud. *Id.* at 910-11, 914. However, there were no allegations that the two lawyers directly profited from the fraudulent scheme or that either attorney's overall law firm compensation "was affected in any non-trivial manner by making a false statement rather than a true statement." *Id.* at 915, 924. Here, in contrast, the SAC alleges that Gallagher directly realized enormous profits by secretly selling his shares of the Target Securities right after fraudulently urging his followers to buy those very shares.

Gallagher also points to one security, with the ticker symbol ALPP, whose stock increase he attributes to a separate scheme by the company's executives to pump up the stock's price, citing an internet article. Br. at 23. As an initial matter, on a motion to dismiss, a court may look only at the allegations on the face of the complaint, documents attached to or incorporated by reference in the complaint, or documents "'upon which [the complaint] *solely* relies and which [are] *integral to the complaint.*'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis in original) (citations omitted). Gallagher's cited internet article falls into none of these categories and therefore should not be considered. Yet even if the Court were to consider it, the fact that ALPP executives may have engaged in fraud that impacted the share price does not mean that Gallagher did not also engage in fraud that impacted the share price. Indeed, the SAC alleges that ALPP's stock price fluctuated significantly from December 8, 2020, through March 11, 2021, when Gallagher sent dozens of

ALPP touts, and that Gallagher sold his shares at a profit soon after touting the stock. *E.g.*, ¶¶ 199-207. These allegations suffice to plead Gallagher's receipt of money under Section 17(a)(2).[16]

## VI.     The SAC Sufficiently Pleads Manipulative Trading under Section 9(a)(2).

Section 9(a)(2) makes it unlawful to effect, directly or indirectly: (1) a series of transactions; (2) creating actual or apparent activity or raising or depressing a stock's price; (3) for the purpose of inducing others to buy or sell the security. *United States v. Stein*, 456 F.2d 844, 850 (2d Cir. 1972). "Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 76 (2d Cir. 2021). The SAC alleges that Gallagher violated Section 9(a)(2) by engaging in manipulative trading in securities with the tickers SPOM and BZWR – specifically, by placing multiple EOD buy orders above the market offer prices to increase the stock prices for the purpose of inducing others to buy the stocks, or "marking the close." ¶¶ 93-114, 121-130. "Unlawful marking the close takes place when an individual engages in a series of late day transactions that" satisfy this standard. *SEC v. Kwak*, 2008 WL 410427, at *1 (D. Conn. Feb. 12, 2008).[17]

Gallagher argues that the Section 9(a)(2) claim should be dismissed because the SAC fails to allege that "but for" Gallagher's manipulative intent, he would not have engaged in the alleged purchases of SPOM and BZWR, citing *SEC v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007) (Holwell, J.). Br. at 23-25. The question of whether a "but for" manipulative intent is required is unsettled. *Masri* held that such an intent was required for an open-market manipulation claim under Section 10(b) and Rule 10b-5(a) and (c) – and did not address Section 9(a) claims – but none of these three provisions includes any such requirement. At least one other court in this Circuit has cast

---

[16] Gallagher cites no case law requiring the SEC to establish the precise amount of profits attributable to a defendant's fraud at the pleadings stage, and such a requirement would be impracticable. Indeed, even at the remedies stage, the SEC need only set forth a "reasonable approximation" of net profits to obtain disgorgement.

[17] The SAC also alleges that Gallagher violated Section 10(b), Rule 10b-5, and Section 17(a) through this conduct.

doubt on *Masri*'s application to Section 9(a), and the SEC itself has disagreed with *Masri*. *See Kwak,* 2008 WL 410427 at *4 n.10; *Donald L. Koch*, Exchange Act Rel. No. 72179, 2014 WL 1998524, at *9 n.97 (May 16, 2014), *aff'd, Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2015) (not addressing this issue).

The Court need not reach this "but for" question on this Motion. As *Masri* recognizes, "the question of whether a plaintiff has established the requisite factual intent…is a factual question appropriate for resolution by the trier of fact." 523 F. Supp. 2d at 373 (denying defendant's summary judgment motion). The SAC amply alleges that Gallagher engaged in the relevant trades for the manipulative purpose of raising the stock price at the end of the day so that he could sell his stock at inflated prices. ¶¶ 93-120, 1410-1411, 1441-1444 (SPOM); 121-130 (BZWR).

Gallagher claims that he was placing EOD above-market SPOM buy orders because he wanted to accumulate more stock. Br. at 24. But it makes no economic sense to place multiple EOD buy orders above the offer price, costing him more money. In any event, this disputed inference should be resolved by a jury, not on a motion to dismiss.

As to BZWR, Gallagher argues that the only sale that occurred the day after he allegedly "marked the close" was March 3, 2021. Br. at 24 (citing ¶ 122). This is misleading. The SAC alleges that Gallagher marked the close in BZWR on two days, March 2 and 5, 2021. ¶¶ 121–130. His EOD buy order on March 2 appears to have raised the closing price, and he profitably sold these shares the next day. ¶ 122. On March 5, he placed two EOD buy orders above the ask price, which appeared to raise the stock's closing price. ¶ 128. On March 8, the next trading day, he sent two tweets touting BZWR and then profitably sold 20,000 shares of BZWR the following day. ¶ 130. The SAC sufficiently alleges that Gallagher engaged in manipulative trading in SPOM and BZWR.

## CONCLUSION

For these reasons, Gallagher's motion to dismiss the SAC should be denied in its entirety.[18]

---

[18] The SEC respectfully requests leave to amend if the Court nevertheless grants any part of Gallagher's motion.

Dated:  New York, New York
         November 30, 2022

Respectfully submitted,

/s/ *Kevin P. McGrath*
Kevin P. McGrath
Thomas Peirce (not admitted in NY or SDNY)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0533 (McGrath)
mcgrathk@sec.gov