UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

                         Plaintiff,                    21-cv-8739 (PKC)

         -against-                                    OPINION AND
                                                      ORDER
STEVEN M. GALLAGHER,

                         Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

   The Securities and Exchange Commission ("SEC") brings this action against

Steven M. Gallagher for violations of section 17(a) of the Securities Act, 15 U.S.C. § 77q(a),

section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2), and section 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b), and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

   The SEC alleges that Gallagher violated federal securities laws by using his

Twitter account to encourage his followers to purchase certain stocks without disclosing that he

was selling or would imminently be selling his own shares.  It further alleges that Gallagher

disseminated false or misleading statements on some occasions and that he engaged in multiple

instances of manipulative trading.  Gallagher moves to dismiss in part the SEC's second

amended complaint (the "Second Amended Complaint").  (ECF 72; ECF 73.)


BACKGROUND

   For purposes of this motion, the Court accepts the SEC's well-pleaded allegations

as true and draws all reasonable inferences in favor of SEC as the non-movant.  See Ashcroft v.

1

Iqbal, 556 U.S. 662, 678 (2009); In re Elevator Antitrust Litigation, 502 F.3d 47, 50 (2d Cir. 2007).

      A.  Scalping Allegations.

Gallagher operated a Twitter account in the name of "Alexander Delarge 655321," with the handle @AlexDelarge6553, between at least September 2019 and October 2021.  (ECF 58 ¶ 30.)  As of October 2021, the account had over 70,000 followers.  (Id.)

Between at least December 2019 and October 2021, Gallagher used his @AlexDelarge6553 Twitter account to encourage his followers (and others who read his tweets) to purchase shares in specific issuers (the "Target Securities"), while not disclosing that he was simultaneously selling, or imminently would be selling, his own shares in those same issuers.  (Id. ¶¶ 7, 11.)  On some occasions, Gallagher falsely stated that he was not selling his shares of the issuers he was promoting.  (Id. ¶ 9.)

The SEC alleges that these actions constituted "scalping," i.e., "a scheme or artifice to defraud in which a defendant (i) acquires shares of a stock; (ii) recommends that others purchase the stock without disclosing his intention to sell; and (iii) subsequently sells the stock for his own benefit."  (Id. ¶¶ 7-8.)

According to the Second Amended Complaint, Gallagher would communicate with a small group of other Twitter users ("Associates") by private direct messages ("DMs") about potential stocks to buy.  (Id. ¶ 32.)  Gallagher and his Associates would choose issuers that had "a large public float, i.e., a large quantity of shares on the public market" and a low price per share.  (Id.)  Gallagher and his Associates would agree on a date and time when they would begin posting public tweets ("Alerts") about the chosen issuer.  (Id. ¶¶ 33-34.)

Prior to issuing an Alert, Gallagher would acquire millions of shares of the Target Security, "a practice he referred to as 'loading' (also . . . known as 'frontloading')."  (Id. ¶ 33). In many instances, he would privately inform a small number of Twitter users in private chat rooms that they should start acquiring shares in the Target Security because he would soon post an Alert.  (Id. ¶ 38.)  This "heads up to start buying" would often "increase[] the volume of trading and create[] an upward looking trend in the Target Security's price, making the stock look more attractive to Gallagher's intended victims when he would issue his public Alert."  (Id. ¶ 40).

Gallagher's Alerts were typically "accompanied by a GIF (short for Graphics Interchange Format, which is a short animated video clip) of a flashing red 'ALERT!!!!' or occasionally, a siren."  (Id. ¶ 41.)  Gallagher often posted Alerts just prior to, or during, his sale of shares.  (Id.)  "At other times, Gallagher built up to these red Alerts through a series of soft alerts, such as adding the issuer to a ranked list of his weekly stock picks."  (Id.)  Once the share price and trading volume of the Target Security increased following the Alert, Gallagher would begin to sell his shares.  (Id. ¶ 43.)

For example, on November 28, 2020, Gallagher sent the following DM to an Associate about AFOM (the ticker symbol for All for One Media Corp.): "afom try not to push that so i can load for a latter alert next week."  (Id. ¶ 34 (alteration removed).)  On November 30, he told another Associate, "im alert afom tomorrow thatll be the big run.  im quiet with it now loading dips," which is alleged to be a reference to buying shares of AFOM when the stock drops in price.  (Id. ¶ 35.)  The same day, he bought 20 million shares of AFOM.  (Id. ¶ 37.)  The next morning, he tweeted an Alert stating, "Challenge alert!!  $afom this runs like no other!!  Load and hold this is a swing multiple pennies fast!!  Buy $afom 500% runner today," accompanied

3

by a flashing red graphic that said "ALERT!!!!  ALEXANDER DELARGE."  (Id.)  "That same morning, after his Alert, Gallagher sold 13 million shares of AFOM for an approximate profit of $42,000."  (Id.)

Gallagher is alleged to have engaged in scalping in connection with shares of at least 59 issuers.[1]  (Id. ¶¶ 10, 131, Attachment A.)  The Second Amended Complaint describes Gallagher's Twitter and trading activity, as well as the amount of his profits, for each of the 59 issuers.  (Id. ¶¶ 47-1847.)  The SEC alleges that, in total, Gallagher generated at least $3,177,000 in net trading profits.  (Id. ¶ 10, Attachment A.)

The SEC also alleges that, on some occasions, Gallagher tweeted false and/or misleading statements.  (Id. ¶ 9.)  For example, Gallagher's Alerts "were often followed by numerous additional tweets or retweets by Gallagher stating or implying that the Target Security was a buy (and/or hold) opportunity."  (Id. ¶ 44.)  He "often retweeted tweets from his [A]ssociates, with whom he had coordinated in DMs."  (Id.)  His tweets and retweets sometimes "included false information about the issuer of the Target Security" – such as false and/or misleading tweets about a pending merger of one issuer (LFER) – or falsely stated that he was not selling (e.g., tweeting: "$tsnp . . .  Not selling!") minutes before selling shares in the referenced Target Security, TSNP.  (Id. ¶ 45.)  He also falsely claimed that he did not benefit from his Alerts (e.g., tweeting in reply to two Twitter users: "Never have I alerted a stock and sold.").  (Id.)

B.  Market Manipulation Allegations.

The SEC also alleges that Gallagher engaged in multiple instances of manipulative trading in connection with at least two issuers, SPOM and BZWR.  Specifically, it

---

[1] Although paragraph 46 of the Second Amended Complaint alleges that Gallagher engaged in scalping in connection with 60 issuers, Attachment A appears to list only 59 issuers.

alleges that he "plac[ed] multiple buy orders at the end of the trading day to raise the stocks' price ('marking the close') with the intent to mislead the public about the trajectory of the stocks' price and induce others to buy the stocks."  (Id. ¶ 9.)  "Marking the close" refers to the practice of buying or selling stocks near the close of trading to influence the closing price of a stock.  (Id. ¶¶ 9, 93.)

