

February 11, 2025

**By ECF**

The Honorable P. Kevin Castel
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Courtroom 11D
New York, NY 10007

Re:  *SEC v. Gallagher*, No. 1:21-cv-08739-PKC

Dear Judge Castel:

We write on behalf of Defendant Steven M. Gallagher and pursuant to Rule 3.A. of the Court's Individual Practices in Civil Cases to submit this pre-motion letter to the Court seeking to lift the preliminary injunction freezing the assets of Mr. Gallagher (Dkt. Nos. 21, 87, 89). The defense seeks to make this motion because, as set forth below, discovery has revealed that the SEC is not entitled to *any* disgorgement. Indeed, the SEC's own "expert" witness (an SEC employee) could not demonstrate that any of Mr. Gallagher's trading profits were causally related to any fraud. The next Court conference is currently scheduled for March 12, 2025, at 2:00 pm.

### Legal Standard

Here, the SEC has sought and obtained an asset freeze because, allegedly, the Commission needs to preserve money to satisfy potential disgorgement. Two legal principles are relevant here for the purpose of this motion. *First*, when seeking to freeze assets to satisfy future disgorgement and penalties, the SEC has the burden to calculate a "reasonable approximation" of a defendant's profits that are causally connected to the wrongdoing. *See SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (it is the SEC's burden to establish an "approximation of the profits causally related to the fraud" for disgorgement). *Second*, as determined in the recent case of *SEC v. Govil*, 86 F.4th 89, 93-94 (2d Cir. 2023), the Second Circuit made clear that "disgorgement must be awarded 'for victims,' and that a "defrauded investor is not a 'victim' for equitable purposes if he suffered no pecuniary harm" from the actual fraud.

### Relevant Procedural Overview

On October 26, 2021, the SEC filed its complaint against Mr. Gallagher, alleging that he engaged in a vast scalping scheme by failing to disclose his own stock sales to Twitter users following the Alex DeLarge meme Twitter account. *See generally* "Complaint," Dkt. No. 1. At the same time, the SEC moved *ex parte* for a temporary

restraining order freezing up to $6.9 million in Mr. Gallagher's assets. *See* "TRO Motion," Dkt. No. 7; "TRO Peirce Decl.," Dkt. No. 8 (attached as Ex. A); "TRO Order," Dkt. No. 11. The $6.9 million calculation had three component parts: (1) disgorgement of $3,394,970 purportedly representing Mr. Gallagher's "ill-gotten gains," (2) prejudgment interest estimated at $100,000, and (3) another $3,394,970 to cover a civil penalty up to the gross amount of pecuniary gain to the defendant under 15 U.S.C. § 78u(d)(6). This motion was granted, and Mr. Gallagher's assets were frozen.

The parties then negotiated the terms of an asset freeze, and the defense ultimately agreed to a freeze, subject to further modification as needed. To be clear, the Defendant did not "consent" to a "permanent" Preliminary Injunction until the time of trial Dkt. No. 89 ("PI Order"). Rather, as the Court may recall, the Defendant moved to have the PI Order *lifted* in its entirety, and as a result of that motion, the Court modified the PI Order to reduce the freeze by half (to roughly $3.2 million), eliminating any freeze for potential penalties. *See* Dkt. Nos. 51, 66. While the Defendant *did* agree to a subsequent modification of the PI Order to allow him to pay his taxes Dkt. No. 87, the Defendant did *not* waive his right to seek further modification of the PI Order. To the contrary, the right to seek modification or dissolution of the PI Order is set forth in the original "stipulated-to" injunction. *See* Dkt. No. 21 (Defendant retained his right to "move for further modification or dissolution of this preliminary injunction at any time"). The sole limitation in the modified PI Order was that the Defendant would not argue that the asset freeze should be lifted pursuant to *SEC v. Govil*, 86 F. 4th 89 (2d Cir. 2023), absent good cause shown. *See* Dkt. No. 89 at 2.

