UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,                        21-cv-8739 (PKC)

               -against-                       OPINION AND ORDER

STEVEN M. GALLAGHER,

                    Defendant.
------------------------------------------------------------x

CASTEL, Senior District Judge

       The Securities and Exchange Commission ("SEC") brought a civil enforcement action against Steven M. Gallagher alleging that he bought penny stocks[1] before promoting those stocks to the approximately 70,000 followers of his Twitter account, from which he posted under the handle @AlexDelarge6553.[2]  Gallagher would state or imply to his followers that he was holding his shares when in truth and in fact he was selling them.

       The SEC proceeded to trial on claims under section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, as well as under section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2).  After a nine-day trial, the jury returned a verdict in favor of the SEC that Gallagher engaged in fraudulent or unlawful trading in the shares of 31 penny stocks.  Gallagher now moves for a new trial invoking Rule 59, Fed. R. Civ. P.  The SEC opposes the motion and seeks the imposition of a disgorgement remedy

---

[1] "Penny stocks" are defined as securities whose shares trade for less than five dollars.  (See Trial Tr. 657.)  When a stock trades "over the counter," it is not listed on an exchange.  (See Trial Tr. 656.)

[2] Because the relevant conduct in this case occurred before Twitter became "X," the Court refers to the platform as "Twitter" and Gallagher's posts on the platform as "tweets."

and civil penalties, among other relief.  For reasons explained, the Court will deny Gallagher's

motion and impose disgorgement in the amount of $1,255,889 and a civil penalty in the amount

of $472,902.

BACKGROUND

The SEC presented two claims at trial: a "scalping" claim and a "manipulative

trading" claim.  As to the "scalping" claim, the SEC alleged that Gallagher violated section 10(b)

of the Exchange Act and Rule 10b-5 thereunder by acquiring shares of 31 stocks, encouraging

others to purchase the stocks without disclosing his then-present intent to sell his shares, and

subsequently selling shares for profit.[3]  As to the "manipulative trading" claim, the SEC alleged

that Gallager violated section 9(a)(2) of the Exchange Act with respect to two of the 31 stocks by

placing multiple buy orders at the end of the trading day in an effort to raise the stocks' closing

price, a practice known as "marking the close."

The scalping claim required the SEC to prove that Gallagher (1) "employ[ed] any

device, scheme, or artifice to defraud, . . . ma[d]e any untrue statement of a material fact or [ ]

omit[ted] to state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading, or . . . engage[d] in any act,

practice, or course of business which operates or would operate as a fraud or deceit upon any

person," (2) "in connection with the purchase or sale of any security," (3) with intent to defraud,

---

[3] The SEC's scalping claim was initially also charged under Section 17(a) of the Securities Act of 1933.  The SEC dismissed the Section 17(a) claim during trial.  (See Trial Tr. 695.)

knowledge of falsity, or reckless disregard of the truth.[4] See 17 C.F.R. § 240.10b-5; S.E.C. v. Sourlis, 851 F.3d 139, 144 (2d Cir. 2016).

As support for the scalping claim, the SEC called Alex Lefferts, Securities Compliance Examiner at the SEC, who analyzed trading data from Gallagher's brokerage accounts along with @AlexDelarge6553 Twitter activity.  Lefferts testified that for each of the 31 stocks, Gallagher tweeted at least one recommendation of the stock and subsequently sold shares.  (Trial Tr. 154–269; see also PX 518–548-1; Trial Tr. 723.)  The SEC presented evidence that Gallagher almost never disclosed that he was selling, and sometimes affirmatively stated that he was not selling when the opposite was true.  (Trial Tr. 703–20.)  For 22 of the 31 stocks, Lefferts testified that Gallagher "pre-alerted" confederates in private messages before touting the stocks to the public on Twitter, (Trial Tr. 154–269; see also PX 518–548-1; Trial Tr. 725), giving confederates an opportunity to buy shares before Gallagher directed a broader audience to the stocks.

Multiple victims who traded based on Gallagher's recommendations testified at trial that they would have wanted to know that when they were buying, Gallagher was selling. Hanfen Liu responded, "of course" when asked if she "would have wanted to have known" that Gallagher was selling shares in PDPR on the same day she was buying.  (Trial Tr. 594.)  Ryan Scribner replied "absolutely" when asked whether it would "have been important to [him] to know, before deciding to buy HDII on Alexander Delarge's recommendation, that he was also selling that stock at the same time[.]"  (Trial Tr. 813–14.)  He explained that it "seems deceitful to tell people to buy a stock when you're selling it."  (Trial Tr. 814.)  Sagine Nicolas responded

---

[4] The parties do not dispute that Gallagher satisfied the additional requirement that the offending acts occurred "by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange[.]"  See 17 C.F.R. § 240.10b-5.

in the affirmative when asked whether she "would have wanted to have known" if Gallagher "sold a stock when he was promoting that stock to others to buy" and whether it "would have been important to" her. (Trial Tr. 52.) On cross examination, Nicolas testified that if she "knew he was selling, it would impact [her] decision [to purchase stock]." (Trial Tr. 434.)

The SEC also introduced evidence showing Gallagher was aware that his followers were taking his advice. One direct message Gallagher sent to a confederate read, for example, "its insaine [sic] when i tell my followers to buy they do[.]" (PX 68a; Trial Tr. 931–32.)

Gallagher testified that when he tweeted about a stock, he "never" knew at the time of the tweet that he was going to sell. (Trial Tr. 1107.) It was also Gallagher's position that his trades were not inconsistent with his tweets because he was not selling all his shares of a stock, but rather "shaving profits" or "taking profits" by selling only some of his shares. (Trial Tr. 1124–25, 1134.) Gallagher further testified that when he tweeted that he was not selling, he only meant to convey that he was not selling at that precise moment. (Trial Tr. 1188.) He claims he was not commenting on his trades, say, "two weeks" earlier, as "[t]wo weeks is an eternity." (Trial Tr. 1188.)

The credibility of Gallagher's testimony was repeatedly undermined. Gallagher acknowledged that he sometimes sold within seconds of promoting a particular stock. (See, e.g., Trial Tr. 961.) At Gallagher's plea allocution in parallel criminal proceedings before Judge Caproni in this District based on his trading in one of the 31 stocks, SCIE, Gallagher stated under oath that he knew certain "tweets concerning [his] stock holdings of SCIE were wrong because [he] was selling some of [his] SCIE portions at the time that [he] was tweeting, therefore, misleading [his] financial position to others." (Trial Tr. 939; PX 457-R at 6.)

Additional evidence introduced through Lefferts showed that Gallagher rarely told followers that he was selling or suggested to his followers that they should also "take profits." Out of 55,080 tweets posted by Gallagher between September 2019 and October 2021, only 146 tweets encouraged followers to "take profits."[5]  (Trial Tr. 270, 273; PX 494-2.)  Only 116 of the tweets included the phrase, "I'm selling."[6]  (Trial Tr. 274; PX 494-2.)

The SEC also argued that the prospect of trading profits was "powerful motive for fraud."  (Trial Tr. 1504.)  Max Clarke, Senior Financial Economist at the SEC, estimated Gallagher's trading profits from the 31 stocks to be $2,626,855.  (Trial Tr. 659–61; PX 392-2.)

To prove the manipulative trading claim, the SEC was required to show a series of transactions in a security creating actual or apparent trading in that security, or raising or depressing the price of that security, carried out with scienter and for the purpose of inducing the purchase or sale of that security by another.  See 15 U.S.C. § 78i(a)(2); S.E.C. v. Malenfant, 784 F. Supp. 141, 144 (S.D.N.Y. 1992) (Mukasey, J.).  The SEC claimed that Gallagher violated section 9(a)(2) by engaging in a practice called "marking the close" by "placing multiple buy orders at the end of the trading day to raise the stocks' price[.]"  (Second Amended Compl't ¶ 9.) The SEC has explained that this kind of end-of-day transaction is "more likely to be manipulative" because "the timing . . . is more capable of artificially affecting the price of the security[.]"  S.E.C. v. Masri, 523 F. Supp. 2d 361, 370 (S.D.N.Y. 2007) (Holwell, J.).

The jury saw evidence that Gallagher placed numerous buy orders in SPOM and BZWR in the last ten minutes of the trading day.  (See PX 395-2a; PX 395-2b; PX 549; PX 550.)

---

[5] The 146 tweets also include those containing the following phrases: "taking profits," "take profits," and "took profits."  (Trial Tr. 273.)

[6] The 116 tweets also include those containing the following phrases: "I sold," "I am selling," "I'm selling," "Im selling," "I will sell," "Ill sell," "I'll sell," the word "sell" within five words of the word "portion," and the word "sold" within five words of the word "portion."  (Trial Tr. 274.)

The jury also heard testimony from David Whitlock, who was an employee of TD Ameritrade

("TDA"), a brokerage firm Gallagher used, during the relevant period.  (See Trial Tr. 475–77.)

Whitlock testified that TDA warned Gallagher about "possible manipulative trading" in his

account six times between July 2020 and August 2021.  (Trial Tr. 483–523.)  When Gallagher's

trading eventually led TDA to restrict his account, Gallagher contacted TDA to remove the

restrictions, explaining in one communication that he placed "multiple trades" at the end of the

day because he had not realized "how much buying power" he had.  (Trial Tr. 495.)

Again, the evidence undermined Gallagher's testimony.  On July 29, 2020, for

example, he tweeted, "Hey traders can you guys buy $spom if it moves 1 penny I'll be green.

Lets keep the green streak alive! Thank you in advance. .175 is a great buy price FYI[.]"  (PX

549.)  He also tweeted on the same day: "I'll be hitting $spom at .17 come join me move this.

EOD[.]"  (PX 549.)  When TDA restricted his account, Gallagher messaged confederates that he

"got suspended from trading two weeks for slapping too much" and that he "knew [he] was

manipulating."[7]  (Trial Tr. 1086; see PX 105a; PX 237a.)

The action is now before the Court on Gallagher's motion pursuant to Rule 59 for

a new trial and the SEC's motion for remedies.  The SEC seeks various forms of injunctive

relief, disgorgement, and civil penalties.  For the reasons explained below, Gallagher's motion

will be denied, and the SEC's motion will be granted in part.


LEGAL STANDARDS

"A court may grant a new trial 'for any reason for which a new trial has heretofore

been granted in an action at law in federal court[.]'"  Raedle v. Credit Agricole Indosuez, 670

---

[7] According to Alex Lefferts, "'[s]lapping' is a trade pattern of aggressively trading, either buying or selling. Just aggressively trying to get your orders filled."  (Trial Tr. 461.)