Between July 23, 2020, and August 3, 2020, Gallagher entered SPOM buy limit orders above the offer price just prior to the close of trading.  (Id. ¶ 93.)  Specifically, "just prior to the close of trading on July 23, July 27, and July 29, 2020, Gallagher placed approximately eighteen [end of day ('EOD')] limit buy orders of SPOM at or above the offer price, with the intent of raising the adjusted closing price to [create the impression that the stock was increasing in value in order to] induce others to buy the stock."  (Id. ¶¶ 93, 98.)  The SEC alleges that "Gallagher's EOD timing of these buy orders at limit prices above the market price indicates that his intent was to artificially raise the price per share of SPOM to induce others to buy it."  (Id. ¶ 99.)

The day before undertaking this alleged scheme, Gallagher sent DMs to other Twitter users stating that he intended to use end of day trades as a means to manipulate SPOM's end of day share price.  (Id. ¶ 94.)  For example, Gallagher sent one DM stating, ". . . . can you get a chart of the last few min of spom today?  spom went nuts with some big buys eod and got a guy who putting something together for me," and another stating, "A friend is putting a spom article together and massive buys eod."  (Id. ¶¶ 95-96.)  The SEC alleges that these messages "suggest[] that Gallagher was coordinating with an Associate to tweet an article touting SPOM as part of a coordinated effort to increase SPOM's EOD share price to induce others to buy the stock."  (Id. ¶ 97.)

Additionally, on July 29, 2020, he publicly tweeted, "Hey traders can you guys buy $spom if it moves 1 penny I'll be green.  Lets keep the green streak alive!  Thank you in advance. . 175 is a great buy price FYI."  (Id. ¶ 102.)  The SEC alleges that this indicates Gallagher was "telling his followers and readers to enter buy limit orders at .175, a price he thought would artificially move SPOM's share price higher."  (Id. ¶ 104; see also id. ¶¶ 105-06 (describing other tweets)).  That same day, he also tweeted, "I'll be hitting $spom at .17 come join me move this.  EOD."  (Id. ¶ 106.)

Just before the close of trading on July 29, "Gallagher entered eight EOD SPOM buy limit orders at $0.17, which was above the offer price."  (Id.)  His "first limit order to buy 5,000 shares of SPOM at $0.1700 was filled at $0.1497 and his final buy limit order for 20,000 shares of SPOM at $0.1700 was filled at $0.1618, indicating that his EOD buy limit orders moved SPOM's EOD price higher."  (Id.)  According to the SEC, "SPOM's adjusted closing price on July 29, 2020 was $0.1579, also indicating that his EOD buy limit orders moved SPOM's EOD price upwards."  (Id.)  The SEC notes that there "was no current news to otherwise account for" this increase.  (Id.)

During this time, Gallagher received and ignored "repeated, written warnings from his brokerage firm ('Broker A') that he appeared to be engaged in manipulative trading in violation of securities laws and regulations."  (Id. ¶ 12; see also id. ¶¶ 100-01.)  On July 29, 2020, Broker A sent Gallagher an email with the subject line, "Possible manipulative trading in your account," which stated that between July 23 and July 28, 2020, bids were executed in his account "which had the effect of raising the closing price of [SPOM].  This activity may be considered marking the close by regulators."  (Id. ¶ 100.)  Gallagher proceeded to place approximately 13 end of day buy limit orders at or above the offer price on July 29 and July 30,

2020.  (Id. ¶ 101.)  Broker A emailed Gallagher again on July 31 and August 3, 2020, and

Gallagher placed buy limit orders on those days.  (Id. ¶¶ 108-110.)  "Broker A then temporarily

restricted Gallagher's account to liquidating transactions only."  (Id. ¶ 111.)  Gallagher then

tweeted, "Always love waking to my [Broker A] account restricted do to stock manipulation!

Who would try to move $spom EOD not me!"  (Id. ¶¶ 111-12.)

   On September 9, 2021, Broker A informed Gallagher that it would close

Gallagher's trading account effective October 9, 2021, and immediately prevent him from

making new stock purchases, restrict his account to liquidating transactions, and prohibit him

from opening a new account in the future.  (Id. ¶ 12.)  The SEC alleges that he continued to

engage in scalping through sales of stock he held in his Broker A account, and also opened a new

trading account at a second brokerage firm ("Broker B").  (Id. ¶ 13.)  "As of October 14, 2021,

[Gallagher's Broker B] account had approximately 40 penny stocks in it, with a market value of

approximately $1 million."  (Id.)  The SEC alleges Gallagher used the Broker B account to

continue scalping through at least October 13, 2021.  (Id.)

   The SEC alleges that Gallagher's marking the close of SPOM "furthered his

scalping scheme," and that while he was engaged in "marking the close" he "simultaneously

tweeted approximately one hundred touts" and sent multiple DMs encouraging others to buy

SPOM.  (Id. ¶¶ 115-16.)  He began selling his shares in SPOM on August 5, 2020, two days after

his last allegedly manipulative EOD trade in SPOM.  (Id. ¶ 117.)  He proceeded to sell over 1.3

million shares of SPOM between August 5 and September 15, 2020, while continuing to

encourage others to buy SPOM.  (Id. ¶ 118.)

   The SEC alleges similar marking the close activity with respect to BZWR,

spanning the period from March 2 to March 5, 2021.  (Id. ¶¶ 121-30.)  On March 2, he "entered a

buy limit order for 120,000 shares of BZWR at $0.2400 per share," which was above the ask of $0.2220.  (Id. ¶ 122.)  The order was partially filled before the close at prices between $0.2220 and $0.2400 and BZWR's adjusted closing price was $0.2400, "indicating that his EOD order affected the adjusted close."  (Id.)  "Gallagher profitably sold these shares the next day."  (Id.) On March 3, Gallagher sent multiple private DMs to Associates and "as yet unidentified recipients" stating, for example: "how much bzwr you have," "i can move it 10 cents eod," "EOD we can smak bzwr 40 cents on little money," and "AGAIN GET BZWR BEFORE THE CLOSE!"  (Id. ¶¶ 124-25.)  He also publicly tweeted, "If you buy $bzwr now!  You be happy EOD."  (Id. ¶ 125.)

The SEC alleges that Gallagher also placed multiple buy orders at a limit above the ask price on March 5, and that those orders affected that day's adjusted closing price.  (Id. ¶ 128.)  On March 8, the next trading day after March 5, he "tweeted at least two touts to buy BZWR and then profitably sold 20,000 shares of BZWR the next day."  (Id. ¶ 130.)

Gallagher's "marking the close" of BZWR coincided with his scalping those shares, "indicating that he used both manipulative strategies together to sell at a profit."  (Id. ¶¶ 129-30.)

C.  Parallel Criminal Proceedings.

On October 26, 2021, the same day the SEC filed its initial complaint in this action, Gallagher was arrested in connection with a criminal complaint filed by the U.S. Attorney's Office for the Southern District of New York.  (Id. ¶ 5.)  Gallagher pled guilty to a criminal information (the "Information") that charged him with one count of using a manipulative and deceptive device and contrivance in connection with the purchase or sale of securities, in violation of 17 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2.