**Relevant Factual Information**

As the Court is aware, the defense has long contested that the SEC was entitled to disgorgement because: (1) the SEC could not link his tweets to any subsequent changes in the stock price, and (2) the SEC could not prove, per *Govil*, that there were victims of Mr. Gallagher's alleged fraud, let alone victims who lost $3.2 million.

The SEC has fiercely fought the defense on this issue. Each time this issue was raised, the SEC told the defense (and this Court) that more than $3 million in disgorgement was needed to be provided to investors, and that they would prove this amount later in the case. The SEC's numerous representations to the Court, including those made in the initial TRO application, have now been proven to be false.

The first major cracks in the SEC's theory of disgorgement appeared at the inception of discovery. In the SEC's response to the defense's requests for admissions (the "RFA"), the SEC admitted that the "trading profits" calculation that was employed to obtain the various asset freezes was not, after all that, a representation of victim losses, thereby rendering their initial calculations irrelevant to the issue of disgorgement under *Govil*. See an example of the SEC's responses below:

> 4. Admit that the monetary amount set forth in "Estimated Net Profits for Period Analyzed" as set forth in Attachment A for INQD does not represent pecuniary harm suffered by investors.
>
> RESPONSE: Admit that Attachment A to the Second Amended Complaint shows, among other things, Gallagher's estimated net profits and does not purport to show losses suffered by investors.

Despite this, the SEC still insisted, when responding to Interrogatories, that during expert discovery it would unveil its theory of disgorgement by providing an "explanation" of the SEC's position on "the amount that Gallagher's tweets increased the price of the charged stocks."

> Subject to and without waiving the foregoing objections, the Commission responds that the Commission plans to include in its expert report an explanation of the Commission's position on the amount that Gallagher's tweets increased the price of the charged stocks.

Dkt. No. 121-7 at 10.

Because of this representation, the defense did not move then to lift the asset freeze. But the SEC's representation proved illusory. The SEC noticed its own employee, Maxwell Clarke, as an expert witness. As part of that notice, Clarke produced two expert reports, one as part of an affirmative case and one in reply to the defense expert's rebuttal report. *See* Dkt. No. 123-14, Amended Expert Report (the "Clarke Report"); Dkt. No. 156-1, Expert Rebuttal Report (the "Clarke Reply Report"), (collectively, the "Reports").

First, Clarke's Report reduced the SEC's "disgorgement" figure from $3.3 million to $1.5 million, finding that more than 50% of the SEC's alleged ill-gotten gain were actually attributable to other factors. Next, Clarke's Reports primarily (but not exclusively) centered around calculating how much profit Mr. Gallagher made from trading certain stocks that he also tweeted about. However, Clarke's Reports were cryptically worded and did *not* state that Mr. Gallagher's tweets (or any tweets at all) explicitly caused the price increases for the stocks alleged in the SAC—in fact, Clarke's Report doesn't even include the word "causation." . The SEC should have then moved the Court to reduce the asset freeze to $1.5 million, per the conclusions of its own expert witness. The defense even asked the SEC to reduce the asset freeze based on this reduction and the SEC refused, unwilling to engage in any meaningful conversation.

Clarke was then deposed by the defense as part of expert discovery. This is where the SEC's case for disgorgement collapsed. During his deposition, Clarke was asked over-and-over by the defense whether it was his opinion that Mr. Gallagher's tweets (not even

February 11, 2025
Page 4 of 5

the alleged fraudulent tweets) caused the stock price changes of the at-issue tickers. Clarke did not fully answer the question, instead repeatedly insisting that: (1) his "analysis" showed "correlation" but not actual "causation;" and (2) that finding causation was not his "assignment."[1] Correlation, of course, means nothing for disgorgement as it simply shows that Mr. Gallagher (and tens of thousands of other people) were tweeting about the penny-stocks that were undergoing significant price volatility. In short, far from demonstrating that the SEC is entitled to disgorgement, Clarke's deposition *proved* that the SEC could not demonstrate any specific causal link between the tweets and the price movements, thereby precluding any application of disgorgement to the 40-odd remaining stocks in the event Mr. Gallagher is found liable at trial.[2]