F.3d 411, 417 (2d Cir. 2012) (quoting Rule 59(a)(1)(A)).  These reasons may include that the verdict is against the weight of the evidence, id., premised upon an erroneous jury instruction, Cobb v. Pozzi, 363 F.3d 89, 112 (2d Cir. 2004), or based upon a trial record with "substantial" evidentiary errors, Stampf v. Long Island Railroad Co., 761 F.3d 192, 202 (2d Cir. 2014) (quoting Sharkey v. Lasmo (Aul Ltd.), 55 F. Supp. 2d 279, 289 (S.D.N.Y. 1999) (Conner, J.), aff'd, 214 F.3d 371 (2d Cir. 2000)).

"[A] decision is against the weight of the evidence . . . if and only if the verdict is seriously erroneous or a miscarriage of justice." Farrior v. Waterford Board of Education, 277 F.3d 633, 635 (2d Cir. 2002).  "[A] new trial under Rule 59(a) 'may be granted even if there is substantial evidence supporting the jury's verdict[.]'" Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003) (quoting DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998)).  Further, "the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Raedle, 670 F.3d at 418.  However, "jury verdicts should be disturbed with great infrequency." Id.  And the court "should rarely disturb a jury's evaluation of a witness's credibility . . . and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury[.]" Id. (citations and internal quotation marks omitted).

"A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." Frazier v. FCBC Community Development Corp., 22-cv-5270, 2024 WL 3666372, at *6 (S.D.N.Y. Aug. 6, 2024) (Subramanian, J.) (quoting 11 Wright & Miller's Federal Practice & Procedure § 2805 (3d ed. 2024)).

Gallagher's motion unambiguously invokes only Rule 59, a motion for a new trial, and not Rule 50(b), Fed. R. Civ. P., a renewed motion for judgment as a matter of law. Gallagher, however, appears to invoke the Rule 50(b) standard in his discussion of the scalping verdict as to ALPP and the manipulative trading verdict as to BZWR.  (See ECF 242 at 28 ("No rationale [sic] jury could have found that Mr. Gallagher committed fraud with respect to ALPP[.]"), 34 (contending no reasonable jury could have found Gallager liable for marking the close).)

"A post-trial Rule 50(b) motion for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law has been made before submission of the case to the jury."  Bracey v. Board of Education of City of Bridgeport, 368 F.3d 108, 117 (2d Cir. 2004).  No Rule 50(a) motion was made when the SEC rested its case, (Trial Tr. 1286), when the defense rested its case, (Trial Tr. 1488), or any other time before verdict.  As the Second Circuit has explained, "a party's failure to move under Rule 50(a) has consequences."  ING Global v. United Parcel Service Oasis Supply Corp., 757 F.3d 92, 97 (2d Cir. 2014).  "If that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice."  Id.  "Manifest injustice exists where a jury's verdict is wholly without legal support."  Id.  The Court thus considers Gallagher's arguments not under Rule 50(b), but under Rule 59 and the "manifest injustice" standard.

DISCUSSION

    I.       Motion for a New Trial

The Court reviews each of Gallagher's arguments for a new trial both in isolation and for their combined impact.  The Court ultimately concludes that the weight of the evidence was strongly in the SEC's favor, that there were no errors in the admission of evidence, and that neither the conduct of the trial, nor the jury instructions, nor the verdict form warrant a new trial.

    A.  Evidence of Gallagher's Trading Profits

Prior to trial, Gallagher sought to preclude evidence of gains from his trading of the 31 stocks at issue.  He argued that the SEC was trying "to convince the jury that he must have done something bad because he made money." (ECF 158 at 5–6.)  In fact, as the Court made clear at the final pre-trial conference, the profits evidence was permitted only on the issue of motive for the alleged fraud.  (ECF 198 at 67–68.)  In response to a specific question from Gallagher's counsel on whether he would be "allowed to say that there are other reasons for the gains[,]" the Court responded that "[i]f they are going to put it in, of course you can."  (Id. at 68.)

Gallagher argues that the Court should have imposed a causation requirement. Gallagher places much reliance on several cases that he claims stand for the proposition that the SEC was required "to demonstrate that [his] profits were derived from the fraudulent scheme" before the profits could be used as evidence of scienter.  (ECF 242 at 26.)  The Court agrees that something more than the mere prospect of profit is needed to show motive.  See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 201 (2d Cir. 2009).  But the required showing is not onerous.  See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc., 732 F. Supp. 3d 300, 318 (S.D.N.Y. 2024) (Subramanian, J.) (finding bonus

payments supported scienter allegations because the purported fraudulent scheme was "critical" to bonus payouts, as "the company just barely hit the thresholds necessary for bonuses"); S.E.C. v. Im, 17-cv-3613, 2018 WL 840094, at *3 (S.D.N.Y. Feb. 12, 2018) (Oetken, J.) (finding bonus payments supported scienter allegations because the defendant "made $3.79 million in bonuses from Nomura based in significant part on the performance of the CMBS desk, which was inflated through the alleged fraud").

The exhibit offered by the SEC at trial, (PX 392-2), showed the start and end dates of Gallagher's trading in each of the 31 stocks, the start and end dates for his tweeting about each stock, and the profit he made for each stock. It also compared his profit ratio in the 31 stocks (77.7%) with his profit ratio resulting from other trading (.4%). (PX 392-2.) That was enough to establish the admissibility of the profits evidence on the issue of motivation. Gallagher was free to offer any other relevant and probative evidence—or argument—to rebut the inference that the SEC encouraged the jury to draw from the trading data.

Further, there was no claim for damages presented to the jury. In private securities litigation, it may be appropriate to insist on evidence isolating the portion of the profits directly attributable to the unlawful trading to the exclusion of other market factors. But as Judge Schofield concluded, an "event study" or the like is not necessary to offer profits evidence on the issue of motive in an SEC enforcement action. SEC v. Genovese, 17-cv-5821, 2022 WL 16748779, at *6 (S.D.N.Y. Nov. 7, 2022) ("Because reliance, loss causation and damages are not at issue, there is no need for an expert with an event study to tease out with mathematical precision the effect of the pitch and the alleged omission, relative to non-fraudulent information."); see also United States v. Treacy, 08-cr-0366, 2008 WL 4934051, at *9 (S.D.N.Y. Nov. 19, 2008) (Carter, J.), opinion after reconsideration, 08-cr-0366, 2009 WL 47496 (S.D.N.Y.

Jan. 8, 2009) (The defendant's "alleged illegal profits from the backdating scheme is relevant and admissible on the issue of motive for entering into the allegedly illegal agreement.").

Gallagher argues that the SEC left the jury "with the false narrative that Mr. Gallagher's profits *were,* in fact, caused by fraud." (ECF 242 at 27 (emphasis in original).) Showing that Gallagher profited from trading the 31 stocks, however, is different than showing that his tweets or end-of-day trades caused the upward price movements that led to his profits. The Court made this distinction clear to the jury through its instruction that "the SEC is . . . not required to prove that the alleged fraudulent conduct was successful, profitable, or otherwise beneficial to the defendant." (Trial Tr. 1585.) Further, putting aside that the SEC's arguments, not always perfectly expressed, were consistent with the Court's in limine ruling that evidence of Gallagher's profits may be used to show motive, it is dispositive that Gallagher points to no instance where he made a timely and specific objection based upon the Court's ruling or sought and was denied a curative instruction.

Finally, Gallagher insists that the profits evidence was "extraordinarily" prejudicial. (ECF 242 at 27.) Assuming he intends to invoke the Rule 403, Fed. R. Evid., balancing test, the argument fails. The SEC's evidence of Gallagher's profits was no more prejudicial to Gallagher than his own tweets, which were also admitted into evidence as proof of fraudulent or deceptive conduct. Cf. United States v. Curley, 639 F.3d 50, 59 (2d Cir. 2011) (explaining that evidence was not unfairly prejudicial where it was no more sensational than the charged conduct). Gallagher repeatedly put his earnings on display on Twitter, posting screenshots of his holdings, (see PX 396-2 (showing dozens of tweets depicting holdings in the millions of dollars)), and bragging about various purchases, (see PX 574 ("My chart all time high

and free tesla free escalade free house and college paid for my daughter during this pandemic year!!")).

The admission of evidence of Gallagher's profits from trading the 31 stocks at issue was probative of Gallagher's motive without being unfairly prejudicial and does not warrant a new trial.

### B. Victim Testimony

Three witnesses, Sagine Nicolas, Hanfen Liu, and Ryan Scribner, testified that they traded certain penny stocks in reliance upon materially misleading statements made in Gallagher's tweets. Gallagher argues in his motion for a new trial that Nicolas and Liu were not reasonable investors and thus should not have been permitted to testify as to the materiality of Gallagher's statements or omissions on Twitter.

A statement or omission is material when "a reasonable investor would have considered [it] significant in making investment decisions[.]" Litwin v. Blackstone Group, L.P., 634 F.3d 706, 717 (2d Cir. 2011) (quoting Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000)). The Second Circuit has instructed that "testimony about the significance of the content of a defendant's misstatements" is permissible only if "each trader's 'own point of view' is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." United States v. Litvak, 889 F.3d 56, 65 (2d Cir. 2018). "In other words, there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market." Id.

The SEC contends Gallagher waived any argument that Nicolas's and Liu's testimony on materiality should have been excluded. Gallagher raised the argument in his

motion in limine but did not renew his objection during trial.  He now states that the "motion *in limine* preserved everything." (ECF 283 at 17.)  However, as the Second Circuit has explained, "sometimes a party objecting to an evidentiary ruling involving potentially prejudicial testimony cannot rely upon an *in limine* objection because the trial court might be unable to balance the probative and the prejudicial values outside of context, without reference to a witness's actual testimony." United States v. McDermott, 245 F.3d 133, 140 n.3 (2d Cir. 2001).  Even if the issue were not context-dependent, Gallagher's objection could have been preserved in limine "only if it was (among other things) 'ruled upon by the court without equivocation.'" See ABKCO Music, Inc. v. Sagan, 50 F.4th 309, 324 (2d Cir. 2022) (quoting McDermott, 245 F.3d at 140 n.3). The Court did not rule definitively on the motion, explaining in the final pretrial conference that if a witness is not "inherently a nonreasonable investor, the jury can hear their testimony and give it such weight as they choose, as long as it's not erroneous or idiosyncratic . . . . That's my ruling here." (ECF 198 at 44.)  The Court stated the correct proposition of law without applying it to the as-yet-unheard testimony of particular witnesses, and no objection was made at trial on the grounds that Nicolas's or Liu's testimony did not represent the viewpoint of a reasonable investor.

Even if the Court's general ruling that victim testimony would be admissible provided the victims are reasonable investors could have preserved Gallagher's specific objections to Nicolas's and Liu's reasonableness, Gallagher's arguments fail.  "Views that are not 'erroneous or idiosyncratic' do not implicate *Litvak II*'s core theory that 'the point of view of an investor who is admitted to be wrong' could not be 'relevant to prove what a reasonable investor, neither confused nor incorrect, would have deemed important.'" United States v. Gramins, 939 F.3d 429, 450 (2d Cir. 2019) (quoting Litvak, 889 F.3d at 69)).