(ECF 58 ¶ 5); see United States v. Gallagher, 22 Cr. 122 (ECF 11; ECF 24) (S.D.N.Y. June 28, 2022) (Caproni, J.).

The Information pertained only to Gallagher's scalping scheme with respect to SCIE. It "charged that he used Twitter to misrepresent the nature of his personal financial stake in the securities of SpectraScience Inc. ('SCIE'), in order to induce others to purchase SCIE stock, and thereby drive up the stock's price, while Gallagher simultaneously and secretly sold his own previously acquired shares at an artificially inflated price." (ECF 58 ¶ 6.)

At his plea allocution, of which this Court takes judicial notice, Gallagher stated:

Gallagher: On January 28, at 9:48 a.m. I tweeted out a screenshot of a buy of SCIE of 1 million shares, valued at $3500. The screenshot was accurate. However, I just sold in my account -- however I did -- however, I had just sold my shares in my account and did not disclose that. Likewise, on the morning of January 29, 2021, at approximately 10:28 a.m., I tweeted out SCIE, I'll hold. Approximately one minute later, I sold one million shares at .0015, for a total value of $1500. As the price of SCIE fell, I continued to sell and tweet statements like, I don't bail.

The Court: I don't bail?

Gallagher: I don't bail. And SCIE I'll hold while continuing to sell portions of my SCIE shares. I know that these Tweets concerning my stock holdings of SCIE were wrong because I was selling some of my SCIE positions at the time that I was tweeting, thereby misleading my financial position to others. I am profoundly sorry to my Twitter followers who purchased SCIE as a result of my tweets regarding holding my SCIE during this time period, and I am sincerely sorry.

* * * *

The Court: So you intended people to think you were holding the stock so that they would buy the stock and that would in turn run the stock price up, correct?

Gallagher: Yes, your Honor.

United States v. Gallagher, 22 Cr. 122 (ECF 16 at 19-21).

Gallagher was sentenced on June 27, 2022, principally to a term of imprisonment of time-served, three years of supervised release with the first six months to be served under house arrest, a $10,000.00 fine, and a $100.00 special assessment fee. (ECF 58 ¶ 6.) He was ordered to forfeit $21,716.00. (Id.) No restitution was sought or ordered. United States v. Gallagher, 22 Cr. 122 (ECF 24).

D. Procedural History.

The SEC initiated this action on October 26, 2021, by filing a complaint and an ex parte emergency application enjoining Gallagher from continuing violations of securities laws, freezing his assets, and granting other relief (the "Emergency Application"). (ECF 1; ECF 5.) The Court granted the Emergency Application and entered a Temporary Restraining Order freezing up to $6.9 million in Gallagher's assets and restraining him from ongoing and future violations of the securities laws. (ECF 11.) On November 5, 2021, the Temporary Restraining Order was modified with respect to the frozen assets held in two particular accounts. (ECF 17.) The parties filed a proposed stipulated preliminary injunction order with substantially the same effect, which the Court entered on November 30, 2021 (the "PI Order"). (ECF 21.)

On March 23, 2022, the Court modified the asset freeze to allow Gallagher and his wife to sell securities held in certain frozen brokerage accounts, subject to certain conditions. (ECF 36.) The PI Order was subsequently modified to freeze Gallagher's assets up to $3,172,990. (ECF 66.)

The SEC's initial 31-page complaint described Gallagher's alleged scalping in connection with 2 issuers (SpectraScience Inc. ("SCIE") and Marathon Group Corp. ("PDPR")) as well as his alleged scalping and manipulative trading in connection with 1 issuer (SPO Global,

Inc. ("SPOM")).  It alleged generally that Gallagher engaged in additional and ongoing scalping

activity in connection with a total of 60 issuers "[a]s summarized in Attachment A."  (ECF 1

¶ 92.)  Gallagher filed a pre-motion letter arguing that the SEC failed to plead its fraud claims

with particularity, as required by Rule 9(b), Fed. R. Civ. P., because it failed to include any

details regarding the vast majority of the 60 issuers.  (ECF 29.)  He further argued that the SEC

failed to plead that the omission of his intent to sell his shares was material and that the market

manipulation claim did not allege that his sole purpose in trading near the end of the day was

unlawful.  (Id.)

       The Court granted leave to the SEC to file an amended complaint, (ECF 31), and

the SEC filed a 52-page amended complaint on April 7, 2022, (ECF 38).  The amended

complaint expanded on the existing SCIE, PDPR, and SPOM scalping allegations by alleging

that Gallagher's intent to sell his shares was material information that a reasonable investor

would consider important to know in deciding whether to buy.  (ECF 38 ¶¶ 67-69, 87-89, 99-

101.)  It also described Gallagher's alleged manipulative trading in SPOM in greater detail and

added allegations as to Gallagher's manipulative trading in a second issuer, Business Warrior

Corporation ("BZWR").  The amended complaint also included "certain additional examples" of

scalping in other issuers, a revised Attachment A, and a new Attachment B providing, for each of

the 60 issuers, an example tweet and the number of shares Gallagher sold.  (Id. ¶¶ 143-144,

Attachment A, Attachment B.)  Finally, it added allegations pertaining to investors who were

victimized by Gallagher's actions.  (Id. ¶¶ 157-78.)

       Gallagher filed a second pre-motion letter re-asserting the same arguments raised

in his first letter, and arguing that the SEC's reliance on "scheme liability" fails as a matter of

law because it "actually alleges multiple separate purported schemes" and did not allege that

Gallagher's entire business model was deceptive.  (ECF 42.)  He also argued that the amended complaint contained factual errors.

With leave of  Court the SEC filed its Second Amended Complaint, the operative complaint, on June 29, 2022.  (Minute Entry of May 25, 2022; ECF 58.)  The 244-page pleading sets forth detailed allegations with respect to each of the 59 issuers identified in the Attachment A annexed thereto.  Counts One and Three allege that Gallagher violated section 17(a) of the Securities Act and section 10(b) of the Exchange Act and rule 10b–5 promulgated thereunder. Count Two alleges that Gallagher violated section 9(a)(2) of the Exchange Act.  Though the claims for relief simply restate language from these statutes and rule, the SEC's submissions elucidate that Counts One and Three pertain to Gallagher's scalping scheme and Count Two pertains to his "marking the close" in connection with SPOM and BZWR.

Gallagher filed another pre-motion letter, (ECF 67), and the Court set a schedule on his motion, (ECF 71).  Gallagher's motion to dismiss the Second Amended Complaint is fully briefed.  (ECF 72, 73, 75, 78.)