In sum, the SEC made numerous representations to this Court, including in an *ex parte* TRO, that more than $3.2 million in disgorgement was warranted. This Court froze Mr. Gallagher's assets due to those representations. Throughout this case, even after the DOJ reduced the charges to just a single count involving forfeiture of just $21,000, the SEC still maintained that their figures would prove disgorgement of more than $3.2 million for 59 different stocks. The SEC, because of this, has insisted on keeping Mr. Gallagher's assets frozen for nearly 3.5 years, causing him extreme permanent financial harm. *See* Dkt. No. 148-1 (Declaration of Steven M. Gallagher). The SEC would not even allow Mr. Gallagher to pay his taxes, resulting in tens of thousands of dollars in unnecessary penalties—penalties that were ultimately paid out of Mr. Gallagher's limited unfrozen assets). *See id.* Then, when discovery commenced, although the SEC conceded that its disgorgement figure ($3.2 million) did not represent victim losses, the SEC told the defense,

---

[1] *See, e.g.* Clarke Depo. 228:24-25 ("A. I'm -- I think my job is to provide evidence that I think would be useful for people to make decisions based on this."); 119:20-123:10 ("Q. Okay. But the $1.5 million figure you gave, you're not claiming at all that that was entirely the proceeds of his own tweeting. That's not your testimony? A. My -- I was asked to and what I did was I calculated his profits for transactions that had occurred during -- at least one part of it turned during the tweeting. Q. Totally get it. But your testimony is not that all of that money was due as a result of the tweeting, right? A. I do not -- I do not do that analysis. I do not try. I wasn't asked.") ("Q. Okay. But would it be -- so sitting here today, would it be speculation as to the total number that -- of his profits that came from securities fraud? …[A]: Yeah, I don't – not my job. [Q]: Q. Okay. Whose job is it? A. I don't know."); 154:12-24 ("[Q:] so within the numbers of the 1.5 million, there was no attempt to separate out what is proceeds of fraud and what's not proceeds of fraud? A. Correct. As I say in my report, my -- my calculation is just the total profits that he gained in these 42."); 280:11-283:6 (For Clarke's investor losses number he testified "This is literally just the losses that they occurred during the tweet period" and that he "can't pinpoint any of these people to Mr. Gallagher."); 19:1-5 (Clarke conceded that report found "correlation in support of causation"); 36:7-18 (Clarke insisted that his "conclusions show correlation, which support causation); 55:9-14 (Clarke felt "fairly confident that the data show that there is a correlation").

[2] To the extent the SEC claims it can prove this causal link now, it is too late. The time to provide this evidence, through an expert or otherwise, was during fact or expert discovery, both of which have long since closed.

DYNAMIS LLP

225 Franklin Street, 26th Floor | Boston, MA 02110 | (t) 617- 802-9157

February 11, 2025
Page 5 of 5

in multiple sworn Interrogatory responses, that they would provide the defense with an "explanation" for how Mr. Gallagher's tweets (not even alleged fraudulent tweets) moved the market. *See* Dkt. No. 121-7 at 10. The SEC did not do this in the Reports, even while cutting proposed disgorgement by more than 60% (down to $1.5 million). Then, when the SEC's own "expert" (an employee of the SEC) was deposed, he finally confessed that he did *not* establish a definitive causal link between Mr. Gallagher's tweets and market movements because this was not his assignment. *See supra* fn.2.

      Now despite the lack of any evidence in the record, the SEC still maintains that an asset freeze is necessary, telling the defense today that the "SEC has not changed its position on the asset freeze, and therefore we do not agree to your request to lift the freeze." When pressed on what facts supported such a freeze, the SEC did not respond. Accordingly, it is clear that the SEC has no current basis for an asset freeze, and that its repeated representations to the Court regarding the scope of the freeze were not true. The defense respectfully requests that the freeze, which has caused irreparable financial damage to Mr. Gallagher, his wife, and his family, be lifted *post haste*.

Respectfully submitted,

*/s/ Eric S. Rosen*
Eric S. Rosen
Kimberly A. Jones
DYNAMIS LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
(617) 802-9157
erosen@dynamisllp.com

**Cc:    Counsel of Record**