Gallagher makes no argument that Nicolas's or Liu's testimony was "erroneous." Rather, he claims they are not reasonable investors because both engaged in risky trading by buying penny stocks without conducting due diligence and placed their trust in Gallagher at least in part because of the number of followers he had on Twitter. Gallagher also highlights that Nicolas took stock tips from a YouTube account called "Fat Cash," (see Trial Tr. 418, 421), and that Liu was a "newbie trader" who did not know that "DD" stands for "due diligence," (see Trial Tr. 588, 618).

That Nicolas and Liu may be risk-tolerant, inexperienced traders does not compel the conclusion that they are unreasonable investors. The OTC penny stock market is accessible to inexperienced retail investors and may draw individuals who tend to have a higher risk tolerance.[8] See, e.g., (Trial Tr. 528 (Whitlock agreeing that OTC stocks are "highly speculative, risky investments"); S.E.C. v. Stubos, 634 F. Supp. 3d 174 (S.D.N.Y. 2022) (Liman, J.) (describing penny stock fraud perpetrated against retail investors). Nor is it necessarily rare for investors today to rely on internet personalities for investment advice. See, e.g., S.E.C. v. Beck, 22-cv-00812, 2024 WL 1626280, at *2 (C.D. Cal. Mar. 26, 2024), aff'd, 24-2244, 2025 WL 2986481 (9th Cir. Oct. 23, 2025) ("Beck operated a Twitter account with the handle '@BigMoneyMike6,' which recommended certain 'penny stocks' to his followers . . . . [T]his account had over three million followers.").

In addition, where multiple witnesses testify "similarly," their beliefs should not be considered "idiosyncratic." See Gramins, 939 F.3d at 450 (holding that the challenged testimony was not idiosyncratic, as "all three of the government's other counterparty witnesses

---

[8] See Litvak, 889 F.3d at 64–65 (explaining that the "reasonable investor" standard "is an objective one" that "may vary" based on "the nature of the traders involved in the particular market"). The Court assumes without deciding that the relevant market is the over-the-counter market for penny stocks.

testified similarly as to their expectations of broker-dealer employees purporting to act in a 'broker' capacity").  In the instant case, Nicolas and Liu, as well as Scribner, testified that it would have been important to know Gallagher was selling shares of the stocks he was promoting.  (Trial Tr. 52–53, 594–97, 813–14.)

Gallagher also argues that Litvak imposes a burden on the SEC to produce evidence showing that Nicolas and Liu meet the "reasonable investor" standard.  The Court declines to read Litvak as imposing a requirement of a special showing or finding on whether the challenged testimony is that of a reasonable investor.  As Litvak acknowledged, Rules 401 and 403, Fed. R. Evid., generally govern relevance and unfair prejudice determinations.  889 F.3d at 68–69.

Based on the entirety of the foregoing, and even assuming arguendo that the Court's equivocal in limine ruling preserved Gallagher's objection, the Court does not conclude that Nicolas and Liu are unreasonable investors ineligible to testify about materiality.

Relatedly, defense counsel sought to cross-examine the victim witnesses about whether they had a "right to expect the disclosure" that Gallagher was selling shares of stocks he was promoting or whether Gallagher had a "legal requirement" to make such disclosures.  (ECF 242 at 54.)  The question defense counsel sought to put to Nicolas was: "Do you understand that there's a difference between what you would want to know and whether Mr. Gallagher has a legal obligation to tell you that he is selling his shares?"  (Trial Tr. 433.)  The Court properly sustained the SEC's objection on relevance grounds.  Materiality does not turn on why an investor finds information important, just that they find it important.  Nor was Nicolas qualified to testify to Gallagher's legal obligations.

Finally, Gallagher urges that Scribner perjured himself on the stand.  In a civil action, "[w]ithout clear and convincing evidence of false testimony, accusations of perjury are insufficient to disturb the jury's verdict."  Rowell v. Ferreira, 16-cv-6598, 2019 WL 4509048, at *4 (S.D.N.Y. Sept. 19, 2019) (Nathan, J.), aff'd, 830 F. App'x 698 (2d Cir. 2020) (quoting Uzoukwu v. Krawiecki, 10-cv-4960, 2016 WL 6561300, at *8 (S.D.N.Y. Nov. 4, 2016) (Abrams, J.)).

Gallagher claims Scribner lied by stating that he relied on certain of Gallagher's tweets in purchasing shares of HDII when in reality he saw the tweets for the first time when the SEC presented them to him before trial.  Scribner's testimony during cross-examination continued as follows:

> Q. And did you pick those [tweets] out or did the SEC pick those out?
>
> A. I did not pick those out.
>
> Q. So the SEC presented them to you, and you agreed that that's why you purchased shares of HDII, right?
>
> A. I—I don't know if the SEC was the one that produced those. I mean, they produced them to me.
>
> Q. Right. But it wasn't you who sent them those tweets; it was them who showed them to you, right?
>
> A. Correct.

(Trial Tr. 815–16.)  Far from showing that Scribner committed perjury by clear and convincing evidence, Scribner's testimony simply suggests that the SEC showed certain tweets to Scribner during the course of trial preparation.[9]  The testimony does not establish that Scribner saw the HDII tweets for the first time when the SEC presented them to him, and Gallagher offers no

---

[9] As is standard in most cases, the Court instructed the jury without objection that "[t]here is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time. In fact, it would be unusual for a lawyer to call a witness without such consultation."  (Trial Tr. 1567.)

evidence to support that claim.  And indeed, Scribner expressly testified that he relied on certain tweets in purchasing stock.  Scribner was asked, "Did this tweet [about HDII posted in 2020] influence your decision to purchase HDII?" to which he responded, "Yes."  (Trial Tr. 807.)

Gallagher's second perjury claim is also baseless.  Scribner testified as follows on direct examination:

> Q. Did you know that on July 30, 2020, the same day that you purchased 15,500 shares of HDII, that Alexander Delarge sold 50,000 of his shares?
>
> A. No, I did not know that.

(Trial Tr. 813.)  Cross-examination based on Scribner's brokerage records later revealed that Scribner had in fact purchased HDII on July 28, 2020, with a settlement date of July 30, 2020.  (Trial Tr. 819–20; see DX 222 at 39.)  But there is nothing in the record to suggest Scribner's testimony was anything other than inadvertent error.  The Court concurs with the SEC's assessment that "the error . . . was in the SEC's question . . . not [Scribner's] answer."  (ECF 252 at 42.)  Further, whether Scribner purchased HDII on July 28 or July 30 has no bearing on his testimony that the fact that Gallagher was selling shares of HDII while promoting the stock would have been important to him.  The error was corrected during cross examination, and no miscarriage of justice resulted.

### C.  The Special Verdict Form

On December 16, 2024, the Court set February 19, 2025, as the date for the parties to submit their proposed verdict sheets.  (ECF 137.)  The SEC submitted a two-page verdict sheet with five questions, none referring to the stocks at issue.  (ECF 178-10.)  Gallagher submitted 176-page verdict sheet with well over 100 questions.  (ECF 178-11.)   Neither submission was especially useful, and the Court directed the parties to submit revised verdict

sheets.  A July 24, 2025, verdict sheet from the SEC was slightly better because it referred to, and required a verdict on, each stock.  (ECF 201-5.)  Further revised versions were submitted by the SEC (ECF 211-1 & 235-1) and Gallagher (ECF 205-4, 212-1 & 236-1.)

The ultimate special verdict form utilized by the Court was two pages in length and required the jury to render a verdict as to some or all of the 31 stocks at issue.  (See Court Ex. 12, ECF 237.)  The jury was instructed to "answer the questions in accordance with the Court's instructions."  (Id.)  The form first asked whether the SEC proved the elements of the scalping claim by a preponderance of the evidence.  (Id.)  If the jury answered in the affirmative, the jurors would be directed to the second question, which asked whether the SEC had carried its burden on the scalping claim "with respect to all 31 stocks presented at trial[.]"  (Id.)  If the jury found the SEC had not succeeded on all 31 stocks, it would then be required to indicate for each stock whether the SEC proved the claim by checking the applicable box.  (Id.)  With respect to the manipulative trading claim, the form asked whether the SEC proved the elements of the claim by a preponderance with regard to SPOM, and separately, with regard to BZWR.  (Id.)

Gallagher now argues that the form should have required the jury to make a separate written finding on each element of the scalping and manipulative trading claims.  He also contends that, for the scalping claim, the form should have included the over 1,000 tweets identified by the SEC and required the jury to indicate on which of the statements it was basing its verdict.

"To preserve objections to the form or substance of a special verdict form, a party must object before the jury has retired to deliberate."  Buchwald v. Renco Group, 13-cv-7948, 2015 WL 925954, at *5 (S.D.N.Y. Mar. 4, 2015) (Nathan, J.).  "The objection must be made 'on

- 18 -

the record, stating distinctly the matter objected to and the grounds for the objection.'" Cash v. County of Erie, 654 F.3d 324, 340 (2d Cir. 2011) (quoting Rule 51(c)(1), Fed. R. Civ. P.).

Gallagher contends he preserved his objection through a motion in limine, oral argument during the final pretrial conference, and the submission of competing verdict sheets during trial. But while Gallagher's motion in limine asked the Court to use a jury form containing every alleged false or misleading tweet, defense counsel backtracked at the final pretrial conference, agreeing that including over one thousand questions in the verdict form would be inappropriate, and explaining, "I didn't want to put all of the misstatements because I didn't want to make it too big. My thought was they would have the complaint, and they would go back and look[.]" (ECF 198 at 18–19.) Further, none of Gallagher's other proposed verdict forms required the jury to find liability for each statement.

Gallagher thus did not preserve an objection to the failure to list each allegedly false statement on the verdict form. See United States v. Yu-Leung, 51 F.3d 1116, 1121 (2d Cir. 1995) (explaining that a motion in limine "may preserve an [evidentiary] objection when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pre-trial hearing, and (3) is ruled upon without equivocation by the trial judge").

Even if Gallagher did not waive his argument, however, there was no error. "Decisions as to the format and language to be used in a special verdict form are committed to the trial court's discretion, and there is no abuse of discretion if the verdict form, when read in conjunction with the instructions to the jury, clearly presents the material factual issues raised by the pleadings and evidence[.]" Lore v. City of Syracuse, 670 F.3d 127, 159–60 (2d Cir. 2012) (citations omitted). Gallagher raises no objection to the contents of the jury charge, which instructed the jury comprehensively on each element of the scalping and manipulative trading

- 19 -

claims.  Gallagher's reliance on In re Vivendi, S.A. Securities Litigation, 838 F.3d 223 (2d Cir. 2016), is misplaced, as it stands only for the proposition that each offending statement by a defendant in a securities fraud case may be listed individually on a special verdict form, not that such treatment of each statement is required.