DISCUSSION

      A.  <u>Gallagher's Motion to Dismiss.</u>

Gallagher moves to dismiss the Second Amended Complaint "to the extent that the claims 1) depend on a fraud-by-omission theory or 2) rely on Mr. Gallagher's vague and nebulous opinions."  (ECF 73 at 6.)  He does not move to dismiss "claims arising from allegedly affirmative false statements."  (ECF 73 at 7 n.3; <u>see also</u> <u>id.</u>, Ex. A (chart identifying issuers for which the Second Amended Complaint alleges affirmative misstatements).)

Gallagher argues, first, that all claims based on a fraud-by-omission theory of liability should be dismissed because he did not owe a duty to disclose his stock sales to his Twitter followers.  (ECF 73 at 8-15.)  Second, he argues that his alleged failure to disclose his stock sales was not "material" to a reasonable investor.  (Id. at 15-23.)  Third, he asserts that his tweets constitute protected speech under the First Amendment.  (Id. at 23-26.)  Fourth, he argues that the SEC's scalping allegations, to the extent based on omissions alone, cannot be a basis for scheme liability under rule 10b–5(a) and (c) or section 17(a)(1) and (3).  (Id. at 26-27.)  Fifth, he urges that the section 17(a)(2) claim should be dismissed to the extent it fails to allege that he "obtained money or property" from scalping.  (Id. at 27-28.)  Sixth and finally, he argues that the SEC has not stated a claim for manipulative trading under section 9(a)(2).  (Id. at 28-30.)

The Court will address Gallagher's arguments in the following order: first, his arguments concerning the scalping claims, Counts One and Three (duty to disclose, materiality, whether Gallagher "obtained money or property" from his alleged scheme, and scheme liability); next, his argument that Count Two fails to state a claim for manipulative trading; and finally, his First Amendment argument.

The Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa.  For the reasons that will be explained, the motion to dismiss will be denied.

### B.  Legal Standard on a Rule 12(b)(6) Motion.

Rule 12(b)(6), Fed. R. Civ. P., requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id. A sufficient complaint must include non-conclusory factual allegations that move its claims "across the line from conceivable to plausible." Id. at 680.

In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth. Id. at 678. Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll International, 231 F.3d 82, 86 (2d Cir. 2000)). "A motion brought under Rule 12(b)(6) challenges only the 'legal feasibility' of a complaint. The test of a claim's 'substantive merits' is 'reserved for the summary judgment procedure, governed by [Rule] 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule.'" Goel v. Bunge, Ltd., 820 F.3d 554, 558-59 (2d Cir. 2016) (quoting Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006)) (citation omitted).

A court reviewing a motion to dismiss "take[s] no account of [the complaint's] basis in evidence" and "may review only a narrow universe of materials." Id. at 559. Such materials include documents incorporated in the complaint, matters of which judicial notice may be taken, and documents that are "integral" to the complaint, even if they are not expressly incorporated. Id.; see also Chambers, 282 F.3d at 153 (stating that a document is "integral" to a complaint where the complaint "relies heavily upon its terms and effect").

C.   <u>Scalping Claims (Counts One and Three)</u>.

Counts One and Three are brought pursuant to section 17(a), section 10(b), and rule 10b–5, and pertain to Gallagher's alleged scalping scheme.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations."  15 U.S.C. § 78j(b).  Rule 10b–5, promulgated under section 10(b), makes it unlawful, in connection with the purchase or sale of any security:

> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.

Section 17(a) provides that it is unlawful for any person in the offer or sale of any securities:

> (1)  to employ any device, scheme, or artifice to defraud, or
>
> (2)  to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3)  to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

To establish a violation of section 10(b) and rule 10b–5, a plaintiff must prove that the defendant (1) "made a material misrepresentation (or a material omission if the

defendant had a duty to speak) or used a fraudulent device," (2) acting with scienter, (3) in connection with the purchase or sale of a security.  SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1467 (2d Cir. 1996).  "Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, . . . or at least knowing misconduct."  Id. (citations omitted).  "Whether or not a given intent existed, is . . . a question of fact."  Id.

The elements of a claim under section 17(a) are "essentially the same as the elements under § 10(b) and Rule 10b–5," except that section 17(a)(2) and 17(a)(3) do not require proof of scienter – a showing of negligence is sufficient.  SEC v. Fiore, 416 F. Supp. 3d 306, 319 (S.D.N.Y. 2019); Aaron v. SEC, 446 U.S. 680, 697 (1980) ("[T]he language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).");  First Jersey Securities, 101 F.3d at 1467.

Because claims brought under these provisions sound in fraud, a plaintiff must state "the circumstances constituting fraud or mistake" with "particularity."   Rule 9(b), Fed. R. Civ. P; see e.g., SEC v. Thompson, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017).

1.   Whether Gallagher Owed a Duty to Disclose.

Gallagher urges that the SEC's scalping claims must be dismissed to the extent they are based on omissions because, as an ordinary investor, he did not owe "a duty to disclose his stock sales to his Twitter followers."  (ECF 73 at 10.)  Relying on a series of cases, he argues that "a duty to disclose sales applies only in limited circumstances [that do not apply to him], 1) where a person is acting in some type of fiduciary or trusting capacity or 2) fails to disclose any beneficial ownership in the touted securities, thereby making it appear that he is offering independent finance advice that can be relied upon by reasonable investors,"  (ECF 73 at 10-13 (citing Chiarella v. United States, 445 U.S. 222 (1980); SEC v. Capital Gains Research Bureau,

Inc., 375 U.S. 180 (1963); <u>Zweig v. Hearst Corp.</u>, 594 F.2d 1261 (9th Cir. 1979), <u>abrogated on</u>

<u>other grounds by</u> <u>Hollinger v. Titan Capital Corp.</u>, 914 F.2d 1564 (9th Cir. 1990); <u>SEC v. Park</u>,

99 F. Supp. 2d 889 (N.D. Il. 2000); <u>SEC v. Fiore</u>, 416 F. Supp. 3d 306).)

This argument misses the mark.  This case is not about a freestanding duty to

disclose.  It is about statements Gallagher made touting the Target Securities that were materially

misleading because they omitted Gallagher's fully-formed, present intent to sell his own shares

of the very same stocks.

Section 17(a)(2) and rule 10b–5(b) forbid the omission of "a material fact

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading."  15 U.S.C. § 77q(a)(2); 17 C.F.R. § 240.10b-5(b).  This case is

controlled by the "well-established precedent in this Circuit that once a person or company

choses to speak on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is

no existing independent duty to disclose information on the issue or topic."  <u>In re Vivendi, S.A.</u>

<u>Securities Litigation</u>, 838 F.3d 223, 258 (2d Cir. 2016) (quotations omitted) (alteration in

original); <u>Caiola v. Citibank, N.A., N.Y.</u>, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an

independent duty [to disclose] is not . . . a defense to Rule 10b–5 liability because upon choosing

to speak, one must speak truthfully about material issues . . . [and] ha[s] a duty to be both

accurate and complete."); <u>Finger v. Pearson PLC</u>, 17-Civ-1422, 2019 WL 10632904, at *8

(S.D.N.Y. Sept. 16, 2019) (Sullivan, J.) ("There is no freestanding duty to reveal 'any and all

material information;' in fact, absent an underlying duty to disclose, companies may remain

silent '[e]ven with respect to information that a reasonable investor might consider material.'  A

duty to disclose arises when a . . . company makes 'a corporate statement that would otherwise

be inaccurate, incomplete, or misleading' without the disclosure."  (citations omitted)); <u>see also</u>

United States v. Donovan, 55 F. App'x 16, 22 (2d Cir. 2003) (summary order) (explaining that "Section 17(a) . . . plainly indicates that a duty to disclose may arise during a securities transaction if omission of a material fact would make another statement misleading," and concluding that the district court properly charged the jury that the defendants could be convicted based on omissions, even in the absence of a fiduciary duty).