It was not error that the special verdict form did not recite the entirety of the jury charge or every element of the SEC's claims.  See Zaratzian v. Abadir, 10-cv-9049, 2015 WL 5474246, at *2 (S.D.N.Y. July 8, 2015) (Briccetti, J.), aff'd, 694 F. App'x 822 (2d Cir. 2017) ("That the verdict form did not lay out each element each party was required to prove does not constitute error."); Camacho v. United States, 204 F. Supp. 2d 667, 671 (S.D.N.Y. 2002) (Stanton, J.) (explaining that "there is no obligation to require a verdict to state separately a finding on each element of an offense").

Finally, Gallagher urges that it was error for the Court to instruct the jury that it may find him liable for scalping with respect to a stock based on a single statement or omission. This argument is without basis in the law.  See 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact . . .").

### D.  The Scalping Verdict on ALPP, ENZC, BZWR, SPOM, TSNP, and WTII

Gallagher argues that with respect to six of the stocks comprising the scalping claim, the jury verdict was against the weight of the evidence.[10]  Tellingly, Gallagher's conduct

---

[10] In a footnote, Gallagher states that in addition to ALPP, ENZC, BZWR, SPOM, TSNP, and WTII, "TLSS, HDII, and CBDD also didn't follow the fraudulent scheme alleged by the SEC" and that therefore "the jury's finding of liability for these stocks is also against the weight of the evidence."  (ECF 242 at 28 n.7.)  Gallagher does not otherwise expand on this argument or explain how this claim warrants a new trial.  He was free to advance his view of the evidence to the jury.

with respect to the stocks he now challenges is substantially identical to his conduct with respect to the remaining stocks.[11]  Most notably, Gallagher does not challenge the verdict as to SCIE, which was also the subject of parallel criminal proceedings in which he pled guilty.

When Gallagher took the stand at trial for the instant civil case, he testified that he "accept[s] responsibility" with respect to SCIE because he "was guilty" of the crime to which he had pled.  (Trial Tr. 935.)  At his criminal plea allocution, Gallagher had made the following statement: "I know that these Tweets concerning my stock holdings of SCIE were wrong because I was selling some of my SCIE positions at the time that I was tweeting, thereby misleading my financial position to others."  (PX 457-R at 6.)  On January 27, 2021, for example, he sent a private message to a confederate that read: "Scie soon CBDY later[.]"  (PX 541.)  Nine minutes later, Gallagher tweeted a public "alert" promoting SCIE.[12]  (PX 541.)  Later that day, he sold 4,000,000 shares.  (PX 541.)  He tweeted the following day: "My $scie #buyscie order filled averaging up for the team! Buy smart sell smart we all win. FYI havent sold a share . . . ."  (PX 541.)  Gallagher's alleged trading activity and tweets with respect to ALPP, ENZC, BZWR, SPOM, TSNP, and WTII followed much the same pattern.

*ALPP*: SEC witness Alex Lefferts testified that between December 8, 2020, and March 29, 2021, Gallagher accumulated, and sold, 158,100 shares of ALPP.  (Trial Tr. 153; PX 519.)  During this period, Gallagher posted numerous tweets promoting ALPP that were inconsistent with his own trading in the stock.  (See Trial Tr. 154–56; PX 519.)  On December 22, 2020, for instance, Gallagher sold 10,000 shares of ALPP.  (PX 519 at 3.)  Roughly one week

---

[11] Gallagher objects to the SEC's use of "summary charts" and "a generalized 'pattern' narrative that does not prove the elements stock-by-stock."  (ECF 283 at 9.)  He argues the summary charts (PX 518–548-1) "do not resolve whether the jury's liability findings for these challenged tickers were supported by the weight of the evidence on the actual elements[.]"  (Id.)  The SEC, however, did not rely solely on the charts to which Gallagher refers.  Nor did it fail to provide evidence supporting its theory of the case.

[12] "Trips" refers to "the stock [ ] trading at .0003 cents per share or more than 3,000 shares per dollar."  (Trial Tr. 938.)

later, on December 29, he tweeted, "$alpp you want this dip!!! Acquisition news coming before the end of the year!! Haven't sold a share and won't!!" (PX 519 at 4.)  Similarly, on January 18, 2021, he tweeted, "$alpp #1 overall OTC because its cheap and going to NASDAQ! Load hold! For your kids!" (PX 519 at 8.)  He sold 10,000 shares the next day.  (PX 519 at 8.)

Evidence of Gallagher's state of mind included his acknowledgement of wrongdoing with respect to SCIE based on largely the same conduct as his ALPP trading and Twitter activity, as well as his understanding that his followers were taking his advice and purchasing shares of ALPP.  (See PX 397-2 at 33.)  Additionally, Gallagher's claim that he was not planning to sell at the time he was tweeting strains credulity given the breakneck speed with which he sold.  Max Clarke testified that on one occasion, Gallagher sold shares of ALPP just 16 seconds after posting a promotional tweet about it.  (Trial Tr. 683; PX 488-1.)  The SEC also introduced evidence that Gallagher made $475,166 in profits from his ALPP trades.  (PX 392-2 at 3.)

Gallagher contends the verdict on ALPP was against the weight of the evidence for several reasons, none of them persuasive.  He notes that he did not pre-alert confederates about his promotional ALPP tweets, did not own shares of ALPP before his first tweet about the stock, and held some shares of ALPP for approximately six months.  Pre-alerts may have bolstered the SEC's case for the 22 stocks in which the pre-alerts occurred, but the "heart" of the fraud Gallagher perpetrated was "that for all 31 stocks he secretly sold shares in the same period of time that he was publicly promoting the stocks on Twitter." (Trial Tr. 1494.)  While Gallagher may have stood to gain little from the three ALPP tweets he posted before buying shares, the same cannot be said of the 367 tweets he posted after he began purchasing shares.  (See PX 510.)

And holding some shares in ALPP for "six months-ish[,]" (Trial Tr. 1179), while consistently selling does little to counter to the SEC's theory that Gallagher misled followers about his sales.

Gallagher next urges that "SCIE was inapposite to ALPP." (ECF 242 at 30.) He suggests that while "SCIE was a lotto play and a complete gamble," the "hype and growth" surrounding ALPP "was in reaction to company news." (Id.) It is unclear what significance Gallagher ascribes to this distinction, as his opinions on the commercial viability of the underlying issuer of the stock is not relevant to the SEC's claims.

Gallagher's remaining arguments concern possible confounding factors driving movement in ALPP's share price. That there was "broader OTC volatility," other "chatter" about ALPP besides Gallagher's tweets, and news that ALPP would soon be listed on the NASDAQ is also immaterial given that the SEC was under no obligation to prove that Gallagher's tweets moved the market.[13]  (ECF 283 at 11); see S.E.C. v. Simpson Capital Management, Inc., 586 F. Supp. 2d 196, 201 (S.D.N.Y. 2008) (Koeltl, J.) ("Unlike private litigants, the SEC is not required to prove investor reliance, loss causation, or damages in an action for securities fraud.").

Given the foregoing, there was sufficient evidence in the record to permit a jury to find Gallagher liable for scalping with respect to ALPP, and there was no manifest injustice. The SEC presented evidence of multiple ways in which Gallagher may have violated Section 10(b) and Rule 10b-5. A jury could reasonably have found Gallagher's tweets about ALPP omitted a material fact, namely that Gallagher was selling, or that his tweeting constituted a deceptive scheme or practice that operated as a fraud. The jury was not required to credit Gallagher's

---

[13] Similarly, Gallagher's argument that the SEC's decision not to seek disgorgement with respect to ALPP reflects "an awareness that Mr. Gallagher's tweets caused no price movement" is both speculative and immaterial. (ECF 242 at 30.)

dubious explanations of his actions, and there was ample evidence that he acted with intent to mislead.

*ENZC, TSNP, WTII, BZWR, SPOM*: The SEC's evidence with respect to ENZC, TSNP, WTII, BZWR, and SPOM was much the same as with ALPP and the remainder of the 31 stocks. Gallagher purchased shares of each stock and sold shares while promoting the stock to followers. He often sold quickly after tweeting and profited from the sales. For each stock, Gallagher received messages or reply tweets from other Twitter users informing him that they had purchased shares after reading his tweets.

In arguing that the verdict was against the weight of the evidence for these stocks, Gallagher repeats several of the arguments he raised, unsuccessfully, as to ALPP. He states ENZC, TSNP, WTII, BZWR, and SPOM were all long holds. He explains he believed that WTII was "a potentially good investment[,]" ENZC was "a real company with real products[,]" and that he "truly loved SPOM." (ECF 242 at 31, 33–34.) These arguments fail for the same reasons addressed in the case of ALPP trading. Indeed, Gallagher concedes in his reply brief that "ENZC being a 'real company' or a 'trips play' does not matter because [the SEC's] theory was about [his] statements about his own position and his intent to sell." (ECF 283 at 11.)

Specifically with respect to ENZC, Gallagher also seizes on Liu's testimony that she had seen the following tweet by Gallagher: "Anyone who knows me know [sic] I don't pump and dump. I can't say sell. Never have I alerted a stock and sold. After alerting, I hold 90 percent long and collect free shares. I take profits, as all should. TSNP and ENZC will explode." (ECF 242 at 31; see Trial Tr. 595–96.) In Gallagher's telling, this shows that Liu "understood that [he] would be selling shares of ENZC when the price increased[,]" undercutting the SEC's claim that he deceived his followers. (ECF 242 at 31.) But a reasonable jury could draw different and

plausible inferences focusing on the untrue statement, "Never have I alerted a stock and sold."
Further, Nicolas and Joshua Rauterkus, another trial witness, testified that they did not recall ever
seeing Gallagher tweet about taking profits, at least with respect to the stocks they had
purchased.  (Trial Tr. 424, 1299.)  And Scribner testified that he could not recall seeing any tweet
"where Alexander Delarge disclosed that he was selling a particular stock at the same time he
was promoting that stock on Twitter[.]"  (Trial Tr. 813.)

With respect to BZWR, Gallagher highlights that he appended the phrase "IMO"
("in my opinion") to one of his tweets.  He also contends that some of the BZWR tweets that the
SEC included in one exhibit, PX 524, were not "rendered false" by him "taking profits[.]"  (ECF
242 at 32–33.)  The jury, however, was presented with BZWR tweets that could fairly be
considered materially misleading, and it was free to draw its own reasonable inferences from
those tweets.  On February 24, 2021, for example, Gallagher tweeted, $BZWR YOU MIGHT
WANNA LOOK AT THIS!! ITS ONE OF MY BIGGEST HOLDINGS!" before making an
undisclosed sale of 21,078 shares later that day.  (PX 524 at 3.)  Gallagher further objects that PX
524 covers January 7, 2021, to March 3, 2021, but excludes March 4, 2021, to September 20,
2021, though the latter dates are within the charged period.  Gallagher, however, does not
contend his activities during this later period were somehow exculpatory or otherwise undermine
the SEC's case, and he declined to provide any such information in his motion.