Once Gallagher chose to publicly recommend the purchase of certain stocks on Twitter rather than remain silent, he assumed a "duty to tell the whole truth" and "to be both accurate and complete" as to material issues.  See In re Vivendi, 838 F.3d at 258; Caiola, 295 F.3d at 331; see also Thompson, 238 F. Supp. 3d at 596-97 (rejecting defendant's argument that a duty to disclose arises only in the context of a fiduciary or trust relationship, and explaining that "Section 10(b), Rule 10b–5 and Section 17(a) require that when a company (or individual) 'speaks', it must disclose all information necessary to make its statement(s) not materially misleading—even where there is otherwise no independent duty to disclose").  As concluded in the following subsection, the SEC plausibly alleges that Gallagher's omission of his then-present intent to sell was material.

Gallagher also contends that his conduct is not actionable as "scalping" because the Second Amended Complaint "contains few allegations that [his] tweets drove a material increase in the stock price or sales volume, as prior scalping definitions required."  (ECF 73 at 14.)  The Court agrees with the SEC that "the deceit of investors occurs, and is complete, upon the dissemination of the false or misleading touts," without regard to whether those touts later cause a rise in share price or sales volume.  (See ECF 75 at 18.)

2. Whether Gallagher's Omission of His Present
   Intent to Sell Was Materially Misleading.

Gallagher contends that the Second Amended Complaint fails to plead that his tweets were materially misleading.  (ECF 73 at 9-10, 15-23.)  For the reasons that follow, the Court concludes that the SEC has plausibly alleged that Gallagher's omission of his then-present intent to sell his shares was misleading and would have been material to a reasonable investor.

Gallagher contends that "selling a stock in the future does not render a prior stock 'recommendation' or tout false or misleading" because "[i]ndividuals sell stock for many different reasons."  (Id. at 9.)  For example, "the person could be overweight in a particular stock or sector and is selling to reduce risk, he could need cash to fund a purchase elsewhere, he could be taking profits based on prior gains in that stock, or he could be diversifying his portfolio.  These scenarios make clear that recommending or tweeting positively about a stock is not rendered false by future sales."  (Id.)  He also states that he disclosed the fact that he owned shares in the Target Securities, and claims that his future sales were "already implicit" in that fact.  (Id. at 14 (emphasis removed).)  According to Gallagher, "when a person discloses their long position in a particular stock, every reasonable investor seeing that disclosure would assume that the owner would want the stock price to rise so that he could profit by selling the stock."  (Id.)

But the SEC does not allege that Gallagher misled investors by recommending a stock and then, at some later point, selling his shares.  It alleges that, at the time he was recommending that others purchase shares in certain issuers, he knew and failed to disclose that he was selling or would imminently be selling his own shares in those same issuers.  The Court agrees that a failure to disclose a then-present intent to sell is sufficient to render the statements touting a stock misleading.

19

Gallagher's omission of his intent to sell his shares was also material.  Section 17(a), section 10(b), and rule 10b–5 prohibit misstatements and omissions as to facts that are "material."  A fact is material under these provisions "if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total" mix of information available.'"  First Jersey Securities, 101 F.3d at 1466 (quoting In re Time Warner Inc. Securities Litigation, 9 F.3d 259, 267-68 (2d Cir. 1993)); see also TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

Materiality is "a mixed question of law and fact."  First Jersey Securities, 101 F.3d 1450 at 1466 (citing TSC Industries, 426 U.S. at 450).  "The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law. The factual component requires an inference as to whether the information would likely be given weight by a person considering that question."  Id. at 1466-67 (citations omitted).

Accordingly, "in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (quotations omitted) (quoting Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000)).

Here, it is not "so obviously unimportant to a reasonable investor" that Gallagher knew, at the time of his touts, that he was selling or would soon be selling his own shares in the stocks he was encouraging others to buy.  See id.  The Second Amended Complaint raises the plausible inference that a reasonable investor would have found this fact important to their

decision of whether to buy, as it could have cast doubt on the credibility and soundness of his advice.

Gallagher's tweets also cannot be described as nonactionable opinion or "puffery." "[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." Tongue v. Sanofi, 816 F.3d 199, 210 (2d Cir. 2016) (citing Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 135 S.Ct. 1318, 1332 (2015)). The "core inquiry" is "whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" Id. (quoting Omnicare, 135 S.Ct. at 1329.) The SEC has plausibly alleged at this stage that Gallagher's omission of his then-present intent to sell made his stock recommendations misleading to a reasonable investor, who would not expect Gallagher to sell substantial portions of his shares at the time of, or shortly after, his Alerts.

Additionally, the Second Circuit has defined "puffery" in this context as "statements [that] are too general to cause a reasonable investor to rely upon them." ECA, Local 134, 553 F.3d at 206. "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." In re Banco Bradesco S.A. Securities Litigation, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017) (Woods, J.) (quoting In re Petrobras Securities Litigation, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (Rakoff, J.). As such, a statement may be "mere puffery" when viewed in isolation but not when viewed in the context in which they were made. Id.; Petrobas, 116 F. Supp. 3d at 381.

Viewed in a light most favorable to the non-movant SEC and in the context of the body of tweets referenced in the Second Amended Complaint, Gallagher's tweets had sufficient

content to potentially cause a reasonable investor to rely on them.  The Court cites a few

examples:

1. "$alpp my #1 applied to up list to NASDAQ!  Uner 4 bucks a share!!  you want this long in your portfolio $10 bucks soon!"  (ECF 58 ¶ 203.)

2. "$BLSP Buy buy buy and HOL.  Then the price won't drop.  This can run 2000%+ on the Gray Market."  (Id. ¶ 381.)

3. "Best trading day ever!  Thanks to smart traders selling smart!  $boty up 178% . . . Every alert higher!  Post your gains tell your story!!  Tell your friends We all get rich Sell smart!"  (Id. ¶ 423.)

4. "$bzwr earnings tomorrow!  This is the buy before close!  This could rocket tomorrow!"  (Id. ¶ 485.)

5. "$drnk will gap up a minimum of 30% in the morning!!  Get this now!  I'm holding not selling!!  $drnk rocks . . .Easy money folks AM news buy hold get rich IMO!"  (Id. ¶ 730.)