With respect to SPOM, Gallagher contends that PX 543 contains chronological
errors.  More specifically, he argues that the first page of the exhibit, which summarizes the
remaining pages, is misleading because the rows for "buys," "public tweets," and "sells"
represent overlapping date ranges.  But the date ranges are clearly stated, and the rest of the
exhibit is comprised of over two hundred rows depicting individual tweets and trades in perfect

chronological order.  Further, Lefferts explained to the jury how the summary page was structured.  (See Trial Tr. 118–20.)  The Court concludes that it is highly doubtful that the first page misled the jury.  The Court notes that Gallagher made no objection to the exhibit and was free to explore this purported issue with Lefferts on cross examination or in closing argument.

Finally, as with ALPP, the SEC did not present evidence that Gallagher pre-alerted confederates about BZWR and SPOM.  The SEC's theory of Gallagher's fraudulent conduct, however, was not dependent upon his pre-alerting a group of confederates who also loaded up on the stock before Gallagher tweeted publicly.  It was sufficient to show that Gallagher loaded up on shares of the stock himself before his blasts promoting the stocks and sold after the price moved favorably while implying that he was holding his position.  The verdict against Gallagher on these stocks was neither against the weight of the evidence nor a miscarriage of justice.

### E.   The Manipulative Trading Verdict on BZWR

Gallagher contends the jury's finding of liability for manipulative trading with respect to BZWR entitles Gallagher to a new trial because the Court admitted evidence in contravention of Rule 404(b), Fed. R. Evid., and permitted improper lay witness testimony. Gallagher also contends the SEC failed to present sufficient evidence to support the verdict.  For reasons explained above, the Court considers these challenges under the weight of the evidence standard and the manifest injustice standard.

### i.   Lay Witness Testimony

At trial, the SEC called David Whitlock, who served as Senior Compliance Advisor in TDA's trade surveillance group.  (Trial Tr. 478.)  He testified that he sent a warning

message to Gallagher regarding "[p]ossible manipulative trading in [his] account." (Trial Tr. 484; see PX 417.) Specifically, the message alerted Gallagher that: "During the period of July 23-July 28, 2020, the client executed bids in SPOM which had the effect of raising the closing price of the stock. This activity may be considered marking the close by regulators." (PX 417.) During trial, the SEC attorney asked Whitlock if he "ha[d] an understanding of" the term "marking the close" in the "usage" of the warning message. (Trial Tr. 486.) Over Gallagher's objection, Whitlock was permitted to express his understanding:

> Q. This message says, "This activity may be considered marking the close by regulators." Do you have an understanding of what "marking the close" means in this usage?
>
> MR. ROSEN: Objection.
>
> THE COURT: No, I'll allow it.
>
> A. Yes.
>
> Q. What is your understanding?
>
> A. Marking the close is the placing of orders or trades at or near the end of the day, which could have the appearance of attempting to influence a closing price of the security.
>
> Q. You say "end of the day." Is that a particular time period you're referring to?
>
> A. Generally, it's the last 10 to 30 minutes. However, you know, somebody could place a trade, you know, at 1 o'clock and it could the closing price [sic]. But generally, in most cases, the last 10 to 30 minutes is what we would focus in on.

(Trial Tr. 486–87.)

Immediately before this portion of Whitlock's testimony, the Court gave a limiting instruction as requested by defense counsel:

> So TDA's view on whether trading activities are proper or not or reflective of improper trading is not offered for its truth that it is improper trading or unlawful activities, but it is offered on the question of notice. So you may consider the fact that the defendant was told what it was told by TDA, but it doesn't come in that TDA was right. The question—that's a question that you will decide as a

jury. But the question of whether the defendant had notice that his brokerage firm took this position is something that you may consider.

(Trial Tr. 485.) This instruction made clear that the jury was only to consider the extent to which Whitlock's testimony showed that Gallagher was on notice that TDA thought his trading activity might have been unlawful, not as evidence that Gallagher was in fact employing an illegal trading strategy.

As the examination proceeded, Whitlock was asked whether what he "described as marking the close" was one of the "manipulative trading practices" referenced in the TDA warning message. (Trial Tr. 487.) Gallagher objected and the Court overruled the objection, instructing the jury: "This is the view of TDA, ladies and gentlemen, and it's not binding on you as triers of fact in this case." (Id.)

There is nothing unusual or inappropriate about a lay witness explaining his understanding of his employer's choice of words in a business communication. Whitlock was not opining on the legal meaning of "marking the close" or utilizing specialized knowledge to provide such a definition. Rather, he explained the term only "in order to describe specific facts in this case." See United States v. Mavashev, 455 F. App'x 107, 113 (2d Cir. 2012) (summary order).

Rule 701, Fed. R. Evid., instructs that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." With regard the third requirement, "[a] witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his

- 28 -

investigatory findings and conclusions, and was not rooted exclusively in his expertise[.]'" United States v. Rigas, 490 F.3d 208, 224 (2d Cir. 2007) (quoting Bank of China, New York Branch v. NBM LLC, 359 F.3d 171, 181 (2d Cir. 2004)).

The discussion of the warning message was a prelude to Whitlock's testimony that he made the decision to restrict Gallagher's account when the same pattern of trading occurred in his account two days later in the same stock. (Trial Tr. 491.) TDA sent Gallagher six messages about repeated purchase orders near the market close, and Whitlock personally spoke to Gallagher on the subject. (See Trial Tr. 499, 520.) It was thus relevant for the jury to hear what Whitlock, Senior Compliance Advisor at TDA, thought his employer was attempting to communicate to Gallagher through the words it chose to include in the warning message. It was certainly testimony "helpful to clearly understanding the witness's testimony" and was not based upon specialized knowledge. See Rule 701.

The Court gave the jury extensive instructions on the SEC's manipulative trading claim premised upon "marking the close" activity in SPOM and BZWR. (Trial Tr. 1580–85.) The Court instructed the jury that "[u]nlawful 'marking the close' takes place when an individual engages in a series of late-day transactions that create actual or apparent active trading in a security or raise or depress the price of such security for the purpose of inducing the purchase or sale of such security by others." (Trial Tr. 1580.) The jury was also instructed that "it is your sworn duty to determine the facts and to follow the law as I give it to you." (Trial Tr. 1557.) There was no error in overruling the objection to Whitlock's testimony, and even if there had been, Gallagher was not prejudiced by it because of the Court's instructions to the jury that it must follow only the Court's instructions on the law governing the claim. The Court's instructions on the applicable legal standard also vitiate any suggestion that the SEC or the Court

improperly conflated Whitlock's testimony on the meaning of "marking the close" and the definition of the term under federal law.

### ii.  Rule 404(b) Evidence

Gallagher challenges the SEC's use of "other acts" evidence under Rule 404(b). More specifically, he contends it was improper for the Court to admit evidence of his activities with respect to BZWR that occurred outside the charged four-day period of March 2, 2021, to March 5, 2021.  One of the SEC's trial charts depicts Gallagher's BZWR buy orders in the final ten minutes of trading along with his contemporaneous tweets.  Only five of the 47 rows in the chart represent activity that occurred during the charged period.  (See PX 550 at 1–3.)  The remainder of the rows depict trades and tweets from later in March 2021 and August 2021.  (See PX 550 at 1–3.)  Similarly, in a chart showing direct messages about BZWR between Gallagher and confederates, only 27 of 387 rows contain messages sent and received during the charged period.  (See PX 550 at 4–21.)

Evidence of other crimes, wrongs, or acts "may be introduced under Rule 404(b) if (1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value, and (4) it is admitted with a limiting instruction if requested."  United States v. Rutkoske, 506 F.3d 170, 177 (2d Cir. 2007) (citing Huddleston v. United States, 485 U.S. 681, 691–92 (1988)).

Gallagher maintains that "the connection between the March 2021 claim and the August 2021 404(b) evidence was tenuous, at best."  (ECF 242 at 41.)  Gallagher also argues that the SEC "used August 2021 to do the work March 2021 evidence did not do."  (ECF 283 at 15.) The Court disagrees on both counts.  Though the August evidence was more voluminous than the

evidence from the charged period, it was not materially different in form or substance.  Both the

March 2 to March 5 and the August trades show Gallagher placed buy orders above the asking

price in the final minutes of trading.  While only the evidence covering later dates in March and

August contains promotional BZWR tweets by Gallagher, the presence of promotional tweets

was not necessary to prove the manipulative trading claim, which depended only on Gallagher's

trading activity and intent.

In addition, the Court gave a limiting instruction on two occasions.  The Court

explained during trial that:

> [I]n this trial, the trades that are at issue in SPOM . . . are between
> July 23 and August 3, 2020. And as to BZWR . . . the dates . . . are
> March 2 to March 5, 2021. The SEC has sought to admit trades
> outside of that time period on a theory that they bear some relevance,
> some showing, of the defendant's intent, his state of mind, perhaps
> the absence of mistake. You may consider this evidence of trades
> outside the time period that I've told you that was at issue, other
> trades in SPOM and BZWR, as bearing on his intent during the
> relevant time period . . . . So you can't base liability on trades that
> took place outside the time period at issue, but you can consider this
> other evidence as bearing, perhaps, on the state of mind during the
> relevant time period. You may not use it for any other purpose . . . .

(Trial Tr. 288.)  In the jury charge, the Court reinforced the message:

> [Y]ou will recall that the SEC has introduced evidence of
> Gallagher's trades in SPOM and BZWR that took place outside of
> the time period during which the SEC has alleged that he engaged
> in marking the close activity. As I already mentioned, you may
> consider this evidence of trades outside the relevant time period as
> bearing on Gallagher's intent or state of mind or the absence of
> mistake during the relevant time period. You may not use this
> evidence for any other purpose in considering whether Gallagher is
> liable under the SEC's second claim.

(Trial Tr. 1584.)

Notwithstanding the limiting instructions, Gallagher urges that there was "classic

propensity spillover" from the Rule 404(b) evidence.  (ECF 283 at 16.)  But the case law on

which Gallagher relies does not provide much support for his claim, as it involves "other acts" that are more lurid than charged conduct. See United States v. Zhong, 26 F.4th 536, 552–53 (2d Cir. 2022) (quoting Curley, 639 F.3d at 62) (holding the district court should have excluded evidence of "a forced-labor scheme perpetrated through force, violence, evictions of workers' families from their homes, and threats of physical injury" as it described "significantly more sensational and disturbing [conduct] than the charged crimes"). Gallagher offers a colorful description of the August evidence, calling it "(1) extensive, (2) explicit, and (3) thematically dominant." (ECF 283 at 16.) But there was substantial similarity between the end-of-day trades Gallagher executed between March 2 and March 5 and those he executed in August, and no unfair prejudice resulted from their admission with a limiting instruction.