6. "Investors talk to me.  Anyone interested in $spom.  This week you wanna get it.  Friday profit takers giving us cheap 180 share for Monday up over 100% last week.  I believe 500% this week."  (Id. ¶ 1395.)

At the motion to dismiss stage, the Court does not conclude that Gallagher's tweets are the kind

of "[s]tatements of general corporate optimism" or aspirational statements about "reputation,

integrity, and compliance with ethical norms" that courts have held to be nonactionable puffery.

IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland

Group, PLC, 783 F.3d 383, 392 (2d Cir. 2015); City of Pontiac Policemen's & Firemen's

Retirement System v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014).

        The Court thus rejects Gallagher's assertion that a reasonable investor, viewing

his tweets in context, "would have realized that Mr. Gallagher was going to sell his shares when

the stock price increased" and that he was motivated by self-interest and was not offering

unbiased advice.  (ECF 73 at 17; ECF 78 at 6-7.)  The Second Amended Complaint raises the at

least equally plausible inference that a reasonable investor would have considered Gallagher's

plan to simultaneously or imminently sell his own shares important to the total mix of information available.  See, e.g., Zweig, 594 F.2d at 1268 (concluding that the defendant "should have told his readers . . . of his intent to sell shares that he had bought at a discount for a quick profit"); SEC v. Reynolds, 08-Civ-0384-B, 2008 WL 3850550, at *6 (N.D. Tex. Aug. 19, 2008) (SEC's allegations were sufficient to survive 12(b)(6) motion to dismiss because "[a] reasonable investor would likely find the fact that [d]efendants planned to liquidate their stock holdings after elevating the price to be material.  More than that, the fact that [d]efendants were encouraging recipients of promotional mailers and . . . e-mails to buy stock at the same time that they were selling their stock would be material to reasonable investors."); SEC v. Huttoe, CIV.A. 96-2543, 1998 WL 34078092, at *7 (D.D.C. Sept. 14, 1998) (concluding that the defendant's practice of recommending stocks to his newsletter subscribers while failing to disclose that he intended to sell his personal holdings "reflects on the objectiveness of the investment advice and is therefore material"); SEC v. Corporate Relations Group, Inc., 2003 WL 25570113, at *8 (M.D. Fla. Mar. 28, 2003) ("[T]he fact that the [defendants] were selling their stock at the same time they were encouraging their readers to buy would clearly be material to reasonable investors.  The SEC has presented abundant evidence that the timing of the [defendants'] stock sales was tied to the promotional articles, and the fact that the [defendants] were not heeding their own advice about the subject stocks would be important to a reasonable reader of the publications."); SEC v. Sripetch, 20-Civ-01864, 2020 WL 6396927, at *4 (S.D. Cal. Nov. 2, 2020) (concluding that the defendants' statements and omissions in stock promotions were materially misleading "because they did not fully disclose the [d]efendants' then-present intent . . . to sell the promoted stock").

In arguing that a reasonable investor would expect him to sell his shares once the stock price increased, Gallagher points to tweets not included in the Second Amended Complaint

in which he stated that he would not tell his followers when he sold.  (ECF 73 at 17, Ex. B.)
These tweets may not be properly considered on the motion to dismiss because they are not
incorporated by reference in the Second Amended Complaint, integral to the Second Amended
Complaint, or matters of which the Court may appropriately take judicial notice.  But, even if
considered, Gallagher's argument still fails.  His statements that he would not tell his followers
when he sold his shares reasonably could be read to imply that, at the time of his Alerts,
Gallagher had not yet formulated an immediate plan to sell, which was false.  Thus, his failure to
disclose his then-present intent to sell nevertheless renders his tweets misleading.  See
Thompson, 238 F. Supp. 3d at 598 (rejecting defendant's argument that his newsletters'
disclaimers that he "may" sell his shares in the stocks he recommended were not materially
misleading, and concluding that the SEC's allegation "that defendants should have disclosed that
their 'intent all along was to sell their entire positions, if possible'" was "sufficient to pass
muster" (emphasis removed)).

   Finally, Gallagher also asserts that his omissions are not material because Twitter
is an inherently unreliable forum when viewed from the perspective of a reasonable investor.
(See ECF 73 at 21.)  But the sufficiency of the pleading turns neither on his perception of reality
nor an objective assessment of reality but on whether the SEC has plausibly alleged that a
reasonable investor would reasonably rely on tweets.  The Court concludes that the SEC's
allegations are plausible.

   Gallagher also argues that the SEC's failure to establish "temporal linkage" or to
discuss "intervening events" between his touts and his subsequent stock sales confirms his tweets
were not material.  The argument is not supported by the SEC's ample allegations, and is
inconsistent even with the allegations he cites.  (See ECF 73 at 22-23 (citing ECF 58 ¶¶ 1146-

1148).)  In paragraphs 1146 and 1147, the SEC alleges that Gallagher purchased 1,500,000 shares of INQD on May 29, 2020, and tweeted at least 100 touts of INQD between May 27 and August 12, 2020.  (ECF 58 ¶¶ 1146-47.)  Then, paragraph 1148 alleges that he sold 1,000,000 shares of INQD on August 13, 2020.  (Id. ¶ 1148.)

The SEC has plausibly alleged that a reasonable investor would have considered it important in the total mix of information to know that Gallagher, at the time he touted the Target Securities, was selling or would soon be selling his own shares in those same issuers.  The Court declines to dismiss the challenged claims on materiality grounds.

### 3.   Whether the Second Amended Complaint Alleges that Gallagher "Obtained Money or Property by Means of" His Omissions.

Gallagher argues that the Second Amended Complaint fails to state a claim for relief under section 17(a)(2).  Section 17(a)(2) makes it unlawful "for any person in the offer or sale of any securities . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77q(a)(2).

Gallagher asserts that the SEC fails to allege that he obtained money or property "by means of" his alleged scheme.  He argues that "[t]here are numerous listed stocks where the SEC alleges that Mr. Gallagher made money but fails to provide a causal link between the earnings and Mr. Gallagher's alleged falsities or omissions."  (ECF 73 at 28.)  He also claims that in certain instances, the stock price decreased after his tweets.  (ECF 78 at 11.)  He urges that the "Section 17(a)(2) claims should be dismissed" "[f]or those stocks."  (ECF 73 at 28.)

With respect to one issuer in particular, ALPP, Gallagher argues that "[w]hile the price of ALPP increased during the period in which Mr. Gallagher owned the stock, the [Second

25

Amended Complaint] does not link the price rise to scalping.  This is hardly surprising given that ALPP's executives, completely unrelated to Mr. Gallagher, were allegedly engaging in a fraud to pump up the price of ALPP."  (Id.)  The alleged fraud by ALPP executives may not be considered by the Court on this motion, as it is outside the four corners of the Second Amended Complaint and not contained within any document incorporated in or integral to the complaint or of which judicial notice may be taken.  Any alleged fraud by ALPP executives also would not necessarily foreclose the possibility that Gallagher's alleged scheme also impacted the share price and caused him to profit.