### iii. The Weight of the Evidence as to BZWR

For its manipulative trading claim as to BZWR, the SEC was required to prove that Gallagher (1) effected a series of transactions in the stock, (2) that created actual or apparent trading in the stock or moved the price of the stock, (3) for the purpose of inducing others to buy or sell the stock. See 15 U.S.C. § 78i(a)(2).

The SEC introduced evidence sufficient to prove each element. First, the SEC showed that Gallagher placed five buy orders in BZWR between March 2 and March 5, 2021, in the final minutes of market open, or one or two buy orders in a given day. (PX 550.) Gallagher's argument that the "series of transactions" element of section 9(a)(2) can only be met if the defendant engaged in three or more transactions on a single day is without basis in the law. See, e.g., In the Matter of Kidder Peabody & Co., et al., 18 S.E.C. 559 (Apr. 2, 1945) ("Pereyra's

purchase on September 22 together with Dick's two purchases on September 23 were, without more, a series of transactions within the meaning of Section 9 (a) (2)[.]").

Second, there was ample evidence to show actual or apparent trading or price movement in the stock. On March 2, the shares of BZWR that Gallagher purchased in the last minute of the trading day constituted 95 percent of the market volume in the stock during that time. (PX 395-2b.) Also during that time, the share price moved from $0.1925 to $0.2400, an increase of roughly 25 percent. (PX 395-2b.) Gallagher agreed during trial that "there's no one else whose trading could be responsible of the price movement at that time[.]" (Trial Tr. 1065.) He also testified that when he messaged a confederate about his March 2 trades, saying that he had "moved [BZWR] 5 cents eod wwhich [sic] is 50k[,]" he was referring to $50,000 in unrealized gains from those trades. (Trial Tr. 1064–66; PX 550.)

Third, the SEC's evidence was enough to permit the jury to infer that Gallagher "acted with the intent to deceive or defraud others by sending a false pricing signal into the market or by artificially affecting market activity." (See Trial Tr. 1583.) In August 2020, he tweeted "$SPOM ERS EOD I HAVE 3 PEOPLE SO FAR HITTING THE ASK A PENNY HIGHER AT 355 TODAY! JOIN US IN THIS! WHAT EVER THE ASK IS ADD A PENNY AND ITLL END ON A HIGH NOTE!" (PX 559.) Gallagher agreed during trial that in posting that tweet, he was "telling [followers] to do that in order to move the price of SPOM higher at the end of the day[.]" (Trial Tr. 1021.) Gallagher also received multiple warnings from TDA about possible manipulative trading in SPOM before March 2021 concerning the same trading behavior underlying the SEC's BZWR claim. (See PX 417, 418, 421.) In August 2021, he told confederates that he had "played stupid" with TDA after receiving its warnings. (See Trial Tr. 1076–77.) Gallagher elaborated at trial: "I knew I was buying the ask multiple times, and I knew

it was going up, and I realized that it was a problem." (Trial Tr. 1077.) The jury was not required to credit Gallagher's dubious claim that he lacked the requisite intent because he was merely trying to "accumulate shares of BZWR" as it was his "favorite stock." (See ECF 242 at 43.)

There was no manifest injustice from the section 9(a)(2) verdict. The motion for a new trial will be denied in its entirety.

II.      Motion for Post-Trial Remedies

The SEC's motion for post-trial remedies asks the Court to (a) permanently enjoin Gallagher from future violations of Exchange Act sections 9(a)(2) and 10(b) and Rule 10b-5 thereunder, (b) impose a penny stock bar on Gallagher, (c) order Gallagher to pay disgorgement of $1,255,889 plus pre-judgment interest, and (d) order Gallagher to pay civil penalties of $7,802,883. In the proposed Joint Pre-Trial Order, the SEC stated: "In the event that the SEC prevails on any of its claims, the Court shall determine the appropriate amount of disgorgement, prejudgment interest and civil monetary penalties, if any, after the jury renders its verdict according to the criteria described in the applicable statutory provisions." (ECF 178 at 6.) Gallagher did not object to the Court's determination of these issues. (See id. at 6–7.)

A.   Permanent Injunction

On November 30, 2021, the Court entered a "Stipulated Preliminary Injunction Order," (ECF 21), in which Gallagher was preliminarily enjoined from violating Securities Act section 17(a), Exchange Act section 9(a)(2), and Exchange Act section 10(b) and Rule 10b-5

- 34 -

thereunder.  The SEC now seeks a permanent injunction against Gallagher from future violations of section 9(a)(2) and section 10(b) and Rule 10b-5 thereunder.[14]

The SEC must demonstrate a "substantial likelihood of future violations of illegal securities conduct."  S.E.C. v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998).  "In determining whether there is a realistic likelihood that a defendant will violate the securities laws in the future, courts look to a number of factors: (1) the degree of scienter involved; (2) the isolated or persistent nature of the past fraudulent acts; (3) the defendant's appreciation of his wrongdoing; and (4) the defendant's opportunities to commit future violations."  S.E.C. v. Opulentica, LLC, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007) (Holwell, J.) (citing Cavanagh, 155 F.3d at 135).

As demonstrated by his testimony at trial and messages to confederates, among other evidence, Gallagher acted with a high degree of scienter.  The nature of the conduct for which he was found liable was recurrent over a two-year period and involved 31 penny stocks. Gallagher has largely failed to take responsibility for his wrongdoing, suggesting that his tweets were not false or misleading, (see Trial Tr. 1134, 1188, 1192), and maintaining that he did not know that manipulative trading was unlawful, (Trial Tr. 1205).  He also remains in a position to commit future violations.  Gallagher has remained active on Twitter, in some cases appearing to "make[] light of the conduct underlying" the instant case.  (ECF 251 at 2.)

The SEC's motion prominently seeks a permanent injunction against future violations.  Gallagher pointedly does not respond to the SEC's arguments on this point. Gallagher is hereby permanently enjoined from violating Exchange Act section 9(a)(2) and Exchange Act section 10(b) and Rule 10b-5 thereunder.

---

[14] The SEC's claim under section 17(a) was dismissed during trial.

B.  Penny Stock Bar

Exchange Act section 21(d)(6) authorizes district courts to prohibit a person from participating in an offering of penny stock if the person was participating in such an offering at the time of the alleged misconduct.  See 15 U.S.C. § 78u(d)(6).  The term "participating in an offering of penny stock" means "engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock."  See id.

Neither party disputes that the stocks in this case are penny stocks.  Gallagher asserts that "[h]e was not involved with brokers, dealers or issuers[.]"  (ECF 284 at 40.)  Nonetheless, "he consents to a lifetime bar from trading in penny stocks."  (Id.)  As previously discussed, Gallagher acted with a high degree of scienter, misled investors, and is in a position to commit repeated violations.  A permanent penny stock bar on consent is therefore warranted and imposed.[15]

C.  Disgorgement

The SEC asks the Court to order disgorgement of Gallagher's unlawful trading profits and prejudgment interest on those profits.  See 15 U.S.C. § 78u(d)(5), (d)(7).  "[B]ecause equity seeks to 'depriv[e] wrongdoers of their . . . profits from unlawful activity,' . . . any remedy must be limited to the defendant's net profits (not total revenues) derived from his securities-law violations."  Sripetch v. S.E.C., 25-466, 2026 WL 1593329, at *3 (U.S. June 4, 2026).  Further, "any amounts the SEC secures must be 'awarded for victims.'"  Id. (quoting Liu v. S.E.C., 591

---

[15] The bar encompasses penny stocks as defined in 17 C.F.R. § 240.3a51-1.  See S.E.C. v. Universal Express, Inc., 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007) (Lynch, J.), aff'd sub nom. S.E.C. v. Altomare, 300 F. App'x 70 (2d Cir. 2008).

U.S. 71, 79 (2020)).[16]  The measure of disgorgement is the defendant's wrongful profits, rather than investors' losses.  See Liu, 591 U.S. at 79.

"The 'amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation.'"  S.E.C. v. Ahmed, 72 F.4th 379, 397 (2d Cir. 2023) (quoting S.E.C. v. Fowler, 6 F.4th 255, 267 (2d Cir. 2021)).  "So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."  S.E.C. v. Core Business One, Inc., 24-2104, 2025 WL 3066349, at *5 (2d Cir. Nov. 3, 2025) (summary order) (quoting S.E.C. v. Warde, 151 F.3d 42, 50 (2d Cir. 1998)).  "Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'"  S.E.C. v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013) (quoting S.E.C. v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996)).  A district court has broad discretion in determining the amount a defendant should disgorge.  S.E.C. v. First Jersey Securities, Inc., 101 F.3d 1450, 1474 (2d Cir. 1996).

The SEC seeks disgorgement in the amount of $1,255,889, which represents SEC expert Max Clarke's calculation of Gallagher's trading profits from the relevant stocks.  Notably, Gallagher does not provide an alternative calculation of his profits.  He does, however, argue that Clarke's latest report is untimely, and that it suffers from various other deficiencies.

---

[16] In S.E.C. v. Govil, 86 F.4th 89, 94 (2d Cir. 2023), the Second Circuit held that district courts must "determine that the investors [the defendant] defrauded suffered pecuniary harm before awarding disgorgement" to ensure that the investors are "victims" in the meaning of Liu, 591 U.S. 71.  The Supreme Court has now held that "proof of pecuniary loss" on the part of investors is not required to order disgorgement.  Sripetch, 2026 WL 1593329, at *5.

i.   Clarke's Analysis

During discovery, the SEC noticed Clarke, a Senior Financial Economist at the SEC, as an expert witness.  (See ECF 156 at 5.)  Clarke has produced two reports in addition to a more recent declaration in support of the SEC's motion for remedies.  The first report ("Expert Report") examined, among other things, how the share price and trading volume of the stocks at issue changed while Gallagher was tweeting, the level of engagement in Gallagher's tweets, and the extent of Gallagher's profits.  (ECF 123-14.)  The Expert Report excluded from its analysis 17 of the 59 stocks alleged in the Second Amended Complaint, specifically, SCIE and 16 additional stocks "for which company-specific news or information might have caused an increase in the stock price during [Gallagher's] tweeting period."[17]  (ECF 123-14 at 9.)

The second report ("Rebuttal Report"), (ECF 156-1), addressed defense expert Lauren Van Allen's arguments, which centered on the purported failure of Clarke's Expert Report to address causation and to isolate Gallagher's precise impact on the market, (see ECF 201-7). Finally, post-verdict, Clarke submitted a declaration ("Declaration") that "perform[ed] the same analyses [as the Expert Report] . . . for just the 31 stocks underlying the jury's verdict."  (ECF 250 ¶ 18.)  Again, SCIE and several additional stocks for which confounding factors existed were excluded from the analysis, leaving 21 stocks remaining.  (Id. at 5 n.6.)  It is Gallagher's profits in those 21 stocks for which the SEC now seeks disgorgement.