The Second Amended Complaint raises the plausible inference that Gallagher's omission of his intent to sell caused more people to purchase shares in the touted issuers than otherwise would have, if given full disclosure, and therefore that his omission caused a rise in stock price that allowed Gallagher to profit from his sale of his shares.  This is sufficient to plausibly allege that Gallagher obtained profits by means of his materially misleading tweets.

    4.   Whether the SEC States a Claim for Scheme Liability
             Under Rule 10b–5(a) and (c) and Section 17(a)(1) and (3).

Gallagher moves to dismiss the SEC's "scheme liability" claims (that is, claims pursuant to section 17(a)(1) and (3) and rule 10b–5(a) and (c)) to the extent they are based on omissions.  He contends that omissions, standing alone, cannot provide a basis for scheme liability under these provisions, and that the SEC has failed to plead the requisite additional deceptive conduct with particularity.  (ECF 73 at 26-27 (citing SEC v. Rio Tinto, 41 F.4th 47 (2d Cir. 2022).)

The Court need not reach these questions because it is clear the SEC has alleged statements that are materially misleading by omission.  The Court declines at this juncture to parse whether allegations falling within the scope of section 17(a)(2) and rule 10b–5(b) also fall

within the scope of the scheme liability subsections.  It is sufficient that the Second Amended

Complaint plausibly alleges an actionable claim for relief.

      D.  Whether the SEC Has Stated a Claim for
          Manipulative Trading Under Section 9(a)(2).

Section 9(a)(2) of the Exchange Act makes it "unlawful for any person, directly or

indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of

any facility of any national securities exchange, or for any member of a national securities

exchange" to:

> effect, alone or with 1 or more other persons, a series of transactions
> in any security registered on a national securities exchange, any
> security not so registered, or in connection with any security-based
> swap or security-based swap agreement with respect to such security
> creating actual or apparent active trading in such security, or raising
> or depressing the price of such security, for the purpose of inducing
> the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2).  This section "was aimed at preventing an individual from dominating the

market in a stock for the purpose of conducting a one-sided market at an artificial level for its

own benefit and to the detriment of the investing public."  Crane Co. v. Westinghouse Air Brake

Co., 419 F.2d 787, 794 (2d Cir. 1969).

To state a claim under section 9(a)(2), the plaintiff must show: "(1) a series of

transactions in a security creating actual or apparent trading in that security or raising or

depressing the price of that security, (2) carried out with scienter and (3) for the purpose of

inducing the security's sale or purchase by others."  SEC v. Malenfant, 784 F. Supp. 141, 144

(S.D.N.Y. 1992) (citation omitted); SEC v. Schiffer, 97-Civ-5853, 1998 WL 226101, at *4 n.10

(S.D.N.Y. May 5, 1998) (stating the same and noting the third element is often referred to as the

requirement of "manipulative purpose").

Section 9(a) "proscribes specific behavior . . . that may constitute market manipulation." SEC v. Competitive Technologies, Inc., 3:04-Civ-1331, 2005 WL 1719725, at *6 (D. Conn. July 21, 2005).  Market manipulation "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476 (1977).  Market manipulation can also encompass "open-market activity" that is not expressly prohibited, such as "short sales and large or carefully timed purchases or sales of stock." SEC v. Masri, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (Holwell, J.).  "The difficulty in such 'open-market' cases . . . is to 'distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers.'" Id.  Accordingly, "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." See Set Capital LLC v. Credit Suisse Group AG, 996 F.3d 64, 77 (2d Cir. 2021); see also ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 (2d Cir. 2007) ("[S]hort selling—even in high volumes—is not, by itself, manipulative. . . .  To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security.").

The SEC alleges that Gallagher violated section 9(a)(2) by engaging in manipulative trading in SPOM and BZWR, specifically, by "marking the close."  (ECF 58 ¶¶ 93-114, 121-130; ECF 75 at 28.)  "Unlawful marking the close takes place when an individual engages in a series of late day transactions that create 'actual or apparent active trading in [a] security, or rais[e] or depress[] the price of such security, for the purpose of inducing the purchase or sale of such security by others." SEC v. Kwak, 304-Civ-1331, 2008 WL 410427, at

*1 (D. Conn. Feb. 12, 2008) (quoting 15 U.S.C. § 78i(a)(2)) (alterations in original).  "[A] marking the close scheme violates Section 9(a)(2)."  SEC v. Wilson, 04-Civ-1331, 2009 WL 2381954, at *6 (D. Conn. July 31, 2009).

Gallagher argues that the SEC's section 9(a)(2) claim must be dismissed in light of SEC v. Masri, 523 F. Supp. 2d 361 (S.D.N.Y. 2007), a decision of another judge of this District that is not controlling precedent.  (ECF 73 at 29-30.)  In Masri, the court concluded "that if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation."  523 F. Supp. 2d at 372.  Thus, the court continued, "in order to impose liability for an open market transaction, the SEC must prove that but for the manipulative intent, the defendant would not have conducted the transaction."  Id.  According to Gallagher, the SEC fails to meet this standard.

Gallagher asserts that the SEC's allegations demonstrate "at least in part" that he was placing his end of day trades for a legitimate economic reason, namely, "to accumulate more stock."  (ECF 73 at 29.)  He also claims that although he "certainly purchased stock at the end of the trading day, he did not sell that stock to capture any alleged profits that came from purchasing SPOM at the end of the day."  (Id.)  In support of that assertion he states that he did not sell SPOM between July 15 and August 5, 2020,[2] and that he only earned a de minimus profit of "a few hundred dollars" from his sale of BZWR on March 3, the day after he allegedly marked the close on March 2.  (Id. at 29-30.) The SEC responds that the question of whether a "but for" manipulative intent is required is unsettled, but regardless, the Court need not reach the question.  (ECF 75 at 28-29.)  The Court agrees.

---

[2] The SEC alleges that Gallagher marked the close with respect to SPOM between late July 2020 and early August 2020.  (ECF 58 ¶ 93.)