Clarke's analysis proceeded in three parts.  He first addressed confounding variables.  The stocks for which he located "some information that may explain at least some portion of the run up in the stock price" were excluded from further analysis.  (ECF 250 ¶ 25.) Then, "[t]o address the possibility that market and industry factors, rather than Gallagher's

---

[17] The SEC does not seek disgorgement for SCIE "because Gallagher already forfeited his net profits in the criminal proceeding."  (ECF 249 at 16–17 n.4.)

tweets, were the driving force of the stock price movements[,]" Clarke "analyzed the relationship between the company stock prices and movements in the overall stock market and in the respective industry sub-sector[s]."  (Id. ¶¶ 27–31.)  Clarke also examined the potential influence of other Twitter users.  (Id. ¶ 32.)  He concluded "that the market and industry returns were not driving the specific companies' stock price movements."  (Id. ¶ 28.)  He also showed that Gallagher was the most influential Twitter user, or among the most influential users, discussing each of the 21 stocks during the relevant periods.  (See id. at 51.)

Second, Clarke analyzed whether the stocks "showed an increase in trading volume and prices" during the periods in which Gallagher was tweeting about them.  (Id. ¶¶ 34–38.)  He concluded, using statistical t-tests, "that Gallagher's tweets caused an increase in price and volume for" the 21 stocks.  (Id. ¶ 38.)  Lastly, Clarke calculated Gallagher's profits using records of trades executed in Gallagher's and his wife's brokerage accounts with TDA and E*TRADE.[18]  (Id. ¶¶ 39–45.)

### ii.  Timeliness of Clarke's Declaration

Gallagher contends that the SEC may not use Clarke's Declaration in support of its motion because it is based on new analysis and opinions that were not disclosed during expert discovery.[19]  Gallagher is incorrect.  Clarke performed much the same analysis in the Declaration as he had in the Expert Report and Rebuttal Report.  The Declaration "simply narrows the presentation of [his] analysis and conclusions to the 31 stocks underlying the jury's

---

[18] Gallagher admitted during trial that he used brokerage accounts in his wife's name.  (See Trial Tr. 1087–91.)
[19] Gallagher previously sought to move to strike Clarke's Declaration on the same grounds.  (See ECF 253.)  The Court directed Gallagher to "include any and all objections to the newly filed Maxwell Clarke declaration" in its opposition to the SEC's motion for remedies.  (ECF 256.)

verdict." (ECF 250 ¶ 18; see also ECF 288-2 (comparing the methods and conclusions from the Expert Report and Rebuttal Report with those in the Declaration).)

It is not the case that Clarke opined for the first time in the Declaration that Gallagher's tweets caused an increase in price and volume. (See, e.g., ECF 156-1 at 28–29 ("[S]everal examples indicate that Gallagher's tweets directly caused stock purchases. These stock purchases put upward pressure on stock prices and directly led to an increase in trading volume. The causal connection is clear.").) Nor do Clarke's references in the Declaration to evidence from trial reveal "that his opinions are new" as Gallagher contends. (ECF 284 at 15.) Clarke's testimony at trial about Gallagher's trading profits and Twitter users' engagement with Gallagher's tweets post-dated his examination of these issues in the Expert Report. (See Trial Tr. 660–63, 680–82.) Further, Clarke's trial testimony about the timing of Gallagher's tweets and trades was based on the same datasets underlying the Expert Report.[20]

Gallagher also repeatedly conflates the Court's ruling on the permissible scope of Clarke's trial testimony with what the SEC may argue in its remedies motion. It is true that the Court ruled Clarke may not testify at trial about Gallagher's profits for any purpose besides showing motive. But that ruling was confined to Clarke's trial testimony. The SEC made the decision not to call Clarke as an expert witness during trial, but it properly noticed him as an expert witness during discovery for other purposes.

In sum, the Declaration was properly submitted. See S.E.C. v. O'Brien, 674 F. Supp. 3d 85, 93 (S.D.N.Y. 2023) (Cote, J.), aff'd, 23-1071, 2024 WL 2813722 (2d Cir. June 3, 2024) (relying on a declaration in a securities enforcement action that "incorporates [the SEC

---

[20] In the Expert Report, Clarke relied on data from Twitter and the brokerage firms Gallagher used, among other sources. (ECF 123-14 at 5–6.) During trial, Clarke also relied on data from Twitter and Gallagher's trading records. (Trial Tr. 654–59.)

expert's] prior two reports and provides additional analysis directed at the relief requested by the SEC in its motion for monetary relief").

### iii. Causation

Courts may only award disgorgement of profits "causally connected to the violation[s]." See Ahmed, 72 F.4th at 397 (quoting Fowler, 6 F.4th at 267). Gallagher challenges causation on a number of grounds, none of which is effective.

Gallagher claims Clarke only established correlation between his tweets and movements in the market, not causation. He seizes on Clarke's pre-trial deposition, claiming Clarke testified that "his 'analysis' only showed 'correlation' not actual 'causation[.]'" (ECF 284 at 9.) Gallagher mischaracterizes Clarke's testimony. Clarke made clear during his deposition that, in his opinion, the correlation he uncovered between Gallagher's tweets and rising share prices "supports a causal interpretation." (ECF 285-1 at 112.) Clarke also explained in his Rebuttal Report that, "[c]onsistent with economic research, tweeting can cause increases in the price and volume of stocks" and that "[w]hile the adage 'correlation is not causation' is correct, causation reveals itself through correlations[.]" (ECF 156-1 at 5–6.) He elaborated:

> Applied in this case, when Gallagher tweeted about specific stocks, his followers or those reached by his tweets bought the stock. This increase in demand for the stock would create upward pressure on prices. In addition, the increase in demand could lead to a further increase in activity and attention to the stock which could continue to increase price levels, volatility, and volumes. This conclusion is supported both by the analysis contained in my opening report, as well as my review of comments on Gallagher's Twitter posts.

(Id. at 5.)

Gallagher also takes issue with Clarke's regression analysis and urges that there is in fact "zero statistical link between the tweets and returns for nearly half the charged stocks."

(ECF 284 at 22.)   However, Clarke's regression analysis "measure[s] the correlation of [each] company's stock returns with movements in the overall stock market and with movements in an industry index[.]"  (ECF 123-14 at 10.)  Van Allen's regression analysis purports to show something entirely different, namely the relationship between Gallagher's tweets and the share price of the stocks at issue.  (See ECF 284 at 24.)  Gallagher's attempt to compare that analysis to Clarke's is therefore misleading.

The Court is also unconvinced that Van Allen's analysis is dependable.  Clarke argues persuasively that Van Allen's analysis fails to capture the influence of Gallagher's tweets in the market because it relies on the number of tweets rather than users' engagement.  (ECF 156-1 at 23–24.)  It also involves a separate model for each stock, which reduces the sample size and does not control for company-specific traits.  (See id.)  Van Allen also did not adjust for the fact that others' tweets may not have been standalone posts, but rather responses to Gallagher's own tweets.  (Id. at 25.)  When Clarke re-ran Van Allen's model addressing these issues, he found that Gallagher's tweets "have a statistically significant and positive effect on daily stock returns."  (Id. at 24.)

Gallagher's attempts to identify confounding factors that defeat the SEC's evidence on causation also fail.  Gallagher seems to suggest that because his tweets only constituted three percent of "total tweet volume" for the stocks at issue, he could not have influenced the market.  (ECF 284 at 23.)  The Court, however, finds Clarke's data on the level of user engagement with Gallagher's tweets to be more compelling than simply considering the raw number of tweets.  And Gallagher's tweets were among the most influential, or the most influential, on Twitter for the 21 stocks.  (See ECF 250-1 at 50–51.)

- 42 -

The Court is also unpersuaded that "news" about COUV and CBBT explain the price spikes that occurred while Gallagher was tweeting about them. COUV announced that it had begun selling COVID-19 face masks while Gallagher promoted the stock, but it had previously announced that it acquired a mask distributor, which did not cause a positive stock price reaction. (ECF 156-1 at 11–12.) COUV also announced that it intended to acquire a battery company, but there was already publicly available information that the company was being sued for fraud in relation to its technology. (Id. at 12.) Additionally, these "news items did not coincide with the dramatic changes in COUV's stock price during Gallagher's tweeting period." (Id. at 13.) Much the same is true of the reaction to CBBT's announcement that a company it owned would become a manufacturer of transparent COVID-19 masks. (See id. at 15.) The Court is satisfied that Clarke conducted a sufficiently thorough investigation of news and other events that may have affected share price for the stocks in issue.

Gallagher next contends that his tweets could not have caused price spikes because OTC markets are inefficient, "meaning they do not rapidly incorporate public information (like tweets) into share prices." (ECF 284 at 24.) However, as adduced by the evidence at trial, when Gallagher tweeted about a stock, his followers would buy the stock. This "can lead to increases in the price and volume of promoted stocks." (See ECF 123-14 at 5.)

Gallagher's arguments also overlook the applicable law. Only "a reasonable approximation of profits causally connected to the violation" is needed to determine the amount to be disgorged. See Ahmed, 72 F.4th at 397 (quoting Fowler, 6 F.4th at 267). Further, because of the difficulty in separating "legal from illegal profit, . . . it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains." Universal Express, Inc., 475 F. Supp. 2d at 428 (quoting S.E.C. v. Bilzerian, 814 F. Supp. 116, 121 (D.D.C.

1993), aff'd, 29 F.3d 689 (D.C. Cir. 1994)).  Gallagher's criticism that Clarke "did not attempt to calculate what portion of the trading profits were attributable to Mr. Gallagher's tweets versus other factors" is therefore unavailing.  (See ECF 284 at 10.)  So too is Gallagher's contention that Clarke's opinions are not relevant under Rule 401 because he never concluded Gallagher's "*fraudulent* tweets caused a price increase." [21] (Id. at 20 (emphasis in original).)

### iv.  Daubert and Rule 702

Gallagher urges that Clarke's reports do not pass muster under Rule 702, Fed. R. Evid., and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), referring the Court to its pre-trial Daubert motion, (ECF 156), on which the Court did not rule.  Even assuming Daubert governs which opinions the Court may consider in deciding post-trial remedies, the Court is unconvinced.  See 720 Lex Acquisition LLC v. Guess? Retail, Inc., 09-cv-7199, 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014) (Nathan, J.) (suggesting that Daubert functions to prevent the jury from being exposed to dubious evidence and that a court may decide for itself how to credit evidence during a bench trial unless it "is wholly irrelevant or so speculative as to have no probative value").