First, it is far from clear that mixed motives precludes liability under section 9(a)(2).  Masri did not involve section 9(a)(2).  It involved section 10(b) and rule 10b–5, and one case in this Circuit, SEC v. Kwak, expressly cast doubt on the applicability of Masri outside that context.[3]  In Kwak, the defendants argued, as Gallagher does, that the SEC was required to show that the transactions at issue would not have been entered into "but for" the existence of manipulative intent, citing Masri as support.  SEC v. Kwak, 304-Civ-1331, 2008 WL 410427, at *4 n.10 (D. Conn. Feb. 12, 2008).  They argued that, "at best, the SEC's evidence showed they had mixed motives in making the prohibited transaction: they sought to manipulate the stock price and they wanted to own the stock for its inherent investment value."  Id.  The court explained that Masri's but-for standard "may make some sense for section 10(b) purposes under the theory that there is nothing deceptive about a transaction if the exact same transaction would have been entered into absent the manipulative intent," but "[i]ts utility for section 9(a) cases is less clear."  Id.  The court further stated that the "theory loses its applicability if the prohibited intent alters the trade in any material respect (e.g. by changing the time at which the trade would otherwise have been executed)."  Id.  The court then concluded that, in any event, the SEC had

---

[3] See also CFTC v. Gorman, 587 F. Supp. 3d 24 (S.D.N.Y. 2022) (Marrero, J.) (denying motion to dismiss claims brought by the Commodity Futures Trading Commission for violations of the Commodity Exchange Act).  In Gorman, the defendant argued, based on Masri, that "[o]pen-market trades are manipulative only when they have no legitimate purpose and are motivated solely by an intent to move prices."  Id. at 42-43 (alteration in original).  Judge Marrero explained that the "Second Circuit has twice analyzed this issue and never expressed a categorical rule that open-market manipulation is actionable only when there is no legitimate economic purpose for the open-market transaction."  Id. at 43 (citing Set Capital, 996 F.3d at 77; ATSI, 493 F.3d at 101).  In fact, "[t]he Set Capital court explicitly considered the argument that 'hedging trades were "done openly" for the legitimate purpose of "manag[ing] risk," not deceiving investors,' and still found the hedging trades in that case were manipulative because plaintiffs adequately alleged manipulative intent."  Id. (quoting Set Capital, 996 F.3d at 78) (alteration in original).  And, on reconsideration of that decision and upon a renewed motion to dismiss, Judge Marrero reaffirmed that analysis, stating that Masri and other cases make clear "that amidst an otherwise legitimate trading strategy, where an actor is motivated by and intends to create an artificial price, the veneer of legitimacy dissolves. . . .  If Gorman knew his trading strategy was unreflective of supply and demand, then the price he sought to attain for his swap trades was artificial, and any legitimate economic rationale is nullified."  CFTC v. Gorman, 21-Civ-870, 2023 WL 2632111, at *7 (S.D.N.Y. Mar. 24, 2023) (Marrero, J.).

produced sufficient evidence that the defendants "engaged in trades at particular times, and in particular amounts, <u>because of</u> their desire to assist in [the] manipulative scheme." <u>Id.</u>

Gallagher has not pointed to any authority establishing that a section 9(a)(2) plaintiff must show that the defendant's exclusive purpose in making a trade was manipulative. And even if a "but for" manipulative intent were required under section 9(a)(2), <u>Masri</u> itself stated that "the question of whether a plaintiff has established the requisite intent . . . is a factual question 'appropriate for resolution by the trier of fact.'" <u>Masri</u>, 523 F. Supp. 2d at 373 (quoting <u>Press v. Chemical Investment Services Corp.</u>, 166 F.3d 529, 538 (2d Cir. 1999)). The allegations in the Second Amended Complaint – particularly those describing Gallagher's private DMs and public tweets regarding SPOM and BZWR – are sufficient, at this stage, to allege with particularity that Gallagher acted with the manipulative intent to raise the stock price of SPOM and BZWR so that he could sell his shares at a profit. (<u>See, e.g.</u>, ECF 58 ¶¶ 94-97, 102-06, 124-26.) Accordingly, Gallagher's motion to dismiss the SEC's section 9(a)(2) claim is denied.

E. Whether Gallagher's Tweets Are Protected
<u>Under the First Amendment.</u>

Gallagher contends that requiring him to disclose his stock sales to his Twitter followers would violate his First Amendment rights against compelled speech. He asserts that "recommending or touting stocks, without spreading false information, is protected First Amendment activity," and that "restrictions on sending messages to others recommending the purchase of stock" are content-based restrictions that must satisfy strict scrutiny. (ECF 73 at 24-25.)

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." <u>Reed v. Town of Gilbert, Ariz.</u>, 576 U.S. 155, 163 (2015). Generally, content-based restrictions on speech are

subject to strict scrutiny, and can stand only if the government can "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." Id. at 171 (quoting Arizona Free Enterprise Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 734 (2011)).  "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny." Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 642 (1994) (citations omitted).

Strictly speaking, the application of the securities laws to Gallagher is a content-based regulation of his speech, as it would require him to disclose material facts but not other information.  See SEC v. AT&T, Inc., 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022) (Engelmayer, J.) (concluding Regulation FD—Fair Disclosure ("Reg FD"), which "prohibits a public company from selectively disclosing material nonpublic information . . . about itself or its securities to certain persons outside the company, unless it also discloses that information to the public," is a content-based restriction "in a strictly denotative sense" because [it] applies only to material non-public information, and not to disclosure of other information").

But "the First Amendment does not shield fraud." Illinois, ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600, 612 (2003).  And the Supreme Court has recognized that the government may regulate "the exchange of information about securities" "without offending the First Amendment." Ohralik v. Ohio State Bar Association, 436 U.S. 447, 456 (1978); SEC v. Wall St. Publishing Institute, Inc., 851 F.2d 365, 373 (D.C. Cir. 1988) ("Speech relating to the purchase and sale of securities . . . forms a distinct category of communications . . . ."); see also AT&T, 626 F. Supp. 3d at 745 (concluding Reg FD is not subject to strict scrutiny).  In Ohralik, the Supreme Court emphasized that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is

32

a component of that activity."  436 U.S. at 456.  Gallagher "overlooks the significant body of

decisions involving laws and regulations mandating affirmative disclosures of information,

particularly for public issuers and other participants in the securities industry," which did not

apply "strict, or even intermediate, scrutiny."  See AT&T, 626 F. Supp. 3d at 743.  This case

involves alleged violations of antifraud provisions of the securities laws and thus does not

implicate Gallagher's First Amendment rights.[4]  Gallagher's motion to dismiss the SEC's claims

on First Amendment grounds is denied.


CONCLUSION

   Gallagher's motion to dismiss is DENIED.  The Clerk is respectfully directed to

terminate the motion.  (ECF 72.)

   SO ORDERED.


P. Kevin Castel
United States District Judge


Dated:  New York, New York
    September 26, 2023

---

[4] Were the Court to conclude that intermediate scrutiny applies because Gallagher's tweets constitute commercial speech, as asserted in the SEC's opposition memorandum, Gallagher's First Amendment argument would still fail. The government's interest in protecting investors from deception is substantial, and the application of the provisions involved in this case to Gallagher directly advances and is not more extensive than necessary to serve that interest. See Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 566 (1980). Requiring Gallagher to disclose his intent to sell would not interfere with his ability to share stock recommendations on Twitter – it would merely ensure he did not materially mislead the individuals he claimed to be helping. See, e.g., United States v. Wenger, 427 F.3d 840, 851 (10th Cir. 2005) ("Section 17(b) does not violate [the defendant's] commercial speech rights.  It allows publicists to still assert a message while advancing the consumer's interest in knowing the publicists' financial stake in promoting a stock, thereby reasonably advancing the government's interest in preventing deception and achieving more open securities markets.").