Gallagher again argues that Clarke's analysis shows only correlation, and not causation, as he "did not perform the necessary econometric work[.]"  (ECF 284 at 17.)  Clarke, however, used common methods of statistical analysis accounting for a variety of potentially market-moving factors to conclude that Gallagher's actions impacted the price of the 21 stocks for which the SEC seeks disgorgement.  Gallagher fails to convincingly explain how Clarke's data or methods were inadequate.

---

[21] Gallagher also argues Clarke's reports should be excluded under Rule 403 but presents no argument on the subject.  The Court concludes that they are probative and not unfairly prejudicial.

Gallagher also argues that Exhibit 2 and Exhibit 5 of the Declaration do not support Clarke's finding that price and trading volume increased in each of the 21 stocks while Gallagher was tweeting about them. But the charts in Exhibit 2 do not purport to show the impact of Gallagher's tweets. (See ECF 250-1 at 2–22.) They were instead intended to show price movement in the stocks independent of underlying markets and industries to exclude changes in those markets as potential confounding variables. Indeed, the share prices of the 21 stocks fluctuated significantly on a relative basis compared to the market and industry indices.

The charts in Exhibit 5 were intended to show the impact of Gallagher's tweets on price and volume. (See id. at 28–48.) Gallagher contends that price appreciation that occurred before he began tweeting disproves his impact. The Court is unconvinced. That some changes in price occurred before Gallagher became involved in a stock does not show that his later involvement had no effect. With BBDA, in particular, the large spike in share price that occurred before Gallagher's tweeting may in fact be explained by "Gallagher's purchase of 20 million shares on February 9, 2021 (two days before his first public tweet) and private DMs and pre-alerts . . ., also before he began tweeting publicly." (ECF 288 at 8–9; see PX 521.) Gallagher also claims TLSS "crashed before [he] began tweeting and stayed flat during the entire time of his tweeting." (ECF 284 at 19.) Exhibit 5 shows this is not the case. Though the share price of TLSS dropped significantly before Gallagher became involved with the stock, Exhibit 5 nonetheless shows increases in price and volume coinciding with Gallagher's trades and tweets. (See ECF 250-1 at 45.)

Nor is Clarke's deposition testimony declining to opine on how much investors lost as a result of Gallagher's actions or acknowledging that it may not be possible to trace every dollar of Gallagher's profits to his fraudulent actions cause for concern. The SEC was not

- 45 -

required to show loss causation.  And "[d]espite sophisticated econometric modeling, predicting stock market responses to alternative variables is . . . at best speculative."  Razmilovic, 738 F.3d at 31 (quoting S.E.C. v. First City Financial Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  Thus, "[r]ules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task."  Id. (quoting First City, 890 F.2d at 1231).

> ### v.   Special Verdict

Gallagher's next challenge to the SEC's disgorgement request centers on the jury's verdict.  In Gallagher's telling, the verdict does not support disgorgement of the totality of his profits for each stock because the jury was only required to agree that one tweet per stock was fraudulent to find Gallagher liable.  That argument fails because it is based on the mistaken premise that the SEC was required to isolate the profits that flowed from each of Gallagher's tweets.  It was Gallagher's burden to show "that his gains 'were unaffected by his offenses.'"  Razmilovic, 738 F.3d at 31 (quoting Lorin, 76 F.3d at 462).  He failed to make that showing, and the jury found that he committed fraud in each of the 21 stocks for which the SEC now seeks disgorgement.  Courts have repeatedly concluded that the appropriate amount to be disgorged in similar circumstances is net trading profits from the stocks in issue.  See Beck, 2024 WL 1626280 (ordering disgorgement of defendant's trading profits obtained through penny stock scalping scheme), S.E.C. v. Sripetch, 20-cv-01864, 2024 WL 1546917 (S.D. Cal. Apr. 8, 2024), aff'd, 154 F.4th 980 (9th Cir. 2025), aff'd, 25-466, 2026 WL 1593329 (U.S. June 4, 2026) (same); S.E.C. v. Williky, 15-cv-0357, 2018 WL 3729137 (S.D. Ind. Aug. 3, 2018), aff'd, 942 F.3d 389 (7th Cir. 2019) (same).  Gallagher does not point to any instances in which a court attempted to parse a defendant's profits as Gallagher would have this Court do.

In sum, the Court finds, based on the totality of the evidence, that Clarke's analysis and conclusions are sound, show the requisite causal connection, and represent a reasonable approximation of Gallagher's profits.  The Court finds that disgorgement in the amount of $1,255,889 is legally and factually warranted.

### vi.  Prejudgment Interest

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion[.]"  First Jersey Securities, 101 F.3d at 1476 (quoting Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1071 (2d Cir. 1995)).  "In deciding whether an award of prejudgment interest is warranted, a court should consider '(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.'"  S.E.C. v. Curshen, 08-cv-7893, 2014 WL 12791876, at *11 (S.D.N.Y. Mar. 21, 2014) (Gardephe, J.) (quoting First Jersey Securities, 101 F.3d at 1476).  The SEC asks the Court to order Gallagher to pay $28,620.21 in prejudgment interest.

The Court initially froze close to seven million dollars of Gallagher's assets, (ECF 21), eventually reduced to roughly one-and-one quarter million dollars, (ECF 216).  Gallagher attests that because of the asset freeze, he paid his 2021 taxes late, which "cost [him] approximately $100,000 in excess interest and penalties."  (ECF 285-6 ¶ 10.)  In light of that cost, the initial size of the asset freeze, and because the SEC does not contend that Gallagher ever violated the asset freeze, the Court declines to impose prejudgment interest in this case.  See Razmilovic, 738 F.3d at 36 ("[W]here, as here, the defendant has had some or all of his assets

frozen at the behest of the government in connection with the enforcement action, an award of prejudgment interest relating to those funds would be inappropriate with respect to the period covered by the freeze order, for the defendant has already, for that period, been denied the use of those assets.").

### D. Civil Penalties

Exchange Act section 21(d)(3), 15 U.S.C. § 78u(d)(3), permits the SEC to seek civil monetary penalties for violations of the Act. The statute describes three tiers of penalties, which vary by the seriousness of the violation. The first, and lowest, tier may be imposed for any violation. 15 U.S.C. § 78u(d)(3)(B)(i). The second tier may be appropriate when the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3)(B)(ii). Lastly, third-tier penalties may be imposed when the requirements of the second tier are met and, in addition, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii).

"Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." Opulentica, LLC, 479 F. Supp. 2d at 331. Courts imposing these penalties "have typically considered such factors . . . as '(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.'" S.E.C. v. Rajaratnam, 822 F. Supp. 2d 432, 433 (S.D.N.Y. 2011) (Rakoff, J.) (quoting S.E.C. v.

Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (Holwell, J.)), aff'd, 918 F.3d 36 (2d Cir. 2019).  However, these "factors are neither exhaustive nor 'to be taken as talismanic.'" S.E.C. v. Lek Securities Corp., 612 F. Supp. 3d 287, 295 (S.D.N.Y. 2020) (Cote, J.) (quoting Rajaratnam, 918 F.3d at 45).

The SEC asks the Court to impose third-tier penalties, which amount to $236,451 per violation.  See Adjustments to Civil Monetary Penalty Amounts, 90 Fed. Reg. 2767 (Jan. 13, 2025).  The Court agrees that third-tier penalties are appropriate, as Gallagher's activities "resulted in substantial losses or created a significant risk of substantial losses" for other investors.  See 15 U.S.C. § 78u(d)(3)(B)(iii).  Here, victim testimony that following Gallagher's stock picks resulted in losses and evidence that Gallagher caused inflated share prices in a volatile and risky market show that substantial losses or, at minimum, a significant risk of substantial losses, occurred.  See, e.g., S.E.C. v. SeeThruEquity, LLC, 18-cv-10374, 2022 WL 171196, at *2 (Jan. 19, 2022) (Stanton, J.) (concluding third tier penalties were appropriate in imposing remedies for a scalping scheme).

The Court does not agree with the SEC as to the number of violations on which to impose penalties.  "[B]ecause the statutory penalty provisions authorize civil penalties 'for each violation,' 15 U.S.C. § 78u(d)(3)(B)(i), but do not define the term 'violation,' courts exercise wide discretion in calculating the number of 'violations,' and thus the number of penalties to be imposed in a given case."  S.E.C. v. Madsen, 17-cv-8300, 2018 WL 5023945, at *5 (S.D.N.Y. Oct. 17, 2018) (Furman, J.).  The SEC urges the Court to impose third-tier penalties for 33 violations, "one violation for each of the 31 stocks for which the jury found Gallagher violated Exchange Act Section 10(b) and Rule 10b-5 . . . and two violations for the two stocks that the jury found Gallagher also manipulated in violation of Exchange Act Section 9(a)(2)."  (ECF 249

at 27.)  The Court instead concludes it is appropriate to penalize Gallagher for two violations, one for the scalping claim and one for the manipulative trading claim.

Gallagher's activities were intentional and perpetrated over the course of roughly two years.  He has failed to adequately accept responsibility.  While he states that he is "embarrassed and ashamed by [his] involvement in the case[,]" (ECF 285-6 ¶ 18), he maintained during trial that he was ignorant of the fact that he was engaged in wrongdoing despite evidence to the contrary.  See S.E.C. v. Honig, 18-cv-8175, 2025 WL 3467911, at *7 (S.D.N.Y. Dec. 3, 2025) (Ramos, J.) ("Courts may weigh a defendant's level of culpability when determining civil penalties by assessing whether the defendant is remorseful[.]").  However, "[a]lthough [Gallagher] engaged in repeated violations of the securities laws, they [ ] arose from a single scheme or plan."  See S.E.C. v. Rabinovich & Associates, LP, 07-cv-10547, 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) (Lynch, J.).  Further, "there is a realistic possibility" that Gallagher's business will close in the near future as it is "suffer[ing] financially" due to industry decline.  (ECF 285-6 ¶ 5.)  The Court also considers the impact of the disgorgement ordered in the amount of $1,255,889.  See Opulentica, LLC, 479 F. Supp. 2d at 332 (considering "the size of other financial components of the judgment" in determining civil penalties).  Given the above, the Court concludes it is appropriate to order Gallagher to pay civil penalties in the amount of $472,902.

CONCLUSION

For the foregoing reasons, the motion for a new trial is DENIED.  The SEC's application is GRANTED in part.  Gallagher is permanently enjoined from (1) violating Exchange Act section 9(a)(2) and Exchange Act section 10(b) and Rule 10b-5 thereunder; and

- 51 -

(2) engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock.  Gallagher is ordered to disgorge $1,255,889 and pay civil penalties in the amount of $472,902.  The SEC shall submit a proposed final judgement within seven days.

The Court respectfully directs the Clerk to terminate the pending motions at ECF 241 and ECF 248.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:    New York, New York
          June 18, 2026